**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| Plaintiff, | § | CASE NO.  4:17-cv-2254 |
| | § | |
| vs. | § | |
| | § | JURY TRIAL DEMANDED |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| Defendant. | § | |

## COMPLAINT AND APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

BMC Software, Inc. ("BMC") files this Complaint and Application for Preliminary and Permanent Injunctive Relief against International Business Machines Corporation ("IBM").

### STATEMENT OF THE CASE

1.       IBM has set out to disrupt BMC's customer relationship with AT&T and insert itself as BMC's replacement. IBM is purposefully violating a non-displacement agreement with BMC, a supporting part of a broader agreement between IBM and BMC that was specifically included to protect BMC from having its own confidential proprietary information unfairly used against it by IBM, its competitor.  For decades, IBM and BMC have both had AT&T as a customer—IBM provided mainframe hardware, and BMC provided software.  Then, in 2007, AT&T outsourced the operation of its mainframes to IBM.  To provide those IT services, IBM needed access to AT&T's software licenses, including the licenses BMC had granted AT&T for its exclusive use.  Allowing that access and use, however, would create enormous vulnerability for BMC: IBM would learn how BMC's products function in AT&T's complex computing environment, including both how the BMC products interact with other products and the strengths and weaknesses of the BMC products in AT&T's specific environment.  If

unscrupulous, IBM could use that information to convince AT&T to replace BMC's products with its own.

2.      To remove that risk, IBM therefore agreed, as part of the agreement with BMC that enabled IBM to operate as an IT services provider for shared customers such as AT&T, to not replace BMC's products with its own products.  IBM, though, succumbed to the temptation of money.  IBM is now breaching its agreement by displacing AT&T's BMC products with IBM products.  First, IBM propositioned AT&T to switch its BMC software products to IBM products, offering a below-market package for support fees and sweetening the offer with the promise that IBM would cover all costs incurred in the transition from BMC products.  Now, IBM is implementing the transition.  That conduct threatens irreparable harm to BMC.  This lawsuit is brought to prevent that outcome.

PARTIES

3.      Plaintiff BMC is a Delaware corporation and a citizen of Texas, with its principal place of business located in the Houston Division of the Southern District of Texas at 2103 CityWest Blvd., Houston, Texas 77042, Harris County.

4.      Defendant IBM is a New York corporation and a citizen of New York, with its principal place of business located at North Castle Drive, Armonk, New York 10504, Westchester County. It does business in Houston, Texas, with an office located in the Houston Division of the Southern District of Texas at 2 Riverway, Houston, Texas 77056, Harris County, and may be served with process through its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      This Court has personal jurisdiction over IBM because IBM continuously and systematically does business in the Southern District of Texas.  Further, IBM directly and intentionally transacted business in Harris County, Texas, that substantially relates to and gives rise to the claims asserted in this case.

7.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b) and 1391(d).

**FACTS**

**A.      BMC Provides Thousands of Customers with Crucial IT Management Solutions**

8.      BMC provides IT management solutions to over 10,000 companies and public sector organizations, including 82 percent of the Fortune 500.  BMC's extensive portfolio of IT management software solutions simplifies the management of IT processes and mainframe, distributed, virtualized, and cloud computing environments.  BMC's products also streamline applications and databases within those computing environments.

9.      BMC's customers purchase BMC's mainframe products to organize and easily retrieve subsets of large amounts of data stored in a centralized, secure location on their mainframe computers.  BMC products assist customers with software implementation, integration, organizational transformation, and education services.  By developing an acute understanding of how BMC products are deployed in a customer's mainframe environment and then further customized and configured to meet a customer's needs, BMC offers its customers a faster, seamless, and more effective way of organizing and recalling data.

10.     The solutions offered by BMC help BMC's customers, like AT&T Services, Inc. ("AT&T"), meet service level requirements while lowering the cost of mainframe, middleware, and workload operations.   Exh. 1, Declaration of Steve Ridge ("Ridge Dec.") at ¶¶ 4-6. Additionally, BMC products: (1) increase the availability of the customer's critical business applications, (2) reduce hardware resource requirements, (3) optimize the management of data, transaction, and task volumes with the same or a reduced number of staff, and (4) mitigate the risk and cost associated with regulatory compliance issues facing mainframe, middleware, and workload automation organizations.   Exh. 1, Ridge Dec. at ¶ 4.

**B.     BMC and IBM Are Direct Competitors, But Also Have Outsourcing Agreements That Permit IBM to Access BMC Products on Behalf of Customers, Subject to Clear Protections for BMC's Customer Relationships**

11.     IBM is one of the world's largest employers with nearly 380,000 employees and more than $80 billion in annual revenue.   IBM's dominant presence in the mainframe marketplace is unchallenged because IBM offers customers products and services that are integrated into each level of a customer's computing environment.   IBM sells BMC's and IBM's mutual customers products that range from the physical mainframes themselves to additional computer hardware and middleware, and from software licenses to hosting and technical support services.   Although IBM's size dwarfs BMC, IBM and BMC directly compete to sell software products installed on a customer's IBM mainframe.   Exh. 2, Declaration of Brian Jones ("Jones Dec.") at ¶ 6.[1]

12.     As a result of IBM's pervasive presence in the mainframe marketplace, some BMC's customers use IBM as their IT services provider.   Exh. 1, Ridge Dec. at ¶¶ 3-6.   For

---

[1] Brian Jones's declaration contains a quotation of Section 5.4 of the 2015 Outsourcing Attachment, the non-displacement provision.  Accordingly, BMC attaches a redacted version of his declaration redacting the quotation from the 2015 Outsourcing Attachment, and contemporaneously files under seal a non-redacted version of his declaration.

example, a customer may own licenses to BMC software products and then outsource its IT services to IBM; IBM then accesses and uses that customer's BMC licenses on behalf of that customer to run the customer's computing environment.  Exh. 1, Ridge Dec. at ¶¶ 5-6.

13.     AT&T is one of BMC's and IBM's mutual customers that outsources certain of its IT services to IBM.  IBM manages AT&T's mainframe data centers, in part, by operating software products BMC has licensed to AT&T, and by operating other products in the AT&T environment.  Exh. 1, Ridge Dec. at ¶ 5.  For the software licenses AT&T has purchased from BMC, IBM provides AT&T day-to-day support by, for example, installing, running, and upgrading the BMC products on the AT&T mainframe data centers.  Exh. 1, Ridge Dec. at ¶ 5. IBM also supports AT&T by submitting trouble tickets directly to BMC when IBM has a question about the way a BMC product functions in the AT&T environment.  Exh. 1, Ridge Dec. at ¶ 5.  For example, an IBM employee will submit an IT trouble ticket to BMC if another vendor's product used in the AT&T environment was upgraded, and as a result interacts differently with a function of one of BMC's software products.  Exh. 1, Ridge Dec. at ¶ 5.  After diagnosing the problem, BMC will explain how to make the BMC product work with the other product, or offer another work-around solution.  Exh. 1, Ridge Dec. at ¶ 5.  This exposure to BMC products gives IBM unique information about how BMC products function in the AT&T computing environment.  Exh. 1, Ridge Dec. at ¶ 5.

14.     There are inherent risks in BMC's allowing one of its biggest competitors, IBM, to access and use BMC products in a mutual customer's computing environment because doing so allows IBM to see why and how BMC products outperform IBM products in the marketplace. Exh. 2, Jones Dec. at ¶ 6; Exh. 3, Declaration of Marc Chagnon ("Chagnon Dec.") ¶¶ 6-9. Therefore, as part of any agreement to allow IBM to access and use BMC licenses in a BMC

customer's environment, BMC requires IBM to agree not to use its position as an outsourced IT services provider, and the information it learns from holding that position, to take BMC's place in the mutual customer's computing environment.  Exh. 2, Jones Dec. at ¶ 6.

15.     BMC and IBM executed a Master License Agreement effective March 31, 2008 ("License Agreement").[2]  The License Agreement replaced other agreements dating back to 1999 between BMC and IBM.  The License Agreement provides the terms and conditions governing IBM's purchase of BMC products, and also contains a non-disclosure clause in Section 8 that restricts IBM's use of BMC's confidential proprietary information.

16.     On the same day the License Agreement was signed, BMC and IBM executed the Outsourcing Attachment to the License Agreement ("2008 Outsourcing Attachment").  The 2008 Outsourcing Attachment enabled IBM to access and use BMC products licensed to BMC's customers solely for the purposes of providing those customers with IT services.  As part of the 2008 Outsourcing Attachment, BMC and IBM also agreed that IBM could not displace any BMC products with IBM products.

17.     Effective March 31, 2013, IBM and BMC agreed to a new outsourcing attachment ("2013 Outsourcing Attachment").   Again, as part of the broader agreement IBM and BMC agreed that IBM could not displace any BMC's customer licenses with IBM products.

18.     Effective September 30, 2015, the 2013 Outsourcing Attachment was replaced by the Amended and Restated Outsourcing Attachment ("2015 Outsourcing Attachment")[3], which is in effect today.   Together, the License Agreement and the 2015 Outsourcing Attachment allow

---

[2] The License Agreement between IBM and BMC contains confidential information.  Upon the assignment of this case to a particular court, BMC will request leave to file the License Agreement with the Court under seal.

[3] The 2015 Outsourcing Attachment between IBM and BMC contains confidential information.  Upon the assignment of this case to a particular court, BMC will request leave to file the 2015 Outsourcing Attachment with the Court under seal.

IBM to (1) license software from BMC for IBM's internal use, (2) license software from BMC for an IBM customer to use, and (3) access and use software products licensed by BMC to IBM's and BMC's mutual customers.   The 2015 Outsourcing Attachment also provides IBM preferential pricing for BMC software products, and provides that IBM does not have to pay a fee to access and use software products licensed by BMC to IBM's and BMC's mutual customers.

19.     These agreements also enable IBM to change the way some of IBM's and BMC's mutual customers have access to BMC products.   For example, IBM may use the software products licensed to it by BMC for multiple customers at the same time, and IBM is permitted to install BMC software on IBM's computers used by more than one customer in a shared hosting environment or in the cloud.   Another way the agreements enable IBM to change the way mutual customers have access to BMC products is by allowing those customers to put their BMC licenses in "deep freeze" and not pay maintenance and support under certain conditions, and instead use IBM's licenses of the same BMC products.

20.     As part of the broader agreement, the 2015 Outsourcing Attachment also contains a provision that precludes IBM from displacing a customer's BMC licenses with IBM products. Exh. 2, Jones Dec. at ¶ 5 (quoting the non-displacement provision).   *See* 2015 Outsourcing Attachment § 5.4

21.     The non-displacement provisions of the 2008 and 2013 Outsourcing Attachments applied to all BMC customers, but at IBM's insistence, the non-displacement provision was narrowed in the 2015 Outsourcing Attachment.  Exh. 2, Jones Dec. at ¶ 4.  The non-displacement provision of the 2015 Outsourcing Attachment applies only to the 54 customers entities listed on Exhibit K of the 2015 Outsourcing Attachment, which includes AT&T.  BMC created the list of

customers on Exhibit K to include the customers from which BMC derived the greatest revenue and that were most important to BMC's business.  Exh. 2, Jones Dec. at ¶ 4.  As such, the 54 customers listed on Exhibit K also constitute the biggest risk and impact to BMC's business if lost as a BMC customer.  Exh. 2, Jones Dec. at ¶ 6.

22.     Section 5 of the 2015 Outsourcing Attachment limits IBM's access and use of BMC licenses owned by a customer, such as AT&T, to access and use solely to support that customer.  If IBM accesses and uses a customer's BMC licenses for other purposes, BMC may terminate IBM's access and use rights.  *See* 2015 Outsourcing Attachment at § 5.1.

23.     The License Agreement also expressly permits BMC to terminate all licenses specific to a material breach by IBM, or to terminate the License Agreement and the 2015 Outsourcing Attachment, in whole or in part, for a material breach that is not timely cured. IBM would  be forced to immediately deinstall and stop using the BMC products, and its access and use rights would also immediately terminate.  *See* License Agreement at § 13.

24.     The 2015 Outsourcing Attachment expressly states that the access and use restrictions and non-displacement provisions apply to all of IBM's prior and prospective IT services engagements.  *See* 2015 Outsourcing Attachment § 17.

25.     In addition to agreeing to restrictions limiting IBM's access and use of BMC licenses, and the non-displacement of BMC products, IBM agreed to protect BMC's confidential proprietary information, assuring BMC that BMC's proprietary and confidential information would be made available only to IBM employees who needed to know it and whose work responsibilities required its use.  See License Agreement at § 8.  In particular, IBM agreed to take specific precautions to avoid the misuse of BMC's confidential proprietary information,

which includes the identity of BMC's top customers identified on Exhibit K to the 2015 Outsourcing Attachment. *See* License Agreement at § 8.

**C.      AT&T Has Been a Customer of BMC Since 1989 and Engaged IBM to Provide IT Services Starting in 2007**

26.      AT&T has been a customer of BMC since 1989—more than 28 years.  Exh. 1, Ridge Dec. at ¶ 4.  During that time, AT&T has used three broad categories of BMC mainframe products: Database Utilities, Workload Scheduling, and Monitoring and Automation.  Exh. 1, Ridge Dec. at ¶¶ 4-6.

27.      AT&T is one of BMC's top ten mainframe customers, accounting for over 2% of BMC's total annual customer spend rate for mainframe-related products.  Exh. 3, Chagnon Dec. at ¶ 4.  The annual customer spend rate allows BMC to compare the amount one customer spends per year with the amount other customers spend that same year, even if the customers have different contract terms.  Exh. 3, Chagnon Dec. at ¶ 4.  BMC also uses the annual customer spend rate to determine each BMC customer's contribution to BMC's overall presence in the mainframe marketplace.  Exh. 3, Chagnon Dec. at ¶ 4.  AT&T currently represents 2% of BMC's presence in the mainframe marketplace.  Exh. 3, Chagnon Dec. at ¶ 4.

28.      BMC's products are used by AT&T for data-storage management and database management.   AT&T also uses BMC products to (1) increase the availability of its critical business applications, (2) reduce hardware resource requirements, (3) optimize the management of its data, and (4) mitigate the risk and cost associated with regulatory compliance. Exh. 1, Ridge Dec. at ¶ 4.

29.      BMC's agreements grant AT&T a perpetual license in the BMC products AT&T purchased, with the related maintenance and support services for those products available for purchase by AT&T for a renewable or extendable term.  Exh. 2, Jones Dec. at ¶ 22.  For the last

28 years, AT&T has purchased the related maintenance and support services for its BMC licenses.  Exh. 1, Ridge Dec. at ¶ 4.  Overall, BMC's mainframe customers have an average contract renewal rate above 90%.  Exh. 3, Chagnon Dec. at ¶ 5.  In AT&T's latest agreement with BMC, AT&T purchased additional BMC products and also purchased maintenance and support for all of its mainframe software that it has licensed from BMC.  Exh. 2, Jones Dec. at ¶ 22.

30.    In March 2007, AT&T engaged IBM to begin providing IT services.  In providing IT services to AT&T, IBM routinely and regularly accesses and uses, under the restrictions of the License Agreement and the 2015 Outsourcing Attachment, software products licensed by BMC to AT&T.  Exh. 1, Ridge Dec. at ¶ 6.  In addition to governing IBM's use of the licenses BMC granted to AT&T, the 2015 Outsourcing Attachment prohibits IBM from displacing AT&T's BMC licenses with IBM products.  Exh. 2, Jones Dec. at ¶¶ 5-6.

31.    On information and belief, IBM has violated the 2015 Outsourcing Attachment, the License Agreement, and common law by using BMC's confidential proprietary information and trade secrets for its competitive advantage in the marketplace, including using that information to displace AT&T's BMC licenses with IBM products.  Exh. 1, Ridge Dec. at ¶¶ 5-6; 13-15.  BMC has reason to believe that IBM has used the information contained in the License Agreement and in the 2015 Outsourcing Attachment, and the information IBM has learned in its position as AT&T's outsourced IT services provider, to create the proposal submitted to AT&T to transition from BMC products to IBM products, and has also used BMC's confidential proprietary information and trade secrets to begin implementing that transition.  Exh. 1, Ridge Dec. at ¶¶ 5-6; 13-15; Exh. 2, Jones Dec. at ¶ 23.

**D.      IBM Is Working Actively to Displace AT&T's BMC Licenses with IBM Products**

32.      BMC has reason to believe that IBM is working actively to displace AT&T's BMC licenses with IBM products in violation of IBM's contractual obligations to BMC.  Exh. 2, Jones Dec. at ¶¶ 8-25; Exh. 1, Ridge Dec. at ¶¶ 7-20.  Such efforts by IBM are a blatant breach of the non-displacement provision of the 2015 Outsourcing Attachment.

33.      Based on information told to BMC by an AT&T employee, IBM is displacing AT&T's BMC products with IBM products.  Exh. 1, Ridge Dec. at ¶¶ 2,13-14.  Even further, AT&T employees have told BMC that IBM's proposal to displace BMC products with IBM products provided financial incentives to AT&T for making the switch. Exh. 1, Ridge Dec. at ¶¶ 2,13-14.  IBM further agreed to fund the costs of transitioning AT&T from BMC products to IBM products.  Exh. 1, Ridge Dec. at ¶¶ 2,13-14.  Shockingly, based on information told to BMC by an IBM employee, IBM's plans to displace AT&T's BMC licenses with IBM products appeared to have started prior to IBM's signing of the 2015 Outsourcing Attachment.  Exh. 2, Jones Dec. at ¶¶ 8-25; Exh. 1, Ridge Dec. at ¶¶ 7-20.

34.      BMC and IBM have periodic discussions about the status of their work for their mutual customers, and BMC has tried to use these discussions to address its concerns that IBM is displacing BMC's products at AT&T.  On July 20, 2016, BMC and IBM participated in the Quarterly Business Review meeting held in IBM's Raleigh, North Carolina office.  BMC expressed significant concern to IBM regarding any potential displacement activity by IBM of BMC products on the AT&T account.  Exh. 1, Ridge Dec. at ¶ 11.  IBM's representative, John Stafford, promised BMC that he would investigate what IBM was doing in the AT&T environment, and tell BMC if IBM was displacing BMC licenses.  Exh. 1, Ridge Dec. at ¶ 11.

35.      At the next meeting, on December 6, 2016, BMC again asked IBM about displacement activity at AT&T.  Exh. 1, Ridge Dec. at ¶¶ 12-13; Exh. 2, Jones Dec. at ¶¶ 11-15.

BMC's employee, Steve Ridge, told IBM that AT&T employees had told BMC that IBM had approached AT&T and offered to: (1) displace AT&T's BMC products with IBM products, and (2) cover AT&T's cost to transition from BMC products to IBM products.  Exh. 1, Ridge Dec. at ¶¶ 12-13. In response to this statement, John Stafford of IBM told BMC that IBM was replacing BMC products at AT&T as part of an agreement it signed with AT&T in 2015.  Exh. 1, Ridge Dec. at ¶ 13.  BMC then asked IBM to cease and desist—expecting IBM would confirm that IBM would not displace AT&T's BMC products.  Exh. 1, Ridge Dec. at ¶ 13.  Stafford agreed to get back to BMC with information about IBM's displacement of BMC products at AT&T.  Exh. 1, Ridge Dec. at ¶ 13.

36.     On March 24, 2017, BMC spoke to with John Stafford of IBM about the situation at AT&T.  Exh. 1, Ridge Dec. at ¶ 15.  Stafford explained that only certain IBM employees were allowed to view the agreement between IBM and AT&T, and that although he was not allowed to review it he had asked other IBM employees about it.  Exh. 1, Ridge Dec. at ¶ 15. He also stated he understood BMC's concern that IBM was breaching the non-displacement provision in the 2015 Outsourcing Attachment, but that IBM's message was that BMC should speak to AT&T.  Exh. 1, Ridge Dec. at ¶ 15.

37.     Eleven days later, on April 4, 2017, BMC and IBM held another Quarterly Business Review conference call ("April 2017 call").  Exh. 2, Jones Dec. at ¶ 17; Exh. 1, Ridge Dec. at ¶ 16.  During this call, BMC asked whether IBM was displacing AT&T's BMC products with IBM products.  Exh. 2, Jones Dec. at ¶ 17; Exh. 1, Ridge Dec. at ¶ 16.  BMC's Brian Jones requested confirmation that IBM was not displacing BMC products.  Exh. 2, Jones Dec. at ¶ 17; Exh. 1, Ridge Dec. at ¶ 16.  IBM's John Stafford told Jones to talk to AT&T.  Exh. 2, Jones Dec. at ¶ 17; Exh. 1, Ridge Dec. at ¶ 16.  Jones then asked Stafford to provide a response to the

question: "as it stands today are BMC products being replaced with IBM products at AT&T, yes or no."  Exh. 2, Jones Dec. at ¶ 16; Exh. 1, Ridge Dec. at ¶ 17.  John Stafford did not respond. Exh. 2, Jones Dec. at ¶ 16; Exh. 1, Ridge Dec. at ¶ 17.

38.    Six days after the April 2017 call, on April 10, 2017, John Stafford emailed BMC to follow-up on the discussion about IBM's conduct with AT&T.  Exh. 2, Jones Dec. at ¶ 17; Exh. 1.  Stafford wrote that he understood the question BMC asked him during the July 2017 call—"[s]pecifically, I believe BMC asked IBM to confirm yes or no whether BMC products were being replaced with IBM tools at AT&T." Exh. 2, Jones Dec. at Exh. A.  Yet he again refused to answer the question.  Exh. 2, Jones Dec. at Exh. B; Exh. 1, Ridge Dec. at ¶ 17. Instead, Stafford told BMC to direct any question "regarding the scope" of the displacement of BMC products with IBM products to AT&T.  Exh. 2, Jones Dec. at ¶ 17.

39.    Ten days later on April 20, 2017, BMC requested that IBM provide written assurances to BMC that:

a.    At the time of signing the 2015 Outsourcing Attachment with BMC, IBM did not have an agreement with AT&T that includes replacement of BMC products with IBM products or includes incentives financial or otherwise, to AT&T to replace BMC products with IBM products;

b.    Since signing the 2015 Outsourcing Attachment with BMC, IBM has not entered into an agreement with AT&T, or made an offer or proposal to AT&T, that includes replacement of BMC products with IBM products or includes incentives, financial or otherwise, to AT&T to replace BMC products with IBM products; and

c.    IBM is not aware of any current effort to replace any BMC products with IBM products at the AT&T account. Exh. 2, Jones Dec. at Exh. B.

40.    IBM refused to provide the requested written assurances to BMC. Exh. 2, Jones Dec. at ¶ 19.  IBM's response on May 4, 2017 was that (1) the parties' agreement did not require it to provide BMC written assurances, and (2) IBM disagreed with BMC's position on the non-displacement provision in Section 5.4 of the 2015 Outsourcing Attachment.  Exh. 2, Jones Dec.

at Exh. C. Importantly, although given the opportunity to deny that IBM was displacing AT&T's BMC licenses with IBM products, IBM declined to do so and instead told BMC that the 2015 Outsourcing Attachment did not prevent it from replacing AT&T's BMC licenses with IBM products.  Exh. 2, Jones Dec. at Exh. C.  IBM also told BMC that its agreement with AT&T precludes it from telling BMC whether it is replacing AT&T's BMC products with IBM products, and that BMC should speak to AT&T.  Exh. 2, Jones Dec. at Exh. C.

41.     On July 18, 2017, IBM sent BMC its proposed agenda for the July 19, 2017, Quarterly Business Review Conference call ("July 2017 call").  Exh. 1, Ridge Dec. at ¶ 18.  In its agenda, IBM marked the issue of whether IBM was displacing AT&T's BMC products with IBM products as "closed" and "completed."  Exh. 1, Ridge Dec. at ¶ 18.  That issue was definitely not closed for BMC however, and BMC responded by email requesting the issue be added to the agenda for the July 2017 call.  Exh. 1, Ridge Dec. at ¶ 18.

42.     During the July 2017 call, IBM and BMC attendees then discussed whether IBM was displacing AT&T's BMC products with IBM products.  Exh. 1, Ridge Dec. at ¶¶ 19-20; Exh. 2, Jones Dec. at ¶¶ 20-21. Brian Jones stated it was BMC's understanding that the IBM project team intends to continue to displace BMC products with IBM products at AT&T, that IBM management will take no action to stop the IBM project team from displacing AT&T's BMC products, and that it has always been IBM's intention to breach the non-displacement provision in the 2015 Outsourcing Attachment. Exh. 2, Jones Dec. at ¶ 21.  In response, Robert Craig of IBM told BMC that if BMC had questions about the displacement of AT&T's BMC products, BMC should speak to Steven Purdy, IBM's litigation counsel.  Exh. 1, Ridge Dec. at ¶¶ 19-20; Exh. 2, Jones Dec. at ¶ 21.

43.     Although BMC has tried to resolve the displacement issue through discussions with IBM, the response given by IBM during the July call makes clear that IBM intends to complete its replacement of BMC at AT&T with itself.  The License Agreement and the 2015 Outsourcing Attachment impose the affirmative obligation on IBM not to do that.  IBM's use of its agreement with AT&T as an excuse to keep BMC in the dark about its activity at AT&T, its sudden characterization of the issue as "closed," and its referral of the issue to litigation counsel has forced BMC to file this lawsuit.

### CAUSES OF ACTION

### A.     Breach of Contract: 2015 Outsourcing Attachment

44.     The 2015 Outsourcing Attachment is a valid, enforceable contract.

45.     BMC performed its obligations under the 2015 Outsourcing Attachment, or was excused from performing one or more of its obligations due to IBM's prior material breach or otherwise.

46.     IBM is breaching the 2015 Outsourcing Attachment by: (1) displacing AT&T's BMC licenses with IBM products as prohibited under Section 5.4 (Non-Displacement), and (2) failing to use AT&T's BMC licenses solely for the purposes of supporting AT&T, as allowed by Section 5.1 (Access and Use).

47.     First, Section 5.4 of the 2015 Outsourcing Attachment prohibits IBM from displacing BMC licenses with IBM products for BMC customers listed on Exhibit K, which includes AT&T.  AT&T employees have told BMC that IBM is in the process of displacing AT&T's BMC licenses with IBM products.  And IBM representatives have orally admitted IBM's intends to displace AT&T's BMC licenses with IBM products.  When subsequently asked by BMC to provide written assurances that it was not displacing BMC licenses in the AT&T environment with IBM products, IBM refused.

48.     Second, Section 5.1 of the 2015 Outsourcing Attachment restricts IBM's access and use of AT&T's BMC licenses solely to the purpose of supporting AT&T.  BMC believes, however, that IBM has used, and is continuing to use, its access to and use of AT&T's BMC licenses for the purpose of selling IBM products as replacements for BMC products, and for the purpose of transitioning AT&T from BMC products to IBM products.  Accordingly, IBM has improperly used AT&T's BMC licenses for the purpose of displacing BMC licenses, not solely to support AT&T.

49.     All conditions precedent for which BMC might have any burden have occurred or have been waived or excused, or IBM is estopped from relying on their non-occurrence.

50.     Unless IBM's conduct in breach of the 2015 Outsourcing Attachment is enjoined, BMC will suffer irreparable harm and actual damages as a direct and proximate consequence of IBM's conduct.

**B.      Breach of Contract: License Agreement**

51.     The License Agreement is a valid, enforceable contract.

52.     BMC performed its obligations under the License Agreement, or was excused from performing one or more of its obligations due to IBM's prior material breach, or otherwise.

53.     IBM has breached Section 8 of the License Agreement by failing to use commercially reasonable efforts to ensure that BMC's confidential proprietary information was disclosed only to those IBM employees who needed to know it and whose work responsibilities required them to use it.   BMC believes that IBM is disclosing confidential proprietary information gained from its use of AT&T's licenses to BMC's products to other IBM employees who have used, and are continuing to use, such information for the purpose of selling IBM products as replacements for BMC products, and for the purpose of transitioning AT&T from BMC products to IBM products.

54.     All conditions precedent for which BMC might have any burden have occurred or have been waived or excused, or IBM is estopped from relying on their non-occurrence.

55.     Unless IBM's conduct in breach of the License Agreement is enjoined, BMC will suffer irreparable harm and actual damages as a direct and proximate consequence of IBM's conduct.

C.      **Misappropriation of Trade Secrets**

56.     BMC owns confidential proprietary information and trade secrets related to BMC products and BMC customers, including how its products function in its customers' mainframe environments.  BMC has taken reasonable measures to keep this information confidential, and the agreements between BMC and IBM create a confidential relationship between the parties.

57.     Exhibit K to the 2015 Outsourcing Attachment, a list including BMC's top-spending customers, is BMC's trade secret; BMC took steps to maintain its confidentiality, IBM acknowledged that the list was to be kept confidential, and the content of Exhibit K is not otherwise readily ascertainable.

58.     BMC's information relating to how BMC's products are deployed, customized, and configured to meet BMC's customers' needs is BMC's trade secret; BMC took steps to maintain its confidentiality, IBM and BMC have a confidential relationship, and the information is the result of the compilation of decades of research and development and is not otherwise readily ascertainable.

59.     BMC's confidential proprietary information and trade secrets have actual and potential value to third parties, particularly to IBM because IBM is BMC's direct competitor.  In fact, IBM and BMC acknowledged in Section 8 of the License Agreement that BMC's confidential proprietary information was the type of information that needed to be protected from

disclosure because it could be used by parties other than BMC to gain a competitive advantage over BMC in the marketplace.

60.     BMC has reason to believe that IBM has used its confidential proprietary information and trade secrets to create the proposal submitted to AT&T to transition from BMC products to IBM products, and to implement AT&T's transition from BMC products to IBM products.

61.     Unless IBM's conduct is enjoined, BMC will suffer irreparable harm and actual damages as a direct and proximate consequence of IBM's conduct.

**D.      Tortious Interference with Prospective Business Relations**

62.     BMC sells software licenses and products, and provides technical support for those products, to a large number of mainframe customers.  Once installed on a customer's mainframe, BMC products become integrated into that customer's operating environment.  For most BMC products, the customer is granted a perpetual right to use the license, but must periodically enter into new contracts with BMC to receive software upgrades and IT services, and to otherwise maintain the functionality of its BMC products.  BMC's mainframe customers have an average current contract renewal rate above 90%.  Accordingly, there is a reasonable probability that BMC and AT&T, and BMC and its other customers, will enter into new contracts to support and maintain the BMC products used by the BMC customer.

63.     IBM is aware of the business relationships between BMC and its customers, like AT&T, for which IBM provides IT services.

64.     On information and belief, IBM is wrongfully and intentionally interfering with BMC's contracts with BMC's customers, including AT&T, by improperly using BMC's proprietary confidential information and trade secrets to induce BMC's customers to displace BMC licenses with IBM products.  IBM's interference is causing AT&T not to enter into

prospective business relationships with BMC that it would have entered with reasonable probability but for IBM's wrongful interference.  IBM knew that interference was certain or substantially certain to occur as a result of its conduct, and there is no justification for its conduct

65.     Unless IBM's conduct is enjoined, BMC will suffer irreparable harm and actual damages as a direct and proximate consequence of IBM's conduct.

### APPLICATION FOR PRELIMINARY INJUNCTION

66.     BMC believes that an efficient approach to its request for preliminary injunction, given what BMC knows at this time, is for the Court to order expedited discovery and set a preliminary injunction hearing forty-five (45) days after the filing of this Application for Preliminary and Permanent Injunctive Relief.  Accordingly, BMC files contemporaneously with this Complaint and Application for Preliminary Injunction a Motion for Expedited Discovery, and requests that this Court set a preliminary injunction hearing during the week of September 4, 2017.

67.     A preliminary injunction should be granted in this case because (1) BMC has a substantial likelihood of success on its claims; (2) there is a substantial threat that BMC will suffer irreparable injury if the injunction is not granted, and BMC has no adequate remedy at law; (3) the threatened injury to BMC outweighs any damage that the issuance of the injunction might cause IBM; and (4) the injunction will not disserve the public interest.  *See Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).  Further, a preliminary injunction would preserve the Court's power to render a meaningful decision after a trial on the merits.  *Canal Authority of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974).

68.     The declarations of Steve Ridge, Brian Jones, and Marc Chagnon attached as Exhibits "1," "2," and "3" establish the merits of BMC's request for preliminary injunction. IBM is breaching the terms of the 2015 Outsourcing Attachment and License Agreement, and

improperly disclosing and using BMC's confidential proprietary information and trade secrets for its own competitive advantage.  If IBM is not enjoined, BMC will be irreparably harmed, BMC's marketshare will be eroded, and BMC's goodwill and reputation will be diminished. Monetary damages alone will not make BMC whole, nor will it protect the property and welfare of interested third parties, such as BMC's employees.  Additionally, the threatened injury to BMC outweighs any damage the injunction might cause IBM because BMC is asking this Court only to require IBM to abide by its agreements and common law duties.  Finally, enforcing contracts is in the public interest, as is the protection against the improper use and disclosure of confidential proprietary information and trade secrets.

**A.    BMC has a substantial likelihood of success on the merits.**

69.    For the reasons articulated in paragraphs 1 through 68, BMC has met its burden to show a substantial likelihood that it will prevail on its claims for breach of contract, misappropriation of trade secrets, and tortious interference with prospective business relations. To show a likelihood of success on the merits for each claim, BMC must establish a prima facie case, but need not prove that it is entitled to summary judgment.  *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013)( *citing Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011)).  With respect to its breach of contract claims, BMC has sufficiently established a prima facie case by establishing that valid contracts exist between BMC and IBM, BMC has performed its obligations under those contracts, IBM has failed to perform or breached the contracts, and IBM's breach has damaged BMC by exposing BMC to irreparable harm and by precluding BMC from receiving the benefit of its bargain under the contracts.  *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (applying New York law).

70.     Next, with respect to misappropriation of trade secrets, BMC has sufficiently established a prima facie case by showing: (1) BMC's trade secrets exist; (2) IBM has a confidential relationship with BMC and has agreed in writing not to disclose BMC's confidential information; (3) IBM improperly used and disclosed BMC's trade secrets to its competitive advantage; and (4) BMC has suffered actual damage and IBM was unjustly enriched by the use of BMC's trade secrets. *See Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991). At the preliminary injunction stage, "the trial court … determines whether the applicant [for preliminary injunction] has established that the information is entitled to trade secret protection until a trial on the merits." *Anadarko Petroleum Corp. v. Davis,* Cause No. H-06-2849, 2006 U.S. Dist. LEXIS 93594, at *42-43 (S.D. Tex. Dec. 28, 2006) (*citing Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 858 (Tex. App.—Fort Worth 2004, no pet.)). Exhibit K and the manner in which BMC products function in the AT&T environment are BMC's trade secrets because each is a formula, pattern, or compilation of information used by BMC and which give BMC an opportunity to obtain an advantage over competitors who do not know or use the information.  *Daniels Health, LLC*, 710 F.3d at 583 (*citing Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (1958)); *Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555, 560 (S.D. Tex. 2011).  Further, Exhibit K and the manner in which BMC products function in the AT&T environment (1) are not information known outside of BMC; (2) are known by a limited number of BMC employees and others involved in the business; (3) are protected from disclosure and use by the measures BMC has taken to guard the secrecy of the information; (4) are of great value to BMC's competitors; (5) are the result of a significant amount of effort and money expended by BMC; and (6) cannot be properly acquired or duplicated by others.  *See Tewari De–Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 610 (5th Cir. 2011)

(*quoting In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009)).  Further, to the extent

that some of the information may be known to the public or ascertainable, the Fifth Circuit has

"specifically rejected the contention that a combination of disclosed technologies cannot itself

constitute a trade secret." *Id*. at 613.

71.     Exhibit K to the 2015 Outsourcing Attachment is also a trade secret because (1)

BMC took steps to maintain the confidentiality of the customers listed on Exhibit K; (2) IBM

acknowledged that Exhibit K was confidential; and (3) the customer list contained on Exhibit K

is not readily ascertainable from other sources.  *See Guy Carpenter & Co. v. Provenzale,* 334

F.3d 459, 467 (5th Cir. 2003) (*citing Sautter, et al. v. The Comp Solutions Network, Inc.,* Cause

No. 14-98-00555-CV, 1998 WL 802481, at *4–*5, (Tex.App.—Houston [14th Dist.] Nov. 19,

1998, no pet.) (finding a customer list was not readily ascertainable where customer list excluded

non-participants in niche insurance market)).  Here, BMC took steps to protect the confidentially

of Exhibit K and IBM knew that the list was confidential because BMC required IBM to sign a

non-disclosure agreement, and because Exhibit K was identified by both parties as a confidential

document.  Additionally, Exhibit K is not a list of every customer that does business with BMC.

Rather, Exhibit K includes a list of only BMC's top-spending customers who were identified by

using BMC's internal financial metrics.  Exh. 2, Jones Dec. ¶¶ 4,6; Exh. 3, Chagnon Dec. ¶¶ 4,8.

IBM could not have otherwise ascertained or identified the customers listed on Exhibit K

because the internal numbers used to create Exhibit K are not shared by BMC with other parties.

As a consequence, Exhibit K is BMC's trade secret, and IBM may not use it to its competitive

advantage.

72.     IBM's use of BMC's trade secrets can be inferred because IBM directly competes

with BMC in the selling of licenses for mainframe products to their mutual customers, like

AT&T, and the value BMC's confidential information confers on IBM is undeniable.  Exh. 2, Jones Dec. at ¶¶ 4-6; Exh. 3, Chagnon ¶¶ Dec. 4-6. The competitive advantage IBM gains from using BMC's trade secrets makes it probable that IBM will use BMC's trade secrets.  *See Rugen v. Interactive Business Sys.*, 864 S.W.2d 548, 552, (Tex. App.—Dallas 1993, no pet.) (court inferred that a former employee's possession of a trade secret and employment by a competitor, where the former employee operated the competitor, made it probable that the former employee would use the trade secrets for her benefit to the detriment of the former employer); *See also T-N-T Motorsports v. Hennessey Motorsports,* 965 S.W.2d 18, 22-24, (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd).

73.    Finally, with respect to tortious interference with prospective business relations, BMC has sufficiently established a prima facie case showing: (1) a reasonable probability that AT&T will not extend its contracts with BMC beyond the current terms due to IBM's wrongful interference, (2) IBM committed an independently tortious act by misappropriating BMC's trade secrets; (3) IBM knew interference was certain or substantially certain to occur as a result of the conduct because it acted to directly take BMC's place with BMC's customers; and (4) BMC has suffered actual harm or damages as a result of the IBM's interference.  *See Bradford v. Vento*, 48 S.W.3d 749, 757 (Tex. 2001).

**B.     There is a substantial threat that BMC will suffer irreparable injury if the injunction is denied, and BMC has no adequate remedy at law.**

74.    IBM's breach of the non-displacement provision in the 2015 Outsourcing Attachment will result in the immediate loss of business to BMC and immediate irreparable harm to BMC's marketshare, goodwill, and revenue that cannot be undone by monetary damages. Exh. 3, Chagnon Dec. at ¶ 4;  *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).  Further, IBM's displacement of BMC products will cause a significant

barrier to BMC's re-entry into the AT&T environment, and into any other BMC customers targeted by IBM, because once transitioned from BMC products it is highly unlikely that the customer will ever return to BMC products. Exh. 2, Jones Dec. at ¶ 25. Customers like AT&T will not return to BMC products because transitions from one product to another product—like the one orchestrated at AT&T by IBM—are difficult and expensive, and the risk a customer faces of disruptions to its business pose an economic burden that hinders that customer's ability to switch back to BMC products once it has migrated from BMC products to IBM products. Exh. 2, Jones Dec. at ¶ 23. Significantly, the long-term value of AT&T's business to BMC cannot be quantified, and therefore no adequate remedy at law is available because the conduct sought to be enjoined is incapable of being remedied by legally-measurable damages. *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 848 (5th Cir. 2004). If IBM is permitted to breach the non-displacement provision, BMC will lose AT&T's mainframe business that it has had for 28 years. AT&T's business alone accounts for approximately 2% of BMC's annual mainframe revenue. Exh. 3, Chagnon Dec. at ¶ 4. In significant revenue shortfall situations, like the loss of AT&T revenue would create, BMC will be required to reduce its expenses to compensate for the revenue shortfall in order to maintain margins for the fiscal year. Exh. 3, Chagnon Dec. at ¶¶ 6-9. As part of this process, BMC will have to cut the amount of expenses that each of BMC's divisions incur and apportion less money to the research and development of new BMC products. Exh. 3, Chagnon Dec. at ¶¶ 6-9. As a consequence, if AT&T's business is lost, BMC will be forced to reduce its workforce by 40 to 50 employees. Exh. 3, Chagnon Dec. at ¶ 7. These employees will face significant challenges in finding alternative employment because their skills are highly specialized in mainframe applications, and the mainframe job market is very limited. Exh. 3, Chagnon Dec. at ¶ 7.

75.    Furthermore, if IBM is permitted to transition AT&T away from BMC's mainframe products to IBM products, the parties' non-displacement agreement will be meaningless.  If that provision is unenforceable, BMC's relationships with its other customers and a large portion of its mainframe business will be in jeopardy.  Exh. 3, Chagnon Dec. at ¶¶ 6-9. The customers represented on Exhibit K to the 2015 Outsourcing Attachment represent one third of BMC's annual mainframe revenue. Exh. 3, Chagnon Dec. at ¶ 8. Should IBM seek to displace BMC from other customers on Exhibit K, the job losses and other harm to BMC would be even more significant.  Exh. 3, Chagnon Dec. at ¶ 7.  The harm done to BMC's employees, and to BMC's goodwill and reputation, cannot be undone by an award of monetary damages to BMC.

76.    IBM's characterization of the parties' agreement leaves BMC with two equally catastrophic options.  Exh. 2, Jones Dec. at ¶¶ 23-24.  First, BMC can do nothing and passively watch IBM dismantle BMC's business relationships and take BMC's revenue and marketshare. Exh. 2, Jones Dec. at ¶¶ 23-24.  Second, BMC can terminate its agreements with IBM, disrupting the business operations of BMC and BMC's customers because they will not be able to use their IT services provider of choice.  Exh. 2, Jones Dec. at ¶¶ 23-24.  Both options disrupt BMC's organized business dealings, threaten customer confidence in BMC's handling of its private affairs, and will cause BMC to lose customers and profits.  Exh. 2, Jones Dec. at ¶¶ 23-24. Unless IBM is enjoined, BMC will have to completely change its go-to-market strategy, including its licensing model, IT services agreements, pricing models, and enablement of customers' use of outsourced IT services.  Exh. 3, Chagnon at ¶ 4.

77.    The equitable principle underlying the non-displacement provision in the 2015 Outsourcing Attachment is similar to the equitable principle underlying covenants not to

compete, which are routinely enforced by injunction.  In both instances, the purpose of the agreement is to protect a company's legitimate business interests by limiting its exposure to the risk of unfair competition.  *Cf. Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 72 (2nd Cir. 1999) (applying New York law).  In covenant not to compete cases, the risk of unfair competition can be established if the plaintiff shows that it had entrusted the former employee with a trade secret, permitted the former employee close contact with the employer's customers, or provided some proprietary and confidential information that would give the former employee an unfair competitive advantage in the marketplace.  *Cf. Id.* (an employer's interest in retaining present customers was sufficient to justify the enforcement of a covenant not to compete, particularly when the to-be-restrained employee may be able to solicit the employer's customers to divert all or part of its business.).  Here, BMC granted IBM permission to access and use all BMC licenses owned by AT&T and to observe how BMC products function in the AT&T mainframe environment.  In return, IBM agreed not to displace BMC licenses in the AT&T environment with its own products.  Exh. 1, Ridge Dec. at ¶ 6.  Ignoring its agreement, IBM is now actively working to displace those very BMC licenses by unfairly using to its competitive advantage the information it learned as a result of the permissions granted by BMC that were necessary for IBM to operate AT&T's data centers.  Exh. 1, Ridge Dec. at ¶ 6; Exh. 2, Jones Dec. at ¶ 21-22. As a consequence, IBM's efforts to transition AT&T from BMC licenses to IBM products will result in the immediate loss of business to BMC and in immediate irreparable harm to BMC's marketshare and customer goodwill that BMC has built up over more than twenty years.  *See Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (noting that the resulting loss of client relationships and customer goodwill built up over many years may constitute irreparable harm); *Bianco v. Globus Med.*, Inc., Cause No. 2:12-cv-00147-

WCB 2014, U.S. Dist. LEXIS 35256, at *17 (E.D. Tex. Mar. 17, 2014) (trade secret case, citing *Z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 440, (E.D. Tex. 2006) (patent infringement case, noting that lost profits and marketshare "are the type of injuries that are often incalculable and irreparable.")); *accord N. Am. Deer Registry, Inc. v. DNA Solutions, Inc.,* Cause No. 4:17-cv-00062, 2017 U.S. Dist. LEXIS 84687, at *25 (E.D. Tex. June 2, 2017).

78.     Moreover, BMC believes that to transition AT&T to IBM products, IBM necessarily must be using BMC's trade secrets to directly compare the capabilities and functions of the BMC products in the AT&T environment to IBM products. *See Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140 (D. Kan. 2007) (injunction was warranted when there was evidence that the defendant developed its competing products by comparing them to plaintiff's products, which necessarily required use of plaintiff's trade secrets).There is no adequate remedy at law for misappropriation of BMC's trade secret information. *Glycobiosciences, Inc. v. Woodfield Pharm., LLC*, Cause Bo. 4:15-cv-2109, 2016 U.S. Dist. LEXIS 56358, at *25-27 (S.D. Tex. April 27, 2016) (court found that plaintiff met its burden showing irreparable harm when the [d]efendant was in possession of plaintiff's trade secrets and was in a position to use the information—if it had not done so already because such use would have severely crippled the plaintiff's business model).  Further, no adequate remedy at law exists when the legal remedy is merely illusory or effective legal relief cannot be obtained without the filing of multiple lawsuits. 11A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2944, at 89-90 (2d ed. 1995); *see, e.g., Symetra Life Ins. Co. v. Rapid Settlements, Ltd.,* 657 F. Supp. 2d 795, 824 (S.D. Tex. 2009) ((*citing Wilson v. Illinois S. R. Co.*, 263 U.S. 574, 576 (1924) (citation omitted) (opinion withdrawn on other grounds)).  Unless IBM is enjoined, BMC will be required to file a new lawsuit each time it learns that IBM is working to displace BMC from a customer

on Exhibit K to the 2015 Outsourcing Attachment or is otherwise using BMC's trade secret information.  Therefore, no adequate remedy at law exists for IBM's breach of its agreements and use of BMC's confidential proprietary information and trade secrets.

79.     IBM's unrestricted ability to leverage its extensive relationships and unique position with IBM's and BMC's mutual customers to systematically displace BMC licenses gives IBM the opportunity to use BMC's confidential proprietary information and trade secrets to unfairly compete against BMC.  Exh. 2, Jones Dec. at ¶ 23.  IBM's understanding of the way that BMC products work together to run jobs, set parameters, and interact with other products in the AT&T computing environment gives IBM unique knowledge that it could use in convincing AT&T to displace BMC products with IBM products, and then in making the transition from BMC products to IBM products.  Exh. 1, Ridge Dec. at ¶ 6.  As an example, if an IBM product were identified as capable of yielding the same end result as the BMC product targeted for replacement, IBM would be able to replace the BMC product with the IBM product with a reduced amount of time and effort, and less risk to AT&T and IBM.  Exh. 1, Ridge Dec. at ¶ 6.

80.     Finally, an injunction is warranted where the potential economic loss is so great as to threaten the existence of the movant's business.  *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1175 5th Cir. 1989) *cert. denied*, 493 U.S. 1075, 110 S. Ct. 1124, 107 L. Ed. 2d 1030 (1990) ("A judgment for damages, acquired years after [the movant]'s business has been obliterated would not be a meaningful remedy").  IBM has told BMC that in its view, Section 5.4 of the 2015 Outsourcing Attachment does not preclude IBM from displacing BMC licenses with IBM products.  The 54 entities listed on Exhibit K include the largest and most important BMC customers and represent one-third of BMC's annual mainframe revenue.  Exh. 2, Jones Dec. at ¶ 6.  IBM's position creates uncertainty, and further efforts to

displace BMC licenses at AT&T and at the other 53 key entities on Exhibit K will result in a devastating impact to BMC's revenues, business operations, employee base, and business outlook, as well as disrupt BMC's customers' businesses.   Exh. 2, Chagnon Dec. at ¶ 4-7. Specific, undisputed evidence of intangible harm to a plaintiff's business can establish an irreparable injury.   *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied); *accord David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex.App.—Houston [1st Dist.] 1982, no writ) ("[t]his harm would not only disrupt the organized business dealings of Bache but would also threaten customer confidence in Bache's handling of their private affairs, and probably cause Bache to lose not only customers but profits as well.").

## C.   The threatened injury to BMC outweighs any damage that the injunction might cause IBM.

81.   The balance of hardships favors BMC.   IBM has represented to BMC that its activities with AT&T are "in full compliance with the provisions of the [Master License] and [2015 Outsourcing Attachment], including Section 5.4 of the [2015 Outsourcing Attachment]." Accordingly, because IBM asserts it is already acting in compliance with those obligations, IBM should not be harmed by the Court's issuance of an injunction prohibiting IBM from breaching its obligations owed to BMC under the License Agreement and 2015 Outsourcing Attachment. *See Cisco Sys., Inc. v. Huawei Techs.*, Co., 266 F. Supp. 2d 551, 554 (E.D. Tex. 2003) (the court granted a preliminary injunction after the defendants gave their voluntary cessation of the allegedly wrongful conduct finding that an injunction enjoining defendants from conduct they had already agreed to cease would cause the defendants no harm, if the defendants intended to actually cease the wrongful conduct); *accord Doe v. Duncanville I.S.D..*, 994 F.2d 160, 166 (5th Cir. 1993); *accord H.O. Sports v. Earth & Ocean Sports, Inc.*, Cause No. Coo-1846p, 2001 WL

514314 (W.D. Wash. Jan 12, 2001)(trademark case, noting "if the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives [the plaintiff] substantial protection of its trademark.").

82.     Additionally, the depth and breadth of IBM's use of BMC's confidential proprietary information and trade secrets in its interference with BMC contracts, or whether it has displaced or plans to displace BMC customer licenses, is information known only by IBM. The BMC customers listed on Exhibit K are the largest and most important customers to BMC, and AT&T is one of the top customers on that list.   Exh. 2, Jones Dec. at ¶¶ 4-6.    The displacement of BMC's licenses at AT&T, and further efforts to displace BMC licenses at other customers on Exhibit K, would be devastating to BMC's business.  Exh. 3, Chagnon Dec. at ¶¶ 5-6.  For BMC customers not included on Exhibit K, IBM is nonetheless barred from using BMC's confidential proprietary information and trade secrets to displace those customers' BMC licenses with IBM products.   Accordingly, enjoining IBM from using BMC's confidential proprietary information and trade secrets protects BMC and causes no harm to IBM, assuming IBM is in full compliance with the parties' agreements.

**D.      The injunction will not disserve the public interest.**

83.     The public interest would be best served by the issuance of the injunctive relief BMC seeks because the obligations breached by IBM are destructive to the sound and productive business practices that fuel a healthy economy.  Importantly, the injunction will serve the public interest and protect the property rights of IBM's and BMC's mutual customers.

84.     If IBM is not enjoined, BMC may be required to terminate the License Agreement and the 2015 Outsourcing Attachment in whole or in part in order to protect the value of BMC's confidential and proprietary information, to protect its relationships, and to mitigate the harm being caused by IBM's displacement of BMC licenses with IBM products. Exh. 3, Chagnon Dec.

at ¶ 9.  Upon termination, IBM is contractually required to deinstall and stop using BMC licenses, and return or destroy all of BMC's confidential and proprietary information.  However, while termination limits one type of harm caused to BMC, it would leave IBM's and BMC's mutual customers without IT services from IBM.  Exh. 3, Chagnon Dec. at ¶ 5.  The requested injunction both avoids interfering with any property rights of BMC's customers listed on Exhibit K to the 2015 Outsourcing Attachment, and protects BMC's customer relationships while allowing BMC's customers to use IBM as their IT services provider.  *See, e.g., Computer Assocs. Int'l v. Quest Software, Inc.*, No. 02 C 4721, 2004 WL 2059508, at *1 (N.D. Ill. July 30, 2004) (to properly protect the rights of third party customers, the court issued an injunction allowing the infringing company to provide minimal technical support to its customers.); *see also Lakedreams v. Taylor,* 932 F.2d 1103, 1109 (5th Cir. 1991).  In contrast, should it be necessary for BMC to terminate IBM's rights to access and use licenses granted to mutual customers by BMC, there would be a significant impact on the public.  Accordingly, granting the requested injunction supports rather than disserves the public interest.

## E.    Requested Injunction

85.    The scope of the injunctive relief requested by BMC is narrowly tailored and substantially related to IBM's specific conduct.  IBM agreed not to displace BMC's licenses with IBM products for the 54 entities listed on Exhibit K to the 2015 Outsourcing Attachment, and not to misuse BMC's confidential proprietary information and trade secrets.  BMC requests the Court hold IBM to its contractual and legal obligations.  The appropriateness of granting injunctive relief against those who have misappropriated confidential and proprietary information is well recognized. *See Hyde Corp.*, 314 S.W.2d at 763.  Indeed, an injunction "must, of necessity, be full and complete so that those who have acted wrongfully and have breached their fiduciary relationship will be effectively denied the benefits and profits flowing

from the wrongdoing." *Elcor Chem. Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204 (Tex. App.—Dallas 1973, writ ref'd n.r.e.); *accord Halliburton Energy Servs. v. Axis Techs., LLC, 444 S.W.3d 251, 260,* (Tex. App.—Dallas 2014, no pet.*)* ([t]he law is clear that injunctive relief for trade secret misappropriation must be sufficient to protect the plaintiff's legal rights and remove the competitive advantage obtained through the misappropriation.).  Accordingly, the Court should grant BMC's request for injunctive relief.

86.    BMC seeks preliminary and permanent injunctive relief enjoining IBM from:

a.    displacing any BMC licenses with any IBM product for customers listed on Exhibit K to the 2015 Outsourcing Attachment;

b.    using its access to AT&T's BMC licenses for any other purpose other than providing IT services to AT&T; and

c.    wrongfully disclosing and using BMC's confidential proprietary information and trade secrets.

## F.    Bond

87.    BMC is prepared to post a bond in an amount that the Court considers proper to pay the costs and damages sustained by IBM should the Court find that IBM was wrongfully enjoined.  Since the requested injunction simply requires IBM to abide by its contractual obligations, any bond should be de minimus.

### ATTORNEYS' FEES AND COSTS

88.    BMC is entitled to recover its costs and reasonable attorneys' fees from IBM, and therefore requests them.

89.    All conditions precedent to BMC's recovery of its costs and attorneys' fees have occurred, or will occur prior to entry of judgment in this suit.

### EXEMPLARY DAMAGES

90.    BMC seeks exemplary damages for BMC's conduct.

**JURY DEMAND**

91.    BMC requests a jury trial in this action.

**PRAYER FOR RELIEF**

92.    BMC respectfully requests that the Court award it:

    a.    injunctive relief as requested above, first as a preliminary injunction, and upon trial as a permanent injunction;

    b.    damages measured by the value conferred on IBM from its use of BMC's confidential proprietary information and trade secrets;

    c.    exemplary damages;

    d.    reasonable attorneys' fees and costs of suit;

    e.    pre-judgment and post-judgment interest at the highest rate allowed by law; and

    f.    all other relief to which it is entitled.

93.    Alternatively, BMC respectfully requests that the Court award it:

    a.    all actual damages;

    b.    unjust enrichment damages, measured by the value conferred on IBM from its improper use of BMC's confidential proprietary information and trade secrets;

    c.    exemplary damages;

    d.    reasonable attorneys' fees and costs of suit;

    e.    pre-judgment and post-judgment interest at the highest rate allowed by law; and

    f.    all other relief to which it is entitled.

Date: July 21, 2017

Respectfully submitted,

Of Counsel:

 _/s/ Sean Gorman_____
Sean Gorman
Texas State Bar No. 08218100
S.D. Bar No. 10168
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2781
(713) 223-2300 Telephone
(800) 404-3970 Facsimile

**Bracewell LLP**
Christopher L. Dodson
Texas State Bar No. 24050519
S.D. Bar No. 613937
Diane M. Crabtree
Texas State Bar No. 24046966
S.D. Bar No. 581390
Elizabeth F. Eoff
Texas State Bar No. 24095062
S.D. Bar No. 2951585
711 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2300 Telephone
(800) 404-3970 Facsimile

**Attorney-In-Charge for BMC Software, Inc.**