United States District Court
Southern District of Texas

**ENTERED**

July 10, 2018

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2254 |
| | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINES CORPORATION, | § | |
| | § | |
| Defendant. | § | |

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[1] is Plaintiff BMC Software, Inc.'s ("BMC") Application for Preliminary Injunction (Docs. 37, 38), BMC's Supplement to and Brief in Support of, Application for Preliminary Injunction (Doc. 92) and Plaintiff BMC's Motion to Admit and Objections to Certain Documents (Doc. 170). On November 28 through December 1, 2017, the court held a preliminary injunction hearing.

The parties have provided the court with excellent briefs and detailed proposed findings of fact and conclusions of law. Because the court will recommend a finding that BMC has not met its burden to show a substantial likelihood of irreparable injury, it will not propose findings of fact and conclusions of law on the other elements necessary for issuance of a preliminary injunction and will focus solely on that element in order to avoid making factual,

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. <u>See</u> Doc. 20, Ord. Dated May 27, 2016.

merits-based findings at this early stage of the lawsuit.

I.  **BMC's Motion to Admit and Objections to Certain Documents**

In the motion, Plaintiff BMC moves to admit several exhibits that were not admitted at the preliminary injunction hearing.  The motion is opposed by International Business Machines Corporation ("IBM").   BMC has not shown good cause why the preliminary injunction record should be reopened after four days of testimony and extensive legal briefing.  The motion is **DENIED**.

II.  **Proposed Findings of Fact**

A.  **The Parties**

Plaintiff BMC develops and sells mainframe and other computer software and competes with IBM in providing mainframe software with certain functionalities.[2]  IBM is an information technology ("IT") company that sells mainframe hardware, mainframe software and outsourcing services.[3]  Both companies license competing software products to mutual customers, such as AT&T, and, in that respect, they are competitors.[4]  BMC does not offer IT outsourcing services.[5]  Although they are competitors, IBM licenses BMC software and assists BMC in developing software products for IBM mainframe

---

[2]  See Doc. 130, Hr'g Tr. ("Tr.") Dated Nov. 28, 2017 p. 19.

[3]  See Doc. 106, IBM's Opp. to BMC's Req. for Prelim. Inj. p. 3.

[4]  See Doc. 130, Tr. Dated Nov. 28, 2017 pp. 16, 17.

[5]  See id. p. 16.

computers.[6]  Some IBM software is embedded into BMC's software products.[7]

IBM has provided IT outsourcing services to AT&T through its Global Technology Services ("GTS") division since approximately 1999.[8]  In order to staff its outsourcing contract with AT&T, IBM hired many of the AT&T in-house mainframe staff, who continued to perform the same work for IBM.[9]  Many of those former AT&T employees are still employed by IBM and have significant historical knowledge about how the AT&T hardware and software systems interact, why certain configurations are/were used and how software issues arising in earlier transition/unification projects were resolved.[10]  On a day-to-day basis, these IBM GTS outsourcing employees run the "business as usual" operations for AT&T's mainframe computers, troubleshoot problems, install new software, perform backup operations and test disaster recovery systems.[11]  IBM has no authority to make architectural control decisions for AT&T in the AT&T mainframe environment.[12]

---

[6]    See id. pp. 21-22.

[7]    See id. p. 22.

[8]    See Doc. 126, Tr. Dated Nov. 29, 2017 p. 97; Doc. 134, Tr. Dated Dec. 1, 2017 p. 5.

[9]    See Doc. 126, Tr. Dated Nov. 29, 2017 p. 98.

[10]    See id. pp. 98-99.

[11]    See id. p. 99.

[12]    See Doc. 134, Tr. Dated Dec. 1, 2017 p. 10.

B.   **The Agreements**

In order to regulate the areas of interface, BMC and IBM entered into a Master Licensing Agreement ("MLA") in 2008.[13]   The MLA provides general terms for IBM's purchase or licensing of BMC's products.[14]   The MLA contains a confidentiality clause that restricts IBM's use of BMC's confidential, proprietary and trade secret information and also limits access to that information to only those IBM employees who have a need to have access to the information.[15]   As explained by Brian Jones ("Jones") of BMC, it would be difficult for IBM to operate in the marketplace if it could not get access to BMC software as part of the services deliverable to its clients.[16]

In addition to the MLA, BMC and IBM also have entered into a series of outsourcing attachments ("OA") to the MLA.[17]   The OAs come into play when IBM must utilize BMC product licenses to deliver IT services.[18]   Both the 2008 and 2013 OAs contained non-displacement provisions whereby IBM agreed not to displace BMC products with its

---

[13]     See Doc. 130, Tr. Dated Nov. 28, 2017 pp. 21-22, 24, 34; Jt. Ex. 1, MLA.

[14]     See Doc. 130, Tr. Dated Nov. 28, 2017 p. 22; see also Jt. Ex. 1, MLA.

[15]     See Jt. Ex. 1, MLA.

[16]     Doc. 130, Tr. Dated Nov. 28, 2017 p. 23.  These services comprise a significant portion of IBM's revenue, estimated by Jones as $35 billion per year. Id. at 24.

[17]     See e.g., Jt. Ex. 2, 2015 OA.

[18]     See Doc. 130, Tr. Dated Nov. 28, 2017 p. 25.

own software.[19]

In June 2007, BMC and AT&T executed a master agreement to govern their relationship.[20]   This agreement has been modified several times.[21]

## C.   **AT&T & Project Swallowtail**

In 2013, AT&T had just concluded its own license negotiations with BMC.[22]   Driven by a need to unify three legacy mainframe software environments acquired through corporate mergers and unhappy with BMC's refusal to accede to AT&T's demands on pricing, AT&T decided to convert its mainframe environment from BMC and thirty-five to forty other independent software vendors to equivalent IBM software.[23]   That effort was named Project Swallowtail.[24]   The implementation of Project Swallowtail was entirely the decision of AT&T, and it was AT&T that decided which products were to be discontinued and which products would replace the discontinued software.[25]

AT&T ultimately decided not to proceed with the software

---

[19]     See id. p. 30.

[20]     See Jt. Ex. 3, BMC-AT&T MLA.

[21]     See Jt. Ex.4, Am. No. 5 to BMC-AT&T MLA.

[22]     See Doc. 126, Tr. Dated Nov. 29, 2017 p. 105.

[23]     See id. pp. 93-94, 110, 111, 114-15.

[24]     See id. p. 114.

[25]     See id. p. 120.

unification process in 2013 due to business conditions.[26]   It entered into a short-term licensing contract with BMC and began to look at alternatives to BMC software to reduce the amount of licensing fees paid to BMC.[27]   In 2014, AT&T entered into a five-year contract with BMC.[28]   The present AT&T-BMC mainframe licensing contract is set to expire on February 29, 2019.[29]

In February 2015, AT&T and IBM resumed discussions regarding Project Swallowtail as a part of a larger project that IBM was executing at AT&T, named Project Cirrus.[30]   The purpose of Project Cirrus was to change AT&T's financial model into a utility-based model whereby AT&T paid for its use of software based on usage and services that were bundled into a variable cost per month.[31]

Between February and June 2015, IBM and AT&T discussed the parameters of the work IBM would undertake to replace BMC software.[32]   According to Ed Conway ("Conway") of AT&T, replacing BMC software was not undertaken to disadvantage BMC but was implemented to streamline, modernize and upgrade AT&T's mainframe

---

[26]     See id. pp. 109, 123.

[27]     See id. pp. 109-10.

[28]     See id. p. 123.

[29]     See id. p. 104.

[30]     See id. pp. 126-29.   Project Cirrus is projected to save AT&T a significant amount of money.   Id. at p. 128.

[31]     See Doc. 128, Tr. Dated Nov. 29, 2017 p. 55.

[32]     See Doc. 126, Tr. Dated Nov. 29, 2017 pp. 128-29.

environment.[33]

In June 2015, IBM and AT&T entered into an agreement whereby IBM would execute Project Swallowtail for AT&T.[34]  The migration schedule lists 2,190 separate tasks which must be completed in a specific order and by specific dates.[35]  The contract required that IBM replace BMC and other redundant software that was presently in use in the AT&T mainframe environment.[36]  Under the terms of this agreement, IBM did not receive any added licensing revenue from Project Swallowtail, as AT&T already paid for software licenses on the IBM replacement products.[37]  The contract included milestone payments and completion schedules.[38]  The February 29, 2019 BMC-AT&T contract expiration date became the target by which AT&T intended to end its BMC mainframe software license payments.[39]  Chet Fenner ("Fenner") of BMC testified that the renewal value of the AT&T mainframe licensing contract was projected to be in excess of $40 million dollars for a five-year period.[40] By the time this suit was

_____

[33]    See id. pp. 117-18.

[34]    See id. p. 128.

[35]    See Jt. Ex. 14, Completion Schedule.

[36]    See Doc. 128, Tr. Dated Nov. 29, 2017 p. 67.

[37]    See Doc. 134, Tr. Dated Dec. 1, 2017 pp. 24, 47-48.

[38]    See Jt. Ex. 12, Ex. 19E to the Project Swallowtail contract, Milestone Pym't Sched. p. 2.; Jt. Ex. 14, Completion Schedule.

[39]    See Doc. 126, Tr. Dated Nov. 29, 2017 p. 104.  Conway testified that a one-year renewal would cost in excess of $10 million dollars.  Id.

[40]    See Doc. 132, Tr. Dated Nov. 30, 2017 pp. 30, 41.

7

filed, Project Swallowtail was sixty-five percent complete.[41]

## D.   2015 OA

At the same time that IBM and AT&T were negotiating the Project Swallowtail contract, IBM and BMC undertook negotiations to modify the 2013 OA, which was not set to expire until March 2018.[42] The negotiations to modify the 2013 OA became more intense commencing in March 2015.[43]   While there were areas of dispute between BMC and IBM that the parties believed needed to be resolved through contract negotiation, BMC was not aware of a key motivating factor in the negotiations from IBM's side - IBM's planned participation in Project Swallowtail and its need to remove a contractual term of the 2013 OA that limited its ability to displace BMC software with its own software.[44]  Jones testified that IBM also sought a different pricing strategy for licensing BMC software.[45]  The 2015 OA put in place a new pricing methodology and added rights for BMC's distributing cloud environment.[46]

Under the executed 2015 OA, IBM had two options in using or

---

[41]    See Jt. Ex. 14, Completion Schedule.

[42]    See Doc. 130, Tr. Dated Nov. 28, 2017 pp. 30, 32.

[43]    See id. p. 32.

[44]    See id. pp. 45-46.

[45]    See Doc. 130, Tr. Dated Nov. 28, 2017 p. 33.

[46]    See id. p. 33.

accessing BMC's products when serving as an IT outsourcer.[47]   One option permitted IBM the ability to purchase outright licenses to BMC products for a pre-negotiated fee.[48]   BMC's chief negotiator estimated that the purchase price of BMC licenses by IBM would have exceeded $700 million.[49]

The other option allowed IBM to access and use the BMC products that were licensed directly to the mutual customer, in which case, IBM did not pay an additional fee.[50]   In the latter case, IBM's use of a BMC customer's license was limited to the "sole [ ] . . . purpose" of supporting that customer and was further limited by the terms of the underlying license agreement with the BMC customer and by a non-displacement provision.[51]

Prior to the execution of the 2015 OA, the non-displacement clauses in the 2008 OA and 2013 OA applied to all of the over-300 mutual customers of BMC and IBM.[52]   According to Jones, IBM demanded that the non-displacement clause of the 2013 OA be removed in its entirety.[53]   Even after BMC had agreed to narrow the non-

---

[47]   See id. pp. 36-37; Jt. Ex. 2, 2015 OA §§ 6-8, pp. 4-5.

[48]   See Jt. Ex. 2, 2015 OA, §§ 6-7 p. 4.

[49]   See Doc. 130, Tr. Dated Nov. 28, 2017 p. 37.

[50]   See Jt. Ex. 2, 2015 OA § 5.1 p. 2.

[51]   Id.

[52]   See Doc. 130, Tr. Dated Nov. 28, 2017 p. 40.

[53]   See id. p. 41.

displacement clause to a smaller list of mutual customers which still included AT&T, IBM continued to demand that four critical clients, including AT&T, be removed from that list.[54]  Because AT&T was one of BMC's biggest mainframe customers and had been a customer for twenty-eight years, BMC refused.[55]  IBM demanded that the non-displacement clause needed to have an exception for customer-based requests; again BMC refused.[56]  The 2015 OA was signed on September 30, 2015.[57]  AT&T was included in the list of customers subject to the non-displacement clause.[58]

The 2015 OA non-displacement provision stated in relevant part:

> This Non-Displacement provision applies only to [IBM]'s Access and Use of BMC Customer Licenses by [IBM]'s strategic outsourcing division (or its successor) for the BMC Customers listed on Exhibit K (the "Exhibit K Customers").  Subject to the foregoing, [IBM] agrees that, while [IBM] cannot displace any BMC Customer Licenses with [IBM] products, [IBM] may discontinue use of BMC Customer Licenses for other valid business reasons.  All terms of Sections 5.1, 5.2, and 5.3 apply to [IBM]'s use of BMC Customer licenses belonging to any Exhibit K Customers.[59]

Under this option, IBM contractually agreed not to displace BMC

---

[54]   See id. p. 42.

[55]   See id. pp. 42-43, 45.

[56]   See Doc. 127, Tr. Dated Nov. 28, 2017 p. 30.

[57]   See Jt. Ex. 2, 2015 OA p. 12.

[58]   See Jt. Ex. 2, Ex. K to 2015 OA p. 45.

[59]   See Jt. Ex. 2, 2015 OA § 5.4 p. 3.

products with its own products for Exhibit K customers.  If IBM violated this section, its ability to access and use the customer's license terminated.[60]

Jones also testified that the 2015 OA contained a "most favored customer" clause whereby BMC agreed to treat IBM comparably with its most favored client.[61]  Jones refused to concede that the inclusion of a non-displacement clause violated the most favored customer clause because IBM was the only outsourcer that competes with BMC on the licensing of software.[62]  Jones later corrected this testimony by stating that Hewlett Packard was also an outsourcer and its contract with BMC contained a non-displacement provision as well.[63]

Jones testified that AT&T pays BMC approximately $20 million per year in licensing fees and that in February 2019, when the mainframe licensing agreement is scheduled to expire, BMC will lose approximately half of that income.[64]  Jones conceded that the loss was less than one percent of BMC's total annual revenue.[65]

As of the date of the hearing, of the fifty-four customers

---

[60]   Id. 2015 OA § 5.1 p. 2.

[61]   See Doc. 127, Tr. Dated Nov. 28, 2017 pp. 16-17.

[62]   See id. p. 18.

[63]   See id. p. 26.

[64]   See id. p. 10.

[65]   See id. p. 12.

listed on Exhibit K, sixteen utilized IBM's outsourcing services.[66]

## E.   **BMC Learns of Project Swallowtail**

In addition to formalizing their relationship through contracts, BMC and IBM met quarterly for business reviews ("QBR").[67] During each QBR, representatives from each company would discuss potential challenges or disputes, the need for updates to the agreements, and potential orders and business with a goal of solving any disputes that had arisen.[68] Despite this quarterly communication, IBM did not disclose to BMC that it had signed the Project Swallowtail contract until Project Swallowtail actually commenced in July 2016, more than a year later.[69] IBM claimed it was following AT&T's instructions in failing to apprise BMC of this development and referred BMC to AT&T to register its protest.[70] According to Conway, IBM was contractually obligated to keep that information confidential.[71] AT&T did not consider any other provider to implement Project Swallowtail, and IBM voiced no objection to AT&T concerning its participation in the project that

---

[66]    See Doc. 130, Tr. Dated Nov. 28, 2017 p. 46.

[67]    See id.

[68]    See id. pp. 46-47.

[69]    See Doc. 128, Tr. Dated Nov. 29, 2017 pp. 14-15, 22.

[70]    See Doc. 127, Tr. Dated Nov. 28, 2017 p. 8.

[71]    See Doc. 128, Tr. Dated Nov. 29, 2017 pp. 15, 38-39.

would require it to replace BMC software with its own software.[72]

## F.   **BMC-AT&T Contractual Obligations**

AT&T is one of approximately 1,750 mainframe customers of BMC.[73]   In addition to licensing its software to AT&T, BMC is contractually obligated to AT&T to provide technical software support to AT&T's IT outsourcer, IBM.[74]   This tech support information may only be accessed by a user with login credentials and a valid product identification number that allows the user to view BMC's tech support website.[75]   The user of the tech support website must also agreed to BMC's terms of use that include the restriction that the information may not be disclosed beyond the customer.[76]   During the Project Swallowtail transition, BMC has been called upon to provide software patches to support its software.[77]

Jeffrey D. Decker[78] ("Decker") testified as an expert witness

---

[72]   See id. pp. 42-43.

[73]   See Doc. 126, Tr. Dated Nov. 29, 2017 p. 25.

[74]   See Doc. 128, Tr. Dated Nov. 29, 2017 pp. 16-17.

[75]   See Doc. 127, Tr. Dated Nov. 28, 2017 p. 56.  A PFT is a temporary change to a BMC product's functionality that resolves a problem in the customer's environment and allows the BMC software to continue to work.  It is commonly referred to as a patch.  See Doc. 128, Tr. Dated Nov. 29, 2017 p. 49.

[76]   See Doc. 127, Tr. Dated Nov. 28, 2017 pp. 148-49.

[77]   See Doc. 128, Tr. Dated Nov. 29, 2017 p. 18.

[78]   Decker has a Master of Science degree from Northern Illinois University and has been teaching computer science course there for the past sixteen years.  See Doc. 127, Tr. Dated Nov. 28, 2017 pp. 32-33.

for BMC on the topic of mainframe computing and programming.[79] Decker explained that he reviewed the Project Swallowtail migration schedule and the number of technical support cases opened by BMC in response to IBM's requests for assistance on software issues during that project.[80]

In reviewing the number of tech support cases opened by IBM at AT&T since 2014, Decker testified that there was one case opened in 2014, four cases opened in the last quarter of 2015, and, in the first quarter of 2016, there was "a huge spike" in the number of cases opened as the work on Project Swallowtail commenced.[81] Decker testified that his review of AT&T records showed that there was some customization of software by IBM in Project Swallowtail.[82] Decker also opined that IBM improperly accessed BMC's technical support to assist it in the Project Swallowtail transition, citing one example where IBM sought assistance when both BMC and IBM's software applications were running in tandem and an abnormal end ("ABEND") repeatedly occurred.[83] After IBM was unable to determine the cause of the ABEND on its software, it called upon BMC to

---

[79]     See id. p. 37.

[80]     See id. p. 41.

[81]     See id. pp. 48-49.

[82]     See id. p. 45.

[83]     See id. p. 47.  The discussion of this example continued on pages 50-55.  The court does not believe that a recitation of the technical details of the ABEND incident are relevant at this time.

create a patch for the problem on its Mainview software without informing BMC of the purpose of the patch.[84]   BMC sent IBM a patch with executable code that solved the problem, prompting IBM personnel to make a number of inquiries about how the problem had been solved.[85]   In a response, a BMC support employee explained, in detail, the source and location of the ABEND and what the patch did to fix the problem.[86]

Decker testified that this information was a trade secret and was improperly used by IBM to assist it in its role in migrating the AT&T mainframe environment from BMC products to IBM products.[87] BMC, citing Decker's testimony, contends that this tech support was not requested in a "business as usual" environment at AT&T but was related solely to Project Swallowtail and therefore fell outside its contractual obligations.[88]

Janet Sessarego, ("Sessarego") Director of Technical Support at BMC, testified that technical support is provided by BMC to help customers resolve any questions or problems they may encounter when utilizing a BMC product.[89]   She stated that source code is

---

[84]   See id. pp. 56-59.

[85]   See id. pp. 60-65, 99-100.

[86]   See Jt. Ex. 133, p. 21.

[87]   See Doc. 127, Tr. Dated Nov. 28, 2017 pp. 71, 91.

[88]   See id. pp. 79-80.

[89]   Dep. of Janet Sessarego p. 6.

confidential and is never divulged to a customer.[90] Sessarego testified that, in her opinion, BMC software patches provided to IBM were confidential because they were provided via a licensing agreement to support AT&T's licenses.[91] She agreed that software patches did not contain source code but executable code.[92] Sessarego believed that the ABEND discussed by Decker did not originate with a BMC product.[93]

Bruce Hartley, ("Dr. Hartley") was presented by IBM as an expert in computer network security and digital forensic issues.[94] Dr. Hartley testified that he reviewed Decker's expert report and concluded that Decker had failed to identify any trade secret that was provided to IBM.[95]  Dr. Hartley stated that typically trade secrets are not found in executable code that would be found in a tech support patch; it is the source code that is highly confidential and which would be a trade secret.[96] He explained that having executable code does not give a user access to a software

---

[90]     See id. p. 10.

[91]     See id. pp. 31, 35.

[92]     See id. p. 32.

[93]     See id. pp. 101-02.

[94]     See Doc. 133, Tr. Dated Dec. 1, 2017 pp. 7-8.  Dr. Hartley has a Ph.D in Computer Science.

[95]     See id. p. 12.

[96]     See id. pp. 18, 21.

vendor's trade secrets.[97]

Dr. Hartley reviewed the approximately seventy-three BMC tech support cases cited by BMC as incursions into its trade secrets by IBM and found no evidence that trade secret information was disclosed by BMC or that the tech support staff at IBM had access to information typically regarded as trade secrets in any of those cases.[98]  In fact, information referenced in those tech support cases was publicly available on the BMC website.[99]  Dr. Hartley explained that it was very common in the course of customer support for a company to include the rationale for the solution provided, concluding that the disclosure of how a particular ABEND was resolved was not surprising and did not disclose trade secret information.[100]  Specifically addressing the ABEND discussed by Decker, Dr. Hartley opined that how a particular bit was set was not a trade secret of BMC.[101]  It appeared to him that IBM had exhausted its options in troubleshooting in its software relative to the ABEND and turned to BMC because the only other possible source of the ABEND was in the BMC software.[102]  Without seeing the

---

[97]    See id. p. 18.

[98]    See id. pp. 19, 22-24.

[99]    See id. p. 57.

[100]   See id. pp. 23-24.

[101]   See id. p. 43.

[102]   See id. pp. 45-46.

17

actual code fix, Dr. Hartley stated, it would be speculation to conclude that the IBM product was causing the BMC program to crash.[103]

Dr. Hartley also stated that, in his opinion, it was not unusual for IBM, as the IT contractor for AT&T, to call on BMC's technical support when there was a problem with a BMC software interface.[104]   Dr. Hartley testified that generally, BMC provides significant information about its software to licensed users of that product through its web portal.[105] Because this information would be provided to thousands of clients, Dr. Hartley believed that this information, while confidential, would be difficult to protect as a trade secret, and it would be unlikely that BMC tech support personnel would have access to highly confidential information.[106]

Dr. Hartley stated that in his expert opinion, a software patch solves a unique problem in a specific manner.[107]   Having access to a patch would not give a competitive advantage to IBM in another company's software environment.[108]

---

[103]    See id. pp. 61-62.

[104]    See id. pp. 27-28.

[105]    See id. p. 33.

[106]    See id. pp. 22-23, 53-54.

[107]    See id. pp. 32-33.

[108]    See id. pp. 32-33.

Howard Rogers, the IBM Tech Support manager for Project Swallowtail, testified that the IBM IT staff was not using BMC's assistance in the migration effort at AT&T.[109]

Guy Skinner ("Skinner") supervised IBM's outsourcing contract with AT&T.[110]  He testified that it was a common practice for IBM to execute transition and transformation projects at AT&T and IBM has done so since 2007.[111]  Skinner stated that the AT&T mainframe environment was "extremely large" and utilized over four hundred independent software products that were being updated "all of the time."[112]  According to Skinner, there were approximately 7,000 changes implemented in 2017 alone, and it was IBM's role to implement those changes and upgrades.[113] Skinner explained that IBM has no architectural control over the decisions to modify AT&T's mainframe computer environment.[114] Skinner also stated that IBM never asked AT&T to remove BMC software from its mainframe environment.[115]  Skinner testified that the IBM products that were included in the Project Swallowtail were not new licenses but

---

[109]   See Doc. 128, Tr. Dated Nov. 29, 2017 p. 126.

[110]   See Doc. 134, Tr. Dated Dec. 1, 2017 p. 5.

[111]   See id. p. 9.

[112]   See id. p. 20.

[113]   See id.

[114]   See id. pp. 10-11.

[115]   See id. p. 23.

represented products that had been licensed by AT&T but not utilized.[116]

Relevant to the present dispute, Skinner testified that it was standard procedure to call the BMC help desk if a problem arose with BMC software.[117]  He considered these calls to be "business as usual" inquiries.[118]  Skinner denied that IBM's GTS personnel used any information learned through BMC's help desk as part of Project Swallowtail to alter any IBM product.[119]  Skinner also denied that any patch provided by BMC contained BMC source code.[120]  He stated that it was common for BMC, in providing a patch, to describe what the problem was and how the patch proposed to fix the problem.[121]

Referencing the ABEND discussed by Decker, Skinner explained that initially IBM's GTS staff believed that the ABEND was in the IBM software and called the IBM help desk for assistance.[122]  After extensive analysis, it was determined that the ABEND was in the BMC software, after which IBM contacted the BMC help desk.[123]  Skinner

---

[116]     See id. pp. 24-25.

[117]     See id. pp. 40-41.

[118]     See id. p. 41.

[119]     See id. p. 42.

[120]     See id. p. 43.

[121]     See id. p. 44.

[122]     See id. pp. 51-52.

[123]     See id. p. 52.

explained that because the ABEND codes are not unique to a particular software product, IBM was not able to tell if the ABEND was in the BMC software or the IBM software.[124]

## G.   __Irreparable Injury__

Nicholas Pachnos of BMC testified that he believed that IBM could glean valuable information from BMC's tech support provided during Project Swallowtail and could use that information in order to convince an Exhibit K client to replace BMC mainframe software with IBM mainframe software.[125]

Fenner, BMC Vice President of Corporate Finance and Investor Relations, testified that in the mainframe market, IBM, BMC and Computer Associates comprise approximately sixty-five to seventy-five percent of the market, with BMC's share approximating fifteen to twenty percent.[126]  Jones estimated that BMC would lose less than $10 million per year if AT&T did not renew its license in 2019.[127] BMC's total annual revenue exceeds $1 billion per year, making the loss a small percentage of its total annual revenue.[128]  Jones conceded that this was within BMC's assumed average annual

---

[124]   See id. p. 53.

[125]   See Doc. 127, Tr. Dated Nov. 27, 2017 pp. 157-58.

[126]   See Doc. 132, Tr. Dated Nov. 30, 2017 p. 47.

[127]   See Doc. 127, Tr. Dated Nov. 28, 2017 p. 11.

[128]   See id. p. 12.  Fenner also agreed with these numbers, clarifying that AT&T's spend rate for Z Solutions, the BMC mainframe software, was a small percentage of its annual revenue.  See Doc. 132, Tr. Dated Dec. 1, 2017 pp. 61-62.

attrition rate of ten percent.[129]

Generally, the renewal rate for mainframe customers exceeds ninety percent.[130]   Fenner testified that Exhibit K customers represented a significant portion of BMC's revenues.[131]   AT&T was in the top five clients in terms of revenue for BMC and is considered an extremely important customer for BMC.[132]   If AT&T does not renew its mainframe licenses in February 2019, BMC will lose in excess of $40 million dollars for a five-year contract.[133]   Once a mainframe customer is lost, it is highly unlikely that it will return as a BMC customer, per Fenner.[134]   Of the top sixteen Exhibit K customers, upcoming renewals through the end of December 2018 exceed $100 million dollars, and, for the entirety of Exhibit K, renewals well exceed $200 million dollars.[135]   Fenner testified that he believed that, absent interference from IBM, AT&T would have renewed its mainframe license agreement.[136]   This opinion was based

---

[129]   See Doc. 130, Tr. Dated Nov. 30, 2017 p. 115; see also Def. Ex. 345, p. 46.

[130]   See Doc. 132, Tr. Dated Nov. 30, 2017 p. 37.

[131]   See id. pp. 22-23.

[132]   See id. p. 24.

[133]   See id. p. 29.

[134]   See id. pp 34-35.

[135]   See id. pp. 28-29.

[136]   See id. p. 41.

solely on his "experience at BMC."[137]

Fenner stated that once IBM establishes a history of a successful migration away from BMC software, renewals of BMC mainframe software licenses become more vulnerable with respect to its other clients.[138]  Loss of other joint customers would impact BMC's market share and could affect its reputation in the marketplace.[139]  Fenner cited no marketing studies, outside research or actual incidents to support this opinion.

Fenner also believed that losing AT&T as a client would require BMC to cut its research-and-development ("R&D") spending in the mainframe business unit.[140] He stated that the loss would be approximately $2.5 million per year of an annual R&D budget of $100 million, but, because BMC books the entirety of the five-year contract in the first year, the loss would be more significant in its effect.[141]  Fenner testified to anticipated layoffs of personnel.[142]  Fenner admitted that discussions concerning layoffs commenced after he was deposed and that layoffs were not discussed

---

[137]   See id. p. 68.

[138]   See id. p. 43.

[139]   See id. pp. 50, 52.

[140]   See id. p. 56.

[141]   See id. p. 64-65.

[142]   See id. p. 58.

in his expert report.[143]   In the absence of concrete plans for
layoffs, the court considers this testimony to be speculative at
this time.[144]

Fenner admitted that BMC became aware of AT&T plans to migrate
away from BMC software in 2016.[145]   Even though BMC software is
being phased out of the AT&T mainframe environment, AT&T will
continue to utilize BMC software in its midrange environment per
AT&T's Conway.[146]

Conway testified that if IBM's participation in Project
Swallowtail was enjoined by the court, it would delay the larger
AT&T Project Cirrus because of the staging on numerous software
changes to the entire AT&T environment.[147]   AT&T is currently
running two software systems concurrently, which exposes AT&T to
operational vulnerabilities.[148]   Conway testified that even a one-
month delay would seriously compromise the Project Swallowtail time
line and would cost AT&T a significant amount of money in licensing
fees if it had to negotiate a short-term license renewal with

---

[143]   See id. pp. 111-12.

[144]   Because the court finds this testimony to lack a factual basis, it
does not discuss the testimony of IBM's expert, Christopher Gerardi, that BMC's
loss, if any, was quantifiable.

[145]   See Doc. 132, Tr. Dated Nov. 30, 2017 pp. 60-61.

[146]   See Doc. 128, Tr. Dated Nov. 29, 2017 pp. 10-11.

[147]   See id. pp. 9-10.

[148]   See id. pp. 28, 36.

BMC.[149]

### III.   Proposed Conclusions of Law

A court may issue a preliminary injunction "only if the movant establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of the injunction will not disserve the public interest."   See Texans for Free Enter. v. Tex. Ethics Comm'n, 732 F.3d 535, 536 (5th Cir. 2013).   Even if a party can show a reasonable likelihood of success on the merits, courts will not presume irreparable injury.   See Plains Cotton Co-op Ass'n of Lubbock, Tex. v. Goodpasture Computer Serv., Inc., 807 F.2d 1256, 1261 (5th Cir. 1987)(stating that preliminary injunctions will be denied based on a failure to prove separately each of the four elements of the four-prong test for obtaining an injunction).   A party seeking a preliminary injunction must carry its burden on all four requirements.   Jordan v. Fisher, 823 F.3d 805, 809 (5th Cir. 2016).

Several experts testified before the court. Under the Federal Rules of Evidence and related case law, an expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.   "To qualify as an expert, the witness must have such

---

[149]      See id. pp. 25, 30-31.

knowledge or experience in [his] field or calling to make it appear that his opinion or inference will probably aid the trier in [the] search for truth." <u>United States v. Hicks</u>, 389 F.3d 514, 524 (5th Cir. 2004).  If an opinion is based solely or primarily on experience, it "must be grounded in an accepted body of learning or experience in the expert's field."  Fed. R. Evid. 702, advisory committee's note, 2000 Amends.  The witness must connect the experience to the conclusion offered, must explain why the experience is a sufficient basis for the opinion, and must demonstrate the appropriateness of the application of the experience to the facts.  <u>Id.</u>

Reliability hinges on the sufficiency of the facts or data upon which the opinion is based, the dependability of the principles and methods employed, and the proper application of the principles and methods to the facts of the case.  <u>See</u> Fed. R. Evid. 702.  The trial judge must make certain that the expert applied "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 152 (1999).

In the present case, the court concludes that BMC has failed to establish a "substantial threat of irreparable injury" for several reasons.

The testimony at the hearing established that the BMC-AT&T contract expires by its own terms in February 2019.  Although BMC

has a stellar renewal rate of over ninety percent, AT&T was never obligated to renew this contract in February 2019 and the potential non-renewal is months away.  BMC became aware of the future loss of AT&T's mainframe business in August 2016 and has had time within which to adjust its business operations to compensate for the expected loss of the potential renewal.  This fact militates against a finding of irreparable injury if the court does not enjoin IBM's work on Project Swallowtail.

BMC's evidence of damages, the loss of the AT&T contract as a result of alleged tortious interference with a contract, may be compensated with monetary damages.  At this time, the court finds that the opinion testimony of BMC's Fenner that other businesses might be influenced by IBM's participation in Project Swallowtail to initiate their own migration away from BMC software is too speculative to form the factual basis for the issuance of an injunction.  See Boyd v. State Farm Ins. Co., 158 F.3d 326, 332 (5th Cir. 1998)("It is a well established rule that without more than his credentials and a subjective opinion, an expert's testimony that a medical opinion simply 'is so' is not admissible.").

The court also finds Fenner's testimony that the projected loss of R&D funds and layoffs of personnel based on reduced revenue to be without a factual foundation.  In fact, forced layoffs of personnel was first raised in his testimony at the preliminary injunction hearing.  The court finds credible the hearing testimony

27

that replacement of any software in a mainframe environment is an extremely complicated project and is not undertaken without considerable planning.  Fenner failed to identify any current BMC mainframe customer that is actively taking steps to replace BMC software, another fact that militates against issuance of an injunction.

Fenner's predictions of lost revenues, lost customers and downgraded debt are also unsupported by any facts or a reliable methodology.  The actual predicted loss of AT&T's mainframe business represents a minute percentage of BMC's overall revenue.

Assuming that AT&T does not renew its contract with BMC in February 2019 and a jury finds that IBM interfered with that contractual relationship, the loss of the revenue is quantifiable.  The court does not credit BMC's argument that its losses are incalculable because of the hypothetical non-renewals of other customers.  Because BMC's loss is capable of calculation, BMC has not established irreparable injury.

BMC also claims that it has established entitlement to an injunction to protect its trade secrets pending a trial on the merits.  Fox v. Tropical Warehouses, Inc., 121 S.W.3 853, 858 (Tex. App. – Fort Worth 2003, no pet.).  When a defendant possesses trade secrets and may use or disclose those trade secrets, harm to the trade secret owner may be presumed.  Id., at 860.

In determining whether to grant an injunction to protect a

trade secret, the court need not determine whether the information is actually a trade secret, it only determines whether "the applicant has established that the information is entitled to trade secret protection until the trial on the merits." Mabrey v. SandStream, Inc., 124 S.W.3d 302, 311 (Tex. App. – Fort Worth 2003, no pet.). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." In re Bass, 113 S.W.3d 735, 739 (Tex. 2003)(citations and internal quotations omitted). The Texas Supreme Court has identified the following considerations in determining whether information is entitled to trade secret protection:

> 1. The extent to which the information is known outside the holder's business;
>
> 2. The extent to which it is known by employees and others involved in the holder's business;
>
> 3. The extent of the measures taken by the holder to guard the secrecy of the information;
>
> 4. The value of the information to the holder and its competitors;
>
> 5. The amount of effort or money expended by the holder in developing the information; and
>
> 6. The ease or difficulty with which the information could be acquired or duplicated by others.

Computer Assocs. Int'l, Inc. v. Altai, 918 S.W.2d 453, 455 (Tex. 1996).

In the present case, BMC argues that its software patches and technical support are trade secrets that must be protected by an injunction.  The court cannot agree.  The software patches are, by definition, solutions provided to a customer to fix a particular BMC software problem.  BMC routinely contracts with its customers to provide tech support and other assistance.  While the disclosure of technical solutions is subject to confidentiality agreements with BMC's customers, the software patches themselves do not contain source code.  The evidence adduced at the preliminary injunction hearing established only that IBM was making more tech requests on behalf of AT&T than it had in the past and that on one occasion, IBM asked for, and was told, how a particular software patch solved the problem.  The court finds that Dr. Hartley's testimony that no BMC trade secrets were divulged as a result of IBM's tech support calls to BMC to be more credible than Mr. Decker's on this matter.  There was no testimony that information obtained by IBM's GTS group from BMC's tech support website was shared with any other division of IBM.

## IV.  Conclusion

For the reasons discussed above, the court **RECOMMENDS** that BMC's Motion for Preliminary Injunction (Docs. 37, 38) be **DENIED**. BMC's Motion to Admit and Objections to Certain Documents (Doc. 170) is **DENIED**.

The Clerk shall send copies of this Memorandum and

Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 10th day of July, 2018.

_____

U.S. MAGISTRATE JUDGE