IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| Plaintiff, | § | CASE NO.  4:17-cv-2254 |
| | § | |
| vs. | § | |
| | § | JURY TRIAL DEMANDED |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| Defendant. | § | |

### BMC'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF BRUCE V. HARTLEY (SEALED)

Of Counsel:
**Bracewell LLP**
Christopher L. Dodson
Texas State Bar No. 24050519
S.D. Bar No. 613937
Timothy R. Geiger
Texas State Bar No. 24078552
S.D. Bar No. 1742526
711 Louisiana Street,  Suite 2300
Houston, Texas 77002-2781
(713) 223-2300 Telephone
(800) 404-3970 Facsimile
chris.dodson@bracewell.com
tim.geiger@bracewell.com

Sean Gorman
Texas State Bar No. 08218100
S.D. Bar No. 10168
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2781
(713) 221-1221 Telephone
(800) 404-3970 Facsimile
sean.gorman@bracewell.com

**Attorney-In-Charge for
BMC Software, Inc.**

**Contains Attorneys' Eyes Only and Confidential Information**

# TABLE OF CONTENTS

*Page*

Table of Authorities ................................................................................................................. ii

Preliminary Statement ............................................................................................................. 1

Nature and Stage of the Proceeding ...................................................................................... 3

Background ............................................................................................................................... 3

Legal Standard ......................................................................................................................... 4

Argument .................................................................................................................................. 6

I.   Hartley's Opinion that Román's Report Does Not Identify a Single Trade Secret
     that BMC Disclosed to IBM is Unreliable and Inadmissible. ...................................... 6

     A.   Hartley Lacks the Qualifications to Opine on Whether Information
          Qualifies as a Trade Secret. ............................................................................. 6

     B.   Hartley's Opinions Based on his Lay Understanding of What Qualifies as
          a Trade Secret are Unreliable and Irrelevant. ................................................. 7

II.  Hartley's Opinion that IBM Did Not Commit Misappropriation is Speculative and
     Unreliable ...................................................................................................................... 10

     A.   Hartley Admitted that He Did Not Evaluate IBM's Misuse of BMC's
          Trade Secrets ..................................................................................................... 10

     B.   Hartley Cannot Opine on Trade Secret Misuse Because He Did Not
          Review the Contractual Restrictions Underlying IBM's Misappropriation. ......... 11

III. Hartley's Opinion About Ownership of Proprietary Information is Speculative and
     an Impermissible Legal Conclusion that He is Unqualified to Make. ........................ 14

IV.  Hartley's Opinions About Allegedly "Standard" Functions of an IT Outsourcer are
     Unsupported and Irrelevant ......................................................................................... 16

Conclusion ............................................................................................................................. 18

Certificate of Service ............................................................................................................ 19

**Contains Attorneys' Eyes Only and Confidential Information**

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Bich-Chau Thi Tran v. Computer Tech. Sols. LP*,
  2010 WL 11646559 (S.D. Tex. Oct. 29, 2010)........................................................................7

*Daubert v. Merell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)..........................................................................................3, 5, 10, 15

*El Aguila Food Prod., Inc. v. Gruma Corp.*,
  301 F. Supp. 2d 612 (S.D. Tex. 2003) ...................................................................14, 15, 16

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)..........................................................................................................5

*Grdinich v. Bradlees*,
  187 F.R.D. 77 (S.D.N.Y. 1999) .........................................................................................17

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146 (3d Cir. 1999).............................................................................................5

*His Co. v. Stover*,
  202 F. Supp. 3d 685 (S.D. Tex. 2016) ..............................................................................12

*Houston-Hines v. Houston Indep. Sch. Dist.*,
  2006 WL 897209 (S.D. Tex. Apr. 4, 2006) .........................................................................7

*Hutton Contracting Co. v. City of Coffeyville*,
  2004 WL 2203449 (D. Kan. Sept. 24, 2004) .....................................................................16

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*,
  2010 WL 4065465 (S.D. Tex. Oct. 9, 2010)......................................................................15

*Jacked Up, LLC v. Sara Lee Corp.*,
  291 F. Supp. 3d 795 (N.D. Tex. 2018) ..............................................................................14

*Johnson v. Arkema, Inc.*,
  685 F.3d 452 (5th Cir. 2012) ...........................................................................................11

*Knight v. Kirby Inland Marine, Inc.*,
  482 F.3d 347 (5th Cir. 2007) ......................................................................................5, 16

*Kozak v. Medtronic, Inc.*,
  512 F. Supp. 2d 913 (S.D. Tex. 2007) ................................................................................6

**Contains Attorneys' Eyes Only and Confidential Information**

*Kumho Tire Co. v. Carmichael,*
 526 U.S. 137 (1999) ..................................................................................5

*Leverette v. Louisville Ladder Co.,*
 183 F.3d 339 (5th Cir. 1999) ...............................................................7, 12

*Martinez v. Porta,*
 601 F. Supp. 2d 865 (N.D. Tex. 2009) ..................................................7, 10

*MM Steel, L.P. v. JSW Steel (USA) Inc.,*
 806 F.3d 835 (5th Cir. 2015) .....................................................................5

*Moore v. Ashland Chem. Inc.,*
 151 F.3d 269 (5th Cir. 1998) (en banc) .....................................................5

*Moore v. Int'l Paint, L.L.C.,*
 547 F. App'x 513 (5th Cir. 2013) .............................................................14

*Orthoflex, Inc. v. ThermoTek, Inc.,*
 986 F. Supp. 2d 776 (N.D. Tex. 2013) .....................................................17

*Raytheon Co. v. Indigo Sys. Corp.,*
 598 F. Supp. 2d 817 (E.D. Tex. 2009) .....................................................15

*Singletary v. Atrium Fin. II, LP D/B/A, Marriott Houston South-Hobby Airport,*
 2017 WL 1400810 (S.D. Tex. Mar. 8, 2017) ...........................................14

*Skycam, Inc. v. Bennett,*
 2011 WL 2551188 (N.D. Okla. June 27, 2011) ..........................................7

*Snap-Drape, Inc. v. C.I.R.,*
 98 F.3d 194 (5th Cir. 1996) .....................................................................15

*State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.,*
 2019 WL 1436659 (N.D. Tex. Mar. 31, 2019) .....................................17, 18

*Taylor Pipeline Constr., Inc. v. Directional Rd. Boring, Inc.,*
 438 F. Supp. 2d 696 (E.D. Tex. 2006) .......................................................6

*United States v. Valencia,*
 600 F.3d 389 (5th Cir. 2010) .....................................................................5

*Wooley v. Smith & Nephew Richards, Inc.,*
 67 F. Supp. 2d 703 (S.D. Tex. 1999) ..................................................10, 15

**Contains Attorneys' Eyes Only and Confidential Information**

**Statutes**

Tex. Civ. Prac. & Rem. Code § 134A.001(3)(B)(ii)(b)............................................................12, 14

Tex. Civ. Prac. & Rem. Code § 134A.002(6)...........................................................................1, 7, 9

**Rules**

Fed. R. Evid. 702 .......................................................................................................................1, 4, 18

**Contains Attorneys' Eyes Only and Confidential Information**

BMC files this motion to exclude the expert opinions of IBM's retained expert Bruce V. Hartley ("Hartley").

## PRELIMINARY STATEMENT

IBM hired Hartley to rebut the opinions of BMC's expert, Kendyl A. Román, regarding IBM's misappropriation of BMC's trade secrets in connection with IBM's displacement of BMC products at AT&T.  Hartley's opinions fail to meet the standards for admissibility under Rule 702 of the Federal Rules of Evidence.

First, Hartley's opinions are founded on an inaccurate understanding of the categories of information entitled to trade secret protection under the Texas Uniform Trade Secret Act ("TUTSA"), which applies to "*all forms and types of information*, including … scientific, technical, … or engineering information."  Tex. Civ. Prac. & Rem. Code § 134A.002(6) (emphasis added).  By contrast, Hartley's opinions are based on his narrow, subjective conception of what type of information may qualify for protection based on his lay understanding of trade secrets.  Moreover, Hartley's failure to consider the proper standards when determining whether BMC disclosed trade secrets is unsurprising given that Hartley has no experience determining whether information qualifies for trade secret protection, or training to do so. As a consequence, Hartley's opinions are unreliable and irrelevant.

Second, Hartley is unable to offer reliable opinions regarding IBM's misappropriation of BMC's trade secrets because Hartley admittedly did not analyze whether IBM's conduct amounted to misappropriation under TUTSA.  Instead, Hartley merely concluded that there were no trade secrets, and did not proceed to analyze how the asserted trade secrets were utilized by IBM. Moreover, Hartley did not review, and was generally unaware of, the contractual restrictions on IBM's use of BMC's trade secrets which form the basis of BMC's trade secret misappropriation claim.   Hartley  simply  ignored  BMC's  core  factual  allegations  and  the  actual  contractual

**Contains Attorneys' Eyes Only and Confidential Information**

restrictions, and instead made the unsupported assumption that IBM was permitted to use BMC trade secrets in the manner that IBM did.

Third, Hartley's opinion that AT&T, not BMC owns, certain proprietary information is a legal conclusion that is not the proper subject of expert testimony. Hartley is not qualified to offer a legal opinion regarding such ownership. Hartley further failed to review the applicable software and license agreements to determine ownership rights with respect to the proprietary and confidential information at issue in this case.

Fourth, Hartley's opinion that IBM's actions at AT&T were "entirely standard for any IT outsourcer" is irrelevant to the issue of whether IBM breached its contractual obligations and misappropriated BMC's trade secrets. Additionally, Hartley's opinion lacks support because he has identified no general "standards" governing IT outsourcing and performed no analysis to arrive at his conclusion. Moreover, Hartley admitted that he did not even review in detail IBM's actions undertaken on Project Swallowtail and could recall no specifics about the steps taken by IBM to displace BMC's products at AT&T.

Accordingly, BMC requests that the following opinions be excluded:

- Hartley's erroneous opinion that BMC did not "divulge" trade secrets to IBM. *Infra* Part I.

- Hartley's speculative and unreliable opinion that IBM did not misuse BMC's trade secrets. *Infra* Part II.

- Hartley's unsupported legal conclusion that AT&T, not BMC, owns certain proprietary information regarding the functions of BMC's products. *Infra* Part III.

- Hartley's irrelevant and unsupported opinion that IBM's conduct on Project Swallowtail was "entirely standard." *Infra* Part IV.

**Contains Attorneys' Eyes Only and Confidential Information**

## NATURE AND STAGE OF THE PROCEEDING

BMC filed this lawsuit on July 21, 2017, alleging that IBM breached the 2015 OA, among other claims. Dkt. 1; *see also* Dkt. 295. Discovery is closed. Docket call is set for February 26, 2021. Dkt. 414. The parties completed briefing on their motions for summary judgement on September 17, 2020. BMC now challenges the admissibility of certain expert opinions offered by Hartley pursuant to *Daubert v. Merell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## BACKGROUND[1]

BMC's claims in this lawsuit stem from IBM's improper conduct while accessing and using BMC software products to provide IT outsourcing services to the parties' mutual customer, AT&T. In January of 2016, IBM began work on a secret project at AT&T, code named "Project Swallowtail," to displace BMC products with predominately IBM products—a longtime objective of IBM. *See* Dkt. 416 at 12-15. The parties' Amended and Restated Outsourcing Attachment ("2015 OA") expressly prohibits IBM from displacing BMC products with IBM products at AT&T and 53 other large BMC customers when IBM elects under the 2015 OA to Access and Use the BMC customer's BMC licenses, for no additional charge, to provide IT outsourcing services to that customer. *See id.*, Part II.B. IBM's conduct at AT&T further violated other restrictions in the 2015 OA and IBM's confidentiality obligations under the parties' Master License Agreement ("MLA"). *See id.*, Parts II.A, C-E.

Starting on ███████████, shortly after work on Project Swallowtail began, IBM began soliciting BMC's confidential and competitively sensitive information from BMC's support

---

[1] The full factual background is described in BMC's response to IBM's motion for summary judgment on BMC's claims, Dkt. 416, BMC's motion for partial summary judgment on its claims for IBM's breach of contract, Dkt. 381, and BMC's motion for partial summary judgment on IBM's counterclaim, Dkt. 391, which BMC incorporates in this motion.

**Contains Attorneys' Eyes Only and Confidential Information**

analysts ███████████████████████████████ in violation of the 2015 OA and MLA.  *See id.* at 28-30.  Without knowing that IBM was requesting this information ███████████ ████████████████████████, BMC disclosed detailed technical information about internal product operation, processes, and technical analysis.  *See id.* at 28-29.

BMC hired Kendyl A. Román ("Román") as an expert to evaluate the technical work IBM undertook to displace BMC's products at AT&T, and IBM's use of BMC's trade secrets and confidential information during Project Swallowtail.  Román submitted his expert report on December 13, 2019, which described his opinions, including his conclusion that IBM misappropriated BMC's trade secrets, as defined under TUTSA, to perform Project Swallowtail in at least eleven instances.  *See id.*  IBM hired Hartley as a rebuttal expert to review and evaluate Román opinions.  Ex. A, Hartley Report ¶ 1.  IBM submitted Hartley's rebuttal report on February 11, 2020 ("Hartley Report").  Without considering the elements for trade secret protection under TUTSA or reviewing the Project Swallowtail materials in detail, Hartley opines that BMC did not disclose any trade secrets to IBM, and further that IBM did not misuse BMC's trade secrets.  As described below, Hartley's opinions are unreliable and inadmissible.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The district court must act as the evidentiary "gatekeeper" and admit scientific, technical, or other specialized opinion only if it is relevant and reliable, and only if it will assist

**Contains Attorneys' Eyes Only and Confidential Information**

the trier of fact. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 156 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

In making this determination, "the court must evaluate whether the reasoning and methodology underlying the testimony is valid and can be reliably applied to the facts of the case." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citing *Daubert*, 509 U.S. at 592-93). "This requires more than a glance at the expert's credentials; the court must also ensure that the expert has reliably applied the methods in question." *Id.* (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)). Moreover, "[t]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *See Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)).

The "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The court should make certain that expert testimony is "more than subjective belief or unsupported speculation" and that all inferences are "derived by the scientific method." *Daubert*, 509 U.S. at 590. The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is legally reliable, and therefore admissible. *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850-51 (5th Cir. 2015).

Here, IBM cannot meet their burden of proving that Hartley's testimony is reliable, nor that it will assist the assist the trier of fact. *See Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007) ("[T]he expert's testimony must be reliable at each and every step or else it is inadmissible.").

**Contains Attorneys' Eyes Only and Confidential Information**

<u>**ARGUMENT**</u>

I.      <u>**Hartley's Opinion that Román's Report Does Not Identify a Single Trade Secret that**</u>
        <u>**BMC Disclosed to IBM is Unreliable and Inadmissible.**</u>

      A.      **Hartley Lacks the Qualifications to Opine on Whether Information Qualifies**
        **as a Trade Secret.**

Hartley opines that "Román's report and the materials he cites do not identify a single trade

secret that [BMC] divulged to IBM."  Ex. A, Hartley Report ¶ 12.  As a preliminary matter, Hartley

lacks the qualifications to opine on whether information meets the legal elements for trade secret

protection and has never been retained to offer any opinion "evaluating whether certain

information qualifies as a trade secret."  Ex. B, Hartley Dep. (Nov. 25, 2017) at 31:4-15; *see Kozak*

*v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 917–18 (S.D. Tex. 2007) ("Whether a witness is qualified

as an expert can only be determined by comparing the area in which the witness has superior

knowledge, skill, experience, or education with the subject matter of the witness's testimony.").

Rather, Hartley's experience is in software engineering and cybersecurity, not the identification of

trade secrets.  *See* Ex. B, Hartley Dep. (Nov. 25, 2017) at 19:1-7.  In the previous trade secret cases

in which Hartley was hired, the party identified the trade secrets for Hartley and he merely relied

on their representations.  *See id.* at 31:4-15 ("Again, I've been told these are our trade secrets").

Hartley further concedes that he is not an expert on the legal elements that must be established for

information to qualify as a protectable trade secret, *id.* at 19:8-18, and that he was unaware of

which trade secret law applies to this case.  Ex. C, Hartley Dep. at 123:16-24.

Accordingly, Hartley lacks the qualifications and experience necessary to opine on whether

the asserted trade secrets qualify for protection under TUTSA.  *See Taylor Pipeline Constr., Inc.*

*v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696, 706 (E.D. Tex. 2006) (expert in "the quality

or methods of construction … is not qualified to render an opinion regarding the obligations of

**Contains Attorneys' Eyes Only and Confidential Information**

parties to construction contracts or other areas of construction law because he does not have experience, training, or education in this discrete area of the industry"); *Houston-Hines v. Houston Indep. Sch. Dist.*, 2006 WL 897209, at *3 (S.D. Tex. Apr. 4, 2006) (expert in routine law enforcement activities unqualified to serve as an expert in case involving law enforcement in a school setting).

### B.  Hartley's Opinions Based on his Lay Understanding of What Qualifies as a Trade Secret are Unreliable and Irrelevant.

Hartley's opinion that BMC did not divulge trade secrets to IBM is inadmissible because it roots from an inaccurate understanding of what constitutes a legally protectable trade secret under TUTSA.  *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 341 (5th Cir. 1999) (affirming exclusion of expert who failed to assess whether product met ANSI standards in accordance with applicable legal standards); *Martinez v. Porta*, 601 F. Supp. 2d 865, 866-67 (N.D. Tex. 2009) (expert opinion based on erroneous legal premise was irrelevant, and legal conclusions "usurp the province of [the] Court"); *Skycam, Inc. v. Bennett*, 2011 WL 2551188, at *6 (N.D. Okla. June 27, 2011) (excluding expert testimony consisting of *ipse dixit* opinions or that information was "trade secret" or "confidential or proprietary information"); *Bich-Chau Thi Tran v. Comput. Tech. Sols. LP*, 2010 WL 11646559, at *3 (S.D. Tex. Oct. 29, 2010) (excluding expert who "fail[ed] to use or even acknowledge the[] governing [legal regulations], and instead establishes a methodology without any citation to legal authority").

TUTSA broadly defines "trade secret" as "*all forms and types of information*, including … scientific, technical, … or engineering information, and any … plan, compilation, code, programs, method, technique, process, [o]r procedure …."  Tex. Civ. Prac. & Rem. Code § 134A.002(6)

**Contains Attorneys' Eyes Only and Confidential Information**

(emphasis added).  Rather than apply TUTSA's definition of a trade secret, Hartley applied a far narrower standard based on his lay understanding of trade secrets:

> what I'm looking for is something to be nonpublic that would be something that is critical to describing or disclosing how something – how one of their software products works.  Not what it does, but how it works internally, how it actually performs its functions that makes it different than any other product.  So again, looking for that secret sauce that how does it get done.

Ex. C, Hartley Dep. at 124:18-125:6.  But this is not the standard for trade secret protection in TUTSA, which is not restricted to only trade secrets describing limited aspects of the internal operation of software.

Hartley admitted that his determination of whether the asserted information constituted a trade secret is not based on the definition of trade secret provided by the applicable legal authority:

> Q.   So you're making a lay conclusion as to what is and is not a trade secret?
> …
> A.   That's my conclusion.
> Q.   Again, not based on legal standards though, correct?
> A.   Again, I'm not an attorney.
> Q.   Is there a reason you didn't put any legal standards for what constitutes a trade secret in your report.
> A.   No specific reason.

Ex. C, Hartley Dep. at 146:2-13.  Hartley's testimony further confirmed that his understanding of what constitutes a trade secret is solely his subjective interpretation.  Ex. C, Hartley Dep. at 132:4-7 ("Q. And you didn't cite any of those statutes in your report, though, correct?  A. No. Again, this is my interpretation based on my experience.").

Yet, as described above, Hartley has no experience identifying trade secrets and possesses no expertise in the legal elements for trade secret protection.  Hartley's use of his own subjective interpretation of what constitutes a trade secret is a fundamental error in his analysis, and yielded flawed conclusions.  Hartley testified, for example, that he concluded no trade secrets were

**Contains Attorneys' Eyes Only and Confidential Information**

disclosed because he "saw no reference to, you know, an internal formula[,] I saw no process discussions, no design documentation, no patterns."  Ex. C, Hartley Dep. at 133:18-134:2.  But TUTSA does not limit protection to the categories of information that Hartley claims he did not see in the asserted trade secrets.  TUTSA instead protects "*all forms and types of information*, including … scientific, technical, … or engineering information …."  Tex. Civ. Prac. & Rem. Code § 134A.002(6) (emphasis added).

Even under Hartley's inaccurate characterization of what constitutes a trade secret, Hartley could not tie his opinion that the asserted information did not qualify for trade secret protection to an alleged failure to meet a particular requirement of his subjective standard.  *See* Ex. A, Hartley Report ¶ 8 ("It is my understanding that a trade secret is a formula, practice, process, design, instrument, pattern, commercial method, or compilation of information not generally known or reasonably ascertainable by others by which a business can obtain and economic advantage over competitors.").  When Hartley was asked whether under the characterization provided in his report BMC's asserted trade secrets were a "compilation of information," he testified that he did not understand what a compilation of information meant, Ex. C, Hartley Dep. at 135:2-18, before conceding that that the asserted trade secrets could be considered "a compilation of information." *Id.* at 135:19-138:8.

Then, after failing to identify a particular element that the asserted trade secrets did not satisfy, Hartley abandoned the characterization of trade secrets in his report and instead claimed that the asserted trade secrets were not "information that [BMC is] trying to protect as a trade secret" because "your technical support people would not know trade secrets," *id.* at 138:3-13, to ensure that "[your trade secrets are] not disclosed to the world-at-large." *Id.* at 139:7-141:21; *see also id.* at 144:15-25 (admitting that he is not aware of any legal authority or other source

**Contains Attorneys' Eyes Only and Confidential Information**

supporting his opinion that information within the possession of a company's technical support analysts cannot be a trade secret).  But then Hartley admitted that the asserted trade secrets were not in fact disclosed to the "world-at-large," and that he had not even read the confidentiality agreements with BMC's customers governing the limited disclosure of such information.  *Id.* at 141:22-143:7.  And in further contradiction of his opinions, Hartley later conceded that "[IBM] had access to potentially what they would consider confidential proprietary information," *id.* at 225:23-226:11, and that information is "not open to the public, ... so it could be confidential information, absolutely," *id.* at 226:22-227:8.

Accordingly, Hartley's opinion that BMC did not disclose any trade secrets to IBM is divorced from TUTSA's standards for trade secret protection.  Hartley's lay conclusion regarding whether the asserted trade secrets qualify as trade secrets in his own subjective opinion is irrelevant to the issues in this case.  *See Martinez*, 601 F. Supp. 2d at 866-67 (expert opinion based on erroneous legal premise was irrelevant, and legal conclusions "usurp the province of [the] Court").

## II.   Hartley's Opinion that IBM Did Not Commit Misappropriation is Speculative and Unreliable.

### A.   Hartley Admitted that He Did Not Evaluate IBM's Misuse of BMC's Trade Secrets.

Hartley opines in his report that "Román's assertions of misuse are also incorrect and unsupported." Ex. A, Hartley Report ¶ 12.  However, Hartley's testimony revealed that he did not actually perform any analysis of IBM's misuse of BMC's asserted trade secrets during Project Swallowtail, confirming that his opinions about IBM's misuse lack any factual underpinning.  *See Wooley v. Smith & Nephew Richards, Inc.*, 67 F. Supp. 2d 703, 709 (S.D. Tex. 1999) ("[b]ecause [the expert] provides no factual basis for his conclusions, his opinion is excluded as conclusory under the standards set forth by the Supreme Court in *Daubert*").

**Contains Attorneys' Eyes Only and Confidential Information**

Specifically, Hartley admitted that he did not "evaluate[] whether [the asserted trade secrets] have been misused by IBM." Ex. C, Hartley Dep. at 30:12-31:4. Hartley further conceded that he did not attempt to determine whether IBM's requests for the asserted trade secrets correlated with tasks performed on Project Swallowtail. *Id.* at 46:6-22. Instead, Hartley merely concluded, using his erroneous lay understanding, that none of the information BMC disclosed to IBM qualified for trade secret protection, "and so you can't misuse something that you never received." *Id.* at 30:12-31:4. In fact, Hartley conceded that he did not "have an opinion one way or another on whether or not the [asserted trade secrets were] correlated with Swallowtail." *Id.* at 46:6-22. Moreover, Hartley testified that "[he] didn't spend a lot of time analyzing Project Swallowtail," *id.* at 81:13-21, and did not extensively review the Project Swallowtail migration schedule describing the task IBM performed to displace BMC products, *id.* at 40:9-41:12. Because Hartley ignored the relevant documentation, he cannot credibly provide an opinion regarding IBM's misuse of BMC's trade secrets to complete Project Swallowtail.

Thus, Hartley admitted he did not perform any analysis that would permit him to opine that IBM did not commit misappropriation. As a result, Hartley's opinions about IBM's misuse of the asserted trade secrets represent no more than his unsupported speculation, which is inadmissible. *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) ("The reliability prong mandates that expert opinion 'be grounded in the methods and procedures of science and ... be more than unsupported speculation or subjective belief.'").

**B.  Hartley Cannot Opine on Trade Secret Misuse Because He Did Not Review the Contractual Restrictions Underlying IBM's Misappropriation.**

BMC's claims for trade secret misappropriation stem from IBM's use and disclosure of BMC's trade secrets to displace BMC's products in violation of the limited permissions under the

**Contains Attorneys' Eyes Only and Confidential Information**

2015 OA §§ 5.1, 5.4, and MLA § 8.  *See* Tex. Civ. Prac. & Rem. Code § 134A.001(3)(B)(ii)(b);

*His Co. v. Stover*, 202 F. Supp. 3d 685, 694 (S.D. Tex. 2016) (TUTSA's "six alternative paths to

liability" include "disclosure or use of a trade secret ... [where] the person's knowledge of the trade

secret was … *acquired under circumstances giving rise to a duty to maintain its secrecy or limit

its use*" (emphasis added)), *vacated as moot*, 2016 WL 6134939 (S.D. Tex. Sept. 8, 2016).  But

Hartley cannot reliably opine on whether IBM misused BMC's trade secrets beyond the

contractual provisions limiting their use because, by his own admission, he did not review and was

generally unaware of the provisions in the applicable agreements.  *See Leverette*, 183 F.3d at 341

(expert excluded for failing to apply correct standards).   Hartley lacks even a cursory

understanding of BMC's misappropriation contentions in this lawsuit—specifically, that IBM

committed misappropriation by unlawfully using BMC's information to displace BMC's products

in violation of the provisions in the 2015 OA and MLA.  *See* Ex. C, Hartley Dep. at 210:19-211:10

("I haven't dived into their contracts, so I really can't opine on [BMC's contentions].").[2]

Hartley's testimony confirms that he did not consider the contractual limitations contained

in the 2015 OA and the MLA governing the permitted uses of BMC's products, and related

confidential and trade secret information.  Hartley admitted that he did not study the "specific

provisions that BMC alleges were breached in this case" and "could offer no opinions even if [he]

did study them" because he lacks any contract experience.  Ex. C, Hartley Dep. at 18:22-19:3; *see

also id.* at 7:22-8:11 ("Q. Is it your understanding that BMC is asserting that IBM breached its

contracts with BMC?  A. I understand that, although, again, I'm not a contracts expert, but I do

---

[2] Hartley's testimony further establishes that he does not understand the acts of misappropriation defined by TUTSA.
Hartley testified that he was unaware that the use of a trade secret "beyond the scope permitted by an agreement" is
an act of misappropriation under TUTSA.  Ex. C, Hartley Dep. at 189:1-190:3.

**Contains Attorneys' Eyes Only and Confidential Information**

understand that, yes. … Q. Are you offering opinions regarding BMC's allegations regarding the breach of contract claims? A. No.").

Hartley further disclaimed any opinions regarding whether IBM used BMC's information beyond the limited permissions granted under the parties' contracts:

> Q.    Right, so you're unable to offer an opinion about whether or not information received from BMC was used beyond the permission granted to IBM in the BMC/IBM outsourcing agreement?
> A.    I mean, yes, I provided no opinion on that.

Ex. C, Hartley Dep. at 35:3-9.  By admitting that he did not consider whether IBM used BMC's information beyond the contractual limitations, Hartley effectively concedes that he is incapable of providing an opinion regarding IBM's misuse of BMC's trade secrets as asserted in this lawsuit.

Moreover, Hartley was not even aware that the parties' agreements restricted IBM's use of BMC's products, and prohibited IBM from displacing BMC's products with IBM products. *Id.* at 24:4-7 ("Q. So if there were restrictions in IBM's permission to use BMC's products, you wouldn't have studied those, correct? A. No.").  Instead, completely ignorant of IBM's contractual obligations, Hartley simply "made the assumption that [IBM was] authorized" to use BMC's products and information for the purposes that it did—including IBM's use to displace BMC's products, which Hartley does not dispute.  *Id.* at 72:22-73:13, 181:20-182:14 (Hartley conceding that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 229:25-232:23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But Hartley is not permitted to offer opinions based on his own assumptions that are antithetical to the core facts

**Contains Attorneys' Eyes Only and Confidential Information**

in this case and further ignore the asserted contractual provisions underlying BMC's misappropriation claim. *See, e.g., Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 806 (N.D. Tex. 2018) (expert's underlying assumptions "must have some factual basis in the record and an underlying rationale" to be considered reliable"); *El Aguila Food Prod., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 621-23 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005) (excluding expert testimony where agreements were available to expert but he failed to consider them); *Singletary v. Atrium Fin. II, LP D/B/A, Marriott Houston South-Hobby Airport*, 2017 WL 1400810, at *3 (S.D. Tex. Mar. 8, 2017) (excluding expert opinion based on two assumptions that amounted to unsupported speculation).

Consequently, Hartley cannot reliably opine regarding IBM's misappropriation because Hartley admittedly did not consider or analyze whether IBM misused the asserted trade secrets in violation of its contractual duties to "maintain [the asserted trade secret's] secrecy or limit its use" as BMC asserts in this lawsuit. Tex. Civ. Prac. & Rem. Code § 134A.001(3)(B)(ii)(b); *see Gruma*, 301 F. Supp. 2d at 621-23 (excluding expert testimony where expert did not review agreements); *see also Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 516–17 (5th Cir. 2013) (affirming exclusion of expert testimony where "the universe of facts assumed by the expert differs frequently and substantially from the undisputed record evidence"). Instead, Hartley merely made unsupported assumptions about IBM's use of BMC information that are directly contrary to the asserted contractual limitations.

## III. Hartley's Opinion About Ownership of Proprietary Information is Speculative and an Impermissible Legal Conclusion that He is Unqualified to Make.

Hartley opines that "IBM … obtained non-public information [about the operation of BMC products]," but that "the information IBM learned … was proprietary to AT&T, not [BMC]."

**Contains Attorneys' Eyes Only and Confidential Information**

Ex. A, Hartley Report ¶ 15; *see also id.* at ¶¶ 46, 48.  Hartley's opinion amounts to nothing more

than an unsupported legal conclusion regarding intellectual property ownership.  *See Raytheon Co.*

*v. Indigo Sys. Corp.*, 598 F. Supp. 2d 817, 821 (E.D. Tex. 2009) (holding that an expert cannot

"offer testimony to the effect that [a party] does not actually own the trade secrets it asserts");

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 WL 4065465, at *9 (S.D. Tex. Oct. 9, 2010)

(excluding expert "opinions regarding authorship, ownership, and derivative works … as improper

legal opinions"); *see also Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996) (noting that

the Fifth Circuit has "repeatedly held that … expert[s may not] render conclusions of law").

Hartley's opinion regarding the ownership of proprietary information is further

inadmissible because it is purely speculative.  Hartley identifies no methodology, experience, or

factual basis underlying his opinions about which company owns which proprietary information.

*See Wooley*, 67 F. Supp. 2d at 709 ("Because [the expert] provides no factual basis for his

conclusions, his opinion is excluded as conclusory under the standards set forth by the Supreme

Court in *Daubert*.").  Moreover, Hartley did not consider the parties' contractual terms or license

agreements that govern such ownership, *see* Ex. C, Hartley Dep. at 18:22-19:3; 104:21-6; 112:15-

17, and did not form his opinions based on any contractual provisions:

> Q.    So when you're making statements that AT&T owns proprietary
> information, that's not based on any review or understanding of the
> contracts in this case, is it?
> A.    That's not a contractual opinion, no.

Ex. C, Hartley Dep. at 105:7-13; *see also Gruma*, 301 F. Supp. 2d at 621-623 (excluding expert

testimony where expert did not review agreements).  As a result, Hartley's opinions about the

ownership of proprietary information should be excluded because they are inadmissible legal

conclusions and, further, unsupported speculation.


**Contains Attorneys' Eyes Only and Confidential Information**

-15-

IV.     **Hartley's Opinions About Allegedly "Standard" Functions of an IT Outsourcer are
        Unsupported and Irrelevant.**

Hartley's opinion that "IBM's actions were entirely standard for any IT outsourcer or in-house IT department performing a live system migration," is unsupported and irrelevant.  Ex. A, Hartley Report ¶ 14; *see also id.* ("I have not identified any steps that IBM took in connection with carrying out AT&T's project that are not entirely standard for a project of this kind or that would not likely be under by any competent contractor hired by AT&T for the same project.").  BMC asserts that IBM violated its contractual obligations under the 2015 OA and the MLA, and, further, that IBM misappropriated BMC's confidential information and trade secrets by using such information in violation of IBM's obligations to maintain secrecy and limit use.  Hartley's bare assertion that IBM's actions were allegedly "standard" says nothing about whether IBM's conduct during Project Swallowtail violated the specific provisions in its agreements with BMC—agreements which Hartley admittedly did not even review.  Ex. C, Hartley Dep. at 18:22-19:3; *See Knight*, 482 F.3d at 352 ("Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'"); *Hutton Contracting Co. v. City of Coffeyville,* 2004 WL 2203449, at *12 (D. Kan. Sept. 24, 2004) (expert's "opinion concerning the industry custom of granting extensions ignores the clear Contract provisions, and as such, is irrelevant").

Hartley admitted that his opinion regarding whether IBM's actions were allegedly "standard" did not consider whether IBM's actions were contractually permitted:

> Q.     Back to paragraph 14, your statement here that IBM's actions were entirely standard. You're not offering the opinion that IBM's actions were being a permissible use of BMC's products under the IBM/BMC outsourcing agreement, correct?
>
> A.     Correct.  No opinion on contracts. They are standard from, this is what IT outsourcers do in the industry.

**Contains Attorneys' Eyes Only and Confidential Information**

Ex. C, Hartley Dep. at 68:10-19.  And, as noted above, Hartley was not even aware of the particular restrictions in the 2015 OA at issue in this case, and instead assumed that IBM was permitted to use BMC's products and information in whatever manner IBM did at AT&T.  *See* Ex. C, Hartley Dep. at 23:13-24:7.

Moreover, Hartley's opinions are unsupported and lack a reliable connection to the facts of this case.  Hartley cites no source or publication regarding alleged "industry standards" for IT outsourcing or performing displacement projects such as Project Swallowtail.  *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013) (excluding expert testimony as no "more than subjective belief or unsupported speculation" where it was based on expert's conclusory assertions that he applied "reliable business principles"); *Grdinich v. Bradlees*, 187 F.R.D. 77, 82 (S.D.N.Y. 1999) (excluding expert opinion as "subjective belief or unsupported speculation" where expert opined that conduct did not meet "industry standards," but failed to cite any such standards); *State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*, 2019 WL 1436659, at *5 (N.D. Tex. Mar. 31, 2019) (Where an expert witness is relying solely or primarily on experience, then he "must explain how that experience leads to the conclusion reached, why that experience is sufficient basis for the opinion, and how that experience is reliably applied to the facts." (citing Fed. R. Evid. 702 advisory committee's notes)).

Nor does Hartley explain what he means by "standard" conduct or identify any methodology or guidelines he applied to arrive at his subjective determination that IBM's actions during Project Swallowtail were allegedly standard.  Despite his conclusory claim that IBM's actions were "standard," Hartley's testimony revealed that he did not scrutinize IBM's actions in performing Project Swallowtail, rendering his opinions about IBM's conduct entirely unsupported. As described above, Hartley testified that "[he] didn't spend a lot of time analyzing Project

**Contains Attorneys' Eyes Only and Confidential Information**

Swallowtail," *id.* at 81:13-21, and did not "extensively" review the Project Swallowtail migration

schedule describing the tasks IBM performed to displace BMC products, *id.* at 40:9-41:12.  In fact,

Hartley could not even recall specific Project Swallowtail documents that he reviewed to form his

opinions.  *Id.* at 41:13-42:3.

Accordingly, Hartley's conclusory opinions that IBM's conduct was "entirely standard,"

is irrelevant, unsupported, and lacks a reliable connection to the facts in this case.

## CONCLUSION

For the foregoing reasons, the opinions of IBM's expert Bruce V. Hartley do not meet the

requirements of Fed. R. Evid. 702, and BMC requests that this Court exclude them.

Date: October 15, 2020                          Respectfully submitted,

Of Counsel,                                       /s/ *Sean Gorman*
**Bracewell LLP**                                Sean Gorman
Christopher L. Dodson                            Texas State Bar No. 08218100
Texas State Bar No. 24050519                     S.D. Bar No. 10168
S.D. Bar No. 613937                              711 Louisiana Street, Suite 2300
Timothy R. Geiger                                Houston, Texas 77002-2781
Texas State Bar No. 24078552                     (713) 221-1221 Telephone
S.D. Bar No. 1742526                             (800) 404-3970 Facsimile
711 Louisiana Street,  Suite 2300                sean.gorman@bracewell.com
Houston, Texas 77002-2781
(713) 223-2300 Telephone                         **Attorney-In-Charge for**
(800) 404-3970 Facsimile                         **BMC Software, Inc.**
chris.dodson@bracewell.com
tim.geiger@bracewell.com

**Contains Attorneys' Eyes Only and Confidential Information**

## CERTIFICATE OF SERVICE

I certify that a copy of BMC's Motion to Exclude the Expert Opinions of Bruce V. Hartley has been sent in the manner indicated below to the following counsel of record on October 15, 2020.

R. Paul Yetter                     By email: pyetter@yettercoleman.com
Grant Martinez                   By email: gmartinez@yettercoleman.com
Yetter Coleman, LLP
811 Main Street, Suite 4100
Houston, Texas 77002

Richard I. Werder, Jr.         By email: rickwerder@quinnemanuel.com
Andrew M. Berdon         By email: andrewberdon@quinnemanuel.com
Rachel E. Epstein          By email: rachelepstein@quinnemanuel.com
Donald J. Reinhard, II     By email: donaldreinhard@quinnemanuel.com
John H. Chun               By email: johnchun@quinnemanuel.com
Marlo A. Pecora           By email: marlopecora@quinnemanuel.com
Kimberly Eden Carson    By email: kimberlycarson@quinnemanuel.com
Quinn Emanuel Urquhart
  & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010

/s/ *Kyle A. Mason*
Kyle A. Mason

**Contains Attorneys' Eyes Only and Confidential Information**