# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| Plaintiff, | § | Case No. 4:17-cv-2254 |
| vs. | § | |
| | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINES CORPORATION, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## IBM'S OPPOSITION TO BMC'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF BRUCE V. HARTLEY

Richard I. Werder, Jr. (admitted pro hac vice)
Andrew M. Berdon (admitted pro hac vice)
Rachel E. Epstein (admitted pro hac vice)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
rickwerder@quinnemanuel.com
andrewberdon@quinnemanuel.com
rachelepstein@quinnemanuel.com

R. Paul Yetter
Texas State Bar No. 22154200
YETTER COLEMAN, LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000 Telephone
(713) 632-8002 Facsimile
pyetter@yettercoleman.com

**Attorneys for International Business Machines Corporation**

**CONTAINS ATTORNEYS' EYES ONLY INFORMATION**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

LEGAL STANDARD.................................................................................................5

ARGUMENT ..............................................................................................................7

I.       DR. HARTLEY'S OPINION THAT BMC DID NOT DISCLOSE TRADE
         SECRETS TO IBM IS ADMISSIBLE ...........................................................7

         A.       Dr. Hartley Is Entitled To Rely On His Experience In Opining That BMC
                  Did Not Disclose Any Trade Secret Information To IBM ....................7

         B.       Dr. Hartley's Opinions Are Both Reliable And Relevant .....................12

         C.       Dr. Hartley's Opinions Will Aid The Court In Determining Whether The
                  Support Cases Constitute Protectable Trade Secrets .............................13

II.      DR. HARTLEY'S OPINION ON MISUSE IS RELIABLE AND ADMISSIBLE .........14

III.     DR. HARTLEY'S OPINION ON AT&T PROPRIETARY INFORMATION IS
         PERMISSIBLE EXPERT OPINION .............................................................17

IV.      DR. HARTLEY'S OPINION THAT IBM'S ACTIONS WERE CONSISTENT
         WITH INDUSTRY STANDARD IS ADMISSIBLE........................................20

CONCLUSION..........................................................................................................24

CONTAINS ATTORNEYS' EYES ONLY INFORMATION

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Accresa Health LLC v. Hint Health Inc.*,
2020 WL 6325731 (E.D. Tex. Feb. 26, 2020) ................................................... 10, 11

*Adacel, Inc. v. Adsync Techs., Inc.*,
2020 WL 4588415 (M.D. Fla. July 9, 2020) ................................................ 9

*Agency Solutions.com, LLC v. TriZetto Grp., Inc.*,
819 F. Supp. 2d 1001 (E.D. Cal. 2011) ................................................ 13

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*,
2009 WL 8592874 (N.D. Ohio Aug. 12, 2009) ........................................ 14

*Amguard Ins. Co. v. Lone Star Legal Aid*,
2020 WL 60247 (S.D. Tex. Jan. 6, 2020) ................................................ 6

*Ariwodo v. U.S. Customs & Immigration Enf't*,
2007 WL 580845 (S.D. Tex. Feb. 20, 2007) ........................................... 6

*Beardmore v. Jacobson*,
131 F. Supp. 3d 656 (S.D. Tex. 2015) .................................................... 14

*Bich-Chau Thi Tran v. Comput. Tech. Sols.*,
2010 WL 11646559 (S.D. Tex. Oct. 29, 2010) ........................................ 9

*Bimbo Bakeries USA v. Sycamore*,
2017 WL 1377991 (D. Utah Mar. 2, 2017) .............................................. 8

*Black v. Toys R US-Del., Inc.*,
2010 WL 4702344 (S.D. Tex. Nov. 10, 2010) ................................... 21, 22

*Browning v. Sw. Research Inst.*,
2006 WL 6549921 (W.D. Tex. Aug. 17, 2006) ........................................ 6

*Core Labs. LP v. Spectrum Tracer Servs., L.L.C.*,
2016 WL 4467443 (W.D. Okla. Mar. 7, 2016) ........................................ 9

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ............................................................................ 6

*DeRubeis v. Witten Techs., Inc.*,
244 F.R.D. 676 (N.D. Ga. 2007) ......................................................... 13

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
301 F. Supp. 2d 612 (S.D. Tex. Dec. 23, 2003) ..................................... 17

*Election Sys. & Software, LLC v. RBM Consulting, LLC*,
　2015 WL 13484484 (D. Neb. Feb. 4, 2015) ........................................................ 14

*Fisher v. Halliburton*,
　2009 WL 5216949 (S.D. Tex. Dec. 21, 2009) ................................................. 16, 23

*Gibbs v. Gibbs*,
　210 F.3d 491 (5th 2000) ........................................................................................ 7

*Grdinich v. Bradlees*,
　187 F.R.D. 77 (S.D.N.Y. 1999) .......................................................................... 21

*Hutton Contracting Co. v. City of Coffeyville*,
　2004 WL 2203449 (D. Kan. Sept. 24, 2004) ...................................................... 23

*IDX Sys. Corp. v. Epic Sys. Corp.*,
　285 F.3d 581 (7th Cir. 2002) .............................................................................. 13

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*,
　2010 WL 4065465 (S.D. Tex. Oct. 9, 2010) ...................................................... 17

*Iofina, Inc. v. Igor Khalev*,
　2016 WL 6246730 (W.D. Okla. Oct. 25, 2016) ............................................. 13, 14

*KCG Holdings, Inc. v. Khandekar*,
　No. 17-cv-3533 (S.D.N.Y.) ................................................................................... 4

*Knight v. Kirby Inland Marine Inc.*,
　482 F.3d 347 (5th Cir. 2007) .............................................................................. 23

*Kumho Tire Co. v. Carmichael*,
　526 U.S. 137 (1999) ............................................................................... 6, 19, 21

*Leverette v. Louisville Ladder Co.*,
　183 F.3d 339 (5th Cir. 1999) ................................................................................ 9

*Martinez v. Porta*,
　601 F. Supp. 2d 865 (N.D. Tex. 2009) .................................................................. 9

*Nations AG II, LLC v. The Hide Co.*,
　2004 WL 1496312 (N.D. Tex. June 30, 2004) .................................................... 15

*Orthoflex, Inc. v. ThermoTek, Inc.*,
　986 F. Supp. 2d 776 (N.D. Tex. 2013) ................................................................ 21

*Perez v. City of Austin*,
　2008 WL 1990670 (W.D. Tex. May 5, 2008) ...................................................... 21

**CONTAINS ATTORNEYS' EYES ONLY INFORMATION**　　　　　　　　iii

*Phazr, Inc. v. Ramakrishna*,
   2019 WL 5578578 (N.D. Tex. Oct. 28, 2019) ....................................................... 15

*Pipitone v. Biomatrix, Inc.*,
   288 F.3d 239 (5th Cir. 2002) ............................................................................... 19

*Pittman v. U.S. Bank NA*,
   451 F. Supp. 3d 686 (E.D. Tex. 2020) ................................................................... 6

*Polyzen, Inc. v. Radiadyne, LLC*,
   2016 WL 5360576 (E.D.N.C. Sept. 23, 2016) ....................................................... 18

*Quintel Tech. Ltd. v. Huawei Techs. USA, Inc.*,
   2018 WL 626355 (E.D. Tex. Jan. 30, 2018) ........................................................... 9

*Raytheon Co. v. Indigo Systems Corp.*,
   598 F. Supp. 2d 817 (E.D. Tex. Feb. 18, 2009) ............................................... 17, 18

*Silvaco Data Sys. v. Intel Corp.*,
   184 Cal. App. 4th 210 (2010) .............................................................................. 14

*Silverman v. Watson Pharm., Inc.*,
   2013 WL 1455754 (S.D. Tex. Apr. 9, 2013) ........................................................... 6

*Skycam, Inc. v. Bennett*,
   2011 WL 2551188 (N.D. Okla. June 27, 2011) ....................................................... 9

*SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*,
   2005 WL 1923811 (D. Minn. Aug. 11, 2005) ....................................................... 18

*Snap-Drape, Inc. v. Comm'r*,
   98 F.3d 194 (5th Cir. 1996) ................................................................................. 17

*Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp.*,
   2020 WL 5822064 (S.D.N.Y. Sept. 30, 2020) ....................................................... 14

*U.S. Gypsum Co. v. LaFarge N. Am. Inc.*,
   670 F. Supp. 2d 768 (N.D. Ill. 2009) .................................................................... 11

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*,
   2011 WL 13134280 (S.D. Tex. July 13, 2011) ........................................................ 6

*United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*,
   80 F.3d 1074 (5th Cir. 1996) ................................................................................ 6

*United States v. Hicks*,
   389 F.3d 514 (5th Cir. 2004) ................................................................................ 6

*Vanderbilt Mortg. & Fin., Inc. v. Flores*,
    2010 WL 4595592 (S.D. Tex. Nov. 1, 2010) ......................................................... 23

*Viterbo v. Dow Chem. Co.*,
    826 F.2d 420 (5th Cir. 1987) ............................................................................. 6

*Warehouse Sols. v. Integrated Logistics, LCC, Inc.*,
    610 F. App'x 881 (11th Cir. 2015) .................................................................... 13

*Waymo LLC v. Uber Techs., Inc.*,
    No. 3:17-cv-00939-WHA (N.D. Cal.) ................................................................ 4

*Wealthmark Advisors v. Phoenix Life Ins. Co.*,
    2017 WL 1133506 (W.D. Tex. Mar. 24, 2017) ............................................. 22, 24

## <u>Rules</u>

Fed. R. Evid. 702 ........................................................................................................ 5

Fed. R. Evid. 702 advisory committee's note (2000) ............................................. 5, 6

International Business Machines Corporation ("IBM") submits this opposition to BMC Software, Inc.'s ("BMC") Motion to Exclude the Expert Opinions of Bruce V. Hartley (the "Motion" or "Mot.").

## PRELIMINARY STATEMENT

BMC moves to exclude certain opinions of IBM's rebuttal expert, Dr. Bruce Hartley, on grounds that are incompatible with the law and wholly unsupported by fact. BMC's arguments, at base, take issue with Dr. Hartley relying on his experience when rendering his opinions (as opposed to trade secret law or the contracts in this case) and assert that his opinions should be excluded on those grounds. BMC's position finds no support from the courts or the Federal Rules, and BMC's Motion should be denied.

*First*, BMC argues (Mot. 6) that this Court should exclude Dr. Hartley's opinion that the support cases disclosed no trade secret information because Dr. Hartley "is not an expert on the legal elements that must be established for information to qualify as a protectable trade secret" under the Texas Uniform Trade Secrets Act ("TUTSA"). But the law does not require Dr. Hartley to be an expert in TUTSA—or trade secret law—to render his opinions. Dr. Hartley bases his opinions on his considerable *experience* in the computer software and IT industry and as a testifying expert in cases alleging misuse of trade secrets, and both the Federal Rules and the case law are clear that an expert is entitled to rely on their experience when offering these types of opinions. Indeed, courts have recently rejected the *very argument* BMC advances. In any event, the legal elements BMC's purported trade secret expert (Kendyl A. Román) cited in his report as determinative of whether information should be considered a trade secret—*e.g.* if reasonable measures have been taken to keep the information secret and whether the information is readily available—are the *same standards* Dr. Hartley considered and analyzed in rendering his opinions.

CONTAINS ATTORNEYS' EYES ONLY INFORMATION

*Second*, BMC claims that Dr. Hartley's opinions regarding the (lack) of misuse of BMC's information are speculative because they are not tied to the facts, and unreliable because they do not reflect an analysis of the contracts at issue in this litigation. BMC is wrong. Dr. Hartley's misuse opinions are anything but speculative—they are based on his thorough and detailed analysis of the support cases, which revealed that BMC disclosed no trade secret information, such that there could be no misuse. BMC's claims of speculation are especially rich in light of the fact that BMC's trade secrets "expert" Román's opinions on misuse are entirely conclusory and devoid of any analysis, as set forth in IBM's *Daubert* Motion. Dkt. 488 (IBM's Motion to Exclude Testimony of Kendyl Román ("Román *Daubert*")) at 22. BMC's reliability argument also fails. In essence, BMC is attempting to fault Dr. Hartley for not offering an impermissible legal opinion. This is unsurprising, as Román offered an impermissible legal opinion on this very topic. *Id.* at 19-21. Rather than offer an opinion that would usurp the authority of this Court, Dr. Hartley permissibly renders his misuse opinions based on his analysis of the support cases.

*Third*, BMC argues that Dr. Hartley cannot opine on whether certain information conveyed in the support cases is information proprietary to AT&T or BMC. But courts have considered expert testimony on this very topic. Moreover, contrary to BMC's assertions, Dr. Hartley grounds these opinions on his extensive experience (including working as and with outsourcers) and the facts of this case, including information disclosed in the support cases and witness testimony.

*Finally*, BMC ignores the opinions offered by its own expert, Román, when arguing that Dr. Hartley cannot opine on whether IBM's actions were consistent with industry standards. BMC claims that Dr. Hartley's opinions on this topic are irrelevant, but those opinions *directly refute* those put forward by Román. BMC cannot reasonably contest the relevance of an opinion on a topic it put at issue. BMC also argues that Dr. Hartley's opinion is unreliable, but, as detailed

below, Dr. Hartley has extensive experience working as and with outsourcers, and relies on that experience when rendering his opinions.

BMC's Motion should be denied.

## BACKGROUND[1]

On December 13, 2019, BMC served the expert report of Kendyl A. Román, BMC's purported trade secrets expert. *See* Ex. 1 (Expert Report of Kendyl A. Román ("Román Report")). In Román's Report, he identifies eleven technical support cases, essentially help desk trouble tickets, that he concludes—in a single sentence and without substantive explanation or methodological support—constitute BMC trade secrets that were purportedly misused by IBM. Román is BMC's second trade secrets expert. The first, Geoffrey Decker, was found to be less "credible" than Dr. Hartley on the question of whether the "technical support [cases] are trade secrets," resulting in Magistrate Judge Johnson finding, at the preliminary injunction phase, that the Court "cannot agree" that "technical support [cases] are trade secrets that must be protected by an injunction." Dkt. 219 (Memorandum and Recommendation) at 30. Judge Johnson's Memorandum and Recommendation was adopted in September 2018, with the Court specifically noting that "protected trade secrets, such as source code, would not be provided to low-level help desk personnel and would not be freely given to IBM employees calling the BMC help desk for IT support." Dkt. 270 (Memorandum Opinion and Order) at 9-10. Importantly, although Román is BMC's second expert, ten of the eleven support cases on which he opines are the *same cases* Decker cited at the preliminary injunction hearing.

---

[1]   A more complete factual background is set forth in IBM's Motion for Summary Judgment on BMC's Claims (Dkt. 396).

On February 11, 2020, IBM served the Rebuttal Expert Report of Dr. Bruce Hartley (Mot., Ex. A[2] ("Report")), who served as IBM's trade secrets expert during the preliminary injunction proceeding.  Dr. Hartley rebuts each of Román's opinions, including those related to these eleven support cases.

A fulsome discussion of Dr. Hartley's extensive experience in software development, digital forensics, security engineering, and other related fields is set forth in his Report and Exhibit A thereto.  Dr. Hartley is a Managing Director at Arete Advisors, where he leads the Advisory Practice (which includes Digital Forensics and Investigations).  He holds a doctorate in Computer Science from Colorado Technical University and has over 35 years of experience in the computer software industry, including both serving as, and working with, IT outsourcers.  Report ¶¶ 4, 6, Ex. A; Mot., Ex. C (Hartley Dep. Tr.) at 8:19-9:7 ("I have been both an outsourcer, and I have hired outsourcers."); *see also id.* at 10:7-16, 11:17-14:3, 56:17-58:3, 59:14-60:7, 82:9-83:16, 89:11-90:9, 228:24-229:8.  Dr. Hartley has authored dozens of articles, including on the topics of information security and computer forensics, and has extensive experience as a testifying expert in cases regarding the identification of, and misuse of, trade secrets.  Report ¶¶ 5, 7, Ex. A; Dkt. 133 (Dec. 1, 2017 P.M. Session PI Hr'g Tr.) at 10:6-21.

Dr. Hartley has recently served as an expert in matters concerning "the unauthorized access and use of confidential, proprietary and trade secret information;" "the application of security controls to protect confidential, and trade secret information;" "software intellectual property theft;" and "software development process issues."  Report ¶ 7, Ex. A; *see also KCG Holdings, Inc. v. Khandekar*, No. 17-cv-3533 (S.D.N.Y.); *Waymo LLC v. Uber Techs., Inc.*, No. 3:17-cv-00939-WHA (N.D. Cal.).  Indeed, during the preliminary injunction phase of this case, IBM

---

[2]  Citations to "Mot., Ex. __" refer to exhibits included in BMC's moving papers (Dkt. 476).

tendered Dr. Hartley as an expert "in trade secret protection with a particular emphasis on computer software" *without objection* from BMC.   Dkt. 133 (Dec. 1, 2017 P.M. Session PI Hr'g Tr.) at 10:22-11:1.

Dr. Hartley applies his extensive experience to the support cases highlighted by Román and explains (among other things) that the information in each is publicly available, concerns readily apparent information (such as the software's standard features and functions and configuration settings in the mainframe environment), or otherwise consists of information not generally protected as trade secret material in the computer software industry.  *See* Report ¶¶ 76, 81, 85, 89, 92, 95-96, 98, 102, 125-29, 135-36, 138.  In a section titled "Summary of Opinions," Dr. Hartley summarizes his nine opinions.  *See id.* ¶¶ 12-20.  BMC does not challenge five of these opinions and moves to exclude the following four: (1) BMC did not divulge its trade secrets to IBM; (2) IBM did not misuse BMC's trade secrets; (3) certain of the information BMC claims trade secret protection over was proprietary to AT&T, not BMC; and (4) IBM's actions on Project Swallowtail were entirely consistent with industry standards.  For the reasons set forth below, BMC's Motion should be denied.

## LEGAL STANDARD

Federal Rule of Evidence 702 authorizes a party to submit opinion testimony from "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *see also* Fed. R. Evid. 702 advisory committee's note (2000) ("the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").  "Whether an expert is qualified depends on if the witness has 'such knowledge or experience in [his] field or calling as to make it appear this his opinion or inference will probably aid the trier of

fact in his search for truth.'" *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 2011 WL 13134280, at

*2 (S.D. Tex. July 13, 2011) (quoting *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004)).

"Under *Daubert*, a trial court acts as gatekeeper, making a preliminary assessment of

whether the reasoning or methodology properly can be applied to the facts in issue." *Silverman v.

Watson Pharm., Inc.*, 2013 WL 1455754, at *1 (S.D. Tex. Apr. 9, 2013) (Miller, J.) (citation

omitted). The standard to evaluate non-scientific expert testimony is whether the expert bases

testimony upon professional studies or personal experience and "employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In the case of nonscientific experts,

"indicia of reliability [] considered under *Daubert*[] includ[e] professional experience, education,

training, and observations." *Ariwodo v. U.S. Customs & Immigration Enf't*, 2007 WL 580845, at

*4 (S.D. Tex. Feb. 20, 2007) (Miller, J.). "As a general rule, questions relating to the bases and

sources of an expert's opinion affect the weight to be assigned that opinion rather than its

admissibility." *Amguard Ins. Co. v. Lone Star Legal Aid*, 2020 WL 60247, at *7 (S.D. Tex. Jan.

6, 2020) (Miller, J.) (citation omitted). Expert testimony is "presumptively admissible unless

excludable on some other ground." *United States v. 14.38 Acres of Land, More or Less Situated

in Leflore Cty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996) (citing *Daubert v. Merrell Dow Pharms.,

Inc.*, 509 U.S. 579, 597 (1993)). "[T]he rejection of expert testimony is the exception rather than

the rule." *Pittman v. U.S. Bank NA*, 451 F. Supp. 3d 686, 688 (E.D. Tex. 2020) (citing Fed. R.

Evid. 702 advisory committee's note (2000)). "Experts should be excluded only if their testimony

is so fundamentally unsupported that it cannot possibly help the factfinder." *Browning v. Sw.

Research Inst.*, 2006 WL 6549921 at *2 (W.D. Tex. Aug. 17, 2006) (citing *Viterbo v. Dow Chem.

Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). Where "a district judge sits as the trier of fact in place of

a jury," as here, "most of the safeguards provided for in *Daubert* are not as essential." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000).

<u>**ARGUMENT**</u>

## I.   DR. HARTLEY'S OPINION THAT BMC DID NOT DISCLOSE TRADE SECRETS TO IBM IS ADMISSIBLE

Dr. Hartley's opinion that BMC did not disclose trade secrets to IBM is admissible, first, because Dr. Hartley has the experience necessary to provide these opinions; second, because his opinions are both reliable and relevant; and finally (and relatedly), because his analysis will assist the Court in determining whether the support cases constitute protectable trade secrets.

### A.   Dr. Hartley Is Entitled To Rely On His Experience In Opining That BMC Did Not Disclose Any Trade Secret Information To IBM

BMC contends (Mot. 6-7) that Dr. Hartley is unqualified to opine on whether BMC disclosed trade secret information to IBM because he did not apply TUTSA by name when analyzing the support cases and reaching his opinions. BMC's argument is rooted in a fundamental misconception of Dr. Hartley's opinions, and the qualifications needed to testify as an expert in a trade secrets case.

BMC improperly characterizes (Mot. 6-7) Dr. Hartley as opining on "whether the asserted trade secrets qualify for protection under TUTSA" and "what constitutes a legally protectable trade secret under TUTSA." But Dr. Hartley never claimed to offer an opinion as to whether the support cases constitute trade secrets under TUTSA. Indeed, Dr. Hartley testified:

> Q. Are you making a legal conclusion that information here is not a trade secret, or are you basing that on your experience?
> A. ***Based on my experience and understanding.  I am not an attorney.  I don't make legal conclusions.***

Mot., Ex. C (Hartley Dep. Tr.) at 122:14-19, 145:2-25 (emphasis added).

Rather, Dr. Hartley reviewed the voluminous record, including all of the documents Román cited, the pleadings, deposition transcripts, declarations, produced documents, and pertinent information in the public domain, and applied his decades of experience in the computer software industry,[3] to reach opinions that, for example, "[n]one of the[] technical support cases discloses any trade secret information"; "BMC did not disclose any trade secret information by sending program temporary fixes"; and "BMC did not adequately protect its purported trade secrets ... many of the purported trade secrets were publicly disclosed by BMC."  Report ¶¶ 15-17, 19.

Dr. Hartley's reliance on the factual record and his experience to render these opinions is entirely appropriate.  An expert "does not need to be a legal expert in trade secret law to testify about a trade secret matter."  *Bimbo Bakeries USA v. Sycamore*, 2017 WL 1377991, at *13 (D. Utah Mar. 2, 2017) ("[Plaintiff] largely argues that Dr. Hoseney is not knowledgeable in trade secret law … these arguments are not persuasive.  Dr. Hoseney does not need to be a legal expert in trade secret law to testify about a trade secret matter.").  Indeed, courts have considered the argument that an expert must be an expert in trade secret law in order to render trade secret opinions rooted in the expert's experience—the *precise argument* BMC advances—and rejected it:

> Defendant argues that Mr. Brochu is not an expert in trade secret law or the legal definition of a trade secret.  This Court agrees, but Defendant's argument *misconstrues the crux of Mr. Brochu's opinions*.  Mr. Brochu has offered opinions based on his experience and knowledge in the industry on the steps taken by Plaintiffs to protect their proprietary information, *which he is qualified to render to rebut the assumptions underlying Dr. Hart's opinions*.  Furthermore, Mr. Brochu's opinions are *sufficiently reliable* as they are based on his firsthand knowledge regarding standard techniques used to protect proprietary information within visual databases by Plaintiffs and other businesses in the industry.  Defendant's arguments are better addressed by rigorous cross-examination than total exclusion.  Accordingly, Mr. Brochu will be *permitted to offer his testimony and opinions* regarding the steps taken by Plaintiffs to protect their proprietary information, his knowledge of such

---

[3]  *See, e.g.*, Report ¶¶ 11, 46-47, Ex. B.

steps taken by others in the industry, and best practices in the maintenance, use, and exchange of proprietary information within the industry.

*Adacel, Inc. v. Adsync Techs., Inc.*, 2020 WL 4588415, at *5 (M.D. Fla. July 9, 2020) (emphasis added).[4]   An expert need only have experience with *the type of information* over which trade secret protection has been asserted.   *See Quintel Tech. Ltd. v. Huawei Techs. USA, Inc.*, 2018 WL 626355, at *4 (E.D. Tex. Jan. 30, 2018) (expert was qualified to testify in action concerning trade secret protection over antenna technology where expert had "twenty-seven years of experience in design and analysis of communications systems, [had] consulted with various corporations to create antenna and circuit designs … and founded a company that created and commercially marketed software for radio frequency circuit design"); *see also Core Labs. LP v. Spectrum Tracer Servs., L.L.C.*, 2016 WL 4467443, at *2 (W.D. Okla. Mar. 7, 2016) (expert was qualified to testify on the oil and gas equipment that allegedly contained plaintiff's trade secrets, and the "efforts [plaintiff] undertook to protect its trade secrets," given the expert's "36 years of experience as a petroleum engineer").   There can be no reasonable dispute that Dr. Hartley has the experience necessary to testify regarding whether technical support cases relied upon by Román "disclose[] any trade secret information of BMC" relating to its computer software.   Report ¶ 16; *see also id.* ¶¶ 15, 17, 19, 47-48, 61, 72, 74, 75-141 (analyzing the technical support cases and Appendix G).

---

[4]   BMC has failed to cite a single case to support its argument that a trade secret expert's opinion is inadmissible unless based on the legal definition of a trade secret.   None of *Leverette v. Louisville Ladder Co.*, 183 F.3d 339 (5th Cir. 1999), *Martinez v. Porta*, 601 F. Supp. 2d 865 (N.D. Tex. 2009), or *Bich-Chau Thi Tran v. Comput. Tech. Sols.*, 2010 WL 11646559 (S.D. Tex. Oct. 29, 2010), grapples with the disclosure of trade secrets.   Further, *Skycam, Inc. v. Bennett*, 2011 WL 2551188 (N.D. Okla. June 27, 2011), the one case BMC cites that does concern trade secrets, actually supports IBM's position.   There, the court stated that while an expert may not "opine that the information was a 'trade secret,'" the expert could opine about "what processes and materials were 'unique;' … the custom and usage of the industry …; that they did not differ materially from information widely known in the industry; and that many elements of the alleged trade secrets were readily available in the public domain."   *Id.* at *5.   This is the type of testimony Dr. Hartley offers here.   *Infra* §§ I.B, II.

*First*, Dr. Hartley has over 35 years of experience in the computer software industry.  *Id.* ¶ 4.  In addition to his current role as a Managing Director of Arete Advisors, a company whose specialties include digital forensics, Dr. Hartley has recently served as Chief Technology Officer and Chief Information Security Officer at Discovia, where he was "responsible for the information technology infrastructure [and] security."  *Id.*; *see id.* Ex. A.  Dr. Hartley also holds a doctorate in Computer Science, and has published dozens of articles on "information security, computer forensics … and other related topics."  *Id.* ¶¶ 5-6, Ex. A.  He is also experienced in the IT outsourcing industry, and has both served as an outsourcer and has hired outsourcers for large data centers he managed.  *See* Mot., Ex. C (Hartley Dep. Tr.) at 8:19-9:7 ("I have been both an outsourcer, and I have hired outsourcers"); *id.* at 10:7-16 ("I hired outsourcers to run my environments … large data center processing [environments] in which I hired folks to operate and maintain those platforms"); *see also id.* at 11:17-14:3 (describing Dr. Hartley's experience working as an outsourcer for the government, including on migration-related projects in which he would "make recommendations regarding products to be run in the environment"); *id.* at 56:17-58:3, 59:14-60:7, 82:9-83:16 ██████████████████████████████████████████████ ██████████████████████████; *id.* at 89:11-90:9 (similar); *id.* at 228:24-229:8.  In fact, Dr. Hartley has experience serving as an outsourcer on software migration projects akin to Project Swallowtail.  *Id.* at 82:9-83:16 ████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████").

These qualifications are more than sufficient to qualify Dr. Hartley to tender the opinions he offers here.  *See Accresa Health LLC v. Hint Health Inc.*, 2020 WL 6325731, at *3-4 (E.D. Tex. Feb. 26, 2020) (finding expert was qualified to testify in case alleging misuse of trade secrets

regarding plaintiff's "healthcare-related software," based on, among other things, expert's education in computer science and healthcare, his "extensive experience in developing software," and his position as "president of a company that designs and develops custom hardware and software solutions for medical device and medical information system companies"); *see also U.S. Gypsum Co. v. LaFarge N. Am. Inc.*, 670 F. Supp. 2d 768, 771-72 (N.D. Ill. 2009) (rebuttal witness qualified to testify in trade secrets matter regarding the "field of computer forensics" given that the expert, among other things, was president of a company that "specialize[d] in computer forensics," had "undergone formal training in computer forensics techniques and software," and had "published articles on topics in computer forensics").

*Second*, Dr. Hartley has been qualified as an expert in the field of computer software, including in cases concerning the identification and protection of alleged trade secrets.  Report ¶ 7, Ex. A; *see* Dkt. 133 (Dec. 1, 2017 P.M. Session P.I. Hr'g Tr.) at 10:18-21.  In one recent matter, *SunPower v. Bunea*, No. 01-19-0003-9663 (AAA), Dr. Hartley was offered as a defense expert to testify on whether the information plaintiff designated as a trade secret actually was a trade secret, based on his experience, and his evaluation of public sources and the manner in which the information was marked, accessed, and protected.  *See also* Report Ex. A.

*Third*, BMC has *conceded* that Dr. Hartley is qualified to opine on the protection of trade secrets related to computer software.  Dkt. 133 (Dec. 1, 2017 P.M. Session P.I. Hr'g Tr.) at 10:22-11:1 ("MR. WERDER: Your Honor, we're tender[ing] Dr. Hartley as an expert in trade secret protection with a particular emphasis on computer software.  THE COURT: Any objection? … MR. GEIGER: No, not on those classifications.").[5]

---

[5]  BMC's argument (Mot. 6) that Dr. Hartley's "experience is in software engineering and cybersecurity, not the identification of trade secrets," is exceedingly disingenuous in light of BMC's previous acknowledgment of Dr. Hartley as an expert in this space.

### B. Dr. Hartley's Opinions Are Both Reliable And Relevant

BMC asserts (Mot. 8) that Dr. Hartley's opinion that the support cases provided no trade secret information is unreliable because "Hartley has no experience identifying trade secrets and possesses no expertise in the legal elements for trade secret protection." As discussed above, BMC's assumption that, in order to be admissible, Dr. Hartley must tether his opinions to TUTSA specifically, rather than his experience, is fundamentally flawed.

BMC also claims (Mot. 8) that Dr. Hartley's opinions are irrelevant because, according to BMC, Dr. Hartley applied a "subjective interpretation of what constitutes a trade secret" not "based on the definition of trade secret provided by the applicable legal authority." BMC ignores that the *substance* of Dr. Hartley's opinions is directly tied to the standard BMC cites. For example, BMC's purported trade secrets expert, Román, states that, based on TUTSA, in order for information to be protectable under TUTSA the owner must "keep the information secret" and the information cannot be "readily ascertainable through proper means." Román Report ¶ 54.[6] But, as Dr. Hartley explains, the support cases Román identified—without analysis (*infra* 15 & n.10)— as "satisf[ying]" the criteria necessary for trade secret protection are made up of this publicly available and readily ascertainable information.[7] *See, e.g.*, Report ¶¶ 75-76 ███████

---

[6] Dr. Hartley cited these *same standards* in describing what constitutes trade secret information. Report ¶ 8 ("a trade secret [is] not generally known or reasonably ascertainable by others"); Mot., Ex. C (Hartley Dep. Tr.) at 247:5-10 ("to have confidential information be considered a trade secret [] you have to limit the access to that information"); *id.* at 248:8-9 (for information to be considered a trade secret it cannot be "available in public means, so publicly available").

[7] BMC also asserts (Mot. 9 (citing Mot., Ex. C (Hartley Dep. Tr.) at 135:19-138:8)) that Dr. Hartley conceded "that the asserted trade secrets could be considered 'a compilation of information.'" But Dr. Hartley actually testified that the technical support cases *are not* compilations of information that would warrant trade secret protection: "Q. So you didn't see a compilation of information? … A. Not that they were trying to protect as a trade secret. There's lots of information in those tickets, and there's lots of discussion back and forth. Would that be a compilation? Possibly, *but not for the purpose of protecting that information.*" Mot., Ex. C (Hartley Dep. Tr.) at 138:3-140:6 (emphasis added).



As set forth further below, far from being irrelevant, based upon an "erroneous legal premise," or "divorced from TUTSA's standards for trade secret protection" (Mot. 7, 10), Dr. Hartley's opinions are relevant precisely because they will assist the Court in determining whether the support cases qualify for trade secret protection under the law.

**C.   Dr. Hartley's Opinions Will Aid The Court In Determining Whether The Support Cases Constitute Protectable Trade Secrets**

Courts routinely admit expert testimony on the technical aspects of the purported trade secrets, as helpful to the trier of fact, where that opinion is based on the expert's experience. *Iofina, Inc. v. Igor Khalev*, 2016 WL 6246730, at *3 (W.D. Okla. Oct. 25, 2016) (admitting expert testimony on trade secrets where the testimony concerned "whether certain matters are generally

---

[8]   Readily ascertainable information regarding the "features and functions" of a product is not protectable trade secret information. *Warehouse Sols. v. Integrated Logistics, LCC, Inc.*, 610 F. App'x 881, 884-85 (11th Cir. 2015) (because a product's "features and functions" were readily ascertainable by users, they could not be trade secrets); *see also IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) (Easterbrook, J.) ("[A] trade-secret claim based on readily observable material is a bust."); *Agency Solutions.com, LLC v. TriZetto Grp., Inc*., 819 F. Supp. 2d 1001, 1028 (E.D. Cal. 2011) (when a company "market[s] [a program] to its customers, revealing in the process how the program works, looks, performs and the purpose behind it," the program's operation is not a trade secret); *DeRubeis v. Witten Techs., Inc*., 244 F.R.D. 676, 679 (N.D. Ga. 2007) ("the end results of, or the functions performed by, the claimed trade secrets" are not "trade secrets at all").

known or readily ascertainable by others engaged in the business" and was based on the expert's "extensive experience in the … industry"); *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 2009 WL 8592874, at *4 (N.D. Ohio Aug. 12, 2009) (permitting trade secret expert opinions "on certain subsidiary components of the overall issue"); *see also Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp.*, 2020 WL 5822064, at *2 (S.D.N.Y. Sept. 30, 2020) (admitting testimony from an expert who "offer[ed] a technical, industry-based perspective that will help the [fact finder] understand what constitutes a trade secret").

Dr. Hartley's testimony will assist the Court in its determination of whether the support cases should be afforded trade secret protection, as it focuses on the underlying nature of the information disclosed by BMC,[9] whether that information is readily ascertainable, publicly available (as discussed *supra*), and the measures BMC took to protect it, among other things.[10]

## II.    DR. HARTLEY'S OPINION ON MISUSE IS RELIABLE AND ADMISSIBLE

BMC asserts (Mot. 11) that Dr. Hartley's opinions regarding IBM's (lack) of misuse of BMC's purported trade secrets are based on "no more than … unsupported speculation, which is

---

[9]   Dr. Hartley's Report would also assist the Court in determining whether information contained in the support cases should be afforded trade secret protection.  To illustrate, as Dr. Hartley explains, the information provided by BMC in certain of the support cases was provided ██████████████ ████████████████████████████████████████ Report ¶¶ 17, 125, 145-146, 172-173. The law is clear that software provided in object code format generally does not "impart knowledge of the trade secret."  *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 220 (2010); *Beardmore v. Jacobson*, 131 F. Supp. 3d 656, 675 (S.D. Tex. 2015) (object code is often "distributed to the public" and thus does not retain independent economic value); *Election Sys. & Software, LLC v. RBM Consulting, LLC*, 2015 WL 13484484, at *8 (D. Neb. Feb. 4, 2015) ("[T]he object code executed by defendants was not itself a trade secret, nor could it have disclosed the source code or imparted any knowledge of its secret aspects.").  Dr. Hartley's identification of the information ██████████ can thus aid the trier of fact.

[10]   The assistance Dr. Hartley's Report would provide the Court is thrown into sharp relief when juxtaposing it against Román's Report, in which Román opines—in an entirely conclusory fashion—that the eleven support cases "satisf[y] all necessary criteria for trade secret" protection without *any* explanation or analysis of how the cases purportedly satisfy the necessary requirements to be afforded trade secret protection.  As set forth in the Román *Daubert*, Román's opinion should be excluded both as impermissible legal opinion and inherently unreliable.  Dkt. 488 at 7-17.

inadmissible."  BMC is wrong.  As BMC well knows, to succeed on a claim for misuse of trade secrets, a plaintiff "must first establish that the information they seek to protect actually qualifies as a trade secret."  *Nations AG II, LLC v. The Hide Co.*, 2004 WL 1496312, at *6 (N.D. Tex. June 30, 2004); *accord Phazr, Inc. v. Ramakrishna*, 2019 WL 5578578, at *3 (N.D. Tex. Oct. 28, 2019) ("To allege misappropriation of a trade secret, the plaintiff must make a threshold showing of the actual acquisition, disclosure, or use of that trade secret.").  Indeed, Román recognized that "in order to prevail on a claim for misappropriation of trade secrets," "plaintiff must prove … that it possessed a trade secret."  Román Report ¶ 59.  But as Dr. Hartley made clear, he could not identify any misuse of trade secrets because he found no trade secret information was disclosed.  Report ¶ 12 ("Since I could not identify any trade secrets that were disclosed, I could not find any evidence of any trade secret misuse by IBM."); *accord id.* ¶ 161.

This opinion is not based on speculation but rather a thorough analysis of the facts and Dr. Hartley's experience.  In direct contrast to Román, who performed no analysis and provided no support for his claims that the support cases constitute trade secrets, Dr. Hartley spends ***65 paragraphs*** of his Report analyzing each of the support cases, and explains in great detail why they do not convey trade secret information based on his experience.  *See, e.g.*, *id.* ¶ 76 ("█████████████████████████████████ "do not convey any trade secrets"); *id.* ¶ 79 (████████████████████████ ████████████████████████████████ ; *id.* ¶¶ 84-85 ████████████████████████████ ███████████████████████ *id.* ¶ 89 ████████████████████████

███████████████████████████████████████████████████

██████████[11]

BMC also argues (Mot. 11) that Dr. Hartley's misuse opinion is unreliable because he "did not review the contractual restrictions underlying IBM's misappropriation." *See also id.* at 11-14. But, just as BMC misstated the nature of Dr. Hartley's trade secret opinions, BMC misstates the nature of Dr. Hartley's misuse opinions. Dr. Hartley opines that there was no misuse because no trade secret information was disclosed. *See, e.g.*, Report ¶¶ 12, 161. This opinion, based on Dr. Hartley's experience and analysis of the support cases, is entirely proper. *Supra* 8-9. Dr. Hartley never purported to offer an opinion that IBM did not misuse BMC's information pursuant to the governing contracts in this case [12]—indeed, doing so would amount to impermissible legal opinion[13]—and BMC's argument on this point is a red herring. The only authority cited by BMC

---

[11]   BMC also asserts (Mot. 11) that Dr. Hartley's misuse opinion is "unsupported speculation" because Dr. Hartley supposedly testified that he "did not 'evaluate[] whether [the asserted trade secrets] have been misused by IBM.'" What Dr. Hartley actually testified was that such an evaluation was impractical, because it would be based on counterfactual information. *Compare* Mot. 11 (quoting Mot., Ex. C (Hartley Dep. Tr.) at 30:24-25), *with* Mot., Ex. C (Hartley Dep. Tr.) at 30:2–31:4 ("Q. What is your understanding of how Mr. Román asserts that IBM has misused BMC's trade secrets?  A. First, again, I cannot identify nor did Mr. Román identify any specific trade secret that was misused or even provided to IBM. And so if I haven't provided any trade secret, I can't misuse them....  Q. So you haven't – assume that even if the things identified by Mr. Román were trade secrets, you haven't gone the next step and evaluated whether those things would have been misused by IBM?  A. Correct, I did not do hypotheticals [or] what ifs.  I looked at the facts that were presented in the material."). BMC frequently mischaracterizes Dr. Hartley's testimony in making these arguments. *Compare* Mot. 13 (representing that "Hartley conced[ed] that IBM's access and use provided IBM with 'unique nonpublic information ...' [which] 'allowed [IBM] to complete [Project Swallowtail]'" (alterations in brief) (quoting Mot., Ex. C (Hartley Dep. Tr.) at 181:20–182:14)), *with* Mot., Ex. C (Hartley Dep. Tr.) at 182:2–18 (testifying that "it was IBM's knowledge and experience [that] allowed them to complete that migration").

[12]   Indeed, Dr. Hartley testified that he is not a contracts expert and was not opining on the legal import of contractual provisions. Mot., Ex. C (Hartley Dep. Tr.) at 18:5–19:3 ("Q.... I believe during your prior deposition, you testified that you hadn't studied the contracts ....  Have you reviewed the contract since then? ... A.  No, I'm still not a contracts expert...."); *id.* at 33:7–11 ("[M]aking an opinion on the contracts would require a business or contracts expert, perhaps a lawyer, not a technical person.").

[13]   *Fisher v. Halliburton*, 2009 WL 5216949, at *5 (S.D. Tex. Dec. 21, 2009) (excluding expert where his opinion "evaluate[d] the legal effect of contract provisions").

for the proposition that expert testimony should be excluded where the expert did not review certain agreements is inapposite.  In *El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 620 (S.D. Tex. Dec. 23, 2003), the court faulted a marketing expert for not consulting the agreements at issue when rendering an opinion on whether the agreements "offend[ed] the principles of free competition."  In other words, the expert was specifically opining on the effects of certain contractual provisions without having reviewed the relevant documents.  That is not the case here.  *Id.*[14]

## III.   DR. HARTLEY'S OPINION ON AT&T PROPRIETARY INFORMATION IS PERMISSIBLE EXPERT OPINION

Dr. Hartley's opinion that certain of BMC's purported trade secret information was actually proprietary to AT&T, and not BMC, is permissible expert opinion.  BMC summarily argues (Mot. 15) that Dr. Hartley's opinion is "an unsupported legal conclusion regarding intellectual property ownership," but the cases BMC relies upon provide no support for this proposition.  Neither *Snap-Drape* nor *Interplan Architects* are trade secret cases.  *See Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 197-98 (5th Cir. 1996) (refusing to admit expert reports from certified public accountants analyzing the deductibility of certain dividends); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 WL 4065465, at *9 (S.D. Tex. Oct. 9, 2010) (copyright case in which the court found an expert opinion on whether plaintiff met the legal elements to establish a copyright claim was impermissible).  And *Raytheon*, the only trade secrets case cited by BMC, is factually distinct. *Raytheon* did not concern whether the purported trade secrets were propriety to Raytheon or

---

[14]   BMC also accuses (Mot. 11) Dr. Hartley of "not attempt[ing] to determine whether IBM's requests ... correlated with tasks performed on Project Swallowtail."  But Dr. Hartley *did* review Project Swallowtail documents to the extent cited by Román.  Report ¶ 160 (stating Dr. Hartley reviewed all of the "material associated with the Román report," including documents on Project Swallowtail); Mot., Ex. C (Hartley Dep. Tr.) at 42:13-43:2 ("If [Román] made a certain assertion that it was Swallowtail-related, ...that's where I looked ....").  In fact, Dr. Hartley explained that certain of the support cases were not shown by Román to have *any connection* with Project Swallowtail.  Report ¶¶ 78, 82, 93, 97, 99, 104.

CONTAINS ATTORNEYS' EYES ONLY INFORMATION                    17

another party (Indigo), and whether Indigo's expert could opine on that question, which is the inquiry here.  *Raytheon Co. v. Indigo Sys. Corp.*, 598 F. Supp. 2d 817, 821 (E.D. Tex. Feb. 18, 2009).

In fact, courts have considered expert testimony on this very issue.  *See, e.g.*, *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 2005 WL 1923811, at *7 (D. Minn. Aug. 11, 2005) (experts "may also testify that the [information] constitutes 'proprietary information' to the extent they mean SL Montevideo owns the information"); *Polyzen, Inc. v. Radiadyne, LLC*, 2016 WL 5360576, at *11 (E.D.N.C. Sept. 23, 2016) ("To the extent that RadiaDyne seeks to have Foreman testify concerning custom and ownership of intellectual property, ... Polyzen's objection goes to the weight, not the admissibility ....").

BMC further argues (Mot. 15) that Dr. Hartley "identifies no methodology, experience, or factual basis underlying his opinions."  This is not true.  In his Report and deposition, Dr. Hartley detailed his experience, including working as and with outsourcers (Report ¶¶ 4-7; Mot., Ex. C (Hartley Dep. Tr.) at 8:19-12:15; *supra* 4, 10), and opined that "[b]ased on my experience in the industry, this information [operation of ISV products in a customer's  environment] is not proprietary to the ISVs whose products are operating in the customer's mainframe environment rather, this information is potentially proprietary to the *customer* who owns its own mainframe environment."  Report ¶¶ 44-46.  Dr. Hartley went on:

> Outsourcers working in a customer's mainframe environment do not learn trade secret information underlying the products provided by ISVs.  An ISV's trade secret information is contained in its detailed design documentation and source code, which **in my experience** is never produced to a customer or its outsourcer. Therefore, the information an outsourcer learns about the "functionality and

operations" of an ISV's products is limited to functionality and operations that are already included in the product licensed by the customer.

*Id.* ¶ 47 (footnote omitted) (emphasis added).[15]   In other words, how a product is used and interacts in a company's environment is the environment owner's information.   Experience and specialized knowledge are sufficient bases to show an expert opinion is reliable.   *Kumho Tire Co.*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. … [T]his circuit has upheld the admission of expert testimony where it was based on the expert's specialized knowledge … [and] experience ….") (quotations omitted).

And, contrary to BMC's assertions, Dr. Hartley also discussed the factual basis for his opinion.   *See, e.g.*, Report ¶ 52 ("Mr. Conway also confirmed that ██████████████ ████████████████████████████████).   And when Dr. Hartley opined on Technical Case No. 00120397 (█████████████████████), his conclusion that "the information provided was proprietary to AT&T, not BMC" was based on the fact that the ████ ████████████████████████ *Id.* ¶ 79.

---

[15]   Román conceded that the proprietary information at issue could have belonged to AT&T.   Ex. 2 (Román Dep. Tr.) at 234:20-235:13 ██████████████████████████████████████████ ██████████████████████████████████████████ ███████████ *id.* at 237:9-13 ███████████████████ ██████████████ *id.* at 237:25-238:14 █████████████ ███████████████████

## IV.   DR. HARTLEY'S OPINION THAT IBM'S ACTIONS WERE CONSISTENT WITH INDUSTRY STANDARD IS ADMISSIBLE

In performing Project Swallowtail, IBM employed the ████████ method,[16] whereby IBM ran the ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ Report ¶ 67; *see also id.* ¶ 14.  Dr. Hartley opines that, based on his experience, IBM's use of the ████████ method was "entirely standard for any IT outsourcer or in-house IT department performing a live system migration."  *Id.* ¶ 14.  BMC seeks to exclude (Mot. 16) this opinion, asserting that it is irrelevant and unsupported.  BMC is wrong.

With respect to relevance, Dr. Hartley's opinion directly rebuts that of Román, and BMC cannot reasonably contest the relevance of an opinion on a topic its expert put at issue.  Román opined that IBM's use of the ████████ method "was advantageous [to IBM]" because it allowed IBM to ████████████████████████████████████████████████████████████████ ████████████████████, which accelerated the completion of the migration.  Román Report ¶¶ 63(d)(ii), 138; *see also id.* ¶ 63(b).  In direct rebuttal to Román's opinion, which frames IBM's process as non-standard and aimed at accelerating the migration, Dr. Hartley explains that IBM's use of the ████████ method is standard in the industry and consistent with what any other outsourcer would have done—in other words, it had nothing to do with acceleration:[17]

---

[16]   Dr. Hartley and Román refer to the process of ████████████████████████████████ ████████████████████████████ (a term used both by Dr. Hartley and Román), t████ ████████████ (used by Dr. Hartley), and ████████████ (used by Román).  Report ¶¶ 36-39, 65-68; Román Report ¶ 63(b), (d)(ii), 126-27.  These various phrases all refer to the same concept.

[17]   Indeed, as Dr. Hartley explains in detail, Román's opinions regarding acceleration are not backed by "any evidence or methodology to support [Román's] claimed 'acceleration,'" and are "unreliable and untestable."  Report ¶¶ 16, 43; *see also id.* ¶¶ 82, 86, 91, 93, 104, 148 (explaining why Román's acceleration opinions are unsupported for numerous support cases).

.

Report ¶ 38; *see id.* ¶ 14 ("I have not identified any steps that IBM took in connection with carrying out AT&T's project … that would not likely be undertaken by any competent contractor hired by AT&T for the same project."); *see also id.* ¶¶ 66-67 (similar).  Thus, in sharp contrast to Román's opinion, Dr. Hartley opines that IBM used the ██████ method because it was consistent with industry standard, not to accelerate the migration process.  *See Perez v. City of Austin*, 2008 WL 1990670, at *4 (W.D. Tex. May 5, 2008) (expert's "proffered testimony is relevant because it directly rebuts the conclusions contained in [the affirmative] report").

With respect to reliability, as detailed above (*supra* 4, 10), Dr. Hartley has extensive experience both working as, and with, outsourcers.  As also explained above (*supra* 8-9) an expert may rely on his experience in forming his opinion, including an opinion on whether conduct is consistent with industry standards.[18]  And, although BMC attempts to make much of the fact that "[Dr.] Hartley cites no source or publication regarding alleged 'industry standards,'" citation to that material is not necessary for an expert's opinion to be considered reliable.  *See Kumho Tire Co.*, 526 U.S. at 156; *Black v. Toys R US-Del., Inc.*, 2010 WL 4702344, at *5 (S.D. Tex. Nov. 10,

---

[18]   Neither *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776 (N.D. Tex. 2013), nor *Grdinich v. Bradlees*, 187 F.R.D. 77 (S.D.N.Y. 1999), upon which BMC relies, is on point.  In *Orthoflex*, the expert did not rely on his experience, and was unable to identify any methodology he used to reach his opinion, which amounted to nothing more than "unsupported speculation."  986 F. Supp. 2d at 798.  Similarly, in *Grdinich*, the expert had "limited professional experience in the [relevant industry]" and based his conclusions on, for example, review of one department store handbook when opining as to industry standards, rather than personal experience.  The expert provided "no reliable foundation" for his opinion, leading the court to conclude that his opinions were based upon "unsupported speculation."  187 F.R.D. at 81-82.  Unlike the experts in *Orthoflex* and *Grdinich*, Dr. Hartley forms his opinions by relying on his considerable experience in the computer software industry and his review of the relevant documents, and has provided extensive foundation regarding his experience working as and with outsourcers (*supra* 4, 10).

CONTAINS ATTORNEYS' EYES ONLY INFORMATION                21

2010) (rejecting defendants' argument that expert opinion was unreliable based on the expert's "failure to rely on publications," as the Fifth Circuit "has recognized that an expert may draw a conclusion from a set of observations based on sufficient experience in the relevant field"); *Wealthmark Advisors v. Phoenix Life Ins. Co.*, 2017 WL 1133506, at *4 (W.D. Tex. Mar. 24, 2017) (permitting expert testimony on industry standards where expert based his opinion on "his personal experiences in the [relevant] industry").

BMC also claims (Mot. 17) that Dr. Hartley's opinion "lack[s] a reliable connection to the facts of this case."  But, as explained above, Dr. Hartley's opinion regarding how outsourcers generally perform ▮▮▮▮▮▮▮▮▮▮▮▮▮ and the method they employ to do so (the ▮▮▮▮ method) is clearly tied to IBM's execution of Project Swallowtail, and it was BMC's own expert who put IBM's use of the method at issue. *See, e.g.*, Report ¶¶ 14, 38-39.  In addition, Dr. Hartley explains in his Report that the ▮▮▮▮ method allowed the migration to continue "without business process interruptions." *Id.* ¶ 67.  Moreover, at his deposition, Dr. Hartley expounded on his opinion, testifying that the ▮▮▮▮ method is the preferred industry standard in part because using a different method for a migration of this nature would carry greater risk. *See* Mot., Ex. C (Hartley Dep. Tr.) at 59:14-60:7 ("Q. … What is your basis for saying that IBM's actions were standard, entirely standard?  A. Again, if you go back to those tasks that I ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮—those are standard activities that one does as an outsourcer.  And so they didn't do anything that I would consider nonstandard, like write a custom application or do any of those things.  So these are normal things in the course of normal business [that] usually IT outsourcer[s] … would … do."); *id.* at 68:20-69:17 ("I believe ▮▮▮▮▮▮▮ is a very common and necessary

activity anytime you're doing any type of software migration."); Ex. 3 (Hartley Dep. Tr. Errata);[19]

*see also* Report ¶¶ 66-68 (similar).

Finally, BMC once again contends (Mot. 16-17) that Dr. Hartley's opinion should be excluded because he is not a contracts expert.  In essence, BMC is faulting Dr. Hartley for not offering an impermissible legal opinion regarding whether IBM breached the relevant contract provisions in this case.  *See Vanderbilt Mortg. & Fin., Inc. v. Flores*, 2010 WL 4595592, at *5 (S.D. Tex. Nov. 1, 2010) ("Expert testimony concerning the ordinary practices of a particular trade or business can be admissible to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry.  However, when an expert purporting to testify regarding customary practices of a trade or business … appl[ies] those standards to the contract at issue, this must be excluded.") (quotations omitted); *Fisher*, 2009 WL 5216949, at *4 (excluding expert where his opinion "evaluate[d] the legal effect of contract provisions").[20]

Rather than offer an excludable opinion on whether IBM's actions were contractually permissible, Dr. Hartley limits his opinion to whether IBM's use of the "███████ method was, based on his experience, consistent with industry practice.  Mot., Ex. C (Hartley Dep. Tr.) at 68:10-19 ("Q. … You're not offering the opinion that IBM's actions were … a permissible use of BMC's products under the IBM/BMC outsourcing agreement, correct?  A.  Correct.  No opinion on contracts.  They are standard from, this is what IT outsourcers do in the industry.").  A party may

---

[19]   Related to the common nature of ███████, Dr. Hartley's deposition transcript reads "I don't believe ███████ is a very common and necessary activity … ." The use of "don't" was a transcription error and should be omitted, as set forth in Dr. Hartley's errata, attached as exhibit 3.

[20]   *Hutton Contracting Co. v. City of Coffeyville*, 2004 WL 2203449, at *12 (D. Kan. Sept. 24, 2004), upon which BMC relies, is inapposite.  There, the plaintiff testified as to the proper interpretation of contracts in the industry generally, an interpretation which was not supported by the relevant contract.  In contrast, Dr. Hartley is not offering an opinion on industry standards based on other outsourcing contracts.  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347 (5th Cir. 2007) is also off-point as the expert there did not opine on industry standards.

introduce expert testimony on whether a party's conduct was consistent with industry standard, so long as that opinion does not venture into the realm of contractual interpretation.  *See Wealthmark Advisors Inc.*, 2017 WL 1133506, at *4 (an expert may testify on industry standards based on "his personal experiences in the … industry" but he "may not testify … as to whether [plaintiff] breached the parties' agreement").

## **CONCLUSION**

For the reasons set forth above, BMC's Motion should be denied.

**CONTAINS ATTORNEYS' EYES ONLY INFORMATION**

Dated:  November 12, 2020

Respectfully submitted,

**QUINN EMANUEL URQUHART
  & SULLIVAN, LLP**

*/s/ Richard I. Werder, Jr.*

Richard I. Werder Jr. (admitted pro hac vice)
Andrew M. Berdon (admitted pro hac vice)
Rachel E. Epstein (admitted pro hac vice)
Donald J. Reinhard (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
rickwerder@quinnemanuel.com

**YETTER COLEMAN, LLP**
R. Paul Yetter
Texas State Bar No. 22154200
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000 Telephone
(713) 632-8002 Facsimile
pyetter@yettercoleman.com
pyetter@yettercoleman.com

**ATTORNEYS FOR INTERNATIONAL
BUSINESS MACHINES CORPORATION**

## CERTIFICATE OF SERVICE

I certify that, on November 12, 2020, the foregoing was filed electronically through the Court's CM/ECF system and served on Plaintiff by transmission of the Notice of Electronic Filing through the Court's CM/ECF system to Plaintiff's counsel of record.

*/s/ Rachel E. Epstein*

CONTAINS ATTORNEYS' EYES ONLY INFORMATION