IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| Plaintiff, | § | CASE NO. 4:17-cv-2254 |
| | § | |
| vs. | § | |
| | § | JURY TRIAL DEMANDED |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | § § | |
| Defendant. | § | |

**BMC'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT OPINIONS OF BRUCE V. HARTLEY (SEALED)**

Of Counsel:
**Bracewell LLP**
Christopher L. Dodson
Texas State Bar No. 24050519
S.D. Bar No. 613937
Timothy R. Geiger
Texas State Bar No. 24078552
S.D. Bar No. 1742526
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2781
(713) 223-2300 Telephone
(800) 404-3970 Facsimile
chris.dodson@bracewell.com
tim.geiger@bracewell.com

Sean Gorman
Texas State Bar No. 08218100
S.D. Bar No. 10168
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2781
(713) 221-1221 Telephone
(800) 404-3970 Facsimile
sean.gorman@bracewell.com

**Attorney-In-Charge for
BMC Software, Inc.**

**Contains Attorneys' Eyes Only and Confidential Information**

# TABLE OF CONTENTS

*Page*

Table of Authorities .................................................................................................................. ii

Argument ....................................................................................................................................1

    I.    IBM Identifies No Experience Enabling Hartley to Opine Reliably on Whether Information Qualifies as a Trade Secret.......................................................1

    II.    IBM Cannot Show that Hartley's Subjective Beliefs and Lay Understanding of What Qualifies as a Trade Secret are Reliable or Relevant................................3

    III.    IBM Does Not Dispute that Hartley did Not Evaluate Whether IBM Used BMC's Technical Information to Displace BMC's Products. .................................6

    IV.    Hartley's Opinion About the Alleged Ownership of Proprietary Information is an Unsupported Legal Conclusion. ....................................................................7

    V.    Hartley's Opinions About Allegedly "Standard" Conduct of IT Outsourcers Do Not Rebut Román's Opinions, and Are Irrelevant..............................................9

Conclusion ................................................................................................................................10

Certificate of Service ................................................................................................................12

**Contains Attorneys' Eyes Only and Confidential Information**

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Adacel, Inc. v. Adsync Techs., Inc.*,
 2020 WL 4588415 (M.D. Fla. July 9, 2020) ..................................................................2, 3

*AHS Staffing, LLC v. Quest Staffing Grp., Inc.*,
 335 F. Supp. 3d 856 (E.D. Tex. 2018) ............................................................................4, 5

*Astro Tech., Inc. v. Alliant Techsystems, Inc.*,
 2005 WL 6061803 (S.D. Tex. Sept. 28, 2005) ....................................................................3

*Bimbo Bakeries USA, Inc. v. Sycamore¸*
 2017 WL 1377991 (D. Utah Mar. 2, 2017) .........................................................................2

*GlobeRanger Corp. v. Software AG United States of Am., Inc.*,
 836 F.3d 477 (5th Cir. 2016) ...............................................................................................4

*Hathaway v. Bazany*,
 507 F.3d 312 (5th Cir. 2007) .........................................................................................8, 10

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*,
 2010 WL 4065465 (S.D. Tex. Oct. 9, 2010) .......................................................................7

*ISC-Bunker Ramo Corp. v. Altech, Inc.*,
 765 F. Supp. 1310 (N.D. Ill. 1990) .....................................................................................6

*Knight v. Kirby Inland Marine, Inc.*,
 482 F.3d 347 (5th Cir. 2007) ...............................................................................................9

*Kozak v. Medtronic, Inc.*,
 512 F. Supp. 2d 913 (S.D. Tex. 2007) ................................................................................1

*Martinez v. Porta*,
 601 F. Supp. 2d 865 (N.D. Tex. 2009) ................................................................................3

*Polyzen, Inc. v. Radiadyne LLC*,
 2016 WL 5360576 (E.D.N.C. Sept. 23, 2016) ....................................................................8

*Raytheon Co. v. Indigo Sys. Corp.*,
 598 F. Supp. 2d 817 (E.D. Tex. 2009) ................................................................................7

**Contains Attorneys' Eyes Only and Confidential Information**

*SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*,
   2005 WL 1923811 (D. Minn. Aug. 11, 2005) ..........................................................................8

*State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*,
   2019 WL 1436659 (N.D. Tex. Mar. 31, 2019) ...................................................................8, 10

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*,
   637 F.3d 604 (5th Cir. 2011) ...................................................................................................4

*Trandes Corp. v. Guy F. Atkinson Co.*,
   996 F.2d 655 (4th Cir. 1993) ...................................................................................................6

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*,
   926 F. Supp. 2d 935 (S.D. Tex. 2013) ....................................................................................4

### *Statute*

Tex. Civ. Prac. & Rem. Code § 134A.002(6)............................................................................4, 5

**Contains Attorneys' Eyes Only and Confidential Information**

## ARGUMENT

**I.      IBM Identifies No Experience Enabling Hartley to Opine Reliably on Whether Information Qualifies as a Trade Secret.**

IBM argues that Hartley should not be precluded from opining on whether BMC's technical information constitutes a protectable trade secret[1] simply because "he did not apply TUTSA by name when analyzing" the information. Dkt. 512, Resp. at 7. IBM also argues that Hartley does not need to be a legal expert in TUTSA to offer any opinions in this case.

IBM's arguments misconstrue the bases of BMC's challenges to Hartley's qualifications. BMC does not assert that Hartley is unqualified solely because he lacks an understanding of TUTSA's requirements. Rather, Hartley has no relevant experience, and has never been retained to offer any opinion under *any standard* "evaluating whether certain information qualifies as a trade secret." Ex. B, Hartley Dep. (Nov. 25, 2017) at 31:4-15; *see Kozak v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 917–18 (S.D. Tex. 2007) (Werlein, J.) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.").

IBM argues that Hartley's 35 years of experience in the computer software industry is sufficient for him to opine on whether the technical information disclosed to IBM is a protectable trade secret. IBM, however, fails to identify any prior experience of Hartley in identifying information that qualifies for trade secret protection.[2] As Hartley concedes, in the previous trade

---

[1] IBM acknowledges that Hartley explicitly set forth numerous opinions claiming that the technical information BMC disclosed to IBM is not a trade secret. Resp. at 8 (quoting Hartley's report stating that "[n]one of the[] technical support cases discloses any trade secret information).

[2] IBM claims also that Hartley's opinions are admissible because "Hartley reviewed the voluminous record, including all of the documents Román cited, the pleadings, deposition transcripts, declarations, produced documents, and pertinent information in the public domain, and applied his decades of experience in the computer software industry." Resp. at 8. However, IBM greatly overstates Hartley's efforts in this case. At his deposition, Hartley testified that "[he] didn't spend a lot of time analyzing Project Swallowtail," Ex. B, Hartley Dep. at 81:13-21, and could not even recall specific Project Swallowtail documents that he reviewed to form his opinions. *Id.* at 41:13-42:3.

**Contains Attorneys' Eyes Only and Confidential Information**

secret cases in which he was hired, the party identified the trade secrets for him, and he merely relied on their representations. *See* Ex. B, Hartley Dep. (Nov. 25, 2017) at 31:4-15 ("Again, I've been told these are our trade secrets").[3,4]

The case law IBM cites to argue that Hartley is qualified to opine on the presence of trade secrets is clearly inapposite. None of the cases IBM cites involved expert testimony on the ultimate issue of whether information constitutes a trade secret. Rather, the experts in those case offered testimony within their respective areas of expertise concerning factual matters bearing on the ultimate determination of trade secret protection. In *Bimbo Bakeries USA, Inc. v. Sycamore*¸ for example, the expert did not purport to claim that the information was not a trade secret. 2017 WL 1377991, at *13 (D. Utah Mar. 2, 2017). Instead, the plaintiff offered an expert, who was "a world renowned baking chemist," to "testify[] to how ingredients, proofing processes, and baking processes chemically interact and influence baked foods." *Id*. And in *Adacel, Inc. v. Adsync Techs., Inc.*, the court found the expert qualified to opine on the steps taken by the plaintiffs to protect their trade secrets "based on his firsthand knowledge regarding standard techniques used

---

[3] IBM cites a single arbitration in which Hartley "was offered as a defense expert" on whether information was a trade secret to bolster his experience. Whether he actually offered opinions in that case, whether those opinions were based on the standards governing the admissibility of expert testimony in federal court, what the opinions were, and whether the panel accepted the opinions or even heard them are not addressed, even in passing. And the arbitration is not disclosed on Hartley's CV.

[4] IBM's argument that Hartley's testimony at the preliminary injunction hearing as an expert in software protection means that BMC conceded that he is an expert in what constitutes a trade secret, or that BMC waived its right to object to the opinions that he now offers is meritless. At the preliminary injunction hearing, Hartley himself only claimed to have expertise in "[c]omputer science in general, … software engineering, computer, network security and digital forensics." Dkt. 133 (Dec. 1, 2017 P.M. Session P.I. Hr'g Tr.) at 4:20-22; *see also id.* at 9:19-22). If anything, Hartley's preliminary injunction testimony further confirms that he is unqualified to determine whether information qualifies as a trade secret. Hartley explicitly testified that "**I can't identify or specify something as a trade secret,**" *id.* at 16:16-23 (emphasis added), and further that he "wouldn't say [he] evaluate[d whether particular types of information are trade secret information], because in the cases [in which he had] been involved in, trade secrets have been very specifically identified in most cases." *Id.* at 9:23-10:5. Moreover, Hartley's assignment for his current report was "to review and evaluate opinions stated in the expert report of" BMC's expert, Kendyl Román, who had not even been retained at the time of the preliminary injunction hearing. *See* Ex. B, Hartley Dep. at 7:3-16.

**Contains Attorneys' Eyes Only and Confidential Information**

to protect proprietary information within visual databases." 2020 WL 4588415, at *5 (M.D. Fla. July 9, 2020). That case did not, however, address whether the expert was qualified to opine on whether the information was in fact a protectable trade secret.

## II. IBM Cannot Show that Hartley's Subjective Beliefs and Lay Understanding of What Qualifies as a Trade Secret are Reliable or Relevant.

IBM, in effect, argues that there is no requirement that an expert apply the correct definition for what information may constitute a trade secret, and instead may substitute his own subjective understanding of trade secrets in place of the applicable legal standards. *See* Resp. at 9 n.4, 12. This is not permitted. *See Astro Tech., Inc. v. Alliant Techsystems, Inc.*, 2005 WL 6061803, at *7 (S.D. Tex. Sept. 28, 2005) (Atlas, J.) (excluding expert who "base[d] his opinions regarding the existence and identification of [party's] trade secrets on his own (and [the party]'s) definition of a trade secret."); *Martinez v. Porta*, 601 F. Supp. 2d 865, 866-67 (N.D. Tex. 2009) (expert opinion based on erroneous legal premise was irrelevant, and legal conclusions "usurp the province of [the] Court").

Hartley does not mention TUTSA or describe its requirements for trade secret protection anywhere in his report. Further, IBM's claim that Hartley's trade secret analysis is allegedly "tied to [TUTSA's standards]," Resp. at 12, is contrary to Hartley's deposition testimony. *See* Ex. C, Hartley Dep. at 132:4-7 ("Q. And you didn't cite any of those statutes in your report, though, correct? A. No. Again, this is my interpretation based on my experience."). IBM ignores Hartley's admission that, at the outset of his analysis, he applied a more restrictive view of which classes of information could qualify for trade secret protection—limiting his analysis to particular types of information (so-called "secret sauce") concerning specific aspects of the internal operation of software. *See* Ex. C, Hartley Dep. at 124:18-125:6 ("So again, looking for that secret sauce that

**Contains Attorneys' Eyes Only and Confidential Information**

how does it get done"); Dkt. 476, Mot. at 7-8; *compare* Tex. Civ. Prac. & Rem. Code § 134A.002(6) (TUTSA broadly defines "trade secret" as "*all forms and types of information*." (emphasis added)), *with, e.g.,* Ex. C, Hartley Dep. at 133:18-134:2 ("I saw no reference to, you know, an internal formula[,] I saw no process discussions, no design documentation, no patterns.").

Because Hartley limited his analysis to only certain types of information, Hartley cannot reliably opine that the entire compilation of information disclosed in the eleven technical cases does not warrant trade secret status under TUTSA's standards. *See GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 493 (5th Cir. 2016) (holding that a plaintiff need only provide evidence that "some aspects" of the asserted technology qualify as a trade secret); *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 960 (S.D. Tex. 2013) (Harmon, J.) ("A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design, and operation of which in unique combination, affords a competitive advantage and is a protectable secret." (quoting *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*, 637 F.3d 604, 613 (5th Cir. 2011))); *AHS Staffing, LLC v. Quest Staffing Grp., Inc.*, 335 F. Supp. 3d 856, 863 (E.D. Tex. 2018) ("[E]ven if a compilation of information consists of readily available information, 'it may be protected as a trade secret given the difficulty and expense of compiling the information.'" (internal quotation marks omitted)).[5]

Hartley's deposition testimony confirmed that he did not understand how to evaluate trade secret protection in the context of analyzing compilations of information. That failure to

---

[5] IBM argues that Hartley should be permitted to opine on the ultimate issue of whether the information BMC disclosed to IBM qualifies as a trade secret because Hartley claims that limited portions of the information from some cases are now publicly available. *See* Resp. at 12. But Hartley's claims of limited public availability alone, even if credited, do not permit Hartley to opine that the compilation of information disclosed in each of the eleven cases did not include trade secret information. As the case law cited above holds, compilations of information may qualify for trade secret protection even if a portion of the information is publicly available or ascertainable. Moreover, with respect to two of the technical cases, Hartley makes no claim that any portion of the information is publicly available.

**Contains Attorneys' Eyes Only and Confidential Information**

understand led to flawed conclusions regarding the eleven technical cases at issue. Ex. C, Hartley Dep. at 135:2-18 ("Q. So you don't know what it means, what a compilation of information means? A. In this context, no."). Hartley admitted that the compilation of technical information BMC disclosed to IBM was non-public, and therefore, could be considered "confidential:"

> Q. **So the information that BMC alleges is a trade secret**, IBM was able to gain access to that information because it was acting as an IT outsourcer at AT&T, correct?
>
> A. **I believe they had access to potentially what they would consider confidential proprietary information**. Again, based on my methodology, it doesn't appear to be trade secret-level information. **It could be confidential information, yes**, not trade secret information.

Ex. B, Hartley Dep. at 225:23-226:11 (emphasis added). Yet, when asked why this confidential information did not qualify for trade secret protection, Hartley cited additional restrictions, based on his lay understanding, related to limiting access to it. *See id.* at 246:4-247:10 ("to have confidential information be considered a trade secret … I think you have to limit the access to that information to a – you know, the minimum number of people you can."), 247:11-14 ("Q. That's not based on a legal authority that you've reviewed, though, is it? A. I'm not an attorney."); *see also* Mot. at 9-10 (describing Hartley's belief that technical support employees would not have access to trade secrets). But again, Hartley's beliefs were not based on TUTSA's standards, which instead require only "reasonable measures *under the circumstances* to keep the information secret," not absolute secrecy. Tex. Civ. Prac. & Rem. Code § 134A.002(6) (emphasis added); *see AHS Staffing*, 335 F. Supp. 3d at 864 ("[C]ourts do not require absolute protection of confidential information for it to qualify for trade secret protection....").[6]

---

[6] IBM further argues that Hartley's testimony about technical details will aid the Court in determining whether the technical support cases constitute trade secrets. *See* Resp. at 13. But BMC does not challenge Hartley's qualifications to offer opinions about technical matters that may shed light on the Court's determination of trade secret protection. Rather, BMC challenges Hartley's ultimate conclusion that the information BMC disclosed does not qualify as a trade

**Contains Attorneys' Eyes Only and Confidential Information**

Accordingly, Hartley's lay, subjective opinion regarding whether the asserted trade secrets qualify as trade secrets is irrelevant to the determination of trade secret protection under TUTSA.

### III. IBM Does Not Dispute that Hartley did Not Evaluate Whether IBM Used BMC's Technical Information to Displace BMC's Products.

IBM concedes that Hartley did not attempt to determine whether IBM misused BMC's asserted trade secrets by using the information to displace BMC's products at AT&T. *See* Resp. at 16 ("Hartley opines that there was no misuse because no trade secret information was disclosed."). IBM instead avoids BMC's arguments by asserting that to succeed on its claim, BMC must also establish that the information it disclosed to IBM qualifies for trade secret protection. But this is a strawman. BMC has never argued that it could prove that IBM misused its trade secrets without first establishing that there were trade secrets to misuse—indeed, BMC's expert, Kendyl Román, spends more than seventy-five paragraphs in his report examining why the technical information disclosed to IBM possesses the factual predicates for trade secrets under the correct standard. However, whether IBM *used* BMC's asserted trade secrets to displace BMC's products at AT&T for Project Swallowtail is an entirely separate issue from whether the asserted information qualifies for trade secret protection. Indeed, Hartley admitted that he did not "evaluate[] whether [the asserted trade secrets] have been misused by IBM." Ex. C, Hartley Dep. at 30:12-31:4, and further, that he did not "have an opinion one way or another on whether or not [IBM's usage of asserted trade secrets was] correlated with Swallowtail." *Id.* at 46:6-22.

---

secret based on his erroneous, subjective understanding of what information qualifies for trade secret protection. IBM further asserts that Hartley's explanations regarding "object code" will assist the Court. But IBM is incorrect to argue that object code cannot be a trade secret. *See* Resp. at 14, n.9. Contrary to IBM's arguments, courts have afforded trade secret protection to "object code," like the BMC PTFs distributed to IBM, where "other persons [could] obtain economic value" from its use. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 663 (4th Cir. 1993); *see also ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1323 (N.D. Ill. 1990) (computer programs distributed as object code were "protectable as trade secrets").

**Contains Attorneys' Eyes Only and Confidential Information**

Accordingly, Hartley should be precluded from offering any opinions that IBM did not use BMC's asserted trade secrets to displace BMC's products at AT&T because he admittedly did no analysis of that issue.[7]

## IV. Hartley's Opinion About the Alleged Ownership of Proprietary Information is an Unsupported Legal Conclusion.

IBM tries to distinguish the case law holding that intellectual property ownership is an inadmissible legal conclusion, but its effort falls flat. IBM argues that the court's decision in *Raytheon Co. v. Indigo Sys. Corp.* "is factually distinct" because the expert testimony at issue in that case did not concern whether the trade secrets were owned by another party. Resp. at 15. The analysis in *Raytheon*, however, certainly applies here: the expert could not "offer testimony to the effect that Raytheon does not actually own the trade secrets it asserts because they are allegedly subject to independent discovery" because doing so would amount to "an inadmissible legal opinion." *Raytheon Co. v. Indigo Sys. Corp.*, 598 F. Supp. 2d 817, 821 (E.D. Tex. 2009). Thus, the court in *Raytheon* correctly held that ownership of intellectual property is fundamentally a legal determination. *See id.*; *see also Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 WL 4065465, at *9 (S.D. Tex. Oct. 9, 2010) (Ellison, J.) (excluding expert "opinions regarding authorship, ownership, and derivative works … as improper legal opinions"). IBM fails to offer any reason that Hartley's opinion that proprietary information is owned by another party is not likewise a legal conclusion.

---

[7] IBM further argues that Hartley did not evaluate the contractual restrictions because it would be an impermissible legal conclusion to determine whether IBM violated the applicable contractual provisions. BMC does not argue that Hartley should be excluded because he did not opine on contractual violations. Rather, it is clear from Hartley's testimony that he has no basis to opine on whether the *factual assertions* underlying BMC's misappropriation claim are correct, *i.e.*, whether IBM used the asserted trade secrets to displace BMC's products. That is not a legal conclusion; it is a technical determination based on IBM's conduct.

**Contains Attorneys' Eyes Only and Confidential Information**

IBM cites two unpublished, out-of-circuit cases to argue that Hartley should be permitted to offer opinions about the ownership of proprietary information. Both cases addressed different circumstances. *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC* involved the testimony of two employees of the plaintiff designated as expert witnesses who were testifying about whether the information at issue originated from their company. And *Polyzen, Inc. v. Radiadyne LLC* involved breach of a development agreement governing which party owned the product at issue and the inventorship of a subsequent patent filed by the plaintiff. *See* 2016 WL 5360576, at *7 (E.D.N.C. Sept. 23, 2016) ("The 2008 DCA assigns to RadiaDyne the so-called "RadiaDyne Product," or the "[s]pecific design of rectal balloon catheter for locating/supporting prostate during radiation therapy with Polyzen's Balloon Process Technology.") (emphasis omitted). Unlike the expert testimony addressed in *Polyzen*, Hartley disclaimed any opinions regarding the contractual provisions involved in this case. *See* Mot. at 12-13.

IBM does not dispute that Hartley did not consider the applicable contractual provisions in this case. IBM instead argues that Hartley's opinions are "based on [his] experience in the industry" and with outsourcers. Resp. at 18. But IBM fails to explain how Hartley's general experience in IT outsourcing supports his opinions about the ownership of the specific technical information in this case. *See Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("Without more than credentials and a subjective opinion, an expert's opinion that 'it is so' is not admissible."); *State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*, 2019 WL 1436659, at *5 (N.D. Tex. Mar. 31, 2019) (where an expert witness is relying solely or primarily on experience, he "must explain how that experience leads to the conclusion reached, why that experience is sufficient basis for the opinion, and how that experience is reliably applied to the facts." (citing FED. R. EVID. 702

**Contains Attorneys' Eyes Only and Confidential Information**

advisory committee's notes)).[8] Similarly, the two factual assertions cited by IBM do not support Hartley's sweeping generalizations that AT&T owns proprietary information about BMC products merely because they are installed in AT&T's environment.[9]

## V. Hartley's Opinions About Allegedly "Standard" Conduct of IT Outsourcers Do Not Rebut Román's Opinions, and Are Irrelevant.

IBM argues Hartley's opinion that ▮▮▮▮▮▮▮▮ is allegedly "standard" in the IT industry is relevant because it rebuts Román's technical analysis describing IBM's use of BMC products to perform ▮▮▮▮▮▮▮▮ to displace them. Resp. at 20, 22. But it is IBM's performance of ▮▮▮▮▮▮▮▮ at AT&T—not how often it is done in the IT industry in general—that is relevant. BMC asserts that IBM breached the limitations on its access and use of BMC products at AT&T when it performed ▮▮▮▮▮▮▮▮ to displace them.[10] *See Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) ("Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'"). Hartley's general claim, without any reference to the relevant contractual provisions, that ▮▮▮▮▮▮▮▮ is allegedly "standard" says nothing about whether IBM breached the terms of its access and use. Significantly, Hartley

---

[8] In footnote 15 to its opposition, IBM argues that "Román conceded that the proprietary information at issue could have belonged to AT&T." Resp. at 19 n.15. IBM mischaracterizes Román's testimony, which addressed the various possibilities of which party owned the JCL programming used in a mainframe environment. *See* Resp., Ex. 2, Román Dep. Tr. at 234:20-235:13. Román's testimony about JCL programming, generally, is unrelated to Román's trade secret opinions, which instead focus on specific ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ Moreover, Román's testimony in fact supports BMC's arguments. As Román explains, contrary to Hartley's unsupported opinions, there are no general rules regarding the ownership of proprietary information in a mainframe environment, and the determination of ownership must be made with specific reference to the information at issue.

[9] Nor is the evidence IBM cites related to Román's opinions—Román did not opine that BMC owns "how [AT&T's] environment works" or AT&T's system "dump." *See* Resp. at 19.

[10] IBM mischaracterizes BMC's motion as criticizing Hartley because "he is not a contracts expert" and "for not offering an impermissible legal opinion regarding whether IBM breached the relevant contract provisions in this case." Resp. at 23. BMC did not argue that Hartley's opinions should be excluded for those reasons. Rather, Hartley's opinion that IBM's conduct was allegedly "standard" is irrelevant because it is untethered to BMCs allegation that IBM breached the relevant contract provisions by using BMC's products for ▮▮▮▮▮▮▮▮

**Contains Attorneys' Eyes Only and Confidential Information**

does not dispute that IBM performed ▮▮▮▮ to complete Project Swallowtail. Ex. B, Hartley Dep. at 231:19-23. Nor is it controversial that ▮▮▮▮ helped IBM displace BMC's products in a shorter period of time than if IBM had not used BMC products for that purpose. *Id.* at 232:21-233:3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, 230:25-231:15 ("… comparing outputs, yes, that's going to help you configure your new product correctly.").

IBM's argument that Hartley's opinion is reliable because he has experience "working as, and with, outsourcers," Resp. at 21, does not satisfy IBM's burden. Whatever experience Hartley claims to have with IT outsourcers, it is clear he did not apply that experience with any real effort to evaluate IBM's conduct on Project Swallowtail in this case. Rather, Hartley testified that "[he] didn't spend a lot of time analyzing Project Swallowtail," Ex. B, Hartley Dep. at 81:13-21, and could not even recall specific Project Swallowtail documents that he reviewed to form his opinions. *Id.* at 41:13-42:3; *see Hathaway,* 507 F.3d at 318 (credentials and a subjective opinion "that 'it is so' is not admissible.").

Accordingly, Hartley's opinion that IBM's conduct was allegedly "standard" is irrelevant to the resolution of BMC's claims and, further, lacks a reliable connection to IBM's conduct in displacing BMC's products, which Hartley scarcely even considered in forming his opinions.

## CONCLUSION

For the foregoing reasons, and the reasons stated in BMC's motion, BMC requests that the Court exclude the opinions of IBM's expert Bruce V. Hartley.

**Contains Attorneys' Eyes Only and Confidential Information**

| | |
|---|---|
| Date: November 25, 2020 | Respectfully submitted, |
| | |
| Of Counsel, | /s/ *Sean Gorman* |
| **Bracewell LLP** | Sean Gorman |
| Christopher L. Dodson | Texas State Bar No. 08218100 |
| Texas State Bar No. 24050519 | S.D. Bar No. 10168 |
| S.D. Bar No. 613937 | 711 Louisiana Street, Suite 2300 |
| Timothy R. Geiger | Houston, Texas 77002-2781 |
| Texas State Bar No. 24078552 | (713) 221-1221 Telephone |
| S.D. Bar No. 1742526 | (800) 404-3970 Facsimile |
| 711 Louisiana Street,  Suite 2300 | sean.gorman@bracewell.com |
| Houston, Texas 77002-2781 | |
| (713) 223-2300 Telephone | **Attorney-In-Charge for** |
| (800) 404-3970 Facsimile | **BMC Software, Inc.** |
| chris.dodson@bracewell.com | |
| tim.geiger@bracewell.com | |

**Contains Attorneys' Eyes Only and Confidential Information**

-12-

## CERTIFICATE OF SERVICE

I certify that a copy of BMC's Reply in Support of its Motion to Exclude the Opinions of IBM's Expert Bruce V. Hartley has been served on all counsel of record by ECF filing on November 25, 2020.

/s/ *Kyle A. Mason*
Kyle A. Mason

**Contains Attorneys' Eyes Only and Confidential Information**