Case 4:17-cv-02254   Document 603   Filed on 02/07/22 in TXSD   Page 1 of 10

United States District Court
Southern District of Texas
**ENTERED**
February 07, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | § | |
| | § | |
| *Defendant*. | § | |

ORDER

On June 7, 2021, United States Magistrate Judge Christina A. Bryan issued a Memorandum and Recommendation ("M&R") on multiple motions for summary judgments. Dkt. 561. The parties filed objections and responses to objections. Dkts. 567, 569, 577, 580. The court adopted the M&R in part. Dkt. 586. Following its order of adoption, the court ordered the parties to provide a joint status report detailing the remaining issues for trial. Dkt. 587. The parties' disagreement as to that issue was evident in their report, *see* Dkt. 588, and the court held a status conference on December 17, 2021, to further elucidate the scope of their disagreement. Minute Entry of December 17, 2021. At the court's request, the parties filed memoranda summarizing the remaining issues for trial. *See* Dkts. 597, 598, 600, & 601. The court issues this order clarifying its prior decision.[1]

---

[1] The parties' filings highlight their disagreement not only on the issues raised during the status conference—whether there was a meeting of the minds, whether the contract is an unenforceable restrictive covenant, and what elements for the breach of contract claims remain—but also on matters of law relating to damages and fraudulent inducement, to name but two. *See* Dkts. 597, 598, 600, & 601. The court's request for memoranda was not an invitation to re-open summary judgment. Accordingly, the instant order does not resolve all the outstanding legal issues raised by the parties.

# I. DISCUSSION

This order addresses five specific issues: (1) whether the parties had a meeting of the minds on § 5.4 of the 2015 OA; (2) whether the issue of whether § 5.4 is an unenforceable restrictive covenant remains to be tried; (3) what elements in BMC's breach of contract claim regarding § 5.4 remain to be tried; (4) the meaning of § 5.1 and what elements in BMC's breach of contract claim regarding § 5.1 remain to be tried; and (5) what elements in BMC's breach of contract claim regarding MLA § 8 remain to be tried.

### 1. Agreement to the unambiguous contract language is objective evidence that the parties formed a meeting of the minds.

IBM requests a ruling on the meeting-of-the-minds question, citing the M&R's conclusion that BMC had raised a fact issue. *See* Dkt. 597 at 18, n. 4. To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound. *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121, 873 N.Y.S.2d 43 (N.Y. App. Div. 2009). These elements establish a "meeting of the minds" — a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Stonehill Capital Mgt. LLC v. Bank of the W.*, 28 N.Y.3d 439, 448, 45 N.Y.S.3d 864, 68 N.E.3d 683 (2016); *see also Ostojic v. Life Med. Techs., Inc.*, No. 15091, 2022 WL 150610, at *1 (N.Y. App. Div. Jan. 18, 2022) (noting that the parties' meeting of the minds must include agreement on all essential terms). Agreement to unambiguous language implies a meeting of the minds because unambiguous language "has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself and concerning which there is no reasonable basis for a difference of opinion." *See 6115 Niagara Falls Boulevard, LLC v. Calamar Constr. Mgmt., Inc.*, 193 A.D.3d 1436, 147 N.Y.S.3d 831 (N.Y. App. Div. 2021) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565 (2002)) (alterations

omitted). *See also Robert Cohn Assocs., Inc. v. Kosich*, 38 Misc. 3d 1233(A), 969 N.Y.S.2d 806 (Sup. Ct. 2008), *aff'd*, 63 A.D.3d 1388, 881 N.Y.S.2d 235 (N.Y. App. Div. 2009) (holding that an unambiguous "signed and integrated writing provides objective evidence of the parties' meetings of the minds regarding essential contract terms and, therefore, represents a binding and enforceable contract."); *Indep. Cmty. Bank v. Olympia Mortg. Corp.*, 17 Misc. 3d 1109(A), 851 N.Y.S.2d 64 (Sup. Ct. 2007) (finding the "meeting of the minds" defense "devoid of merit" where party agreed to "express written terms" of a guaranty).

In keeping with these principles, the court concludes that the parties had a meeting of the minds. The M&R's conclusion that whether IBM and BMC had a meeting of the minds was a fact question was predicated on its finding that the 2015 OA, including § 5.4, was ambiguous. *See* 561 at 10–13. The court disagreed with that finding and concluded that the 2015 OA provisions, including § 5.4, were unambiguous. Dkt. 586 at 3. Because the 2015 language is unambiguous, it is axiomatic that the parties formed a meeting of the minds.

### 2. The court's ruling that IBM is liable for breach of § 5.4 did not resolve whether the breach caused BMC's damages or if BMC performed pursuant to the contract.

With respect to § 5.4, BMC argues that "the *sole* related issue for trial is the amount of damages." Dkt. 598 at 7 (emphasis added). IBM disagrees and claims that the court must still "decide whether BMC has proved that IBM's role in AT&T's Project Swallowtail actually and directly *caused* the claimed BMC damages." Dkt. 597 at 8 (emphasis added). IBM relatedly argues that BMC must also show that it performed pursuant to the contract. *Id.* at 13.

New York law requires the following four elements to sustain a breach of contract claim: (1) the existence of a contract; (2) the plaintiff's performance pursuant to the contract; (3) the defendant's breach; and (4) damages resulting from, or caused by, that breach. *Riccio v. Genworth Fin.*, 184 A.D.3d 590, 591, 124 N.Y.S.3d 370 (N.Y. App. Div. 2020). As the Court of Appeals of

3

New York has explained, "[i]t is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach—*i.e.*, where the transaction would have failed and the damage would have been suffered, even if no breach occurred." *Pesa v. Yoma Dev. Grp., Inc.*, 18 N.Y.3d 527, 532, 965 N.E.2d 228 (2012).

In its summary judgment motion, BMC argued that IBM violated § 5.4 by displacing BMC's products with its own, addressing "only the third element of BMC's claims—*i.e.*, whether IBM breached Sections 1.1 and 5.4 of the 2015 OA under the proper construction of the contract." Dkt. 381 at 36. The court found that BMC established that third element. Dkt. 586 at 4–5. However, the court did not decide whether BMC performed pursuant to the contract or what damages were caused by the breach because BMC did not raise those questions in its motion. *See id.* Therefore, those two elements remain to be decided at trial.

Regarding causation, BMC must prove that IBM "breach *directly and proximately caused* [its] damages." *See Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis original). Because damages must "be directly traceable to the breach," IBM is permitted to produce evidence disputing the causal nexus between its breach and BMC's harm. *See id.* at 526.

BMC's performance is also an essential element of its breach of contract claim. *See Legum v. Russo*, 133 A.D.3d 638, 639, 20 N.Y.S.3d 124, 126 (N.Y. App. Div. 2015). In its Seventh Affirmative Defense in answering BMC's second amended complaint, IBM argued that the equitable doctrine of unclean hands barred BMC's claims. As the M&R recounted:

> IBM's unclean hands defense is based on the allegation that BMC breached the 2013 and 2015 OAs by not disclosing material differences between its contract with AT&T and its standard EULA which would have allowed IBM to operate BMC software licensed to AT&T without electing to proceed under the 'access and use' provisions of the OA.

4

Dkt. 561 at 51. IBM now repackages this defense as a challenge to whether BMC performed pursuant to the contract.[2] *See* Dkt. 597 at 12–14. Because neither party moved for summary judgment on BMC's performance, that issue remains for trial.

### 3. Whether § 5.4 is an unenforceable restrictive covenant was not squarely resolved on summary judgment and may be raised at trial.

IBM contends that the question of whether § 5.4 is an unenforceable restrictive covenant remains to be tried because BMC did not move for summary judgment on that defense. Dkt. 597 at 14–15. BMC disagrees, arguing that the court "implicitly resolved" the question when it adopted the M&R's conclusion that the § 5.4 serves a legitimate business interest. Dkt. 601 at 6–7 (citing Dkt. 561 at 12–13).

Rule 56 permits a party to move for summary judgment but it instructs that the party must "identif[y] each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Typically, a district court may grant summary judgment only on grounds requested by the moving party." *Molina v. Home Depot USA, Inc.*, 20 F.4th 166, 169 (5th Cir. 2021). Relatedly, a court cannot grant summary judgment *sua sponte* without giving the parties at least ten days' notice. *Id.* (citing *Lozano v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 641 (5th Cir. 2007).

IBM raised § 5.4's enforceability as an affirmative defense in its answer to BMC's second amended complaint. Dkt. 299 at 22. BMC moved for partial summary judgment on some of IBM's affirmative defenses but not its enforceability defense. *See* Dkt. 387. Instead, IBM argued

---

[2] IBM correctly notes that its unclean hands defense responds to BMC's claims for *equitable* relief. Dkt. 597 at 13. The unclean hands defense cannot be used to defend against a contract action for damages. *See Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 607 (2d Cir. 2005) ("Unclean hands is an equitable defense to equitable claims...Because [the plaintiff] seeks damages in an action of law, [the defendant] cannot avail itself of unclean hands as a defense."); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 742 (S.D.N.Y. 1989).

5

that it was entitled to summary judgment on BMC's interpretation of § 5.4 because "[a]ccepting BMC's interpretation" of the provision would render it a "restrictive covenant" as a matter of law. Dkt. 396 at 27, 45. The M&R rejected IBM's interpretive argument, concluding that the provision advanced "legitimate business interests" under the "rule of reason" test. Dkt. 561 at 12. The court adopted the M&R's analysis as its own except otherwise noted. Dkt. 586 at 11. It did not exempt the M&R's enforceability analysis under the larger umbrella of contract interpretation from its holding. *See id.* So, BMC is correct in asserting that the court agreed with "the M&R's reasoning that refutes IBM's argument." Dkt. 601 at 7.

However, as a procedural matter, IBM is correct that its enforceability defense was not squarely resolved during the summary judgment stage of this case. Mindful of the Federal Rules of Civil Procedure, recent Fifth Circuit caselaw, and the upcoming trial dates, the court holds that whether § 5.4 is an unenforceable restrictive covenant under New York law is an issue remaining for trial.

### 4. Though § 5.1 did not authorize IBM to displace BMC's products, whether IBM's displacement activities were for the sole purpose of supporting AT&T remains to be tried.

IBM also appears to request clarification as to the meaning of § 5.1, noting that "the parties...dispute whether the Court ruled that § 5.1 is a *prohibition* on displacement of BMC software or is not itself permission for displacement." *See* Dkt. 597 at 18 (emphasis original).

"A written contract will be read as a whole, and every part will be interpreted with reference to the whole." *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358, 794 N.E.2d 667 (2003). Where that contract is "straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Ruttenberg v. Davidge Data Sys. Corp.,* 215 A.D.2d 191, 192, 626 N.Y.S.2d 174 (N.Y. App. Div. 1995). But even when a contract is complicated—and the business relations it governs complex—it is still

unambiguous so long as its language has a "definite and precise meaning, unattended by the danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference in opinion." *Greenfield*, 98 N.Y.2d at 569. This is true even when a contract is silent on certain issues. *Id.*

In interpreting contracts, courts are to give effect to each term and avoid the interpretation that would render contractual language mere surplusage. *See Laba v. Carey*, 29 N.Y.2d 302, 308, 277 N.E.2d 641 (1971). Just as they are to avoid surplusage, so too are courts counseled against "interpreting a contract so as to produce unreasonable results." *Fresh Del Monte Produce N.V. v. Eastbrook Caribe A.V.V.*, 40 A.D.3d 415, 418, 836 N.Y.S.2d 160 (N.Y. App. Div. 2007). "It is a well-established canon of interpretation that in seeking for the intent of the parties the fact that a construction contended for would make the contract unreasonable may be properly taken into consideration." *Fleischman v. Furgueson*, 223 N.Y. 235, 241, 119 N.E. 400 (1918).

As is standard, the court starts with the contract's text. Section 5.1 (Access and Use) provides that:

> BMC will allow Customer to use, access, install and have operational responsibility of the BMC Customer Licenses (together, "Access and Use") under the terms of the BMC Customer's license agreement with BMC for no fee, including on Computers owned or leased by BMC Customer and at BMC Customer's facility, provided that the BMC Customer Licenses are used solely for the purposes of supporting the BMC Customer who owns such licenses...Except as set forth herein, the BMC Customer Licenses will continue to be governed by the terms, conditions and discounts of the BMC license agreement between BMC and the BMC Customer; notwithstanding the terms of the Agreement and the OA, Customer shall be bound by such terms of such license agreement.

Section 5.4 (Non-Displacement) provides:

> This Non-Displacement provision applies only to Customer's Access and Use of BMC Customer Licenses by Customer's strategic outsourcing division (or its successor) for the BMC Customers listed on Exhibit K (the "Exhibit K Customers"). Subject to the foregoing, Customer agrees that, while Customer cannot displace any BMC Customer Licenses with Customer products, Customer may discontinue use of BMC Customer Licenses for other valid business reasons.

> All terms of Sections 5.1, 5.2 and 5.3 apply to Customer's use of BMC Customer licenses belonging to any Exhibit K Customers. BMC and Customer agree to update the Information contained on Exhibit K as part of the reporting requirements in Section 5.3.

Dkt. 382, Ex. 2 at 1–3.

In its prior order, the court concluded that "§ 5.1 is unambiguous and must be interpreted to preclude access and use of Customer licenses to displace BMC products." Dkt. 586 at 6. IBM now questions whether § 5.1 prohibits the displacement of BMC software or "is not itself permission for displacement." Dkt. 597 at 18. IBM argues that reading § 5.1 as a blanket prohibition on displacement would make § 5.4 redundant, a surplusage anathema to the principles of contract interpretation. *See id.* Embracing the latter construction, IBM contends that "it did not breach § 5.1 because any access, use, and operational responsibility for AT&T's BMC licenses was solely to support AT&T." *Id.* at 19. BMC counters that § 5.1 plainly "prohibits using BMC's Customer Licenses under § 5.1 to displace BMC products." Dkt. 601 at 7.

The court's conclusion rested, in part, on the contract's "operational responsibility" provision. *See* Dkt. 586 at 5. Section 5.1 "allow[ed]" IBM to "use, access, install and have *operational responsibility* of the BMC Customer Licenses." Dkt. 382, Ex. 2 at 1–3; *supra* at 7 (emphasis added). IBM previously argued that this language empowered it to remove BMC's licenses and displace BMC's products with its own. *See* Dkt. 396 at 38. But, relying on the rules guarding against surplusage, the court explained that:

> This is not a viable interpretation of the contract and cannot render the language of § 5.1 ambiguous. *See* Dkt. 561 at 10 (citing common definitions of "operational responsibility"). Reading the contract as a whole, "operational responsibility" cannot be interpreted so broadly that it renders the entire purpose of Exhibit K and the non-displacement provision meaningless.

Dkt. 586 at 5. If the phrase "operational responsibility" were construed to permit IBM to effectively *displace* the operation of BMC's software, "little acuity is needed to see the

8

unreasonableness of the results that well could ensue" after accounting for § 5.4's explicit non-displacement provision. *See Fresh Del Monte Produce N.V.*, 40 A.D.3d at 419.

Nevertheless, that § 5.1 cannot be read to authorize IBM to displace BMC's software does not mean, as a matter of logic or contract interpretation, that it prohibits displacement. Failure to permit displacement does not, by itself, transform into a prohibition against displacement. This is especially the case given that § 5.4 governs displacement. In distinguishing the two provisions, the M&R explained that:

> Section 5.1 governs how and why IBM may access and use BMC licenses (including that it may not do so for its own benefit), whereas § 5.4 governs how and why IBM may displace BMC products with its own. The Court is not persuaded that IBM could not simultaneously comply with BMC's interpretations of §§ 5.1 and 5.4. For one thing, § 5.4 is limited to the 54 customers on Exhibit K and there are many more BMC customers who use IBM IT outsourcing services. In addition, there appear to be fact issues regarding whether IBM could have displaced BMC products without "access and use" of AT&T's licensing rights (thereby complying with § 5.1).

Dkt. 561 at 11. Given the different roles each provision plays, the court will not distort the overall meaning of the contract by giving "undue force...to single words or phrases" found in § 5.1. *See Westmoreland Coal Co.*, 100 N.Y.2d at 358. Equally important is that § 5.1 qualifies the scope of its allowances: any use of the BMC Customer Licenses is restricted for the "sole[]...purpose of supporting the BMC Customer who owns such licenses." Dkt. 382, Ex. 2 at 1–3. Reading the contract as a "harmonious and integrated whole," the court agrees with IBM that § 5.1 does not serve as a broader prohibition of displacement than the actual non-displacement provision, § 5.4. *See Westmoreland Coal Co.*, 100 N.Y.2d at 358.

Therefore, the issue of breach—whether IBM's use of "BMC products to accomplish the processes to displace BMC's products," *see* Dkt. 601 at 8, was done for the "sole[]" purpose of supporting AT&T—is a question of fact that remains to be tried. The elements of plaintiff's performance and causation of damages also remain. *See Riccio*, 184 A.D.3d at 591.

9

**5. Breach, causation, and damages elements regarding BMC's MLA § 8 claim remain to be tried.**

BMC also brings a breach of contract claim against IBM regarding MLA § 8. The M&R denied IBM's motion for summary judgment on that claim and this court adopted that finding. *See* Dkts. 561 at 15, 586 at 11. Therefore, BMC's breach of contract claim for § 8 of the MLA remains to be tried consistent with each element described in New York law.[3] *See Riccio*, 124 N.Y.S.3d at 372.

### III. CONCLUSION

Consistent with the analysis above, the court holds as follows:

1. The parties formed a meeting of the minds when they agreed to the unambiguous contract language in the 2015 OA;

2. With respect to BMC's breach of contract claim regarding § 5.4 of the 2015 OA, the elements of its performance and the causation of damages remain to be tried;

3. Whether § 5.4 is an unenforceable restrictive covenant remains to be tried;

4. With respect to its breach of contract claim regarding § 5.1, the elements of BMC's claim remain to be tried;

5. With respect to its breach of contract claim regarding MLA § 8, the elements of BMC's claim remain to be tried.

Signed at Houston, Texas on February 7, 2022.

Gray H. Miller
Senior United States District Judge

---

[3] BMC proposes that the court resolve the legal argument as to whether a document's restrictive marking is a condition precedent to enforcing MLA § 8. Dkt. 598 at 18–19, n. 8. BMC did not move for summary judgment on that issue and the court declines to re-open the summary judgment stage of this case on the suggestion of a footnote.