## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | CASE NO. 4:17-cv-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant*. | § | |

## JOINT PRETRIAL ORDER (SEALED)

Plaintiff BMC Software, Inc. ("BMC") and Defendant International Business Machines

Corporation ("IBM") respectfully submit this Joint Pretrial Order for the Court's approval.

## APPEARANCE OF COUNSEL

BMC appears through the following counsel of record:

Sean Gorman
Texas State Bar No. 08218100
S.D. Bar No. 10168
BRACEWELL LLP
711 Louisiana Street,  Suite 2300
Houston, Texas 77002-2781
(713) 223-2300 Telephone
sean.gorman@bracewell.com

Christopher L. Dodson
Texas State Bar No. 24050519
S.D. Bar No. 613937
BRACEWELL LLP
711 Louisiana Street,  Suite 2300
Houston, Texas 77002-2781
(713) 223-2300 Telephone
chris.dodson@bracewell.com

Timothy R. Geiger
Texas State Bar No. 24078552
S.D. Bar No. 1742526
BRACEWELL LLP

711 Louisiana Street,  Suite 2300
Houston, Texas 77002-2781
(713) 223-2300 Telephone
tim.geiger@bracewell.com

Andrew W. Zeve
BRACEWELL LLP
Texas State Bar No. 24042209
S.D. Bar No. 570754
711 Louisiana Street,  Suite 2300
Houston, Texas 77002-2781
(713) 223-2300 Telephone
andrew.zeve@bracewell.com

IBM appears through the following counsel of record:

Richard I. Werder, Jr. (pro hac vice)
Rachel E. Epstein (pro hac vice)
Donald J. Reinhard, II (pro hac vice)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
rickwerder@quinnemanuel.com
rachelepstein@quinnemanuel.com
donaldreinhard@quinnemanuel.com

R. Paul Yetter
Reagan W. Simpson
Timothy S. McConn
Grant B. Martinez
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 682-8000
pyetter@yettercoleman.com
rsimpson@yettercoleman.com
tmcconn@yettercoleman.com
gmartinez@yettercoleman.com

*Contains Attorneys' Eyes Only and Confidential Information*

## STATEMENT OF THE CASE

BMC previously licensed mainframe software products to AT&T.  At the same time, IBM provided AT&T with information technology (IT) "outsourcing" services in which IBM operated AT&T's mainframe computing environment.  On July 17, 2017, BMC filed suit against IBM, claiming, *inter alia*, that IBM improperly used its access to BMC's software products licensed by AT&T in violation of its contracts with BMC and other laws, including by displacing AT&T's BMC software products with IBM's competing products.  IBM denies BMC's allegations.  The case is set for trial beginning on March 14, 2022 subject to prior rulings of the Court.

## JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because there is complete diversity between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Additionally, the Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  There are no unresolved jurisdictional questions.

## MOTIONS

There are no motions pending before the Court at this time.

## CONTENTIONS OF THE PARTIES

**BMC's Contentions:**

BMC and IBM sell competing mainframe software products.  For decades, AT&T was BMC's mainframe software customer and held licenses to many of BMC's software products. Like virtually all software companies, BMC controls the permitted use of its software products through licenses and related agreements that give customers certain specifically enumerated rights to use the BMC software products, while ensuring that BMC is compensated for its investment in

*Contains Attorneys' Eyes Only and Confidential Information*

developing and updating its proprietary software products.  In addition to selling software products, IBM also sells (and at all times relevant to this lawsuit, sold) information technology services, such as IT outsourcing services in which a customer hires IBM to operate the customer's mainframe computing environment, including the customer's mainframe software products.  The operation of AT&T's mainframe environment has been completely outsourced to IBM, giving IBM special access to BMC's software products and customer support and to its customer, AT&T. Internally, IBM valued its outsourcing agreement with AT&T at over ███████████████.

The fact that IBM sells mainframe software products and hardware alongside its outsourcing services makes IBM unique among outsourcers.  IBM offers a full suite of mainframe software products that overlaps and directly competes with BMC's suite of products.  That creates significant risk for BMC when IBM provides outsourcing services to a customer that uses BMC software products.  To protect BMC's proprietary interests in its software, and to preclude IBM, one of BMC's largest competitors in the mainframe software space, from taking advantage of its access to BMC software and support when performing outsourcing services, BMC and IBM entered into an agreement to facilitate IBM's use of BMC products while acting as an outsourcer. This "Outsourcing Attachment" benefited IBM by giving it a centralized set of rights, terms, and conditions vis-à-vis BMC products when providing outsourcing services, which minimized the practical difficulties and compliance risks inherent in operating under a different set of terms with each outsourcing customer.  The structure of the Outsourcing Attachment dates back to 2008.  At that time, the parties also entered into a Master License Agreement (the "MLA") to govern their relationship worldwide and set general terms for IBM to license BMC products.  Since then, the parties have renewed or amended the Outsourcing Attachment in 2013, 2015, and 2018.

*Contains Attorneys' Eyes Only and Confidential Information*

The 2015 Outsourcing Attachment (the "OA" or "2015 OA") is operative for the events at issue in this case.  It provides IBM with five heavily-negotiated options when it acts as an IT outsourcer for a customer that licenses BMC's products and uses IBM's outsourcing services.  One option allows IBM to access and use the mutual customer's BMC licenses for no cost when providing outsourcing services to that customer, subject to certain restrictions, including that IBM is prohibited from displacing BMC products with IBM products at certain mutual customers (including AT&T).  Unlike prior Outsourcing Attachments, which prohibited displacement at *all* mutual customers under this option, the 2015 OA prohibited displacement at only 54 actual or potential IBM customers.  At the time the OA was signed, only 18 of those were actually outsourced to IBM.  So the displacement prohibition applied to only 18 IBM customers, one of which was AT&T.

Another option under the 2015 OA grants IBM greater use rights of BMC products and avoids the non-displacement restrictions if IBM purchases BMC licenses at an agreed negotiated ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  IBM and BMC heavily negotiated these options, and IBM understood how they worked in practice.  In various internal presentations, IBM ▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  IBM also repeatedly acknowledged ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  telling its people around the world that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉

The 2013 Outsourcing Attachment (the "2013 OA") was not set to expire until 2018.  In 2015, however, the parties began negotiating the 2015 OA as a mid-term amendment to the 2013

*Contains Attorneys' Eyes Only and Confidential Information*

OA.   Concurrently, and unbeknownst to BMC, IBM was also negotiating a new outsourcing agreement with AT&T, one of both BMC's and IBM's largest customers, as part of which IBM would displace AT&T's BMC products with IBM products.   Under this agreement, IBM would receive ████████████████████████████████████   The IBM-AT&T outsourcing negotiation was code-named Project Cirrus, and the displacement portion was code-named Project Swallowtail.

Throughout the negotiations of the 2015 OA, IBM actively hid Project Swallowtail and its planned displacement at AT&T from BMC, instructing its employees ████████████████ ███████████████████   After IBM and AT&T signed the Project Cirrus agreement, IBM began trying to negotiate terms to the 2015 OA that would permit its now contractually required displacement of BMC products at AT&T.   It first tried to get the non-displacement provision removed—BMC refused.   It then tried to negotiate for an exception that it thought would include Project Swallowtail—BMC refused.   It then tried to negotiate the removal of AT&T from the list of customers that the non-displacement provision covered—BMC refused again.   Because IBM had to have the OA in order to provide outsourcing services to the hundreds of customers it shared with BMC, it eventually executed the OA.   Instead of paying for the broader use rights that would allow IBM to execute its displacement contract with AT&T without breaching the OA, however, IBM told BMC that it was proceeding at AT&T under the OA's free access and use option.   IBM then performed the displacements anyway—without purchasing the rights to do so at the contractually-negotiated discount.   IBM's failure to pay for these broader use rights deprived BMC of the benefits of its bargain.

After the execution of the 2015 OA and the start of Project Swallowtail, IBM continued to hide its efforts to displace BMC products at AT&T despite BMC's repeated requests for

*Contains Attorneys' Eyes Only and Confidential Information*

confirmation, once rumors surfaced, that IBM was *not* displacing BMC's AT&T products without purchasing the requisite licenses.  Finally, having exhausted all attempts at diplomacy, on July 17, 2017, BMC filed this lawsuit against IBM.  The parties have since completed discovery and filed several summary-judgment motions, which the Court has granted in part and denied in part.  At this point in the litigation, the remaining claims are BMC's claims for (1) breaches of contract based on §§ 5.1 and 5.4 of the OA and § 8 of the MLA, (2) fraudulent inducement, (3) violations of the Texas Uniform Trade Secrets Act (TUTSA) and the Defend Trade Secrets Act (DTSA), and (4) common-law unfair competition by misappropriation.  In light of the Court's prior rulings, BMC's contentions are as follows:

*First*, as the Court has held as a matter of law, IBM breached OA § 5.4 by displacing BMC's products with IBM's products at AT&T.  And because IBM's access and use of BMC's products, including to accomplish the displacement, was not for the sole purpose of supporting AT&T, IBM also breached OA § 5.1.  Additionally, IBM breached MLA § 8 when using and distributing BMC's confidential information as part of Project Swallowtail.  BMC incurred significant damages, including the loss of the benefit of its bargain under the OA, as a result of IBM's breaches, and is entitled to recover on its claims for breach of contract in this case.

*Second*, IBM fraudulently induced BMC into the OA by signing the unambiguous contract, promising to perform under the unambiguous terms of the OA, including by not displacing BMC products with IBM products unless IBM purchased the license rights to do so, while simultaneously having no intention of so performing.  This was a material misrepresentation that IBM knew was false at the time and that IBM made intending to induce BMC to enter into the OA.  BMC actually and justifiably relied on that misrepresentation in entering into the OA.  In doing

*Contains Attorneys' Eyes Only and Confidential Information*

so, BMC incurred significant resulting damages, including the loss of the benefit of its bargain under the OA.

*Third,* IBM violated TUTSA and DTSA by soliciting from BMC detailed technical information about the internal operation of BMC's products, processes, and technical analysis, which qualifies for trade-secret protection and which IBM then misappropriated in executing Project Swallowtail. IBM's misappropriation of BMC's trade secrets caused BMC significant damages.

*Fourth*, as to any information that does not qualify for trade-secret protection, IBM engaged in unfair competition by using BMC's confidential and proprietary information in executing Project Swallowtail. BMC's confidential and proprietary information was created through BMC's extensive time, labor, skill, and money. IBM's use of it gave IBM a special advantage in competing with BMC by assisting IBM in the displacement of BMC's AT&T products without purchasing the requisite licenses, thereby causing BMC significant damages.

As damages, BMC will seek its loss of the license and support fees prescribed by the OA for the bundle of rights that IBM exercised but did not pay for, BMC's loss of profits from AT&T that also result from IBM's conduct, and alternatively for the trade-secrets claim, a reasonable royalty to compensate BMC for IBM's misappropriation of BMC's trade secrets. Although the MLA contains damages limitations provisions, they do not apply to the facts of this case, and they are not enforceable in any event because IBM's conduct "smacks of intentional wrongdoing," as it was fraudulent, malicious, in bad faith, *or* recklessly indifferent to BMC's rights. And regardless of enforceability, by their plain language, those damages limitations do not apply to BMC's claims for breach of MLA § 8, TUTSA and DTSA violations, and common-law unfair competition by misappropriation, and they allow for the full amount of lost license and support fees (both of which

*Contains Attorneys' Eyes Only and Confidential Information*

are "payable by IBM") that BMC seeks here.  Additionally, BMC will seek exemplary damages based on IBM's fraud and also based on IBM's willful and malicious trade-secret misappropriation.  BMC is also entitled to prejudgment interest on all of its claims and to recover its attorneys' fees and costs.[1]

**IBM's Contentions:**

AT&T was a mutual customer of IBM and BMC and held mainframe software licenses for both IBM and BMC products.  To improve the efficiency of its mainframe IT environment and save money, AT&T decided to stop using ███████████ and to rely instead on a combination of ████████████████  This decision was made by AT&T, for its own business reasons, was not the result of unfair competition by IBM, and did not result in new software sales for IBM.  To implement AT&T's decision, AT&T relied on IBM, which had provided outsourcing services, and carried out many transitional and transformational projects, for AT&T since no later than 1999.  IBM carried out AT&T's decision as AT&T's outsourcer, using the exact same information concerning BMC's products that AT&T itself, or any other outsourcer or IT service provider, would have used to do so.

BMC's claims in this case largely focus on the 2015 OA to the MLA between BMC and IBM.  Like earlier OAs entered into in 2008 and 2013, the 2015 OA contained a non-displacement provision that BMC claims was required to protect IBM from significant competitive risks posed by IBM's dual role as an outsourcer and a BMC competitor in the mainframe software market.  Because AT&T made the decision to replace BMC software with IBM and third-party software for its own business reasons, without any unfair competition by IBM, that justification for the non-displacement provision is not applicable to the AT&T project at issue here.

---

[1] BMC seeks attorneys' fees and costs, but the Court has indicated the attorneys' fees will be addressed separately after trial as previously agreed by the parties.  Dkt. 594 at 16.

*Contains Attorneys' Eyes Only and Confidential Information*

The non-displacement provision in OA § 5.4 is a restrictive covenant, the substantive terms of which have been largely unchanged since 2008. It generated significant controversy and disputed interpretations between BMC and IBM, almost from its inception.

In 2013, fully aware of customer-directed displacement projects in which IBM had participated while accessing and using BMC software licensed by outsourcing customers, BMC sought to change the terms of the non-displacement provision to preclude IBM's interpretation that customer-directed displacements like the one at AT&T were permitted by the provision's "other valid business reasons" clause. BMC ultimately withdrew its insistence on its proposed new language.

In 2015, again fully aware of customer-directed displacements in which IBM had participated while operating under Access and Use, BMC again sought to change the terms of the non-displacement provision. BMC's recitation of the history of these negotiations ignores most of the key facts. IBM's negotiator advised BMC from early on that IBM was not looking to change the non-displacement provision because IBM was comfortable with its position. It was BMC, not IBM, that sought to change the provision. BMC's proposal from the inception of the negotiations was to limit the application of the non-displacement provision only to certain named customers, while changing the language to remove the "other valid business reasons" clause and to insert new language (described internally at ███████████ to foreclose IBM's interpretation that customer-directed displacements were permitted. As in 2013, BMC ultimately withdrew its ███████████████████—a decision that its negotiators recognized would ███████ ██████████ posed by IBM's interpretation of the non-displacement provision—because it ████████████████████████

*Contains Attorneys' Eyes Only and Confidential Information*

Although the 2015 OA, as signed, did not include ██████████████████████ ████████████████████████████████████████ the provision was—as BMC had originally proposed—limited to a named list of customers, including AT&T. For those named customers, the non-displacement provision was unchanged from the 2008 and 2013 OAs—it provided no greater protection than the earlier OAs and did not resolve the parties' competing interpretations. When BMC agreed to this "compromise" result, BMC was fully aware that IBM interpreted the non-displacement provision as allowing it to participate in customer-directed projects like the one at AT&T and that IBM was fully prepared to defend its interpretation in court if necessary. Indeed, that awareness ████████████████████████████████████████ ████████████████████████████████████████ ████████████—precisely because of the way that IBM had interpreted and applied the provision historically.

BMC's contentions include the assertion that IBM "actively hid" AT&T's Project Swallowtail from BMC during the 2015 negotiations. Notwithstanding this contention, at the summary judgment phase of the case, BMC withdrew its claim that IBM committed fraud by failing to disclose AT&T's plans and project to BMC. To the extent that BMC is now seeking to revoke its withdrawal of that claim, IBM respectfully submits that the Court should not allow that to happen. Nor was there any "active hiding" of AT&T's project by IBM. The record will firmly establish that AT&T regarded its decision as confidential information of AT&T that it did not want BMC to know until a time of AT&T's choosing and, accordingly, AT&T insisted that IBM execute a confidentiality agreement specific to this AT&T project.

BMC's claims for damages relating to the assistance that IBM provided to AT&T in implementing AT&T's Project Swallowtail are now focused on what BMC calls "licensing fee

*Contains Attorneys' Eyes Only and Confidential Information*

damages." This is BMC's shorthand for windfall sums that BMC contends IBM could have chosen to pay BMC for IBM-owned licenses duplicating the BMC Customer Licenses held by AT&T that were displaced in Project Swallowtail.  Until this Court's summary judgment, BMC consistently grounded its claim for licensing fee damages on the assertion that these license purchases were required by OA § 1.1.  The Court granted summary judgment holding that § 1.1 unambiguously did not have the effect, or impose the requirements, claimed by BMC.  Although other provisions of the OA (and, specifically, the shared hosting provisions that were newly created and extensively negotiated in 2015) unambiguously impose license purchase obligations on IBM, and impose licensing fee damages remedies like the one BMC seeks here, for other breaches of the OA, the OA unambiguously does not do so for the claimed breaches at issue in this case.  That BMC clearly knew how to create an affirmative obligation to buy licenses and to create a licensing fee damages remedy for breach of that obligation, and yet did not do so for claimed breaches of §§ 5.1 and 5.4, should end the matter with respect to the claimed licensing fee damages.

Recognizing the profound effect of the Court's dismissal of the claim for breach of OA § 1.1 on its licensing fee damages claim, BMC now claims that even though the OA contained no affirmative requirement that IBM purchase BMC licenses for displacement projects, licensing fee damages reflect the "benefit of its bargain" for a claimed breach of §§ 5.1 and 5.4.  But the "bargain" reflected in those provisions is not that IBM will make new purchases of BMC software licenses duplicating a set of BMC Customer Licenses like those held by AT&T.  Section 5.4, in particular, is a restrictive covenant that prohibits IBM from taking certain actions while operating under Access and Use.  It does not reference software purchases.  It reflects no bargain, whether explicit or implicit, that involves IBM purchasing BMC licenses duplicating any BMC Customer Licenses that may have been improperly displaced with IBM's assistance.  And § 5.1 also does

*Contains Attorneys' Eyes Only and Confidential Information*

not purport to impose license purchase obligations on IBM under any circumstances, including for purposes of a displacement project.

IBM therefore responds as follows to BMC's four contentions:

*First*, the Court's finding that IBM breached OA § 5.4 leaves various issues for trial on BMC's claim under § 5.4. One such issue is whether BMC complied with its own contractual obligations under the OA, including § 5.1 and the effect of BMC's non-compliance on its claim for breach of § 5.4.  Further, the Court's finding of breach does not imply a breach of any other provision of the MLA or OA.  As to BMC's claim under OA § 5.1, that claim relies on a reading of the "solely for the purposes" language in § 5.1 that is not supported by the plain language and is not a reasonable reading; IBM never accessed or used AT&T's BMC Customer Licenses to support any customer other than AT&T, which is all that this language in § 5.1 requires.  BMC's claim under MLA § 8 ignores the plain language of OA §§ 3 and 3.1 and suffers from a number of other deficiencies.

*Second*, BMC's fraud claim appears to have abandoned the factual assertions under which Special Master Bryan allowed that claim to survive summary judgment; the claim instead now rests on a theory that is flatly inconsistent with governing Texas law.  Rather than contending that IBM withdrew or abandoned its well-known interpretation of the non-displacement provision during the 2015 negotiations, and that BMC justifiably relied on such a withdrawal or abandonment, BMC now contends simply that since this Court has resolved the dispute over interpretation that BMC's negotiators recognized ███████████████████████ ███████████████ IBM necessarily committed fraud.  This is a transparent attempt to turn a dispute over contract interpretation into a fraud claim, and Texas law does not allow it.  Notably, moreover, BMC now appears to have also abandoned the rescission damages model it propounded

-13-
***Contains Attorneys' Eyes Only and Confidential Information***

in discovery as reflecting its damages for fraud, in favor or an unexplained assertion that IBM's claimed fraud somehow deprived BMC of the benefit of its bargain under the OA.   The abandonment of a rescission damages claim, IBM submits, is tantamount to an admission that BMC was not damaged financially by any alleged fraudulent inducement to execute the 2015 OA.

*Third*, BMC's trade secrets claims fail because they are based on information provided by customer-service personnel in the ordinary course of business.  Sophisticated companies like BMC do not entrust their trade secrets to such personnel.  None of the information at issue constituted trade secrets, nor has BMC even tried to quantify the value of any alleged trade secrets that its customer-service personnel provided to IBM.  The supposed "reasonable royalty" that BMC has quantified is not a royalty tied to the value of any particular piece of information alleged to constitute a trade secret; rather it is the amount that BMC claims it would have charged IBM for a perpetual license and support for each of the BMC products about which BMC claims to have provided a piece of information for which it claims trade secret protection.  This is not a legally recognized form of trade secret damages.

*Fourth*, BMC's fallback position that any information it provided that was not trade secret information was nevertheless still confidential ignores clear and unambiguous provisions of the 2015 OA that allowed IBM to use such information and to disclose it to its employees and to third parties engaged by either IBM or AT&T.  It also ignores the relationship between OA § 5.1 (a broad authorization to access and use AT&T's BMC Customer Licenses and BMC's product-related information to support AT&T) and OA § 5.4 (a restrictive covenant that prohibits one specific action by IBM while accessing and using AT&T's BMC Customer Licenses but does not otherwise affect IBM's right access and use those licenses to support AT&T).  Texas law is clear,

*Contains Attorneys' Eyes Only and Confidential Information*

moreover, that there is no common law, non-contractual claim for disclosure of confidential information that is not a trade secret.

## ADMISSIONS OF FACT

The following facts have been stipulated and admitted, and require no proof:

1.  BMC is a Delaware corporation and a citizen of Texas, with its principal place of business located in Texas.

2.  IBM is a New York corporation and a citizen of New York, with its principal place of business located in New York.  IBM also does business in Texas.

3.  AT&T and BMC entered into a Master Purchase Agreement in 2007.

4.  IBM was the IT Outsourcer for AT&T's mainframe environment for many years.

5.  The current AT&T is the result of various mergers, including the acquisition by SBC of two other "Baby Bell" companies.

6.  BMC and IBM entered into the MLA in March 2008.

7.  The MLA is a valid contract in existence between BMC and IBM.

8.  BMC and IBM entered into a 2008 Outsourcing Attachment to the MLA.

9.  BMC and IBM entered into a 2013 Outsourcing Attachment.

10.  IBM and AT&T entered into an agreement to perform Project Swallowtail on June 26, 2015.

11.  BMC and IBM entered into the 2015 OA on September 30, 2015.

12.  The 2015 OA is a valid contract in existence between BMC and IBM.

13.  Project Swallowtail is complete. It has resulted in the replacement of 14 BMC mainframe software products with IBM's mainframe software products, the replacement of 5 BMC

*Contains Attorneys' Eyes Only and Confidential Information*

mainframe software products with third-party products, and the retirement of 1 additional BMC mainframe software product.

14.    BMC is not pursuing any claims for equitable relief.

## CONTESTED ISSUES OF FACT

The following factual issues are contested and are necessary to final disposition of the case:

1.    Whether, in relation to all of BMC's claims for breach of the OA or the MLA, BMC has performed under the MLA to the extent required by law.[2]

2.    Whether, in relation to BMC's claim for breach of OA § 5.4, BMC has performed under the OA to the extent required by law.

3.    Whether the Court ruled that IBM "breached § 5.4" because "IBM displaced BMC Customer Licenses with IBM products when it implemented Project Swallowtail at AT&T." Dkt. 586 at 4-5.

4.    Whether, as applied to Project Swallowtail, OA § 5.4 is an unenforceable restrictive covenant under New York law.

5.    Whether, in relation to any of BMC's claims for breach of the OA, including its claim for breach of OA § 5.4, IBM's participation in Project Swallowtail directly and proximately caused AT&T to stop using the BMC mainframe software products that AT&T no longer used after Project Swallowtail was completed.

---

[2] BMC maintains, and reserves the right to argue, that BMC's performance under the MLA is immaterial to its claims for breach of the *OA* (and vice versa). To the extent IBM argues that BMC must demonstrate performance under *both* contracts in order to satisfy its burden on its claims for breach of *either* contract because of the Court's prior ruling, in the context of IBM's motion to strike BMC's jury demand, that the MLA and the OA form one integrated contract, *see* Dkt. 256 at 2-3, 14-22; Dkt. 287 at 6-8, BMC contested that point, *see* Dkt. 225 at 4-14, and continues to reserve its right to challenge the Court's ruling and all its implications. *See also* Dkt. 381 at 28 n.11; Dkt. 385 at 1; Dkt. 387 at 12 n.2; Dkt. 416 at 31 n.15 (all are prior BMC reservations of rights to challenge this ruling and all its implications).

*Contains Attorneys' Eyes Only and Confidential Information*

6. Whether IBM's breach of OA § 5.4 directly and proximately caused BMC's damages, including (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; and (b) BMC's loss of profits from AT&T.

7. Whether, in relation to BMC's claim for breach of OA § 5.1, BMC has performed under the OA to the extent required by law.

8. Whether IBM's use of BMC products, including related support, as part of Project Swallowtail was other than "solely for the purposes of supporting" AT&T, such that IBM failed to comply with OA § 5.1.

9. Whether IBM's breach of OA § 5.1 directly and proximately caused BMC's damages, including (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; and (b) BMC's loss of profits from AT&T.

10. Whether, in relation to BMC's claim for breach of MLA § 8, BMC has performed under the OA to the extent required by law.[3]

11. Whether IBM used or distributed BMC's confidential information in violation of MLA § 8.

12. Whether IBM's breach of MLA § 8 directly and proximately caused BMC's damages, including (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; and (b) BMC's loss of profits from AT&T.

13. Whether IBM made a material misrepresentation to BMC by promising to perform under the OA, including a promise that it would not displace AT&T's BMC products with IBM products unless it purchased the required licenses from BMC.

---

[3] BMC maintains, and reserves the right to argue, that BMC's performance under the OA is immaterial to its claims for breach of the *MLA* (and vice versa). As noted above (*see supra* n.2), to the extent IBM argues that BMC must demonstrate performance under both contracts in order to satisfy its burden on its claims for breach of either contract because of the Court's prior ruling, in the context of IBM's motion to strike BMC's jury demand, that the MLA and the OA form one integrated contract, BMC continues to reserve its right to challenge the Court's ruling and all its implications. *See also* Dkt. 225 at 4-14; Dkt. 381 at 28 n.11; Dkt. 385 at 1; Dkt. 387 at 12 n.2; Dkt. 416 at 31 n.15.

*Contains Attorneys' Eyes Only and Confidential Information*

14.   If IBM made the misrepresentation referenced in No. 13, whether IBM knew at the time it entered into the OA that its promise to perform under the OA was false.

15.   Whether, at the time IBM entered into the OA, it intended not to perform under the OA.

16.   If IBM made the misrepresentation referenced in No. 13, whether IBM made the misrepresentation with the intention that BMC would act on it.

17.   If IBM made the misrepresentation referenced in No. 13, whether BMC actually and justifiably relied on the misrepresentation when BMC entered into the OA.

18.   If IBM made the misrepresentation referenced in No. 13, whether IBM's misrepresentation caused, or proximately caused, BMC's damages, including (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; and (b) BMC's loss of profits from AT&T.

19.   Whether BMC disclosed to IBM information entitled to trade-secret protection.

20.   Whether IBM misappropriated BMC's trade secrets.

21.   Whether BMC's trade secrets were used in interstate commerce.

22.   Whether IBM's misappropriation of BMC's trade secrets caused BMC's damages, including (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; and (b) BMC's loss of profits from AT&T.

23.   Whether BMC disclosed to IBM confidential and proprietary information that BMC created through extensive time, labor, skill, and money.

24.   Whether IBM gained an unfair advantage in competing with BMC by using BMC's confidential and proprietary information to displace BMC products at AT&T for IBM's own commercial benefit.

*Contains Attorneys' Eyes Only and Confidential Information*

25.    Whether IBM's use of BMC's confidential and proprietary information to displace BMC products at AT&T caused BMC commercial harm, including (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; and (b) BMC's loss of profits from AT&T.

26.    What amount of damages (if any) to award BMC consistent with the law for each of its claims, including (a) the amount of BMC's lost license and support fees, and (b) the amount of BMC's lost profits from AT&T?

27.    What is the license price or reasonable royalty (if any) that IBM would have paid to use BMC's confidential and proprietary information and/or trade secrets in implementing Project Swallowtail?

28.    Whether IBM's conduct was fraudulent, malicious, in bad faith, recklessly indifferent to BMC's rights, or otherwise "smacks of intentional wrongdoing" under controlling New York caselaw.

29.    Whether, in relation to the potential application of MLA § 10 to BMC's claimed licensing fee damages, there is an "amount" per impacted product "greater" than $5 million that is "paid or payable by [IBM] for the license to the applicable product giving rise to the claim."

30.    Whether an award of exemplary damages to BMC is appropriate based on BMC's fraud claim, and if so, what amount of exemplary damages to award BMC with respect to BMC's fraud claim in light of the nature of the wrong, the character of the conduct involved, the degree of IBM's culpability, the situation and sensibilities of BMC and IBM, the extent to which IBM's conduct offends a public sense of justice and propriety, and the net worth of IBM?

*Contains Attorneys' Eyes Only and Confidential Information*

31.     Whether IBM willfully and maliciously misappropriated any of BMC's trade secrets, and if so, whether and what amount of exemplary damages to award BMC with respect to BMC's trade secrets claims.

32.     Whether BMC is entitled to an award of attorneys' fees and costs.[4]

33.     Whether IBM is entitled to an award of attorneys' fees and costs.

34.     If either party is entitled to an award of attorneys' fees and costs, what is the appropriate award.

35.     Whether BMC is entitled to prejudgment interest with respect to the damages to which it is entitled on any of its claims.

36.     If BMC is entitled to prejudgment interest, what is the appropriate amount.

37.     Whether there was the required performance by BMC of the MLA and OA and whether BMC can meet its burden to prove the required performance, including performance by BMC under § 5.1 of the OA, and whether BMC's claim that IBM breached the OA, including its claim that IBM's breached §5.4, is barred by any such non-performance by BMC or any failure by BMC to prove its performance.

38.     Whether there is legally sufficient evidence of the elements of BMC's claims, including the following:

   ▪   Breach of any OA provision other than OA § 5.4[5]

---

[4] The Court has indicated attorneys' fees will be addressed separately after trial as previously agreed by the parties. Dkt. 594 at 16.

[5] Although the Court granted an interlocutory summary judgment finding a breach by IBM of § 5.4, IBM reserves its right to challenge the Court's rulings that there was a meeting of the minds between BMC and IBM on section 5.4, that the language of § 5.4 is unambiguous, and that IBM breached § 5.4.  Further, IBM reserves the right to challenge the Court's grant of BMC's motion for summary judgment as to IBM's counterclaim for breach of the most favored customer provision and the Court's grant of a summary judgment against BMC's affirmative defenses, with the exception of the defense of ratification.

*Contains Attorneys' Eyes Only and Confidential Information*

- Enforceability of OA § 5.4 as a restrictive covenant under New York law in light of the facts and circumstances of AT&T's Project Swallowtail

- Breach of MLA § 8

- Performance of the MLA and OA by BMC

- Causation of damages for breach of the OA

- Nature and quantum of damages for any breach of the OA

- Causation of damages for breach of the MLA

- Nature and quantum of damages for any breach of the MLA

- Fraudulent inducement of the 2015 OA by IBM

- Justifiable reliance by BMC

- Causation of damages for fraud

- Nature and quantum of damages for fraud

- The existence of a trade secret

- Misappropriation of a trade secret

- Causation of damages for any misappropriation of a trade secret

- Nature and quantum of damages for any misappropriation of a trade secret

- The existence of confidential information

- Misappropriation of confidential information

- Causation of damages for any misappropriation of confidential information

- Nature and quantum of damages for any misappropriation of confidential information

- IBM engaging in any conduct that amounted to unfair competition

39.   BMC and IBM each incorporate their respective proposed findings of fact herein.

*Contains Attorneys' Eyes Only and Confidential Information*

## AGREED APPLICABLE PROPOSITIONS OF LAW

The following legal propositions are not in dispute:

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  Additionally, the Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(a), (b) and (d).

3. New York law governs the contract claims in this case.[6]

4. Texas law applies to BMC's common law claims.

5. Texas or federal law governs BMC's statutory trade secrets claims.

6. Texas law governs the Master Purchase Agreement between AT&T and BMC.

7. Under New York law, the elements of a breach of contract claim "are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach."  *Canzona v. Atanasio*, 118 A.D.3d 837, 838-39 (N.Y. App. Div. 2014) (internal quotations and citations omitted); *see also Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).

8. Under New York law, a plaintiff seeking to establish its performance under a contract, such that it can recover on a breach of contract claim, must prove that it substantially performed. *See, e.g.*, *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 270 F. Supp. 3d 716, 734-35 (S.D.N.Y. 2017); *Barbagallo v. Marcum LLP*, 925 F. Supp. 2d 275, 287-88 (E.D.N.Y. 2013), *aff'd*, 552 F. App'x 102 (2d Cir. 2014); *Weschler v. Hunter Health*

---

[6] The Court's prior ruling that the MLA and the OA form one integrated contract, *see* Dkt. 256 at 2-3, 14-22; Dkt. 287 at 6-8, is the only reason BMC has agreed New York law applies to its *OA* breach claims, *see, e.g.*, Dkt. 381 at 28 n.11 (flagging issue and reserving right to challenge ruling).  BMC again raises the issue for preservation purposes, reserving its right to challenge the ruling.

*Contains Attorneys' Eyes Only and Confidential Information*

*Systems*, 330 F. Supp. 2d 383, 421-22 (S.D.N.Y. 2004); *Anderson Clayton & Co. v. Alanthus Corp.*, 91 A.D.2d 985, 985 (N.Y. App. Div. 1983); *Hadden v. Consol. Edison Co. of New York*, 312 N.E.2d 445, 449 (N.Y. 1974).

9.     Under Texas law, the elements of a claim for fraudulent inducement are "(1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on, and (5) which caused injury." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

10.    "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 43, 46, 48-49 (Tex. 1998).

11.    The elements of a claim for trade secret misappropriation under TUTSA and DTSA are (1) the ownership of a trade secret, (2) the misappropriation of a trade secret, and (3) an injury to the plaintiff or unjust enrichment to the defendant. *See Morris-Shea Bridge Co. v. Cajun Indus., LLC*, 2021 WL 4084516, at *6-7 (S.D. Tex. Feb. 22, 2021); *Silverthorne Seismic, LLC v. Sterling Seismic Servs., Ltd.*, 2021 WL 4710813, at *4 (S.D. Tex. Oct. 7, 2021 (Miller, J.); *see also* TEX. CIV. PRAC. & REM. CODE §§ 134A.004; 18 U.S.C. § 1836. A claim under DTSA also requires a showing that the trade secrets were used in interstate commerce. 18 U.S.C. § 1836(b)(1); *Silverthorne*, 2021 WL 4710813, at *4.

12.    Under New York law, "an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing," including conduct that is "fraudulent," "malicious," "in bad

*Contains Attorneys' Eyes Only and Confidential Information*

faith," or "reckless[ly] indifferen[t] to the rights of others."  *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416-17 (N.Y. 1983).

13.    Texas law permits the recovery of exemplary damages where a plaintiff proves by clear and convincing evidence that the harm with respect to which it seeks recovery of exemplary damages resulted from the fraud.  TEX. CIV. PRAC. & REM. CODE § 41.003(a); *Formosa Plastics Corp.*, 960 S.W.2d at 47.  Exemplary damages may be awarded against a defendant in an amount up to the greater of (1) two times the amount of economic damages, plus the amount of noneconomic damages; or (2) $200,000.  TEX. CIV. PRAC. & REM. CODE § 41.008(b).  Texas law requires the consideration of evidence (if any) relating to certain factors when determining the amount of such exemplary damages.  *See id.* § 41.011(a).

14.    Under TUTSA and DTSA, where a plaintiff shows the misappropriation was "willful and malicious," a court may award exemplary damages of up to two times the amount of damages awarded.[7]  TEX. CIV. PRAC. & REM. CODE § 134A.004(b); 18 U.S.C. § 1836(b)(3)(B); *DBG Grp. Invests., LLC v. Puradigm, LLC*, 2022 WL 313435, at *1 (N.D. Tex. Feb. 2, 2022) ("[P]unitive or exemplary damages are recoverable under both TUTSA and DTSA upon a showing of willful and malicious misappropriation.").  "Willful and malicious misappropriation" means "intentional misappropriation resulting from the conscious disregard of the rights of the owner of the trade secret."  TEX. CIV. PRAC. & REM. CODE § 134A.002(7); *Silverthorne*, 2021 WL 4710813, at *7 (applying TUTSA's definition of "willful and malicious misappropriation to a DTSA claim).

---

[7] Under TUTSA, this showing must be by "clear and convincing" evidence, which "means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. CIV. PRAC. & REM. CODE §§ 134A.002(1-a), 134A.004(b).

*Contains Attorneys' Eyes Only and Confidential Information*

15.     Under New York law, a plaintiff is entitled to recover prejudgment interest at the rate of 9% "as a matter of right" on a breach of contract claim.  *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 602-03, 606 (2d Cir. 2003); N.Y. C.P.L.R. §§ 5001(a), 5004.  Under Texas law, "an equitable award of prejudgment interest should be granted" to a plaintiff that prevails on a common law claim "in all but exceptional circumstances." *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 172 (5th Cir. 2010). Under TUTSA and DTSA, a plaintiff is entitled to recover prejudgment interest.  *In re AmeriSciences, L.P.*, 781 F. App'x 298, 306-07 (5th Cir. 2019) ("Texas law on trade secret claims mandates the award of prejudgment interest."); *Agrofresh Inc. v. Essentiv LLC*, 2020 WL 7024867, at *26 (D. Del. Nov. 30, 2020) (awarding prejudgment interest on DTSA claim).

16.     Because BMC is not pursuing any claims for equitable relief and has decided not to present its rescission damages model at trial, IBM's unclean-hands defense is moot, *see, e.g.*, Dkt. 603 at 5 n.2 (the Court recognizing "[t]he unclean hands defense cannot be used to defend against a contract action for damages," and citing authorities), as is IBM's ratification defense.

## CONTESTED ISSUES OF LAW

The following issues of law are in dispute:

1.     Whether, in relation to BMC's claims for breach of the OA and the MLA, BMC has performed under the MLA and the OA *as a matter of law*.

2.     Whether any non-performance by BMC of the MLA and OA, or any failure by BMC to prove the element of performance of the MLA and OA, including performance under § 5.1, bars BMC's claim that IBM breached § 5.4.

*Contains Attorneys' Eyes Only and Confidential Information*

3.      Whether restrictive marking of information is a condition precedent to IBM's breach of MLA § 8.

4.      Whether BMC is entitled to recover on its claim for breach of OA § 5.1, including damages in the form of (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; and (b) BMC's loss of profits from AT&T.

5.      Whether BMC is entitled to recover on its claim for breach of OA § 5.4, including damages in the form of (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; and (b) BMC's loss of profits from AT&T.

6.      Whether BMC is entitled to recover on its claim for breach of MLA § 8, including damages in the form of (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; and (b) BMC's loss of profits from AT&T.

7.      Whether BMC is entitled to recover on its claim for fraudulent inducement, including damages in the form of (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; and (b) BMC's loss of profits from AT&T.

8.      Whether BMC is entitled to recover on its claims for trade secrets violations under TUTSA or DTSA, including damages in the form of (a) BMC's loss of the license and support fees under the OA that BMC claims in its licensing fee damages models; (b) BMC's loss of profits from AT&T, and (c) a reasonably royalty that IBM would have paid to use BMC's trade secrets in implementing Project Swallowtail.

9.      Whether BMC is entitled to recover on its claim for unfair competition by misappropriation, including damages in the form of (a) BMC's loss of the license and

*Contains Attorneys' Eyes Only and Confidential Information*

support fees under the OA that BMC claims in its licensing fee damages models; and (b)

BMC's loss of profits from AT&T.

10.      Whether Texas law recognizes a claim for misappropriation of confidential information

that is not a trade secret.

11.      Whether the damages limitations in MLA §§ 9 and 10 are enforceable under New York

law based on IBM's conduct in this case.[8]

12.      If they are enforceable, whether MLA §§ 9 and 10 limit BMC's damages recovery for each

of its claims in this case.[9]

13.      Whether, as a matter of law, in relation to the potential application of MLA § 10 to BMC's

claimed licensing fee damages, there is an "amount" per impacted product "greater" than

$5 million that is "paid or payable by [IBM] for the license to the applicable product giving

rise to the claim."

14.      Whether BMC is entitled to an award of exemplary damages based on its claims either of

fraud or of willful and malicious misappropriation of trade secrets.

15.      Whether BMC or IBM is entitled to recover its attorneys' fees and costs.

16.      Whether BMC is entitled to prejudgment interest.

17.      Whether, under Texas common law, the elements of a claim for unfair competition by

misappropriation are "(1) the creation of plaintiff's product … through extensive time,

---

[8] Beyond enforceability, BMC maintains that the damages limitations in MLA §§ 9 and 10 do not apply to the OA. The Court's prior ruling that the MLA and the OA form one integrated contract, *see* Dkt. 256 at 2-3, 14-22; Dkt. 287 at 6-8, is the only reason that §§ 9 and 10 of the MLA could arguably apply to BMC's breach of contract claims based on the *OA, see, e.g.,* Dkt. 381 at 28 n.11 (flagging issue and reserving right to challenge ruling).  BMC again raises the issue for preservation purposes, reserving its right to challenge the ruling.

[9] As just noted, one reason that the damages limitations in MLA §§ 9 and 10 do not apply to the OA claims is BMC's position that the MLA and OA are separate contracts, but the Court has ruled that the MLA and the OA form one integrated contract.  *See* Dkt. 256 at 2-3, 14-22; Dkt. 287 at 6-8; *see also* Dkt. 381 at 28 n.11 (flagging issue and reserving right to challenge ruling).  BMC again raises the issue for preservation purposes, reserving its right to challenge the ruling.

*Contains Attorneys' Eyes Only and Confidential Information*

labor, skill, and money; (2) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (*i.e.*, a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff." *BP Auto., L.P. v. RML Waxahachie Dodge, L.L.C.*, 448 S.W.3d 562, 571-72 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App.—Waco 1993, writ denied); *PIU Mgmt., LLC v. Inflatable Zone Inc.*, 2011 WL 13257634, at *1 (S.D. Tex. Feb. 11, 2011) (Miller, J.) (adopting in full a report and recommendation articulating the elements of unfair competition and denying summary judgment on claim).

18. Whether there is legally sufficient evidence of any of BMC's claims, including the following:

- Breach of any OA provision other than OA § 5.4

- Enforceability of OA § 5.4 as a restrictive covenant under New York law in light of the facts and circumstances of AT&T's Project Swallowtail

- Breach of MLA § 8

- Performance of the MLA and OA by BMC

- Causation of damages for breach of the OA

- Nature and quantum of damages for any breach of the OA

- Causation of damages for breach of the MLA

- Nature and quantum of damages for any breach of the MLA

- Fraud by IBM

- Justifiable reliance by BMC on any fraud committed by IBM

*Contains Attorneys' Eyes Only and Confidential Information*

- Causation of damages for fraud

- Nature and quantum of damages for fraud

- The existence of a trade secret

- Misappropriation of a trade secret

- Causation of damages for any misappropriation of trade secrets

- Nature and quantum of damages for any misappropriation of trade secrets

- The existence of confidential information

- Misappropriation of confidential information

- Causation of damages for any misappropriation of confidential information

- Nature and quantum of damages for any misappropriation of confidential information

19.   BMC and IBM each incorporate their respective proposed conclusions of law herein.[10]

## EXHIBITS

BMC's Exhibit List is attached as Exhibit A.  IBM's Exhibit List is attached as Exhibit B.

## WITNESSES

BMC's Witness List is attached as Exhibit C, which includes a list of the names and addresses of witnesses that BMC will or may call and a brief statement of the subject matter and substance of their testimony.  IBM's Witness List is attached as Exhibit D, which includes a list of the names and addresses of witnesses that IBM will or may call and a brief statement of the subject matter and substance of their testimony.  BMC's Page/Line Deposition Designations are

---

[10] BMC reserves its right to challenge the Court's summary-judgment and any other pretrial rulings that are adverse to BMC, including the Court's ruling that the OA and MLA are a single integrated contract and any implications it has (not only for the jury waiver, but all the issues highlighted above); the Court's grant of summary judgment against BMC's claims for breach of OA § 1.1 and breach of the duty of good faith and fair dealing; and the ruling that the AT&T lost profits are consequential (as opposed to direct) damages.

*Contains Attorneys' Eyes Only and Confidential Information*

attached as Exhibit E, which include citations to the inclusive pages and lines to be read.  IBM's Page/Line Deposition Designations are attached as Exhibit F, which include citations to the inclusive pages and lines to be read.

### SETTLEMENT

During the course of this case, the parties have participated in two formal mediations. Magistrate Judge Johnson remains engaged to help facilitate any settlement negotiations between the parties.  Lead counsel for both parties are available to negotiate directly without the need for a mediator.  The parties have been unable to reach agreement on settlement terms.

### TRIAL

Pursuant to the Court's January 25, 2019 order, this will be a non-jury trial.  Dkt. 287.  The Court has allotted 8 days of trial, from March 14, 2022 to March 24, 2022, pursuant to its February 16, 2022 Trial Scheduling Order.  Dkt. 604.  BMC estimates that trial will take 5-6 days.  IBM estimates that the case will take 2 weeks (10 trial days).  The witnesses that BMC expects to call at trial are available during the scheduled trial time.

### ADDITIONAL REQUIRED ATTACHMENTS

The parties will not be filing motions in *limine*.  BMC's Proposed Findings of Fact and Conclusions of Law are attached as Exhibit G.  IBM's Proposed Findings of Fact and Conclusions of Law are attached as Exhibit H.  BMC's Trial Memorandum of Law is attached as Exhibit I. IBM's Trial Memorandum of Law is attached as Exhibit J.  BMC's expert designations are attached as Exhibit K.  IBM's expert designations are attached as Exhibit L.

_____
Date

_____
Gray H. Miller
United States District Judge

*Contains Attorneys' Eyes Only and Confidential Information*

**APPROVED**:


*/s/ Sean Gorman*
Sean Gorman
Texas State Bar No. 08218100
S.D. Bar No. 10168
sean.gorman@bracewell.com
Christopher L. Dodson
Texas State Bar No. 24050519
S.D. Bar No. 613937
chris.dodson@bracewell.com
Timothy R. Geiger
Texas State Bar No. 24078552
S.D. Bar No. 1742526
tim.geiger@bracewell.com
Andrew W. Zeve
Texas State Bar No. 24042209
S.D. Bar No.
andrew.zeve@bracewell.com
BRACEWELL LLP
711 Louisiana Street,  Suite 2300
Houston, Texas 77002-2781
(713) 223-2300 Telephone

**COUNSEL FOR PLAINTIFF
BMC SOFTWARE, INC.**



*/s/ Richard I. Werder, Jr.*
Richard I. Werder, Jr. (pro hac vice)
Rachel E. Epstein (pro hac vice)
Donald J. Reinhard, II (pro hac vice)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
rickwerder@quinnemanuel.com
rachelepstein@quinnemanuel.com
donaldreinhard@quinnemanuel.com

R. Paul Yetter
Reagan W. Simpson
Timothy S. McConn

-31-
*Contains Attorneys' Eyes Only and Confidential Information*

Grant B. Martinez
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 682-8000
pyetter@yettercoleman.com
rsimpson@yettercoleman.com
tmcconn@yettercoleman.com
gmartinez@yettercoleman.com

**COUNSEL FOR DEFENDANT**
**INTERNATIONAL BUSINESS**
**MACHINES CORPORATION**

*Contains Attorneys' Eyes Only and Confidential Information*