# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 4:17-CV-2254 |
| | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINES CORPORATION, | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF MURRAY FOGLER

My name is Murray Fogler.  I am over 18 years of age and qualified to make this declaration.

1.     I have been retained by BMC Software, Inc. ("BMC") to provide opinions about the reasonableness and customariness of the legal fees and expenses incurred by BMC in the prosecution of its claims against IBM and in the defense of IBM's counterclaim in this case.  This declaration is organized into the following sections:

     I.        My qualifications

     II.       Putting the attorneys' fee issues into context

     III.     Digesting a massive file

     IV.     Hours spent and hourly rates

1

V.      Factors to consider

VI.     To segregate or not segregate

VII.    Recovery of costs

VIII.   My opinions

2.      There is no need for me to recount the procedural history of the case or the background of the dispute between the parties.  The Court has already ably summarized those matters in its Findings of Fact and Conclusions of Law entered May 30, 2022 (Dkt. 756).  I will therefore get right to the point.

## I.      My qualifications

3.      I received a B.A. from the University of North Carolina in 1975 and J.D. from Harvard Law School in 1978.  I am an attorney licensed to practice in the State of Texas and have been in good standing since my licensure in 1978.  I am a partner at the law firm of Fogler, Brar, O'Neil, & Gray, LLP.  Since graduating law school, my practice has focused on handling civil litigation matters in state and federal courts in Harris County, Texas, including commercial and partnership disputes.  I have represented clients in numerous commercial litigation matters in the capacity as counsel for both plaintiffs and defendants.

4.      I have tried over 100 cases to jury verdict in state and federal court.  I have also worked on and argued dozens of appeals in Texas state courts and the Fifth Circuit.  I am recognized by Chambers USA as a Band 1 lawyer in Litigation,

General Commercial in Texas and Band 1 lawyer in Litigation, Energy & Natural Resources in Texas.  I am one of the few lawyers in Texas who is a Fellow in the International Academy of Trial Lawyers, Fellow in the American College of Trial Lawyers, Fellow in the International Society of Barristers, and an Advocate in the American Board of Trial Advocates.

5.      I have familiarity with attorney and paralegal billing practices, the normal and customary fees charged for handling civil litigation disputes in state and federal courts in Harris County, Texas, the skill level required, and the tasks involved and amount of work necessary to litigate such disputes to conclusion.  I am also familiar both with the hourly rates, as well as the hours spent, that are reasonable, customary, and necessary for appellate matters.

6.      While I am often retained to provide opinions on attorneys' fees, in the last four years I have offered trial testimony on the issue of attorneys' fees in only one matter: *Capital Royalty Partners II, L.P. et al. v. Navidea Biopharmaceuticals, Inc. et al.*, No. 2016-22242, in the 151st Judicial District Court of Harris County, Texas.

## II.      Putting the attorneys' fee issues into context

7.      The parties agreed to defer the issue of attorneys' fees until after the Court ruled on the substantive issues.  The Court entered Final Judgment on May

3

30, 2022 and ordered the parties seeking to recover fees and costs to file their submissions 14 days later.

8.      In its Findings of Fact and Conclusions of Law, the Court left open the issue of which party was the "prevailing party" as that term is defined in New York law.  I understand that BMC's lawyers will be providing a separate brief on why BMC is the prevailing party under New York law.  In this declaration, I am assuming that BMC is the prevailing party, an assumption that strikes me as reasonable in light of the Court's findings and conclusions.

### III.      Digesting a massive file

9.      This case was filed July 21, 2017, almost five years ago.  Over 750 documents appear on the Court's docket sheet.  The sheer size of the file, the scope of the issues, and vigorousness with which the case was litigated would make it time-consuming to perform a detailed study of the events of the litigation.  Happily, such a chore is unnecessary, as there are efficient ways to summarize the extensiveness of the litigation, and the Court is intimately familiar with the complexities of the case.

10.      We can get our arms around the file by enumerating several key indicators of the work required to litigate the case.  I have already made reference to the number of docket entries, which reflects pleadings, orders, and notices of various types.  That number, however, is too imprecise to give a full picture of the legal

4

work.  The number of substantive filings provides more clarity, as each motion prompted responses and replies, each with a significant expenditure of time and effort.

11.     Attached to this Declaration as **Exhibit A-7** is a chart of the motions and pleadings, with references to the Court's docket numbers, that required factual and/or legal argument.  The parties filed 126 such motions, responses, and other substantive pleadings (so far).  I anticipate a few additional ones in the post-judgment phase of the case.  The Court held 17 hearings or status conferences before the trial of this case.  **Exhibit A-6**.

12.     Many of the motions dealt with IBM's assertions of privilege and the concomitant withholding of documents claimed as privileged.  BMC filed numerous motions to compel and letter briefs to obtain documents withheld by IBM.  Many of the discovery issues raised in BMC's pre-motion letters and motions to compel dealt with BMC's efforts to obtain documents that were ultimately referenced repeatedly at trial and in the Court's Findings and Conclusions.  For instance, BMC had to ask the Magistrate Judge to compel production of many of the so-called IBM Guidance Documents and had to challenge IBM's privilege claims over the IBM internal negotiation reports—privilege claims that Magistrate Johnson held were "more than a stretch."  Dkt. 378; see also, Dkts. 551, 552 (compelling IBM to produce additional

documents wrongfully withheld as privileged). IBM's efforts to avoid production of these categories of documents necessarily drove up the litigation costs.

13.     While the Court is familiar with the efforts made to obtain IBM's documents, the time needed to review and analyze the voluminous documents will not be reflected on the Court's docket. The electronic document collection, review, and production issues were particularly complex. The parties (and third-parties) together produced a total of 58,879 documents, consisting of 401,813 pages in this case. **Exhibit A-8**. For BMC to accomplish its document production, it gathered a universe of a substantially greater number of documents to review for responsiveness and privilege. Ultimately, BMC produced 14,579 documents (with most documents consisting of multiple pages). Once the disputes about the scope of discovery were resolved, IBM produced a total of 33,550 documents (again, most with multiple pages), which required substantial time to review. It is evident from the Court's findings that the fight for and identification of key documents played an essential role in the successful conclusion of the case.

14.     The document production numbers tell only part of the story. Dealing with the documents in this case presented special challenges. The parties agreed to and the Court entered a protective order which set up two tiers of confidentiality. One tier protected documents against disclosure to any outside parties. A higher tier designated certain documents as "attorneys' eyes only." Because of the large

number of AEO documents (3,661 documents were marked as AEO), most of the substantive briefs and pleadings had to be redacted before any BMC representative could review them.  The confidentiality issues also required redaction prior to public filing of briefs and pleadings.  In short, the special care required by the protective order took additional time and effort.

15.    The parties took 52 depositions, many of which required travel outside of Houston.  **Exhibit A-5**.  They exchanged 17 expert reports on a broad range of liability and damage subjects.  **Exhibit A-9**.

16.    The legal issues in the case required extensive briefing.  BMC filed four motions for summary judgment.  IBM in turn filed two motions for summary judgment, one regarding its counterclaim, the other seeking to defeat all of BMC's claims.  BMC successfully denied most of IBM's requested relief on its summary judgment motions and obtained dismissal of IBM's counterclaim and a finding that IBM breached the key non-displacement provision in the parties' Outsourcing Attachment.

### IV.    Hours spent and hourly rate

17.    As the Court can see from its own docket sheet and this declaration, a great deal of work went into the prosecution of BMC's claims and the defense against IBM's counterclaims.  **Exhibit A-4**.  BMC engaged a single Houston-based law firm (Bracewell LLP) to handle the entirety of the case.  Bracewell maintained

a contemporaneous record of the hours spent on each task by timekeeper, for, among other things, conducting discovery, developing facts, researching the law, drafting briefs, and trying the case.  These records were compiled into monthly billings to BMC.  The 58 months of redacted billing statements, which I have reviewed, are attached as **Exhibit A-3**.

18.     At my request, Bracewell prepared a summary spreadsheet of each timekeeper with the number of hours billed to the file and the hourly rate for each. That spreadsheet is attached to my declaration as **Exhibit A-1**.  The summary shows 34 timekeepers, broken down into 11 partners, two counsel, 18 associates, and three legal assistants.[1]  Because of the length of the litigation (five years), not all time-keepers on the matter remained the same throughout the duration of the matter.  The summary shows that most of the work on the case was performed by six partners, 10 associates, and one legal assistant.

19.     The Court will note that the spreadsheet contains a single hourly rate for each timekeeper for the entire several-year period of the case.  Normally, a law

---

[1] Fees of a qualified legal assistant or paralegal may be recovered if the work performed is the type of work traditionally done by an attorney and the paralegal works under the direction and supervision of an attorney.  Bracewell's primary paralegal on the case, Georgette South, is a very experienced trial paralegal.  She has been a licensed paralegal since 1996 and she has participated in well over 100 trials.  She was supervised on the case primarily by Sean Gorman and Chris Dodson, both experienced attorneys.  The monthly invoices and overall time records reflect that the work performed by Ms. South on this case is the type of work traditionally done by an attorney and was performed under the direction and supervision of attorneys.

firm like Bracewell LLP will incrementally increase its rates on a yearly basis. Here, however, when Bracewell LLP was first engaged by BMC, BMC negotiated two rate concessions from Bracewell. Most significantly, Bracewell agreed to an hourly rate freeze, so that the original rates agreed upon in 2017 applied throughout the litigation. When new attorneys joined the team after 2017, Bracewell used rates reflective of the 2017 agreed rate structure.[2] Had Bracewell's yearly rate increases applied to this matter, the fees shown on the spreadsheet would have been $6,011,560.70 higher than as actually billed. See **Exhibit A-11**.

20.   The second hourly rate concession was a 30% discount BMC negotiated for fees leading up to the preliminary injunction. In other words, for the first several months of the case, during which the parties were hotly contesting BMC's application for an injunction, Bracewell was billing at 70% of its agreed hourly rates. This had the effect of discounting the billings to BMC by the amount of $1,349,148.41, but later BMC agreed to make up some of that discount with a one-time payment of $625,000, for a net discount of $724,148.41.

21.   In most cases hotly contested commercial cases involving numerous lawyers on both sides, the billings of one side or the other might be questioned in

---

[2] In the course of preparing the fee application, Bracewell noticed for the first time that hourly rates for four timekeepers were inadvertently adjusted upward. This amounted to a combined increase in the billings to BMC of $24,827. That amount is being deducted from the net discounts discussed in this paragraph.

particular instances for potential duplication of effort or excessive time spent on certain tasks.  This might ordinarily require an adjustment in a fee application to the Court for what is called billing judgment.  In this case, in addition to the discounts set out above, Bracewell voluntarily and periodically wrote-off time that it considered to be potentially duplicative or unnecessary.  These write-offs, totaling $597,467.85, constitute over 3% of the total billings by Bracewell to BMC.

22.    In summary, this is one of those rare instances in which two large corporations engage in protracted and contentious litigation, which goes the distance through discovery, motions, and a full-blown trial.  Small wonder the fees and costs incurred by BMC were substantial.

## V.    Factors to consider

23.    My opinions are based on the factors set out in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714, 717-19 (5th Cir. 1974) and Rule 1.04(b) of the Texas Disciplinary Rules of Professional Conduct.[3]  A brief discussion of the eight factors set out in Rule 1.04(b) follows:

---

[3] New York law applies to the contract at issue.  While I believe Texas law would govern the standards for determining the reasonableness of fees for Texas lawyers like the Bracewell lawyers here, I note that New York uses similar factors to determine the reasonableness of attorneys' fees. See, e.g., *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987) ("the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fee charged by the Bar for similar services; and the amount involved").

a. *The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.* This matter is in top tenth of 1% in terms of these factors. The legal and fact issues were exceptionally complex, requiring not only great skill to navigate them but huge amounts of time and labor to bring them to a conclusion.

b. *The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.* This is not a material factor for the Bracewell law firm, but it was surely a factor for many of the primary handling attorneys. Taking on a case of this magnitude would have precluded their ability to accept and handle other matters. When this litigation was at its most intense, the principal handling attorneys devoted most of their time to this case.

c. *The fee customarily charged in the locality for similar legal services.* The hourly rates charged by Bracewell, especially as fixed by its agreement with BMC, were in line with and indeed less than comparable fees of other large firms handling complex commercial litigation.

d. *The amount involved and results obtained.* There are not many true 10-figure lawsuits, and an even smaller number that obtain a 10-figure result.

11

This lawsuit falls into the highest echelon of "amount involved and results obtained."

e.  *The time limitations imposed by the client or the circumstances.*  At the early stages of the litigation, BMC sought injunctive relief, necessitating intense activity to gather and put on evidence.  Otherwise, this is not a significant factor.

f.  *The nature and length of the professional relationship with the client.*  This is not a material factor.  BMC and its predecessors had been occasional clients of Bracewell, but BMC was not an active client at the time this matter began.

g.  *The experience, reputation, and ability of the lawyer or lawyers performing the services.*  Those principally responsible for the handling of the case are:

- Sean Gorman (trial partner).  A 1988 graduate of University of Houston Law Center, Gorman has represented plaintiffs and defendants in the energy, financial services, chemical, petrochemical, steel, communications, oil field services, medical products, software, government, accounting, construction, real estate, and manufacturing sectors.  Gorman is a well-respected and

well-known trial lawyer in Houston, and his skills have been noted by several legal-recognition services.

- <u>Chris Dodson</u> (trial partner).  Dodson is a 2005 graduate of the University of Texas Law School and handles a wide range of commercial litigation. Dodson is a well-respected and well-known trial lawyer in Houston, and his skills have been noted by several legal-recognition services.

- <u>Jeff Oldham</u> (appellate partner).  Oldham graduated from Northwestern University Law School in 2003, clerked for Judge J. Harvie Wilkinson of the U. S. Court of Appeals for the Fourth Circuit, and then for Chief Justice William H. Rehnquist of the United States Supreme Court.  He has an extensive appellate practice.

- <u>Yvonne Ho</u> (former appellate partner).  Now a United States Magistrate Judge, Judge Ho was an appellate specialist while at Bracewell.  Ho graduated from Rice University and then first in her class from the University of Houston Law School and previously worked at Susman Godfrey LLP.

- <u>Andrew Zeve</u> (trial partner).  Zeve has a degree in industrial engineering from Texas A&M and is a 2003 University of Texas

13

Law School graduate.  He is co-chair of Bracewell's energy litigation practice group, but also handles trade secrets and other commercial litigation.

- Timothy Geiger (trial partner).  A 2011 graduate of the University of Houston Law Center, Geiger also has a mechanical engineering degree.  He represents companies in intellectual property and technology disputes, including patents, trademarks, trade secrets, and software licensing.

h. *Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered*.  As this was an hourly rate engagement, this is not a material factor.

## VI.   To segregate or not segregate

24.    As the Court's Final Judgment demonstrates, BMC did not prevail on all its claims.  BMC's trade secret claims (under DTSA, TUTSA, and common law unfair competition) were dismissed with prejudice.  Some of BMC's contract claims were also unsuccessful.

25.    Furthermore, as discussed above, IBM had a significant counterclaim for breach of contract, seeking, with interest, over $100 million dollars.  The counterclaim was intertwined with BMC's contract claims.  The counterclaim was dismissed on summary judgment.

14

26.     The written contract between BMC and IBM contains a contractual fee provision.  Section 18 of the Master Licensing Agreement (MLA) provides that in any litigation between the parties, the prevailing party "is entitled to recover reasonable and customary attorney's fees and costs from the other party."  This provision broadly provides for recovery of fees and costs regardless of the nature of the cause of action and seems to permit total fee recovery to whichever party is determined to be the prevailing party.

27. As I stated, my opinions assume that BMC is the prevailing party.  I present in the section below why I believe no segregation is a reasonable approach for this case.[4]

## VII.   Recovery of Costs

28.     BMC incurred the following costs in connection with this case:

- $2,031,295.34 for experts

- $1,123,152.87 for eDiscovery (setting up and hosting a database for the documents, running searches, and managing the document production)

---

[4] I understand that New York law is generally consistent with Texas law regarding segregation; that is, so long as the claims for which fees would not otherwise be recoverable are inextricably intertwined with the claims for which fees are recoverable, work spent on the former is compensable.  See, e.g., *Douyon v. NY Medical Health Care, P.C.*, 49 F. Supp. 3d 328, 339 (E.D.N.Y 2014).  So long as a common core of facts and related legal theories exists (intertwined), then New York courts have found that it is "unnecessary and unhelpful to segregate fees claim by claim." *See J.S. Nicol, Inc. v. Peking Handicraft, Inc.*, 2008 WL 4613752, at *6 (S.D.N.Y. Oct. 17, 2008).

- $908,111.57 in other expenses (deposition transcripts and videos, travel, copy costs, legal research, and other customary litigation expenses).

A summary of the costs is provided as **Exhibit A-2**. Not included in these amounts are $125,080.83 in costs (mostly online research and staff overtime) that Bracewell wrote off as part of its billing judgment.

## VIII.   My opinions

29.    Based on my experience, my review of the materials, and discussions with BMC's trial and appellate counsel, I have formed the following opinions:

a. The result obtained in this case for BMC is extraordinary by any measure.

b. The legal services performed by Bracewell for BMC were all necessary to achieve the extraordinary result.  To the extent there was any wasted or duplicated efforts by Bracewell lawyers or any other billing judgment issue, it has already been accounted for with the voluntary write-offs made by Bracewell in its billings.  These write-offs more than suffice to discount the fees for billing judgment; no further discount in that regard is warranted.

c. The work performed by Bracewell was reasonable and customary for a case of this size, type, and complexity.  The staffing of the case was

reasonable and customary, both in overall numbers and in terms of relative seniority for a case of this nature. Based on my review of the extensive file and evidence provided to me, I do not see any work performed that was not customary for a case like this.

d. The hourly rates charged by Bracewell to BMC were reasonable and customary, even more so because those rates were frozen in 2017.

e. No segregation is required or necessary. BMC prevailed on its core contract and fraud theories. While it was unsuccessful on its trade-secrets related claims, the facts underlying those claims were part of the overall story of the case and the parties' relationship, especially as it pertained to BMC's fraud theories. The claims (and IBM's counterclaim) all arise from a common set of facts and are therefore all interrelated such that no segregation is required. If segregation is found to be required to account for BMC's unsuccessful trade-secrets claims, it is my opinion that no more than 10% of the total fees charged should be segregated and not recovered.

f. The work performed by the paralegals or legal assistants were of the type of work typically performed by attorneys and the tasks were performed under the direction and supervision of the attorneys. See p. 8, n. 1 above.

17

g.  The lodestar amount (total hours x reasonable hourly rate), net of write-offs is $18,129,053.89.  That amount accounts for time spent through June 11, 2022.  In addition, I am estimating an additional billing for time spent responding to expected post-judgment motions to be $118,870, as shown on **Exhibit A-10.**

h.  Because of the extraordinary result achieved in this case, it is my opinion that the lodestar amount should be adjusted upward.   A reasonable adjustment would be to add the amounts that would have been billed to BMC but for the hourly rate concessions negotiated at the beginning of the case.  As set forth in paragraphs 19 and 20 above, the amounts of those concessions were $6,011,560.70 and $724,148.41, totaling $6,735,709.11.  In short, a reasonable and customary fee in this case, in light of the results obtained, should be the hours billed to BMC at Bracewell's undiscounted hourly rates for each year the work was performed.

i.  Adding the lodestar amount and the success adjustment provides a total fee through the trial court of $24,983,632.90.  Given all the factors I have considered and my experience in these types of matters, it is my opinion that this amount is a reasonable and customary fee.  As a test

on the reasonableness, I note that the requested fee represents approximately 1.5% of the total amount awarded in the Final Judgment.

j.  The contract between the parties permits recovery of litigation costs. In this case, the costs were significant and necessary for BMC to prosecute its claims and defend against IBM's counterclaim. Attached as **Exhibit A-2** is a summary of the expert costs, deposition costs, and other costs incurred by BMC. In light of the necessity of various subject-matter expert witnesses (e.g., damages, antitrust, most-favored customer, technical), the size of the electronic-document repositories, and the number of depositions hearings, and trial, these costs are reasonable and customary.

k.  IBM has stated an intent to appeal. BMC will be required to expend significant resources to respond to the appeal. In estimating the amounts of time necessary to handle the appeal, I have relied on my own experience in handling federal appeals to the Fifth, Eleventh, and Federal circuits, and I consulted with Warren Harris and Jeff Oldham, both experienced appellate lawyers with Bracewell. Together, we have estimated the hours that will be required at each stage of the appeal process. Our estimate is attached as **Exhibit A-10**.

19

l.   As shown on Exhibit A-10, a reasonable fee for successfully defending against an appeal to the Fifth Circuit is $486,580, and an additional $133,308 if it becomes necessary to file or respond to a petition for certiorari to the United States Supreme Court, and an additional $493,800 if the United States Supreme Court grants certiorari.

m. I am being compensated for my time spent in preparing this declaration at the rate of $850/hour.  I have spent a total of 15 hours to prepare this declaration.

28.   I reserve the right to supplement this declaration with additional comments or opinions depending on any submissions by IBM.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 13, 2022.

Murray Fogler