United States District Court
Southern District of Texas
**ENTERED**
August 08, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION & ORDER**

Pending before the court is BMC's motion for recovery of its attorneys' fees and costs. Dkt. 760. After reviewing IBM's response (Dkt. 773), BMC's reply (Dkt. 774), and the applicable law, the court is of the opinion that the motion should be GRANTED IN PART and DENIED IN PART.

**I.   BACKGROUND**

The court assumes familiarity with the underlying facts of the case, and recounts only facts necessary to give a general overview for purposes of the instant motion. *See generally* Dkt. 756 at 1–66.

**A.   BMC's Claims**

In 2008, the parties entered into a Master License Agreement (the "MLA"), which provides that "[t]he prevailing party in any litigation is entitled to recover reasonable and customary attorney's fees and costs from the other party." PX1. BMC initiated suit against IBM and raised eleven causes of action in its Second Amended Complaint (the "SAC"), including breach of sections 1.1, 5.1, and 5.4 of a 2015 Outsourcing Attachment (the "2015 OA") governing the

parties' business relationship; anticipatory breach of contract; breach of section 8 of the MLA for misuse of confidential information; fraudulent inducement; breach of the duty of good faith and fair dealing; tortious interference; common law misappropriation of trade secrets and unfair competition; and misappropriation of trade secrets under both the Texas Uniform Trade Secrets Act ("TUTSA") and the Defend Trade Secrets Act ("DTSA").[1]  Dkt. 295 ¶¶ 71–180.

BMC's three breach of contract claims related to the 2015 OA all involved the same universe of facts wherein IBM—after agreeing not to displace BMC's products with its own pursuant to section 5.4—breached its agreement with BMC when it did just that.  *See* Dkt. 295 at ¶¶ 71–79.  BMC's breach of section 1.1 claim rested on the theory that IBM, which elected the contractual option to use BMC's products for free subject to a non-displacement restriction, was legally obligated to elect the contractual option that would have allowed it to the displace BMC's products for a fee.  *Id.* at ¶ 34, 90–97.  BMC also claimed that IBM breached section 5.1 of the 2015 OA by virtue of using BMC's own products to effectuate the displacement.  *See id.* ¶¶ 84–89.

The facts surrounding BMC's breach of section 5.1 claim also intersect with those related to BMC's breach of MLA section 8 claim and misappropriation of trade secrets claims.  In the SAC, BMC alleged that

> IBM is not allowed to use BMC's products and confidential, proprietary, and trade secret information to transition a customer from BMC products to other products. IBM, however, has used, and is continuing to use, its access to and use of AT&T's BMC products and related confidential, proprietary, and trade secret information, including BMC Technical Information, for the purpose of displacing BMC products and selling IBM products and services.

Dkt. 295 ¶ 84.  This conduct put IBM, BMC averred, in breach of both section 5.1 of the 2015 OA

---

[1] Seven of BMC's claims—breach of 2015 OA sections 5.1 and 5.4, breach of MLA section 8, fraudulent inducement, and its three trade secrets claims—survived summary judgment.  *See generally* Dkt. 756 at 5.

and section 8 of the MLA and helped form the basis of BMC's trade secrets claims. *See id.* ¶ 109 ("IBM is breaching Section 8 of the Master License Agreement by disclosing BMC's Confidential Information, as defined in the Master License Agreement, to third parties without BMC's consent."); ¶ 150 (detailing the overlapping relationship between BMC's common law misappropriation claim and breach of contract claims); ¶ 160 (detailing the overlapping relationship between BMC's TUTSA claim and breach of contract claims); ¶ 170–80 (detailing the overlapping relationship between BMC's DTSA claim and breach of contract claims).

### B. Bracewell's Representation of BMC

When BMC initiated suit in 2017, it entered into an agreement with Bracewell LLP ("Bracewell") to fix attorneys' fees at their 2017 rates throughout the entirety of the matter. Dkts. 760 at 14, 760-1 at 10. Generally, law firms increase their rates incrementally on an annual basis. Dkt. 760-1 at 9–10. But, pursuant to BMC and Bracewell's fixed-rate agreement, new attorneys added to this case worked under the 2017-rate structure. *Id.* at 10. Because Bracewell increased its standard rates annually, the 2017 agreement resulted in an increasing discount—valued at approximately $6,011,560.70—to BMC over time. *Id.* In addition, Bracewell reduced its fee rate by 30% while pursuing a preliminary injunction for BMC, resulting in a $724,148.41 discount.

In the lead-up to trial, the parties extensively litigated multiple discovery issues and collectively took fifty-two depositions, issued seventeen expert reports, admitted over one thousand exhibits into evidence, and authored voluminous objections to Judge Bryan's Memorandum & Recommendation. *See* Dkts. 760-8, 760-9, 760-10. Together, the parties filed six motions for summary judgment as well as responses and replies for each; the summary judgment record alone totaled 790 pages of briefing and over 18,000 pages of exhibits. *See*

Dkts. 517, 760-9.  All told, the parties collectively filed 126 pleadings and motions in this matter and produced 401,813 pages of documents.  Dkts. 760-8 at 2, 760-9 at 2.

Following a two-week bench trial, the court entered its Findings of Fact and Conclusions of Law, determining that BMC proved only its breach of section 5.4 claim and fraudulent inducement claim.  *Id.* at ¶¶ 164–76, 181–206.  The court's final judgment awarded BMC $717,739,615.00 in direct damages on its breach of contract claim and $717,739,615.00 in punitive damages on its fraudulent inducement claim.  Dkt. 757.

Pursuant to Federal Rule of Civil Procedure 54, BMC filed its motion for attorneys' fees on June 13, 2022.  Dkt. 760.  BMC seeks attorneys' fees and costs in the amount of $30,220,319.13, including $18,129,053.89 in total fees billed; $6,011,560.70 in recovery for the discounted rates pursuant to the 2017 fixed-rate agreement; $724,148.41 in discounted rates for the unsuccessful preliminary injunction; $4,122,998.13 in total costs; and $1,232,558.00 in conditional post-judgment and appellate representation costs.  *Id.* at 26.  IBM responded on July 1, 2022, and BMC replied on July 6, 2022.  Dkts. 773, 774.

## II. Legal Standard

"Under the bedrock principle known as the American Rule, each litigant pays his own attorneys' fees, win or lose, unless a statute or contract provides otherwise."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382, 133 S. Ct. 1166 (2013) (cleaned up).  The court must "not deviate from the American Rule 'absent explicit statutory authority.'"  *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126, 135 S. Ct. 2158 (2015) (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Hum. Res.*, 532 U.S. 598, 602, 121 S. Ct. 1835 (2001)).

New York law recognizes that parties "may contract for the indemnification of attorneys' fees and expenses."  *Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 341 (S.D.N.Y. 2018),

4

*aff'd*, 802 F. App'x 28 (2d Cir. 2020) (citation omitted). Should parties contract for indemnification of attorneys' fees and expenses, determining the reasonableness of those fees is committed to the discretion of the district court. *Id.*

### III. DISCUSSION

#### A. The MLA Entitles the Prevailing Party to Reasonable Fees and Costs

The court previously found that the MLA is governed by New York law and that section 18 is "clear and enforceable." Dkt. 756 at 104. When a New York contract "provides for shifting of the actual attorneys' fees expended by a prevailing party, 'the court will order the losing party to pay whatever amounts have been expended . . . so long as those amounts are not unreasonable.'" *Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 353 (S.D.N.Y. 2003) (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1263 (2d Cir. 1987)). Thus, the MLA contractually requires the losing party in this litigation to pay reasonable attorneys' fees and costs to the prevailing party, a proposition that IBM does not contest.

#### B. BMC is the Prevailing Party

IBM also declines to contest that BMC is the prevailing party in this litigation. *See generally* Dkt. 773. A party can be said to have prevailed if it succeeded "with respect to the central relief sought." *Blinds to Go (U.S.), Inc. v. Times Plaza Dev., L.P.*, 143 N.Y.S.3d 91, 93 (N.Y. App. Div. 2021). "Such a determination requires an initial consideration of the true scope of the dispute litigated, followed by a comparison of what was achieved within that scope." *Id.* (internal quotations omitted). Put differently, a party must receive "substantial relief" relating to the central claims advanced. *Grand v. Schwarz*, No. 15-CV-8779(KMW), 2019 WL 624603, at *3 (S.D.N.Y. Feb. 14, 2019) (citing *Sykes v. RFD Third Ave. I Assocs., LLC*, 833 N.Y.S.2d 76, 77–78 (N.Y. App. Div. 2007)). And, because New York law looks principally to a party's

"central" claims, *see Blinds to Go*, 143 N.Y.S.3d at 93, "it is of no moment that [the] plaintiff did not prevail on its [alternative] claims." *See Okoye v. deVere Grp., Ltd.*, 92 N.Y.S.3d 625, 626 (N.Y. App. Div. 2019).

BMC is the prevailing party. The crux of BMC's case turned upon the allegation that IBM fraudulently induced BMC to sign the 2015 OA, which IBM allegedly then breached when it displaced BMC's products with its own. *See* Dkt. 295. By clear and convincing evidence, the court found that IBM fraudulently induced BMC to enter into a contract by agreeing, in section 5.4, not to poach an important BMC account, when IBM did not intend to uphold that agreement. Dkt. 756. Relatedly, the court found for BMC because it showed by the preponderance that IBM breached the contractual promise not to displace. *Id.* Even though BMC raised, and lost, other claims—including trade secrets violations, unfair competition, a breach of section 5.1 of the contract, and a breach of section 8 of the contract—in this suit, those claims were of a lower tier compared to the core claims it won.

### C. The Reasonableness of BMC's Fee Request

The court next turns to whether BMC's fee request is reasonable and customary. *See F.H. Krear & Co.*, 810 F.2d at 1263. The "lodestar" amount for attorneys' fees—what the Fifth Circuit has characterized as presumptively reasonable fees, *League of United Latin Am. Citizens No. 4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1232 (5th Cir. 1997)—"is the product of reasonable hours times a reasonable rate." *City of Burlington v. Dague*, 505 U.S. 557, 559, 112 S. Ct. 2638 (1992); *accord Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2008) (noting that the lodestar method is presumptively reasonable).[2]

---

[2] IBM does not disagree with BMC's contention—and the court's conclusion—that New York law applies to the MLA's application in this dispute. However, in determining a reasonable fee, courts in both the Fifth Circuit and the Second Circuit apply the lodestar method and look to prevailing rates within the judicial district—here, the Southern District of Texas. Thus, though reasonable and customary attorneys' fees in the Southern District of Texas

6

In calculating an award of fees, courts must determine the "number of hours reasonably expended on the litigation" and then multiply them by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933 (1983); *Arbor Hill*, 522 F.3d at 184 (noting that a "reasonable hourly rate" is "what a reasonable, paying client would be willing to pay"); *accord La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir.), *cert. denied*, 516 U.S. 862, 116 S. Ct. 173 (1995).

"[I]n some cases of exceptional success an enhanced award may be justified." *Blum v. Stenson*, 465 U.S. 886, 897, 104 S. Ct. 1541 (1984); *see also Hensley*, 461 U.S. at 435 ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified."). So, "[o]nce the court determines a lodestar figure, the court may, in its discretion, increase or decrease that amount based upon the prevailing party's level of success." *EEOC v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 234 (E.D.N.Y. 2018); *accord LULAC*, 119 F.3d at 1232 ("[T]he district court may adjust it upward or downward in exceptional cases.").

1. **Reasonable Hours**

IBM challenges the reasonableness of BMC's hours on two fronts, arguing that the court should (1) reduce BMC's lodestar amount by 25% to account for the hours its attorneys spent litigating BMC's failed trade secrets claims and (2) downwardly adjust BMC's expended hours due to its submission of "block billing" invoices. The court agrees that BMC should have segregated time spent on its trade secrets claims but will impose a more reasonable 10% reduction. Otherwise, the court rejects IBM's objections to BMC's invoices and finds that the number of

---

might differ from those in the Southern District of New York, courts in both districts use the same method in determining reasonable and customary fees.

7

hours Bracewell expended on this litigation is reasonable.

### a. Segregation

IBM first argues that the court should reduce Bracewell's fee by 25%—or $4.5 million—for time that BMC spent pursuing its unsuccessful trade secrets claims. Dkt. 773 at 4–8. Specifically, IBM claims that two Bracewell partners, Tim Geiger and Andrew Zeve, "worked exclusively on the trade secret claim," collectively charging $3,256,458.20—or 18%—of BMC's total bill. Dkt. 773 at 7. IBM also claims that Sean Gorman, lead counsel for BMC, and Liza Eoff, an associate, devoted considerable time to the trade secrets claims, and asks the court to deduct the fees for BMC's trade secret experts. *Id.* BMC counters that its trade secrets claims involved facts overlapping with its successful breach of contract claim and that, even if segregation were required, a reduction of ten percent is more reasonable. Dkt. 774 at 3–7.

Generally, "[i]n determining the number of hours reasonably expended for purposes of calculating the lodestar, the district court should exclude excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999). But, as the Supreme Court made clear in *Hensley*, when unsuccessful claims "involve a common core of facts" with a meritorious claim "or [are] based on related legal theories," they are compensable. 461 U.S. at 435; *accord LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 762 (2d Cir. 1998) ("No fees should be awarded for time spent pursuing a failed claim if it was unrelated to the plaintiff's successful claims in the sense that it was based on different facts and legal theories.") (internal quotations omitted).

While Bracewell achieved excellent results for its client after nearly five years of litigation, BMC's trade secrets claims are severable from its meritorious breach of section 5.4 claim and fraudulent inducement claim. To be sure, BMC always alleged that "IBM . . . used its confidential

8

proprietary information and trade secrets . . . to implement AT&T's transition from BMC products to IBM products," *see* Dkt. 1 ¶ 60, a theme it reiterated throughout the operative SAC. *See* Dkt. 295 ¶¶ 84, 109, 150, 160. But BMC's successful breach of contract claim rested on the fact that IBM *removed* BMC's products from AT&T's mainframe and replaced them with its own—not that it *used* BMC's products to effectuate this transition. Moreover, IBM's use of BMC's products after the parties executed the 2015 OA had nothing to do with IBM's clear and convincing fraud inducing BMC into that contract. Therefore, segregation is appropriate. However, the court disagrees with IBM that a 25% reduction is necessary and agrees with BMC's expert, Murray Fogler, that a 10% reduction is more appropriate to account for Zeve, Geiger, Gorman, and Eoff's work on the trade secrets claims. *See* Dkt. 760-3 at 969–1139.

Relatedly, IBM asks the court to exclude BMC's $337,629 in trade secrets expert costs. Dkt. 773. BMC's initial trade secrets expert, Geoffrey Decker, billed $28,280, and its subsequent expert, Kendyl Roman, billed $309,349. As BMC correctly notes, Roman opined both at trial and in his reports on far more than trade secrets, and his testimony discussed IBM's displacement activities at length. IBM's displacement of BMC's products and replacement of those products with IBM's own products put IBM in breach of section 5.4 of the 2015 OA, one of the core claims of this case. The court agrees with IBM that BMC's expenses related to Decker should be segregated, as his work focused more exclusively on BMC's failed trade secrets claims, but disagrees that BMC's expenses related to Roman merit segregation. Accordingly, the court will (1) reduce the fee award by 10% to account for the time Bracewell attorneys pursued the BMC's trade secret claims and (2) exclude $28,280 in expenses related to Decker from BMC's recovery of litigation costs. *See supra* at 14–16.

    b. **Block Billing**

IBM next complains that BMC's fee submissions reflect "block billing," Dkt. 773 at 8, the practice of billing for "the tasks performed during [a time] period, giving some detail about the kinds of work performed on a particular day, but [not itemizing] the amount of time spent on each." *Humphrey v. United Way of Tex. Gulf Coast,* 802 F. Supp. 2d 847, 864 (S.D. Tex. 2011). In particular, IBM objects to the following entries:

- 14.7 hours a Bracewell associate worked on finalizing BMC's "proposed findings of fact and conclusions of law" and "meet[ing] and [confer]ing with IBM." Dkt. 760-4 at 141;

- 8.7 partner hours spent to "[r]eview, analyze, and revise multiple versions of draft proposed findings of fact and conclusions of law; multiple working team meeting regarding [REDACTED]; review and analyze legal authorities and other materials regarding [REDACTED]; and revise draft regarding same; work with working team regarding [REDACTED]." *Id.*; and

- Several hours used to "prepare for trial," "revise joint pre-trial order," and "meet with [expert] to [REDACT]." *Id.* at 1043–45.

"Block billing is disfavored because it prevents the court from accurately determining the time spent on any particular task, thus impairing the court's evaluation of whether the hours were reasonably expended." *Hoffman v. L & M Arts*, No. 3:10-cv-0953-D, 2015 WL 3999171, at *4 n.15 (N.D. Tex. July 1, 2015). But reductions for block billing are not automatic. *Fralick v. Plumbers & Pipefitters Na. Pension Fund*, No. 3:09-cv-0752-D, 2011 WL 487754, at *5 (N.D. Tex. Feb. 11, 2011). However, if the records are inadequate to determine reasonable hours, the court may reduce the hours or the lodestar figure by 10–30%. *Peterson v. Tenant Tracker, Inc.*, No. 6:20-CV-00588, 2021 WL 4956244, at *6 (E.D. Tex. Sept. 30, 2021); *accord N.Y. State Ass'n*

*for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1142, 1146 (2d Cir. 1983) (concluding that inadequate timekeeping may justify "trimming [the] fat" from a fee application).

The court finds that BMC's billing entries are not unreasonably vague and further concludes, especially given the time the court devoted to the Findings of Fact and Conclusions of Law, that 14.7 associate hours and 8.7 partner hours is more than a reasonable expenditure for BMC's *proposed* Findings of Fact and Conclusions of Law.  In that same vein, the court finds that Bracewell's entries for trial preparation and revisions to the joint pre-trial order are sufficiently descriptive to be credited toward their ultimate hour count.  More generally, the court concludes that the number of hours BMC's attorneys billed on this case is reasonable and customary given the case's duration and complexity.  *See* Dkt. 760-2 at 2–3.  The parties zealously litigated this matter at every stage, resulting in extensive discovery, protracted discovery disputes, and substantial motion practice that culminated in two weeks of trial.  Except for the time spent on the trade secrets claims—for which the court will deduct 10% from the lodestar figure—BMC's attorneys billed a reasonable number of hours.

### 2. Reasonable Rate

The court next turns to whether BMC's requested fee rates are reasonable.  "In determining an hourly rate, the district court bases its decision on the 'prevailing market rates in the relevant community.'"  *LULAC*, 119 F.3d at 1234 (quoting *Blum*, 465 U.S. at 895).  The "burden is on the applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Blum*, 465 U.S. at 895 n.11; *accord Farbotko v. Clinton Cnty.*, 433 F.3d 204, 208 (2d Cir. 2005).  The Fifth Circuit "has interpreted rates 'prevailing in the community' to mean what it says," namely that district courts are required to consider the local

11

rates for similar work "in the community." *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011). District courts can, of course, "draw on [their] own expertise" in determining the reasonableness of fees. *Kondos v. Allstate Tex. Lloyds*, No. 1:03-CV-1440, 2005 WL 1004720, at *18 (E.D. Tex. Apr. 25, 2005).

The court agrees that BMC's attorneys billed a reasonable hourly rate. Thirty-four timekeepers—including eleven partners, two counsel, eighteen associates, and three legal assistants—charged for their time on this matter based on their 2017 rates, which ranged from $165 per hour to $885 per hour. *See* Dkts. 760-1 at 9, 760-2 at 2. Gorman charged BMC $850 per hour. *Id.* Eoff charged BMC $394 per hour. *Id.* All told, Bracewell billed $18,129,053.89 under the 2017 rate structure. *Id.* Notably, IBM does not object to Bracewell's hourly rates. *See generally* Dkt. 773. The court concludes that Bracewell's rates are "reasonable in comparison to the prevailing market rates in Houston, Texas for comparable law firms and attorneys" of its caliber. *See Eni US Operating Co Inc. v. Transocean Offshore Deepwater Drilling Inc.*, No. 4:13-CV-03354, 2018 WL 2271162, at *1 (S.D. Tex. May 16, 2018) (finding rates ranging from $360 to $800 per hour reasonable); *see also Calsep A/S v. Intelligent Petroleum Software Sols., LLC*, No. 4:19-CV-1118, 2022 WL 508334, at *5 (S.D. Tex. Feb. 18, 2022) (finding a rate of $700 for partners and $500 for mid-level associates reasonable in a trade secrets dispute resolved on default judgment).

### 3. Upward Adjustment

To fairly compensate its attorneys, BMC requests an upward adjustment of the lodestar figure based on the fixed rates and preliminary injunction discount it and Bracewell agreed to at the start of this litigation. *See* Dkt. 760 at 14, Ex. A at 11. IBM objects. Dkt. 773. Generally, "[t]he reasonable hourly rate is the rate a paying client would be willing to pay." *Arbor Hill*, 522

F.3d at 190. Where, as here, "a sophisticated client pays attorneys' fees that it does not know it will necessarily recover, the rate paid is presumptively reasonable." *Wells Fargo Bank v. Konover*, Civ. No. 3:05-CV-1924 (AWT), 2014 WL 3908596, at *6 (D. Conn. Aug. 8, 2014) (citing *Blanchard v. Bergeron*, 489 U.S. 87, 93, 109 S. Ct. 939 (1989)); *see Crescent Publ'g Grp. v. Playboy Enters.*, 246 F.3d 142, 144 (2d Cir. 2001) ("[A]ny evidence of the actual billing arrangement between [the party seeking fees] and its counsel should be considered a significant, though not necessarily controlling, factor in the determination of what fee is 'reasonable'"); *Diamond D Enters. USA, Inc. v. Steinsvaag,* 979 F.2d 14, 19 (2d Cir. 1992) ("[W]hen a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay *whatever amounts have been expended* by the prevailing party, so long as those amounts are not unreasonable." (emphasis added) (internal quotations omitted)). For this reason, the fee applicant—here, BMC—shoulders the burden to show that an upward enhancement is necessary to provide fair and reasonable compensation. *See Blum*, 461 U.S. at 898.

While the court acknowledges that BMC's attorneys obtained an extraordinary result for their client, the court pays great deference to the contractual agreement that BMC and Bracewell executed. Bracewell agreed to represent BMC at its 2017 rates and to discount its work pursuing a preliminary injunction, and the court rejects BMC's invitation to award fees beyond what it and its counsel privately contracted for. *See Steinsvaag,* 979 F.2d at 19.

### 4. The Lodestar Figure and Segregation Deduction

Considering the number of hours worked multiplied by the reasonable rates charged, BMC's lodestar figure is $18,129,053.89. *See* Dkt. 760-1 at 19. Per the discussion above, the court will apply a 10% deduction—or $1,812,905.38—to account for attorneys' fees associated

13

with the failed trade secrets claims that BMC should have segregated. Because the court declines BMC's invitation to apply an upward adjustment to the fee award, the total lodestar amount is $16,316,148.40.

### D. Litigation Costs

BMC seeks reimbursement for $4,122,998.13 in litigation costs. Of that, BMC seeks to recover $2,031,295.34 incurred from the following types of costs: photocopying, printing, service of process, legal research, filing fees, delivery and postage services, transcribing services, document production costs, and witness fees. *See* Dkts. 760-2, 760-3. Inclusive of this total, BMC seeks to recover $1,403,795.20 in taxable costs pursuant to 28 U.S.C. § 1920. BMC also seeks to recover costs incurred by its experts in the amount of $2,449,029.78.

IBM claims that $1,123,152.87 of BMC's e-discovery expenses—such as a $250 charge related to "Encrypted Imaging Media" and a $2,611.56 charge for "Active Relativity Monthly Data Hosting Review Pop Size (GB) – Peak"—is not recoverable under 28 U.S.C. § 1920(4). Dkts. 773 at 10, Dkt. 760-15 (first invoice detailing charges). BMC argues that e-discovery costs are generally recoverable under § 1920(4) and that, in any event, the MLA permits recovery for the "reasonable and customary *costs*" of litigation. Dkt. 774 at 5 (emphasis added). And, as previously noted, IBM also seeks to exclude only $337,629 in trade secrets expert costs.[3]

#### a. Taxable Costs

The court agrees with IBM that the two charges identified above, together totaling $2,861.56, are unrecoverable under § 1920(4). Section 1920(4) provides that the court may tax as costs "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920(4). As other courts have

---

[3] As the court previously explained, it will exclude only Decker's $28,280 fee. *See infra* at 9.

recognized, decryption might be "necessary to make a final production copy that is viewable by the requester," but it precedes the act of copying in the same way that safely storing paper copies in a safe prior to printing hard copies is an antecedent to copying itself. *CBT Flint Partners, LLC v. Return Path, Inc.*, 737 F.3d 1320, 1331 (Fed. Cir. 2013). Just as "the party's expense in removing [the paper copies] from such security, and getting them to the duplication machine, would not naturally constitute 'making copies,'" encrypting and decrypting electronic documents does not constitute making copies. Likewise, to extend the analogy to "data hosting," *see* Dkt. 760-15, the expense of paying for a space to store paper files a party intends to copy is separate from duplication expenses. *Accord Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 169 (3d Cir. 2012) ("Section 1920(4) does not state that all steps that lead up to the production of copies of materials are taxable.").

Though IBM asks the court to exclude $1,123,152.87 in e-discovery expenses, it only specifically objects to two of BMC's e-discovery charges. Absent an itemized list and explanation from IBM as to why the remaining $1,120,291.31 in e-discovery expenses is unrecoverable under 28 U.S.C. § 1920, the court credits BMC's explanation that these expenses were related to statutorily legitimate document production efforts. *See U.S. ex rel. Long v. GSDMIdea City, L.L.C.*, 807 F.3d 125, 132 (5th Cir. 2015) (noting with respect to an e-discovery dispute that, "[w]ithout an itemization by [the objecting party] of which costs were not permissible and an explanation of why § 1920 does not cover those costs, we find no abuse of discretion in this award."). Therefore, under § 1920, BMC may recover taxable costs in the amount of $1,400,933.64.

### b. Recovery Through the MLA

The court agrees with BMC that the MLA entitles it, as the prevailing party, to recover

"reasonable and customary . . . costs" beyond attorneys' fees from IBM. *See* Dkt. 774 at 5; PX1. These costs reasonably include the full $4,122,998.13 BMC seeks to recover, including those costs BMC incurred from photocopying, printing, service of process, legal research, filing fees, delivery and postage services, transcribing services, document production costs, and expert witness fees, except for Decker's $28,280 fee for his trade secrets opinion. *See Themis Cap. v. Democratic Republic of Congo*, No. 09 Civ. 1652 (PAE), 2014 WL 4379100, at *9 (S.D.N.Y, Sept. 4, 2014) ("[C]ourts in this District routinely reimburse prevailing parties for the costs of expert witnesses and consultants, regardless of whether the expert testified at trial."). Accordingly, BMC can recover $4,094,718.13 in litigation costs under the MLA, including the taxable costs discussed above.

### 5. Post-Judgment Attorney Expenses and Appellate Expenses

Finally, BMC seeks $1,232,558.00 in conditional appellate expenses. Dkt. 760. In the Second Circuit, as in Texas, the trial court may award conditional post-judgment and appellate attorney fee expenses. *See, e.g.*, *Wifiland, LLP v. R.V.C., Inc.*, 564 F. App'x 612, 614 (2d Cir. 2014) (interpreting a contract including an attorneys' fee award to include appellate attorneys' fees); *Q2 Software, Inc. v. Radius Bank*, No. A-18-CV-00878-RP, 2020 WL 1482591, at *1 (W.D. Tex. Mar. 27, 2020) ("In Texas, it is well-settled that the trial court's award of attorneys' fees may include appellate attorneys' fees.") (internal quotations omitted), *report and recommendation adopted*, No. 1:18-CV-878-RP, 2020 WL 10056073 (W.D. Tex. Apr. 14, 2020). IBM does not object to BMC's post-judgment and conditional appellate expenses, which the court finds reasonable. Accordingly, the court will award BMC $1,232,558.00 in post-judgment and conditional appellate fees.

## IV. CONCLUSION

For the reasons outlined above, BMC's motion for recovery of its attorneys' fees and costs (Dkt. 760) is GRANTED IN PART and DENIED IN PART. BMC is AWARDED:

1. $16,287,868.40 in attorneys' fees;

2. $4,094,718.13 in litigation costs, consistent with this opinion; and

3. $1,232,558.00 in post-judgment and conditional appellate expenses.

Signed at Houston, Texas, on August 8, 2022.

_____
Gray H. Miller
Senior United States District Judge