United States District Court
Southern District of Texas
**ENTERED**
August 09, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant*. | § | |

### MEMORANDUM OPINION & ORDER

Pending before the court is IBM's motion to amend judgment. Dkt. 772. After reviewing the motion, BMC's response (Dkt. 776), IBM's reply (Dkt. 780), and the applicable law, the court is of the opinion that the motion should be GRANTED IN PART and DENIED IN PART.

### I.     BACKGROUND

The court assumes familiarity with the underlying facts of the case, and recounts only facts necessary to give a general overview for purposes of the instant motion. On May 30, 2022, the court entered its Findings of Fact and Conclusions of Law and a Final Judgment in this case. Dkts. 756, 757. Concluding that BMC prevailed on its breach of section 5.4 claim and fraudulent inducement claim, the court awarded BMC $717,739,615.00 in direct damages and $717,739,615.00 in punitive damages. Dkt. 756 ¶¶ 206, 214.

### II.     LEGAL STANDARD

IBM brings its motion to amend judgment under Federal Rules of Civil Procedure 52(b), 59(a), and 59(e). Dkt. 772 at 9. For the court to grant IBM the relief it seeks under Rule 52(b), 59(a), or 59(e), IBM must show that the court committed a "manifest error of law or fact." *See,*

*e.g.*, *Pounds v. Katy Indep. Sch. Dist.*, 730 F. Supp. 2d 636, 641 (S.D. Tex. 2010) (Rosenthal, J.) ("[T]o alter or amend the judgment under Rule 59(e), [the moving party] 'must clearly establish either a manifest error of law or fact.'") (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003)); *Cooper v. Ocwen Loan Servicing, LLC,* No. 3:14-CV-2795-N, 2016 WL 4440485, at *2 (N.D. Tex. July 29, 2016) ("Rule 52(b)'s purpose is, generally, to correct manifest errors of law or fact.") (quotation marks omitted), *report and recommendation adopted*, No. 3:14-CV-2795-N, 2016 WL 4429248 (N.D. Tex. Aug. 22, 2016); *Hicks v. R.H. Lending, Inc.*, No. 3:18-CV-0586-D, 2020 WL 2065637, at *1 (N.D. Tex. Apr. 29, 2020) ("A motion for a new trial in a nonjury case . . . should be based upon a manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons.") (quoting *Isystems v. Spark Networks Ltd.*, No. 3:08-CV-1175-N, 2015 WL 13469855, at *1 (N.D. Tex. Jan. 13, 2015)).

But—critically, for this case—"a party may not use a motion under Rule 52(b), 59(a), or 59(e) to repeat previous arguments or raise arguments that could, and should, have been raised at trial." *Equistar Chems., L.P. v. Indeck Power Equip. Co.*, No. CV H-19-3757, 2021 WL 2270212, at *1 (S.D. Tex. June 3, 2021) (Rosenthal, C.J.); *see also T. B. ex rel. Bell v. Nw. Indep. Sch. Dist.*, 980 F.3d 1047, 1051 (5th Cir. 2020) (stating a Rule 59(e) motion "cannot be used to raise arguments which could, and should, have been made before the judgment issued") (internal quotations omitted); *Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir. 2004) (stating a Rule 59(e) motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment"); *Cooper*, 2016 WL 4440485, at *2 (stating a Rule 52(b) motion "should not be employed . . . to re-litigate old issues, to advance new theories, or to secure a rehearing on the merits").

### III.   ANALYSIS

Contrary to the Fifth Circuit's clear instruction, IBM uses its motion to rehash the very arguments that the court previously rejected. *See Templet*, 367 F.3d at 478–79. IBM asserts that the court committed manifest errors of law because (1) section 5.4 of the 2015 Outsourcing Attachment between IBM and BMC (the " 2015 OA") is an unenforceable restrictive covenant; (2) the court's damage award for breach was incorrectly determined because there was no causation, the license prices the court relied on were incorrect, and the award is a windfall; (3) BMC's fraud claim is barred by New York law; (4) BMC's fraud claim is contrary to established Texas law; (5) the punitive damages award violates the 2008 Master Licensing Agreement's ("MLA") punitive damages waiver provision contained in § 9; (6) the punitive damages are barred by Texas law in the absence of aggravating circumstances apart from the underlying wrongful act; (7) the punitive damages award violates due process under Texas state and federal constitutional law; and (8) the court used the wrong interest rate for the post-judgment interest award. The court addresses each of IBM's complaints in turn.

### A.   Section 5.4 Is Not an Unenforceable Restrictive Covenant

IBM argues that section 5.4, as applied, is an unenforceable restrictive covenant. Dkt. 772. BMC asserts that IBM's challenge "has been made many times before and IBM does not identify any basis for Rule 52 or 59 relief." Dkt. 776. The court agrees with BMC. The court previously held that section 5.4 is not an unenforceable restrictive covenant, *see* Dkt. 756 ¶¶ 181–84, and IBM has not convinced the court that this ruling is a manifest error of law.

Restrictive covenants, or anticompetitive agreements, enjoy a long and rich common law history.[1] *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388, 712 N.E.2d 1220 (1999) (noting

---

[1] The parties agree that New York law governs the contract claims in this case and Texas law applies to BMC's common law and statutory trade secrets claims. Dkt. 612 (joint pretrial order);

that reported cases upholding some forms of restrictive covenants date back 300 years).  Three factors govern the court's assessment of contractual restraints on trade agreed to between businesses: (1) the presence of a legitimate business interest; (2) the reasonableness of the restriction's scope; and (3) the hardship on the restricted party.  *Calico Cottage, Inc. v. TNB, Inc.*, No. 11-CV-0336 (DLI) (MDG), 2014 WL 4828774, at *5 (E.D.N.Y. Sept. 29, 2014).  In applying these factors, some courts have invalidated restrictive covenants where a reasonable nexus is lacking between the conduct they proscribe and the conduct challenged in court.  *See, e.g.*, *Freedom Mortg. Corp. v. Tschernia*, No. 20-CV-1206 (AJN), 2021 WL 1163807, at *4 (S.D.N.Y. Mar. 26, 2021) (invalidating an "exceptionally broad" post-employment restrictive covenant of indefinite length covering any commercial or residential mortgage business in the entire United States that did not implicate plaintiff's "legitimate interest in the enjoyment of the goodwill it purchased" from company where employee was a shareholder).

The court found that section 5.4 advanced a legitimate business interest by preventing IBM from leveraging its role as an IT outsourcer and using BMC's software for free to unfairly compete against BMC in the software business.[2]  Dkt. 756 ¶ 183.  IBM does not challenge the court's finding; instead, it claims the court found that the "covenant's purported legitimate purpose was . . . to preclude unfair competition and misappropriation of BMC's confidential information." Dkt. 772 at 11.  On that premise, IBM reasons that 5.4's legitimate "purpose is not implicated" by IBM's breach "given the Court's holdings on unfair competition and misappropriation" regarding BMC's trade secrets claims.  Dkt. 772.

---

Dkt. 756 (findings of fact and conclusions of law).

[2] In passing, IBM argues that "[section] 5.4's application implicates an invalid, publicly-injurious purpose—to attempt to lock AT&T into BMC's mainframe products." Dkt. 772 at 12.  That argument is unavailing, as section 5.4 did not prevent AT&T, which was not a party in this case, from using another mainframe software developer's products.  Nor did it prevent IBM from displacing BMC's products with another software developer's products.

4

But IBM's argument rests on a dubious characterization of the court's finding and a faulty premise to boot. The court did not conclude that the covenant's legitimate purpose was to preclude conduct that would amount to an "unfair competition" claim or "misappropriation of . . . confidential information" claim, as IBM suggests. Dkt. 772 (noting that BMC failed to prove unfair competition or trade secrets misappropriation). Rather, the court concluded that the covenant was "designed to prevent giving IBM an *unfair advantage* when competing with BMC in the *software* business." Dkt. 756 ¶ 183 (emphasis added). This mischaracterization notwithstanding, IBM's premise that the court's dismissal of BMC's common law unfair competition and trade secrets claims annuls any finding of "unfair advantage" is wrong, as not all unfair advantages in business will constitute unfair competition or misappropriation of trade secrets. Equally wrong is IBM's assertion that a reasonable nexus is lacking between the court's factual findings and the covenant's purpose. As the court previously explained, IBM, as an IT outsourcer, enjoyed free access to the inner workings of BMC's software, enabling it to "acquire unique knowledge about how a competitor's software operates on a mutual customer's mainframe system" that could benefit its "*software*" development business. Dkt. 756 ¶ 183 (emphasis added). Leveraging the familiarity with AT&T's mainframe needs and the intimate knowledge of BMC's mainframe software it gained as an IT outsourcer for "no fee," IBM transitioned AT&T to IBM's software during Project Swallowtail. *See id.* This conduct squarely implicates section 5.4's legitimate purpose of preventing IBM from applying the "unfair advantage" it secured as an IT outsourcer "when competing with BMC in the *software* business." *See id.* Accordingly, the court concludes, once more, that section 5.4 is not an unenforceable restrictive covenant.

## B.    IBM's Breach Resulted in over $717 Million in Direct Damages

IBM brings a bevy of objections based on the court's breach-of-contract damages findings.

Dkt. 772.  BMC asserts that all of the arguments are "repeat arguments" that are "procedurally improper and should not be considered" as the damages flow directly from the 2015 OA.  Dkt. 776.  While the court agrees that IBM is mostly rehashing previous arguments, it will briefly consider each objection.

### 1.  Causation

*First*, IBM claims that "the Court manifestly erred in holding that IBM's purported breach of § 5.4 caused BMC's damages."  *Id.* at 12.  Specifically, IBM argues that "[c]ausation requires proof by a preponderance of the evidence that it is 'reasonably certain' that IBM would have paid BMC $718 million in licensing fees."  *Id.*  BMC asserts that the damages award is based on the rights IBM exercised and did not pay for under the 2015 OA's terms and pre-negotiated discount prices that, again, IBM agreed to pay.  Dkt. 776 at 9.

IBM misapprehends and muddles the law of direct damages and causation, misapplying the consequential damages causation standard to direct damages.  Under New York law, "a breaching party is liable for all direct and proximate damages which result from the breach." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (citing *Wakeman v. Wheeler & Wilson Mfg. Co.*, 56 Sickels 205, 209, 101 N.Y. 205, 4 N.E. 264, 266 (1886)).  The damages, however, "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach of the contract."  *Wakeman*, 56 Sickels at 209.

"[Direct] damages are those which are the natural and probable consequence of the breach."  *Am. List Corp. v. U.S. News & World Rep., Inc.*, 75 N.Y.2d 38, 42–43, 549 N.E.2d 1161 (1989).  A "natural and probable consequence of the breach" refers to consequences that are "in the ordinary course of things" or directly within the contract itself.  *See Kenford Co. v. Cnty. of*

*Erie*, 73 N.Y.2d 312, 319, 537 N.E.2d 176 (1989).  With respect to direct damages, the "certainty" element "refers to the fact of damage, not the amount." *Tractebel*, 487 F.3d at 11.  As New York courts have long observed, "when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach.  A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain." *Wakeman*, 56 Sickels at 209.  "[T]he burden of uncertainty as to the amount of damage is upon the wrongdoer" and "[t]he plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred because of the breach." *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977) (internal quotations omitted).  Unlike direct damages, consequential damages "are recoverable only upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made." *Am. List Corp.*, 75 N.Y.2d at 42–43; *see also Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145.

Two contracts—the 2015 OA and the 2008 MLA—are relevant here.  Section 5.4 of the 2015 OA prohibited IBM from displacing BMC's products with its own. Dkt. 756 ¶ 28.  Section 10 of the MLA limited "'[e]ach party's liability arising out of or related to [the MLA] agreement, the product, or the use of the product . . . . to the greater of $5,000,000 or the amount paid or *payable by the customer for the license* to the applicable product giving rise to the claim.'"  *Id.* ¶ 22 (emphasis added).  Agreeing with IBM, the court previously concluded that the 2015 OA and 2008 MLA form an integrated contract.  *Id.* at 2.  IBM breached section 5.4.  BMC's damages are direct and reasonably certain as they follow from the contracts themselves.  *See id.* ¶¶ 112, 167–69; *see also Tractebel*, 487 F.3d at 110 (certainty "refers to the *fact* of damage, not the amount").

2.      **The License Prices**

This marks a good segue into IBM's second objection.  IBM contends that the court's finding that the license fee amounts specified in the 2015 OA and its addenda formed a "contractual price" is a manifest error because the license prices used rest on a clear misreading of the OA and the court ignored the parties' course of dealing.  Dkt. 772.  The court understands IBM to argue that if there is no "contractual price," then there is no certainty that it would have paid the $717 million in license fees, and therefore there is no causation.  *See id.*  BMC asserts that IBM is merely rehashing previous arguments relating to the license-fee damages flowing from BMC's claim for breach of the OA § 5.4.  Dkt. 776.  BMC argues, moreover, that none of IBM's arguments identify error.  *Id.*  IBM replies that BMC's argument "underscores how far BMC and the Court have departed from precedent," asserting that the court erred when it "fail[ed] to examine a world in which IBM declined to participate in Project Swallowtail, assuming instead that IBM would have paid BMC $717 million."  Dkt. 780.

IBM's arguments fail.  Section 8.1 of the 2015 OA entitled IBM "to a global minimum discount of 72% off the Listed Price in Exhibit H for all purchases of new licenses."  Dkt. 756 ¶ 173.  IBM reasons that this "price" is only the price IBM must pay if it "elects to purchase" licenses, not a "damage for a breach."[3]  Dkt. 772.  But going back to section 10 of the MLA, it is plain that liability is limited to the greater of $5,000,000 or the amount payable for the license. Dkt. 756 ¶ 22.  How does the court know the amounts payable by IBM for the applicable licenses? Exhibit H to the 2015 OA outlined the costs of each license for the parties.  Section 8.1 gave IBM "a global minimum discount of 72% off" those listed prices.  Dkt. 756 ¶ 173.  IBM claims that the court converted the 72% discount into a set price, when it is more appropriately viewed as an

---

[3]  IBM's own briefing acknowledges that there is, in fact, a price in the contract for the license fees.

invitation to bargain.  *See* Dkt. 772 at 15.  But the court does not view the words "minimum discount" as inherently inviting maximalist bargaining.  Instead, minimum discount refers to "the smallest acceptable" discount the parties could agree on.  *See* MINIMUM, Black's Law Dictionary (11th ed. 2019).  BMC offered a "stable foundation" for a persuasively "reasonable estimate" of the direct damage incurred by IBM's breach, *see Contemporary Mission*, 557 F.2d at 926, and the court once more declines IBM's invitation to "escape liability."  *Wakeman*, 56 Sickels at 209.

### 3.  Windfall

IBM likewise argues that the court's direct "damage award departs from the stalwart principle that a plaintiff cannot recover more from a breach than it would have gained from performance"—ostensibly nothing, given the 2015 OA's "no fee" provision—because "damages cannot be windfalls."  *See* Dkt. 772 at 16.  BMC asserts that the court awarded benefit-of-the-bargain damages based on the parties' agreements and the damages.  Dkt. 776.

"IIt has long been recognized that the theory underlying damages is to make good or replace the loss caused by the breach of contract."  *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261, 692 N.E.2d 551 (1998); *accord U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 696 (2d Cir. 1991) ("Since the purpose of damages for breach of contract is to compensate the injured party for the loss caused by the breach, those damages are generally measured by the plaintiff's actual loss.") (citing 5 Corbin On Contracts § 1002, at 31 (1964)).  In gauging an expectation interest, courts look to the "loss in the value to the injured party of the other party's performance that is caused by the failure of, or deficiency in, that performance."  Restatement (Second) of Contracts § 347 (1981).

Here, in violation of its contract with BMC, IBM exercised rights—namely, the right to displace—for which it did not pay despite having the option to purchase.  Therefore, IBM's failure

to perform in accordance with section 5.4's non-displacement provision deprived BMC of the value of those displacement rights.  *See id.*  Though the cost of the licenses that would have enabled it to legally displace might seem steep to the average American, IBM—a sophisticated, multibillion dollar company—entered a contract that identified each license's exact cost in Exhibit H to section 8.1.  BMC is not recovering a windfall so much as it is recuperating the benefit of its bargain.

**C.     BMC's Fraud Claim and New York Law**

In the joint pretrial order, IBM agreed with BMC that "Texas law applies to BMC's common law claims" and New York law applies to the contract claims.  Dkt. 612 at 22.  However, IBM argues that the court's fraud findings merged BMC's fraudulent inducement claim into its breach of contract claim, compelling the application of New York law.  Dkt. 772.  IBM further argues that under New York law, BMC's fraud claim fails because it is entirely duplicative of its breach of contract claim in that it rests upon an "insincere[e] . . . promis[e] to perform a contractual provision."  *Id.* (citing *Cronos Grp. Ltd. v. XComIP, LLC*, 156 A.D.3d 54, 64 (N.Y. App. Div. 2017)).

BMC asserts that (1) this argument is procedurally barred because IBM has never argued New York law applies to the fraud claim and has agreed—even in the pretrial order—that Texas law applies; (2) IBM is judicially estopped from arguing that New York law applies; (3) section 16 of the MLA—the New York law provision—on its face applies only to the construction of the MLA and 2015 OA; and (4) notwithstanding IBM's arguments that BMC's current fraud theory is different, BMC has consistently argued fraud pursuant to *Formosa*.  Dkt. 776.

In reply, IBM asserts that (1) the type of fraudulent inducement found by the court does not exist under New York law, and IBM raised its New York law issue in its pretrial briefs;

(2) while IBM agreed New York law governs contract claims and Texas law governs tort claims in the pretrial order, it disagrees with the characterization that the fraudulent inducement claim here sounds in tort because it is actually a contract claim governed by New York law; (3) regardless, because this is an issue of law, it may be asserted post-judgment; and (4) estoppel does not apply because IBM's agreement that Texas law governs fraud is distinct from the specific claim this court labelled fraudulent inducement, which IBM insists is actually a contract claim. Dkt. 780.

The court begins with BMC's argument that IBM is estopped from arguing that New York law applies to the fraudulent inducement claim because IBM agreed that Texas law applies in the pre-trial order.  The pre-trial order limits the "claims, issues, and evidence" to "narrow[] and expedite the proceeding." *Flannery v. Carroll*, 676 F.2d 126, 129 (5th Cir. 1982).  The "court may only modify a pretrial order issued after a final pretrial conference 'to prevent manifest injustice.'" *Jordan v. Maxfield & Oberton Holdings, L.L.C.*, 977 F.3d 412, 421 (5th Cir. 2020) (citing Fed. R. Civ. P. 16(e)).  A party may be properly estopped from presenting legal arguments that contradict stipulations made in the joint pretrial order.  *See Matter of Pirani*, 824 F.3d 483, 493 n.1 (5th Cir. 2016) (party was estopped from arguing a proposed definition that was stipulated to in the joint pre-trial order) (citing *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000).

IBM now argues that the fraudulent inducement claim is a contract claim, or merged with the contract claim, and thus is controlled by New York law.  However, in the joint pretrial order, the parties agreed that "New York law governs the contract claims in this case," and "Texas law applies to BMC's common law claims."  Dkt. 612 at 22.  Further, the parties agreed to the elements of fraudulent inducement under Texas law, and they agreed that a "'promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of

performing at the time it was made.'"  *Id.* at 23 (citing *Anderson v. Durant*, 550 S.W.3d 605, 614

(Tex. 2018), for the elements of fraudulent inducement and quoting *Formosa Plastics Corp. USA*

*v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 43, 46, 48–49 (Tex. 1998), which

recognizes the tort as distinct from a breach of contract).

IBM attempts to distinguish these stipulations by saying the "no intent to perform" claim

is contractual rather than common law fraud.  Dkt. 772.  However, the underlying cause of action

for a no-intent-to-perform claim is fraudulent inducement, not breach of contract.  *Tony Gullo*

*Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304–305 (Tex. 2006) (citing *Formosa Plastics Corp.*

USA, 960 S.W.2d at 46).  Such a claim is a tort action that "arise[s] from general obligations

imposed by law, not the underlying contract."  *In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206,

209 (Tex. 2007).  Thus, the no-intent-to-perform claim is not a contract claim, it is a common law

fraudulent inducement claim governed by Texas law according to the pre-trial order.  IBM is

estopped from arguing New York law applies.

IBM asserts that notwithstanding the joint pretrial order, it raised the New York law issue

in its pretrial briefs.  Dkt. 780.  Indeed, IBM stated in its pretrial brief on remaining issues for trial,

filed on January 14, 2022, that "New York law does not even recognize [BMC's] promissory fraud

claim: entering a contract with no intent to perform and then breaching the contract.  A complaint

'does not plausibly alleged fraud [when] it describes only an unexpressed intent not to perform

under the Agreement.'"  Dkt. 597 at 20–21 (quoting *Presnall v. Analogic Corp.*, No. 17-cv-6662

(PKC), 2018 WL 4473337, at *6 (S.D.N.Y. 2018)).  This statement was made in the context of

IBM's argument that mere fraud is insufficient to void the contract damages limitations, and the

quoted section also discusses how Texas courts "enforce contract damages limitations even when

fraudulently induced."  *See id.*  It did not argue that the court should apply New York law to the

fraud claim here, and, regardless, does not negate that fact that IBM later agreed in the pre-trial order (dated March 4, 2022) that Texas law—and specifically *Formosa Plastics*—applies to the fraudulent inducement claim.

Moreover, the fraudulent inducement theory under which the court held IBM liable is actionable in tort under New York law.  The Court of Appeals of New York has long recognized that a party may be liable in tort where it has "fraudulently induced the plaintiff to enter into a contract."  *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316, 662 N.E.2d 763 (1995).  New York, however, distinguishes between contractual promises made without the intention to perform and those made for the *purpose* of inducing another to act or refrain from acting.  With respect to the former, "general allegations that [a] defendant entered into a contract while lacking the intent to perform it are insufficient to support a claim for fraud."  *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 361, 165 N.E.3d 180 (2020) (internal quotations omitted); *accord Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 370 (S.D.N.Y. 2020) (acknowledging that under New York law, "[a] party's *mere* promise to perform its contractual obligations, even if knowingly false at the time of making, is not enough to support a claim of fraud") (emphasis added).  So, a cognizable fraudulent inducement claim must be predicted on "independently tortious" conduct that is "separate and distinct from the conduct giving rise to the breach of defendants' contractual obligations to plaintiff."  *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 361.

With respect to the latter category of contractual promises, however, one "who fraudulently makes a misrepresentation of *intent[]* for the *purpose* of inducing another to act or refrain from action in reliance thereon in a business transaction is liable for the harm caused by the other's justifiable reliance upon the misrepresentation."  *Channel Master Corp. v. Aluminum Ltd. Sales,*

*Inc.*, 4 N.Y.2d 403, 407–08, 151 N.E.2d 833 (1958) (emphasis added) (cleaned up) (noting that "one who fraudulently misrepresents himself as intending to perform an agreement is subject to liability in tort whether the agreement is enforceable or not").[4]

Though overlapping, BMC's fraudulent inducement claim is not duplicative of its breach of contract claim, so Texas law still applies. *See* Dkt. 756 ¶ 134. As the court recounted in its Findings of Fact and Conclusions of Law, the factual record evidenced that IBM promised not to displace for the "purpose of inducing" BMC into signing the 2015 OA, *see Channel Master Corp.*, 4 N.Y.2d at 407, which gave IBM "no fee" access to BMC's software and critical shared hosting rights. Dkt. 756 ¶¶ 189–95. This theory of fraud is far more particularized and independent from the "general allegations" often dismissed at the outset of litigation in New York courts. *See Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 361. Thus, even if New York law applied, BMC would have a cognizable claim.

## D.   BMC's Fraud Claim is Consistent with Texas Law

Regarding BMC's fraudulent inducement claim as analyzed under Texas law, IBM largely reiterates the same arguments the court already rejected. *See Equistar Chems., L.P. v. Indeck Power Equip. Co.*, No. CV H-19-3757, 2021 WL 2270212, at *1 (S.D. Tex. June 3, 2021) ("A party may not use a motion under Rule 52(b), 59(a), or 59(e) to repeat previous arguments or raise arguments that could, and should, have been raised at trial.").

*First*, IBM argues that BMC could not justifiably rely on IBM's representations in a written contract when contradicted by IBM's oral representations during contractual negotiations. Dkt. 772 at 19. The court already explained why IBM's theory conflicts with Texas law. Dkt. 756

---

[4] On this score, Texas law parallels New York law. *See Formosa Plastics Corp. USA*, 960 S.W.2d at 48 (stating that a fraudulent inducement claim requires a defendant to make "representations with no intention of performing as represented in order to induce [the plaintiff] to enter into this contract").

¶¶ 196–203; *see JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653 (Tex. 2018) (explaining that "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. . . . . If written contracts are to serve a purpose under the law, relative to oral agreements, it is to provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute"). IBM cannot cite a single case for the proposition that a party must rely on oral representations made *before* a contract's execution—and during contractual negotiations, at that—that are contradicted by the contract's plain language. Such a rule would encourage fraudulent parties to gaslight their counterparts during contractual negotiations—what IBM did here—to evade subsequent accountably in a fraudulent inducement action. That principle finds no support in Texas law.

*Second*, and relatedly, IBM claims that the court "did not analyze whether IBM intended to deceive BMC through § 5.4." Dkt. 772 at 21. That assertion is belied by several pages of analysis in the court's Findings of Fact and Conclusions of Law. *See* Dkt. 756 ¶¶ 190–95. IBM agreed, in writing, not to displace BMC's products while lacking the intention of abiding by that promise to gain something of advantage; that conduct is, by definition, deceptive. *See id.*

*Third*, and lastly, IBM argues that BMC's reliance did not result in an injury because "BMC was not injured by entering into the OA or by agreeing to § 5.4."[5] Dkt. 772 at 21. Common sense and the factual record instruct otherwise. As the court previously explained, because "BMC entered the 2015 OA with IBM, IBM was able to access and use BMC's software at AT&T for 'no fee' while blatantly violating the non-displacement provision." Dkt. 756 ¶ 205. IBM injured

---

[5] The court notes that IBM's defense parallels the classic "dog bite defense," where a defending party declares that he does not have a dog, but if he did have a dog, the dog did not bite the plaintiff, and even if the dog bit the plaintiff, the bite did not result in injury.

BMC by exercising displacement rights for which it did not pay. *See, e.g.*, *id.* ¶ 174.  Those rights, like all intellectual property, may be intangible, but courts still recognize their unlawful exercise as a cognizable injury.

**E.    New York Law Suspended the MLA's Damages Limitation**

IBM next argues that the court's suspension of the MLA's damages limitation was manifest error because an intentional breach of contract is insufficient to suspend a contract's damages limitations under the public policy doctrine articulated *Kalisch-Jarcho Inc. v. City of New York*, 448 N.E.2d 413, 58 N.Y.2d 377 (N.Y. 1983).  Dkt. 772 at 22–23 (citing cases).  IBM also argues that the court erroneously applied New York law to the MLA's limiting provision and Texas law to the fraudulent inducement claim and reiterates its argument that BMC could not allege a fraud claim under New York law.  *Id.* at 24.  Finally, IBM argues that the Court of Appeals of New York's recent decision in *Matter of Part 60 Put-Back Litigation* precludes *Kalisch-Jarcho*'s application to breach of contract claims.  *See generally* 36 N.Y.3d 342.  The court addresses each objection in turn.

IBM's first objection is premised on an incorrect fact.  Contrary to IBM's representations, the court did not find that *Kalisch-Jarcho* applied because IBM intentionally breached a contract.  Rather, consistent with New York case law, the court concluded that the *Kalisch-Jarcho* doctrine applied because IBM committed fraud.  Dkt. 756 ¶¶ 207–10.

With respect to IBM's next objection—that the court improperly applied New York law to the contract's damages limitation and Texas law to the fraudulent inducement claim—IBM *agreed* in the Joint Pretrial Order that New York law—not Texas law—applied to the contract while Texas law applied to BMC's common law claims.  *See* Dkt. 612 at 22.  It further agreed that the *Kalisch-Jarcho* doctrine applied in instances of intentional wrongdoing.  *Id.* at 23–24.

Lastly, IBM overextends the Court of Appeals of New York's holding in *Matter of Part 60 Put-Back Litigation*.  First, as New York courts have recognized, that case "considered only the public policy exception for gross negligence; it did not discuss the public policy exception for willful misconduct."  *IS Chrystie Mgmt. LLC v. ADP, LLC*, 205 A.D.3d 418, 420, 168 N.Y.S.3d 449 (1st Dept. 2022).  In this case, the court applied *Kalisch-Jarcho*'s willful misconduct exception, not its gross negligence exception.  *See* Dkt. 756 ¶¶ 207–10.  Second, *Matter of Part 60 Put-Back Litigation* involved a claim where "a breach of contract occurred as a result of gross negligence." 36 N.Y.3d at 352.  That is, the case was at bottom, "a breach of contract case."  *See id.* at 353.  Thus, the court explained, where "the only causes of action raised in the complaint sound in breach of contract," the "rationales underlying the gross negligence public policy exception fail to overcome the public policy in favor of freedom of contract," and the court will not suspend the limiting clause.  *Id.* at 355.  Here, however, BMC's claims sound in fraudulent inducement and breach of contract.  This court declines IBM's implicit invitation to extend *Matter of Part 60 Put-Back Litigation* beyond its express terms and posture, especially given that a party fraudulently induced into a contract cannot provide the assent necessary to make the contract binding.

## F.    The Punitive Damages Award is Consistent with Texas Law

IBM argues that the court's punitive damages award is inconsistent with Texas law, which it claims required the court to find "aggravating circumstances."  Dkt. 772 at 26.  That is, IBM argues that Texas law forecloses an award of punitive damages where it was motivated by profit or other economic considerations, and not an ill or evil will toward the plaintiff.  *Id.*  BMC asserts that because IBM never raised this issue before, it is procedurally improper.  Dkt. 776.  BMC also argues that IBM is estopped from making this argument because the court has accepted and relied

on IBM's previous position that fraud will support an award of punitive damages.  *Id.*  BMC contends, moreover, that IBM is "also plainly wrong" because section 41.0003 indicates that "clear and convincing evidence of fraud is a sufficient predicate for punitive damages."  *Id.*  BMC argues that fraud itself is the "aggravating circumstance."  *Id.*

Texas statutory law, itself, distinguishes between the fraud and malice that IBM seeks to obscure.  Section 41.003(a) of the Texas Civil Practice and Remedies Code provides that a claimant prove "by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from (1) fraud, (2) malice, or (3) gross negligence."  Unsurprisingly, the Fifth Circuit has upheld punitive damages awards based on fraud and absent the "aggravating circumstances" IBM claims are necessary.  *See, e.g.*, *Dunbar Med. Sys. Inc. v. Gammex Inc.*, 216 F.3d 441, 455 (5th Cir. 2000); *accord Cont'l Coffee Prod. Co. v. Cazarez*, 937 S.W.2d 444, 453 (Tex. 1996) ("The existence of [ill-will, spite, evil motive, or purposing the injuring of another] may not be necessary in a case where the defendant's acts are accompanied by *fraud* or other aggravating circumstances.") (emphasis added) (quoting *Clements v. Withers*, 437 S.W.2d 818, 822 (Tex. 1969)).  Accordingly, the court concludes that the punitive damages award is consistent with Texas law.

## G.    The Punitive Damages Award is Consistent with Federal and State Constitutional Law

IBM also argues that the punitive damages award is unconstitutional under state and federal law.  The court disagrees.  "Punitive damages may properly be imposed to further a . . . legitimate interest[] in punishing unlawful conduct and deterring its repetition," but it is important to "avoid an arbitrary determination of an award's amount."  *BMW of N. Am. v. Gore*, 517 U.S. 559, 568, 116 S. Ct. 1589 (1996); *Philip Morris USA v. Williams*, 549 U.S. 346, 352, 127 S. Ct. 1057 (2007).  Under federal constitutional law, courts reviewing punitive damages consider three guideposts: (1)

the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S. Ct. 1513 (2003).  In Texas, whether an award of punitive damages is excessive is measured by the: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice.  *Lesikar v. Rappeport*, 33 S.W.3d 282, 315 (Tex. App.—Texarkana 2000, *pet. denied*) (citing *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981)).

The punitive damages framework in this case is not excessive under either framework.  The court concluded that IBM's intentional, deceptive, and fraudulent misconduct was near the apex of reprehensibility for an entity of its size and sophistication.  *See* Dkt. 756 ¶ 213.  IBM knew that BMC would not enter the 2015 OA absent the non-displacement protection, a provision that resulted in months of protracted negotiations, and it took advantage of BMC's justifiable reliance on IBM's contractual promise.  *See generally* Dkt. 756.  Moreover, there is zero disparity between the harm suffered by BMC—namely, the $717 million in lost license fees—and the punitive damages award.  And, though there are few cases with comparable awards, the $717 million award, which represents a 1:1 ratio, is consistent with the ratio that has been found to comport with due process in other cases involving sizeable awards.  *See, e.g.*, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513, 128 S. Ct. 2605 (2008) (finding that while excessive punitive damages awards may offend due process, "a 1:1 ratio, which is above the median award, is a fair upper limit in . . . maritime cases" when the compensatory award was $507.5 million); *see also State Farm*, 538 U.S.

at 425 ("[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process."); *Epic Sys. Corp.*, 980 F.3d 1117, 1145 (7th Cir. 2020) (holding that a 1:1 ratio resulting in a $140 million punitive damages award comported with due process).   Finally, IBM's fraudulent, bad faith conduct privileged profit over the good faith that free contractual enterprise requires, eroding the public senses of justice and confidence. As the Supreme Court, itself, has instructed, "[a]ction taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure." *See Exxon Shipping Co.*, 554 U.S. at 494.   The punitive damages award was therefore not excessive under either federal or state constitutional law.

**H.     Excessive Interest**

Lastly, IBM correctly complains that the court entered the incorrect post-judgment interest rate.   Dkt. 772.   BMC asserts that any change made to the post-judgment interest award should be limited to correcting the rate.   Dkt. 776.   The court agrees with both parties.   The correct post-judgment interest rate is 2.02 percent per annum.   Accordingly, IBM's motion to amend judgment is GRANTED as to the court's post-judgment interest award.

## IV.   CONCLUSION

For the reasons described above, IBM's motion to amend judgment (Dkt. 772) is GRANTED IN PART and DENIED IN PART.   It is GRANTED with respect to the post-judgment interest rate, which shall be corrected to 2.02 percent per annum in an amended judgment, but it is otherwise DENIED.

Signed at Houston, Texas, on August 9, 2022.

Gray H. Miller
Senior United States District Judge