**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO.  4:17-cv-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| | § | |
| Defendant. | § | |

---

**BMC SOFTWARE'S OPPOSITION TO IBM'S
APPLICATION FOR RECOVERY OF ITS ATTORNEYS' FEES AND COSTS**

---

Of Counsel:

Christopher L. Dodson
Texas State Bar No. 24050519
S.D. Bar No. 613937
Kyle Mason
Texas State Bar No. 24116728
S.D. Bar No. 3501712
Stephen Shuchart
Texas State Bar No. 24125703
S.D. Bar No. 3831642
White & Case LLP
609 Main Street, Suite 2900
Houston, Texas 77002
(713) 496-9700 Telephone
(713) 496-9701 Facsimile

Sean Gorman
Texas State Bar No. 08218100
S.D. Bar No. 10168
White & Case LLP
609 Main Street, Suite 2900
Houston, Texas 77002
(713) 496-9700 Telephone
(713) 496-9701 Facsimile
sean.gorman@whitecase.com

**Attorney-In-Charge**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

BACKGROUND .......................................................................................... 6

   I.   THE FEE EARNERS ................................................................. 6

   II.   THE CLAIMS ....................................................................... 7

   III.  DISCOVERY ...................................................................... 8

   IV.  IBM'S HOURS, RATES, AND EXPENSES ............................... 10

LEGAL STANDARD .................................................................................. 12

ARGUMENT .............................................................................................. 13

   I.   IBM IS NOT THE "PREVAILING PARTY" .............................. 13

   II.   IBM'S REQUESTED FEES ARE NOT REASONABLE AND CUSTOMARY .......... 16

      A. IBM's Attorney Hours Are Not Reasonable and Customary .................... 16

         1. IBM's Attorney Hours Should be Reduced Because the Number of Hours is Unreasonable ........................................ 16

         2. Quinn's Hours Should be Reduced Further to Account for its Block-Billing ................................................ 20

         3. IBM's Hours Should be Further Reduced Because IBM's Counsel Drove Up the Number of Hours Expended During Discovery .................. 22

         4. IBM's Hours Should be Reduced to Account for Inefficient Staffing ............ 24

      B. Quinn's 2021-2024 Rates Are Not Reasonable or Customary for This Case in This Market ................................................ 25

   III.  IBM CANNOT RECOVER FOR HOURS BILLED FOR NON-COMPENSABLE WORK ................................................ 26

      A. IBM Cannot Recover for Time Spent Working on Motions Never Filed ................. 26

      B. IBM Failed to Segregate for its Unsuccessful Counterclaim ..................... 27

      C. IBM Cannot Recover "Fees on Fees" ........................................ 28

      D. IBM Cannot Recover Attorneys' Fees and Costs Paid or Owed by Kyndryl ............ 29

IV. THE COURT SHOULD EXCLUDE QUINN'S FEES FROM IBM'S APPELLATE FEE RECOVERY ................................................................................................ 30

V. IBM'S LITIGATION COSTS ARE EXCESSIVE AND UNRECOVERABLE ........... 31

      A. IBM's Expert Fees Should be Reduced .................................................... 31

      B. The Taxable and Other Costs IBM Incurred Are Not Reasonable or Customary ...... 34

CONCLUSION ................................................................................................................ 35

CERTIFICATE OF SERVICE ......................................................................................... 37

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*25 E. 86 Corp. v. 83rd St. Assocs.*,
213 A.D.2d 269 (N.Y. App. Div. 1995) ...............................................................16

*AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC*,
2011 WL 102715 (S.D.N.Y. Jan. 6, 2011) ...........................................................34

*In re Arbitration Between Okyere & Houslanger & Assocs., PLLC*,
2015 WL 4366865 (S.D.N.Y. May 28, 2015) ......................................................22

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*,
522 F.3d 182 (2d Cir. 2008)..................................................................................12

*Bank v. Ho Seo*,
2009 WL 5341672 (S.D.N.Y. Dec. 16, 2009) ......................................................22

*Bergerson v. N.Y. State Office of Mental Health*,
652 F.3d 277 (2d Cir. 2009).................................................................................13

*Blinds to Go (U.S.), Inc. v. Times Plaza Dev., L.P.*,
191 A.D.3d 939 (N.Y. App. Div. 2021) ...............................................................13

*Blue Sage Capital, L.P. v. Alfa Laval U.S. Holding, Inc.*,
168 A.D.3d 645 (N.Y. App. Div. 2019) ..........................................................14, 15

*Broker Genius Inc. v. Seat Scouts LLC*,
2019 WL 3773856 (S.D.N.Y. Aug. 12, 2019)......................................................21

*Chambless v. Master, Mates & Pilots Pension Plan*,
885 F.2d 1053 (2d Cir. 1989)...............................................................................19

*CORE Grp. Mktg., LLC v. MIP One Wall St. Acquisition LLC*,
184 N.Y.S.3d 13 (N.Y. App. Div. 2023) ..............................................................15

*Craig v. UMG Recordings, Inc.*,
2019 WL 2992043 (S.D.N.Y. July 9, 2019) ....................................................32, 33

*East Ramapo Cent. Sch. Dist. v. New York Schs. Ins. Reciprocal*,
158 N.Y.S.3d 173 (N.Y. App. Div. 2021) .............................................................12

*Echevarria v. Insight Med., P.C.*,
102 F. Supp. 3d 511 (S.D.N.Y. 2015)...................................................................12

*Ernie Otto Corp. v. Inland Se. Thompson Monticello, LLC,*
  936 N.Y.S.2d 756 (N.Y. App. Div. 2012) ...............................................................15

*Feng v. Kelai Corp.,*
  2024 WL 1348654 (S.D.N.Y. Mar. 29, 2024) .......................................16, 17, 19, 30

*Fluor Corp. v. Citadel Equity Fund Ltd.,*
  2011 WL 3820704 (N.D. Tex. Aug. 26, 2011) .....................................................22

*Gierlinger v. Gleason,*
  160 F.3d 858 (2d Cir. 1998).............................................................................26, 27

*Gillberg v. Shea,*
  1996 WL 406682 (S.D.N.Y. May 31, 1996) ........................................................24, 25

*Graham Ct. Owners Corp. v. Taylor,*
  24 N.Y.3d 742 (N.Y. 2015) ...............................................................................15

*Grand v. Schwartz,*
  2019 WL 624603 (S.D.N.Y. Feb. 12, 2019)...........................................................16

*Hines v. City of Albany,*
  613 F. App'x 52 (2d Cir. 2015) ..........................................................................21

*IG Second Generation Partners, L.P. v. Kaygreen Realty Co.,*
  114 A.D.3d 641 (N.Y. App. Div. 2014) ..............................................................28, 29

*Impact Fluid Sols. LP v. Bariven SA,*
  2022 WL 824836 (S.D. Tex. Mar. 18, 2022).......................................................24, 25

*Indep. Project, Inc. v. Ventresca Bros. Constr. Co., Inc.,*
  397 F. Supp. 3d 482 (S.D.N.Y. 2019).................................................................26, 27

*King Fook Jewellry Grp. v. Jacob & Co. Watches, Inc.,*
  2019 WL 2535928 (S.D.N.Y. June 20, 2019) .......................................................20

*Mark Andrew of the Palm Beaches, Ltd. v. GMAC Comm. Mortg. Corp.,*
  2003 WL 21767633 (S.D.N.Y. July 31, 2003) .......................................................35

*Mathis v. Exxon Corp.,*
  302 F.3d 448 (5th Cir. 2002) ...........................................................................12

*Matsumura v. Benihana Nat. Corp.,*
  2014 WL 1553638 (S.D.N.Y. Apr. 17, 2014).........................................................16

*Matteo v. Kohl's Dept. Stores, Inc.,*
  2012 WL 5177491 (S.D.N.Y. Oct. 19, 2012) ...........................................13, 31, 34

*N.A.A.C.P. v. E. Ramapo Cent. Sch. Dist.*,
   2020 WL 7706783 (S.D.N.Y. Dec. 29, 2020) ........................................................34

*In re Nat'l Lloyds Ins. Co.*,
   532 S.W.3d 794 (Tex. 2017)......................................................................................19

*Pall Corp. v. 3M Purification Inc.*,
   2012 WL 1979297 (E.D.N.Y. June 1, 2012) .........................................................21

*Patel v. St. John's Univ.*,
   2020 WL 13157553 (E.D.N.Y. Dec. 27, 2020) .....................................................24

*Penberg v. HealthBridge Mgmt.*,
   2011 WL 1100103 (E.D.N.Y. Mar. 22, 2011)..................................................31, 33

*Penzo v. Consol. Edison Co. of New York, Inc.*,
   2024 WL 3966694 (S.D.N.Y. Aug. 28, 2024) .......................................................13

*Piccolo v. Top Shelf Prods., Inc.*,
   541 F. Supp. 3d 256 (E.D.N.Y. May 25, 2021) ...............................................22, 23

*Preston Expl. Co. v. GSP, LLC*,
   2013 WL 3229678 (S.D. Tex. Jun. 25, 2013) .................................................13, 25

*Quaratino v. Tiffany & Co.*,
   166 F.3d 422 (2d Cir. 1999)....................................................................................27

*Rai v. WB Imico Lexington Fee, LLC*,
   2017 WL 1215004 (S.D.N.Y. Mar. 31, 2017) ......................................................26

*Ravina v. Columbia Univ.*,
   2020 WL 1080780 (S.D.N.Y. Mar. 6, 2020) .........................................................19

*Red Tree Invest. LLC v. Petroleos de Venezuela SA*,
   2022 WL 17834945 (S.D.N.Y Nov. 29, 2022).......................................................21

*Ross Dress for Less, Inc. v. ML Dev. LP*,
   2022 WL 2704545 (S.D. Tex. July 12, 2022)........................................................19

*Rozell v. Ross-Holst*,
   576 F. Supp. 2d 527 (S.D.N.Y. 2008).....................................................................26

*Sanchez v. Oceanside First Class Roofing, Inc.*,
   818 F. App'x 106 (2d Cir. 2020) ............................................................................27

*Scientific Holding Co., Ltd. v. Plessy Inc.*,
   510 F.2d 15 (2d Cir. 1974).......................................................................................16

*Simmons v. New York City Transit Auth.*,
    575 F.3d 170 (2d Cir. 2009)..............................................................................25, 26

*SING for Serv., LLC v. DOWC Admin. Servs., LLC*,
    2023 WL 3294279 (S.D.N.Y. May 5, 2023) ...........................................................28

*SS Richmond LLC v. Harrison*,
    2023 WL 7646505 (D.N.J. Nov. 14, 2023) ............................................................21

*Stanczyk v. City of New York*,
    990 F. Supp. 2d 242 (E.D.N.Y. 2013) ...................................................................31

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*,
    2008 WL 5539688 (S.D.N.Y. Dec. 18, 2008) ........................................................22

*Thor 725 8th Ave. LLC v. Goonetilleke*,
    2015 WL 8784211 (S.D.N.Y. Dec. 15, 2015) .............................................20, 28, 29

*United States v. Vahlco Corp.*,
    895 F.2d 1070 (5th Cir. 1990) ...............................................................................28

*Vista Outdoor Inc. v. Reeves Family Trust*,
    2018 WL 3104631 (S.D.N.Y. May 24, 2018) ........................................................32

*WFCM 2016-LC25 W. Bay Area Blvd., LLC v. Tyler*,
    2024 WL 4664720 (S.D.N.Y. Mar. 12, 2024) ........................................................24

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*,
    51 F. Supp. 2d 302 (S.D.N.Y. 1999)......................................................................35

*Zamora v. Morphix Co.*,
    2019 WL 4221558 (S.D.N.Y. Sept. 5, 2019)...............................................13, 14, 15

**Federal Rule**

Fed. R. Civ. P. 54 ...........................................................................................................15

BMC Software, Inc. ("BMC") submits its Opposition to IBM's Application for Recovery of its Attorneys' Fees and Costs ("Application").

## INTRODUCTION

IBM asks the Court to order BMC to reimburse it for $58.4 million dollars in fees and costs, an eye-popping number under any circumstances. In this case, however, because neither side ultimately prevailed on its substantive, affirmative claims, no fee-shifting is appropriate. But even if it were, IBM failed to establish that more than a portion of its fees and costs were "reasonable and customary" such that they should be awarded. As a starting point for the Court's analysis, BMC's attorney's fees expert, Murray Fogler, has concluded that "fees totaling $21 million … are … on the high side of what would be a reasonable and customary fee for the services of IBM's counsel in this case." Ex. 1 ¶ 45. As addressed below, an even more modest award of fees is appropriate.

This commercial contract case was hard-fought, with plenty at stake to go around. At the end of the day, the Fifth Circuit re-interpreted the parties' unambiguous contract as allowing IBM's conduct, wiping away on a narrow legal issue BMC's trial court win. But IBM also lost decisively on its own massive counterclaim, asserting that BMC breached a separate contractual provision in the contract, the "most favored customer" provision, by providing better pricing and terms to IBM's competitors than it did to IBM. For this alleged breach, IBM sought to recover $100 million in money damages from BMC.

The relief IBM sought through its counterclaim, however, went far beyond this $100 million. IBM also independently sought to reform and modify the parties' ongoing contract in a number of ways, including by removing the "non-displacement clause" entirely. Reformation of the parties' contract was crucial to IBM, as IBM's secret business plan, revealed in discovery, was to target BMC's largest customers for displacement, just as it did with AT&T, and carry out these

1

displacements without having to incur hundreds of millions in licensing fees.  *See* Dkt. 756 at 35-36; Dkt. 810-5 at 7-8 (IBM internally discussing "[o]utstanding [i]ssue" that "[c]urrent list of 54 BMC client accounts" included "AT&T," where there was a "planned displacement of BMC tools," and "Kaiser and UBS," where there were "ongoing [d]isplacement projects"); *see also* Dkt. 962 ("App.") at 14 (IBM admitting in the Application that non-displacement clause (under BMC's interpretation and the trial court's interpretation) "had potential ramifications for IBM's business at large" with "potentially crippling effects on IBM's relationship with several of its customers"). The potential value of IBM's counterclaim, therefore, was a multiple of both the monetary damages IBM sought and the actual damages BMC sought.

Not surprisingly, the parties spent significant fees and expenses prosecuting and defending IBM's claims.  One-sided discovery and document production from BMC was conducted focused on BMC's contractual relationships with its customers and IBM's competitors, BMC's fact witnesses were interrogated on those relationships and negotiations, both parties hired and paid experts millions of dollars to assess IBM's claims, and both parties filed cross motions for summary judgment focused exclusively on IBM's claims.  BMC prevailed completely on IBM's claims. Dkt. 586 at 9-11.

Neither side therefore prevailed such that it must pay the other's fees and costs.  In New York, there cannot be more than one prevailing party for purposes of fee-shifting, but there can sometimes be none.  And that is this case.  The ultimate result here was that both parties walked away with nothing.  BMC lost on its claims on appeal; IBM lost on its claims in the trial court. Both sides' claims were dismissed as a matter of law.  No one was ordered to pay the other any money, and the underlying contract was not reformed.  This was a walk-away and no fee-shifting is appropriate.

Even if IBM prevailed, IBM's eye-popping request for $58.4 million in fees and costs is not "reasonable and customary" for a case like this in this District and should be slashed significantly.  BMC retained Houston-based Bracewell LLP ("Bracewell") to represent it.  IBM retained Houston-based Yetter Coleman LLP ("Yetter") and the New York office of Quinn Emanuel Urquhart & Sullivan LLP ("Quinn").  BMC's lawyers billed BMC $18.1 million.  IBM's lawyers billed IBM $43.1 million during this same period.  This shocking difference is impossible to square with anything reasonable or customary in the District.  While in some cases, one side or the other might be expected to spend more time on a case, this was not one of those cases.  Both sides took roughly the same number of depositions (BMC 28 vs. IBM 24); both sides retained the same number of experts (5); both sides filed multiple cross motions for summary-judgment; both sides filed *Daubert* motions; and, both sides tried the exact same case.  So, what drove the dramatic difference in fees?  Unreasonable and non-customary hours, rates, and staffing inefficiencies, primarily from Quinn in New York.

The primary driver of IBM's nearly 2x fee request was Quinn's hours and staffing.  Month after month after month after month, Quinn billed at least twice as many hours as BMC's Houston lawyers.  BMC billed 36,892 hours through trial and final judgment; Quinn billed 71,843 hours through the same period.  Adding Yetter to the mix, IBM's hours through trial were 78,210, more than twice as many as BMC's.  Digging deeper, the double-hours came almost entirely from Quinn *associates*.  BMC's non-partner timekeepers billed 23,462 hours.  IBM's non-partner timekeepers billed 65,321 hours (the equivalent of more than 30 years of work at 2,000 hours per year).  Nowhere does IBM's expert seek to explain IBM's dramatic difference in hours, other than pointing to a supposedly outsized document review (a discrete task that could be easily segregated but wasn't) and the unsupported claim that this case just meant more to IBM.  Those are both false

narratives, but even if true, do not explain why it was reasonable and customary for IBM to consistently bill at least double hours for nearly every mutual task in the case.

The rates of the Quinn lawyers from 2021-2023 were also out-of-market. While the rack rates charged by Yetter and Bracewell—both Houston firms—were comparable throughout the case, the rates charged by Quinn were too high for a commercial contract case in the forum. From 2021-2023, the Quinn rates ballooned to roughly double what all the Houston lawyers, on both sides, were charging on this case. Quinn's partners and counsel were charging up to $1,925 per hour while its associates were charging up to $1,185. IBM's expert offers nothing to demonstrate that these rates are reasonable and customary for a commercial contract case in the forum. Yetter's rates prove the point. From 2017-2023 (the trial was in 2022), Yetter's partner rates ranged from $420 to $935, and its associate rates ranged from $420 to $575. Those rates are notably consistent with BMC's rates. Only Quinn's rates stand out.

Other issues also contributed to the outsized fee request. For instance, for the entirety of the case, Quinn block-billed as a matter of course. This block-billing makes it impossible to determine how much time Quinn spent on any particular task, to evaluate the reasonableness of time on any task, and to assess IBM's claim that it spent more time than BMC reviewing documents. Quinn's block-billing is especially problematic given the outsized number of hours billed and because it makes accurately segregating non-compensable tasks (such as IBM's counterclaim, on which BMC indisputably prevailed) impossible. IBM's expert notably does not try to address any of these issues relating to block-billing; instead, he relies on a "video conference" with two New York Quinn partners and IBM's in-house counsel to justify his opinions on these billing practices. Pecht Decl. ¶ 16. Regardless, because of this block-billing, we are left with only bottom-line comparisons—which plainly demonstrate that month after month after

4

month, IBM's fee was more than double BMC's fee regardless of the tasks at hand and without any supportable justification. Ex. 2.

Entire categories of other fees and expenses requested by IBM are plainly not recoverable. For example, IBM added to its Application time preparing motions that were never filed, legal fees incurred by a third-party that was spun-out of IBM during the litigation (Kyndryl Holdings, Inc ("Kyndryl")),[1] an eye-watering request of $936,574 just for the time IBM spent on this Application (including charging $1,185/hour for an associate to redact invoices), meals at Brennan's and Commander's Palace, and a $280,000 hotel conference room during trial, despite the fact that Yetter *and* Quinn both have well-appointed offices in Houston, just blocks from the courthouse. IBM can spend its money however it wants, but that does not mean that its fees and expenses are "reasonable and customary" such that BMC should have to reimburse them.

Neither party prevailed in this case. But if IBM somehow did, there is ample basis to cut IBM's $46.2 million fee request significantly. Specifically, IBM's requested fees must be discounted to account for IBM's billing problems (such as Quinn's persistent block billing and Quinn's use of non-market rates) and to account for IBM's distinctive approach to litigating this case, as observed by the Court, that caused both parties to unnecessarily run up fees. In addition, any fees associated with non-compensable claims and tasks must be segregated. With respect to costs, a substantial reduction is also warranted for IBM's $12.1 million request, as IBM's experts' fees are unsupported and other costs for which IBM seeks reimbursement include unreasonable and non-customary expenses.

---

[1] Tellingly, IBM's fee expert says he was retained by IBM *and* Kyndryl. Dkt. 962-1 ("Pecht Decl.") ¶ 1. That is odd considering Kyndryl is not a party to this case and has no contractual or other basis to seek reimbursement from BMC. IBM never explains why Kyndryl is involved in this Application. This is likely because Kyndryl has an interest in the fee recovery—perhaps IBM never even paid for a large portion of the fees it is requesting.

## BACKGROUND

### I.    The Fee Earners

In the district court, IBM retained two law firms—Yetter and Quinn.  Pecht Decl. ¶ 17.

IBM retained Yetter to take the lead during significant court proceedings and retained Quinn to

work the case up and take the lead on discovery.  *Id.*  While Quinn is a global law firm with an

office in Houston, Quinn did not utilize its Houston presence in any meaningful way.  Of the 76

Quinn timekeepers, BMC is aware of only one who worked in Houston, an associate (Emily Smith)

who worked on the case for a limited period.  *See* Dkt. 962-2 at 2-3.  And of the 21 attorneys IBM

says were responsible for "billing nearly 75% of the total fees," Pecht Decl. ¶ 42, only Yetter's

attorneys and that one associate were based in Houston, *see* Dkt. 992-6.  Quinn's core team worked

in New York, San Francisco, and Washington, D.C.  *See id.*

On appeal, IBM retained Paul Clement to handle the briefing (along with Yetter) and argue

the case.  Pecht Decl. ¶¶ 38-39.  Quinn did not appear in the appeal.  IBM also retained Jones Day

and Beck Redden to provide appellate consulting.  *Id.*  Kyndryl further retained its own appellate

counsel at Lynn Pinker, for which *IBM* now seeks reimbursement.  *See* Dkt. 990-5.  Surprisingly,

Quinn, which did not sign the appellate briefing and did not attend argument, billed IBM

approximately $1 million during the post-judgment proceeding and the appeal.  Pecht Decl. ¶ 64.

BMC engaged Bracewell in Houston to take the lead on trial court and appellate

proceedings.[2]  Dkt. 760-1 ¶ 17.  After judgment was entered in favor of BMC, BMC filed its own

fee application.  Dkt. 760.  BMC sought reimbursement of $26.1 million in fees and $4.1 million

in costs.  *Id.* at 19.  Included in BMC's request was a fee enhancement in the amount of $6.7

---

[2] In January 2023, during the pendency of the appeal, certain attorneys for BMC left Bracewell and joined White & Case LLP in Houston.  From that point forward, Bracewell and White & Case were co-counsel to BMC.

million (a proposed true-up for its hourly rate discount) and $1.2 million in anticipated appellate fees. Applying the same contract provision at issue now, the district court awarded BMC $16.287 million in fees, $4.094 million in costs, and $1.23 million in conditional appellate fees, for a total award of $21.6 million. Dkt. 781 at 17.

## II.    The Claims

BMC sued IBM for breach of contract, fraud, and misappropriation of trade secrets in July 2017. Dkt. 756 at 1-2. The allegations related to IBM's violation of a limited software license granted to IBM in the parties' outsourcing agreement (the OA). *Id.* BMC sought expectation damages mathematically calculated by reference to the schedule of license fees in the OA. *Id.* at 59-60. The sum of the license fees for the broader licenses IBM actually used, but did not have authorization to use, was $717.7 million, which after a bench trial the District Court (Hon. Gray Miller) awarded for both breach of contract and fraud. *Id.* at 63. The District Court added punitive damages and interest to its final judgment. *Id.* at 66.

IBM appealed and the Fifth Circuit reversed the judgment. Dkt. 958. In a succinct opinion, the Fifth Circuit found that the provision BMC sued under unambiguously allowed IBM's conduct and that IBM had not breached and therefore had also not committed fraud. Dkt. 959.

IBM also sued BMC for breaching a separate contractual provision known as the "most favored customer" (MFC) provision. Dkt. 299 at 28-42. IBM claimed that the MFC provision required BMC to give IBM not only the best pricing, but also the best commercial terms, as compared to any other outsourcer with whom BMC did business. *Id.* In addition to requiring one-sided discovery into BMC's commercial contracting and pricing, the parties also retained industry experts to evaluate and opine on the various bespoke contracts BMC has with other customers as compared to IBM's contract with BMC. *See* Dkt. 760-1 ¶ 29(j). Damages experts also opined on the damages from BMC's alleged breach of the MFC. *See id.*; Dkt. 391 at 18.

IBM sought nearly $100 million in damages for breach of the MFC.  Pecht Decl. ¶ 58; *see* Dkt. 299 at ¶65(a); Dkt. 760-1 ¶ 25.  Significantly, IBM also sought to reform its ongoing agreement with BMC to bring it into what IBM considered lock-step with BMC's other customer contracts.  Dkt. 299 at ¶ 65(b)-(c).  While IBM initially raised these issues via a prior-material-breach affirmative defense, on the pleadings deadline IBM asserted the claim as an affirmative breach claim that materially expanded the scope of the litigation and the risk to BMC.  *Compare* Dkt. 61, *with* Dkt. 294.  Three years later, after full discovery, the parties filed cross motions for summary judgment on IBM's claim and objections to the Magistrate's R&R, Dkts. 391, 394, 574, 575; the District Court then granted BMC's motion for summary judgment in full.  *See* Dkt. 586. IBM did not appeal.

### III.    Discovery

Supervised by Magistrate Judge Johnson, discovery was long and hard-fought, but was not one-sided.  Both sides took roughly the same number of depositions (28 to 24) and both sides retained the same number of testifying experts (5) who issued a similar number of reports (8 to 9). App. at 15-16.  While IBM implies that it had to review more electronic documents (there is no evidence of that in the Application), it fails to provide any factual basis for that claim.  App. at 15-16.  IBM certainly objected to and fought almost every discovery request full-tilt.  *See, e.g.,* Dkts. 177, 209, 317, 344.   IBM's unreasonable discovery positions resulted in lengthy (and unproductive) meet-and-confers, followed by Magistrate Judge rulings that IBM almost always lost.  *See* Dkts. 209, 342.  IBM would then often argue about the scope of the Magistrate Judge's ruling, further dragging out the process.  *See* Dkt. 344.  Whatever the cost to IBM of its alleged greater document review—which is not established and is impossible to establish because of IBM's block-billing—that cost was surely more than offset by BMC's increased cost to address IBM's unreasonable and non-customary discovery positions.

Take IBM's privilege logs as one example. IBM initially logged 1,524 documents on its privilege logs. Ex. 8. The parties litigated some of those privilege claims for years, resulting in multiple *in camera* reviews and evidentiary hearings. *See, e.g.,* Dkts. 209, 344. Of special focus was IBM's claim that internal documents concerning the negotiation of the OA were privileged. Dkt. 344. After IBM largely lost following an *in camera* review of a sample of withheld documents—where Magistrate Judge Johnson called certain of IBM's privilege claims "more than a stretch," Dkt. 378—IBM refused to extrapolate Judge Johnson's findings to the other documents on its logs. Dkt. 407. This required BMC to go to Court again, and after conducting a broader, more extensive review, Magistrate Judge Bryan again largely ruled against IBM. Sept. 4, 2020, Hrg. Tr. at 31. Proper privilege assertions would have avoided years of discovery disputes and two court interventions. Yet IBM never relented and continued to aggressively promote its position even after it lost. (Notably, many of these improperly withheld documents took center-stage at the trial and in Judge Miller's Findings of Fact, which explains why IBM tried so hard to conceal them.) This exercise (and others like it) drove up fees and the length of the case[3]—for both sides. Simply because on appeal IBM defeated BMC's claims on a discrete, narrow legal issue does not mean it should be reimbursed for its fees incurred in the repeated, unreasonable, and unsuccessful positions it took during discovery, positions which materially drove up fees for both sides. And simply because BMC's fee was reasonable for defending against those tactics does not mean that IBM's fee for pursuing those tactics is reasonable or customary. IBM should not be reimbursed for such conduct.

There is also no credible indication that there was more work for IBM to do. For instance, discovery on IBM's counterclaim was entirely one-sided, requiring BMC to search for and produce

---

[3] The case was filed in 2017 and tried in 2022.

to its competitor all its historical contracts with its outsourcing customers.  *See, e.g.,* Ex. 9.  BMC also deposed more witnesses, drafted more motions for summary judgment, filed more *Daubert* motions, and filed more motions to compel.  *See* Ex. 1 ¶ 15.  As is typical in commercial cases between sophisticated parties, with claims going both directions, the tasks conducted by the parties likely evened out over time.  *Id.*  Certainly, there is nothing establishing the opposite from IBM or its expert.  *See generally* App.; Pecht Decl.  Nor is there anything to support IBM's claim that this case was more important to IBM than it was to BMC, nor does that claim make any sense.

## IV.    IBM's Hours, Rates, and Expenses

Here are the total hours, fees, and expenses incurred by the primary law firms involved through trial and final judgment (June 2022):

|  | IBM | | BMC |
|---|---|---|---|
|  | **Quinn** | **Yetter** | **Bracewell** |
| **Total Hours** | 71,843 | 6,366 | 36,892 |
| **Partner/Counsel Rates** | $685 - $1,750 | $420 - $935 | $394 - $885 |
| **Associate Rates** | $460 - $1,185 | $420 - $575 | $309 - $565 |
| **Total Fees** | $39,552,405 | $3,578,956 | $18,126,772 |

Various charts are attached as Exhibit 2 to summarize the key inputs over time and show comparisons to BMC's invoices.  While Yetter's rates and billing practices are generally in line with Bracewell's (the two Houston firms involved in this case), Quinn's rates stand out.  Ex. 1 ¶¶ 31-35.  IBM's attorneys billed 78,209 hours through June 2022 (the date of Judgment), as compared to Bracewell's 36,892 hours during that same period.  Ex. 3.  For BMC, 63.6% of those hours were billed by non-partners.  *Id.*  For IBM, 83.5% of those hours were billed by non-partners.  *Id.*

The excess manifested itself in a variety of ways.  For instance, from January-March 2022 (the trial and trial preparation months), when the parties were indisputably doing the exact same

tasks, BMC attorneys billed $3.2 million, while IBM attorneys billed $7.2 million.  Ex. 5.  When

the Court stayed the case due to COVID on March 25, 2020, Dkt. 362, IBM billed $2.3 million

from March-May 2020; BMC billed $523,502.  Ex. 4.  The nearly double-fee result was systemic

throughout the life of the case, regardless of what was going on.  Ex. 1 ¶¶ 17, 41-42.  While this

difference was largely driven by hours, rates also contributed to the deltas.  *Id.* ¶ 32.  BMC's rates

topped out at $885 for partners and $565 for associates.  *Id.* ¶ 10.  In contrast, IBM's rates topped

out at $1,925 for partners and counsel and $1,185 for associates.  Dkt. 962-2 at 12-13; *see also*

Ex. 1 ¶ 32.  IBM's staffing was also inefficient, exemplified by Quinn's associates billing at

$1,185/hour simply to redact invoices for the Application.  Ex. 1 ¶ 27 & n.10.

And the bloated methodology carried into the expenses.  While both sides retained the same

number of experts to cover the same topics and published the same reports (8 for BMC and 9 for

IBM), IBM's experts billed $3.2 million, while BMC's experts billed $2 million.  *Compare* Pecht

Decl. ¶ 61, *with* Dkt. 760-1 ¶ 28.  And even though Yetter and Quinn both have offices in

downtown Houston, IBM spent $280,000 for a hotel "war room" during trial, including charges

for furniture, printers, WiFi, and other overhead that its law firms' offices already provide.

Dkts. 988-2, 988-3.  Quinn also racked up huge expenses flying its attorneys across the country,

even if depositions were taking place in Houston, where the case and Yetter were based and where

Quinn also had lawyers on the ground; it further flew its experts internationally on business class.

Dkts. 963-89.  These expenses may have been acceptable to the client, but it does not make them

"reasonable and customary" such that they should now be borne by BMC.

One explanation for IBM's excess may be that Kyndryl, not IBM, is responsible for the

fees and costs at issue.  During this litigation, IBM spun-out its outsourcing division (the IBM

division involved in the conduct that gave rise to this case) into a new, stand-alone public company,

Kyndryl.  Soon after judgment was entered, Kyndryl disclosed in SEC filings its potential responsibility to pay the judgment (and presumably the attorneys' fees at-issue here).  Ex. 7 at 93-94.  And Quinn began directing its invoices to Kyndryl, as opposed to IBM, in November 2022.  Dkt. 989-4.  IBM's fee expert in fact disclosed that he was retained by IBM *and* Kyndryl.  Pecht Decl. ¶ 1.  Even more, many of the time entries in Quinn's invoices describe communications with "E. Sebold," an in-house lawyer for Kyndryl.  *See, e.g.,* Dkt. 989-4; 989-6; 989-7; 989-10.  While IBM's lawyers may have been directing the litigation, IBM may not have been paying for it.

So, while IBM argues that the fees are reasonable *because IBM agreed to them*, IBM may have had different ideas about the ultimate payor all along.  Further, to the extent IBM is asking BMC to reimburse *Kyndryl*, there is no basis for such an award because the contract at issue here is not between BMC and Kyndryl and Kyndryl was never a party to this case.

## LEGAL STANDARD

The Court found that the Master License Agreement ("MLA") and OA are governed by New York law.  Dkt. 756 at 104.  State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision.  *Mathis v. Exxon Corp*., 302 F.3d 448, 461 (5th Cir. 2002).  Here, the MLA provides that "[t]he prevailing party in any litigation is entitled to recover reasonable and customary attorney's fees and costs from the other party."  PX001 at MLA § 18.

If a party is entitled to attorneys' fees, the court must calculate the "presumptively reasonable fee," often referred to as the "lodestar," by multiplying the reasonable number of hours worked by a reasonable hourly rate.  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 189-90 (2d Cir. 2008).  Hours that are "excessive, redundant or otherwise unnecessary" are excluded from this calculation.  *Echevarria v. Insight Med., P.C.*, 102 F. Supp. 3d 511, 516 (S.D.N.Y. 2015).  Courts evaluate what is "customary" by looking to the "customary

fee charged for similar services by lawyers in the community with like experience and of comparable reputation to those by whom the prevailing party was represented." *East Ramapo Cent. Sch. Dist. v. New York Schs. Ins. Reciprocal*, 158 N.Y.S.3d 173, 181 (N.Y. App. Div. 2021) (internal quotation marks omitted).

The "forum rule" requires the court to use "the hourly rates employed in the district in which the reviewing court sits." *Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 290 (2d Cir. 2009). Courts may also consider their own experience in determining reasonableness. *Preston Expl. Co. v. GSP, LLC*, 2013 WL 3229678, at *6 (S.D. Tex. Jun. 25, 2013); *Penzo v. Consol. Edison Co. of New York, Inc*., 2024 WL 3966694, at *6 (S.D.N.Y. Aug. 28, 2024) (court may evaluate attorneys' fee application records for reasonableness "in light of its own experience and knowledge of the demands of the action").

The party seeking to recover attorneys' fees and costs bears the burden. *Matteo v. Kohl's Dept. Stores, Inc.*, 2012 WL 5177491, at *2 (S.D.N.Y. Oct. 19, 2012) (citation and internal quotation marks omitted), *aff'd*, 533 F. App'x 1 (2d Cir. 2013).

## ARGUMENT

### I.    IBM is Not the "Prevailing Party"

IBM argues that it "plainly prevailed" because "the Fifth Circuit adopt[ed] IBM's construction of the disputed provisions of the OA." App. at 6. While IBM obviously won on its appellate reversal of the district court judgment entered on *BMC's claims*, IBM obviously lost on its own affirmative claims against BMC.

In New York, not every case has a prevailing party; sometimes "everyone los[es]" and "neither party [is] the prevailing party." *See, e.g., Zamora v. Morphix Co.*, 2019 WL 4221558, at *6 (S.D.N.Y. Sept. 5, 2019). Determining whether there is a prevailing party requires the Court to evaluate the "true scope of the dispute litigated, followed by a comparison of what was achieved

13

within that scope." *Blinds to Go (U.S.), Inc. v. Times Plaza Dev., L.P.*, 191 A.D.3d 939, 942 (N.Y. App. Div. 2021). Whether a "net judgment" was entered is insufficient. *Blue Sage Capital, L.P. v. Alfa Laval U.S. Holding, Inc.*, 168 A.D.3d 645, 646 (N.Y. App. Div. 2019).

In New York, failure to win a counterclaim can be fatal to an attorneys' fees application. For example, the plaintiff in *Zamora* brought two claims and, in response, the defendant brought two counterclaims, all arising out of the same agreement. *Zamora*, 2019 WL 4221558, at *1-2. The majority of the parties' claims were withdrawn or dismissed on summary judgment. *Id.* Ultimately, the court concluded that the only remaining claim, the defendant's breach of contract claim, failed because the defendant did not suffer damages, despite the jury's finding that plaintiff had violated the contract. *Id.* at *3. The court subsequently declined to award either party attorneys' fees because the defendant limited the plaintiff to "utterly insubstantial" relief; but it still "fared no better" than plaintiff and "obtained zero relief" because it lost its counterclaims. *See id.* at *4-5 (finding that even if defendant "had received nominal damages and … won its breach of contract claim," "such relief would hardly have constituted the 'substantial relief' required for an award of contractual attorneys' fees in New York"); *see also Blue Sage*, 168 A.D.3d at 646 (despite defendant winning a $2.9 million judgment *and* successfully defending against plaintiff's claims, "mixed results of th[e] case" meant that there was no prevailing party).

Here, both BMC's and IBM's claims ultimately failed. *See* Dkts. 586 at 11; 959 at 13. No money exchanged hands and, like the defendant in *Zamora*, "everyone lost." *Zamora*, 2019 WL 4221558, at *6. IBM attempts to hide its losses by focusing narrowly on its appellate reversal and ignoring the significant effort it put into its affirmative claim. But on its counterclaim, IBM sought "over $100 million dollars" in damages and sought removal and/or reformation of key provisions

14

of its ongoing agreement with BMC.[4]  Pecht Decl. ¶ 58; Dkt 299 at ¶ 65(a), (b).  One of IBM's

two motions for summary judgment focused entirely on its counterclaim.  Dkt. 404.  Two of IBM's

five retained experts opined on its counterclaim.  Those experts were paid $1.3 million out of its

total expert spend of $3,292,694.  Dkt. 962 at 22; *see* Dkt. 991-4.  For all these efforts,[5] IBM

recovered nothing and failed to obtain reformation of the agreement.  Dkt. 586 at 11.  Nor did the

district court or the Fifth Circuit sustain IBM's prior-material-breach affirmative defense to bar

BMC's claims.  *See, e.g.,* Dkt. 561 at 45; Dkt. 959 at 6.  Thus, BMC "thwarted a significant portion

of [IBM's] litigation goals."  *Blue Sage*, 168 A.D.3d at 646.  In such cases, neither party recovers

fees.  *See id.*; *Zamora*, 2019 WL 4221558, at *6.*

    The cases relied on by IBM do not change this result.  IBM cites cases to support the

proposition that IBM should be the prevailing party because "the complaint was dismissed in its

entirety."  *See* Dkt. 962. at 6-7.  But IBM ignores the fact that the defendants in those cases did

not assert counterclaims, meaning (unlike IBM) those defendants were never denied any relief

they sought.  *See CORE Grp. Mktg., LLC v. MIP One Wall St. Acquisition LLC*, 184 N.Y.S.3d 13,

14 (N.Y. App. Div. 2023); *Ernie Otto Corp. v. Inland Se. Thompson Monticello, LLC*, 936

N.Y.S.2d 756, 759 (N.Y. App. Div. 2012).

    The remaining cases IBM cites for the proposition that the dismissal of its massive

counterclaim "is of no moment" are inapposite.  *See* App. at 7.  Those cases award fees pursuant

---

[4] IBM's request for reformation of the contract posed significant risk to BMC and a significant benefit to IBM.  For instance, striking the non-displacement clause of the OA would have removed all the guardrails preventing IBM from "using its outside sourcing services to (a) gain inside knowledge as to how BMC's customers use BMC software and (b) sell IBM software to the same customers with this knowledge."  *See* Dkt. 959 at 9.  For example, in addition to its conduct at AT&T that evoked this lawsuit, IBM had also targeted Kaiser and UBS, two other large users of mainframe software, for similar displacements.  *See* Dkt. 756 at 35-36; Dkt. 810-5 at 7-8.

[5] Because of IBM's block billing, which amalgamates and conceals performed tasks, it is impossible to calculate the number of hours IBM's counsel billed towards the counterclaim.

to Federal Rule of Civil Procedure 54 or a landlord-tenant statutory scheme, not a contractual "prevailing party" fee-shifting provision. *See Graham Ct. Owners Corp. v. Taylor*, 24 N.Y.3d 742, 752 (N.Y. 2015); *Scientific Holding Co., Ltd. v. Plessy Inc.*, 510 F.2d 15, 28 (2d Cir. 1974); *25 E. 86 Corp. v. 83rd St. Assocs.*, 213 A.D.2d 269 (N.Y. App. Div. 1995). Precedent interpreting civil rights statutes, the Federal Rules, and other statutory schemes are "of little value;" only cases applying contractual provisions awarding fees are relevant to the "prevailing party" inquiry. *Matsumura v. Benihana Nat. Corp.*, 2014 WL 1553638, at *4 (S.D.N.Y. Apr. 17, 2014); *Grand v. Schwartz*, 2019 WL 624603, at *3 (S.D.N.Y. Feb. 12, 2019).

IBM's counterclaim failed completely. Accordingly, neither IBM nor BMC is the prevailing party. The Court should deny IBM's Application in its entirety.

## II.    IBM's Requested Fees Are Not Reasonable and Customary

If the Court determines that IBM is the prevailing party, it should reduce IBM's requested award significantly.

### A.    IBM's Attorney Hours Are Not Reasonable and Customary

The Application seeks to recover attorneys' fees for 81,435 total hours. That is the equivalent of 40 years of full-time legal work (at 2,000 hours per year). Insane.

#### 1.    *IBM's Attorney Hours Should be Reduced Because the Number of Hours is Unreasonable*

The Court has already concluded that 36,892 hours is a reasonable number of hours for this case through trial. *See* Dkt. 781 at 7-11. Thus, a number of hours that "a reasonable attorney would have engaged in similar time expenditures" has already been set.[6] *See Feng v. Kelai Corp.*,

---

[6] To be clear, 36,892 hours represents the number of hours BMC was entitled to recover for the trial court proceedings in this case. But, while those hours were appropriate for BMC, they are not appropriate for IBM considering its consistently unreasonable conduct during discovery designed to run up fees. *See infra* Section II.A.3.

2024 WL 1348654, at *23 (S.D.N.Y. Mar. 29, 2024). IBM's request for more than double the number of hours in the same proceeding is unjustifiable. *See* Ex. 1 ¶¶ 41-42; *see generally* Dkt. 962. IBM bears the burden to show that it is entitled to an award for its hours billed and that "at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Feng*, 2024 WL 1348654, at *23. "[W]hether hindsight vindicates an attorney's time" is irrelevant. *Id.* Any hours that are "excessive, redundant or otherwise unnecessary" should be excluded. *Id.*

Here, a simple comparison of IBM's hours to BMC's hours illustrates IBM's excessive billing. During every stage of the case, IBM's counsel billed dramatically more than BMC's. *See* Ex. 2. Through trial and final judgment, the *difference* between the hours IBM's counsel billed and the hours BMC's counsel billed was 41,318 hours. *See* Ex. 3. This delta alone is greater than the total number of hours billed by BMC and accounts for over 20 years of legal work (at 2,000 hours per year). Not accounting for appellate fees, IBM's attorneys' fee award request, $46,264,764, is ***nearly triple*** what the Court awarded BMC in attorneys' fees.[7] *Compare* App. at 23, *with* Dkt. 781 at 17.

Rather than defend its hours on their merit, IBM claims that because the Fifth Circuit adopted its legal interpretation of the agreement, the outcome "alone justifies" its fees. App. at 14. But that assumes causation that is belied by the Fifth Circuit's opinion. IBM's only positive

---

[7] Quintessential examples of IBM's excessive hours occurred during the height of the COVID-19 pandemic and during trial preparation and trial. During spring 2020, the Court issued a stay of all deadlines. Dkt. 362. The Court assured the parties that a scheduling conference would be set when the stay was lifted. *Id.* IBM's counsel still billed 3,505 hours, equaling $2,300,679.10 from March-May 2020. *See* Ex. 4. In comparison, BMC's counsel billed 962 hours, totaling $523,502.70 in fees, over the same time, a difference of nearly $1.8 million in fees over three lockdown months. *See id.* From January 2022 to March 2022, during trial preparation and trial, IBM billed 10,492 hours, equaling $7,181,571 in fees, and BMC billed 6,769 hours, totaling $3,244,537 in fees, despite the fact that the parties were indisputably completing the same task. *See* Ex. 5. But for IBM's block-billing, we could better compare task-by-task hours. Ex. 1 ¶ 18. But just the bottom-line numbers reflect more than 2x hours throughout the lifetime of the case. Ex. 2.

outcome was on appeal, for which its appellate counsel together charged $3.4 million. Pecht Decl. ¶ 64. For the balance of the $43.1 million IBM spent, it did not achieve much success at all. *Id.*; *see* Ex. 1 ¶ 20. And after losing in the trial court, IBM had already expended 96% of the hours it would spend on the case. *See* Ex. 2. The "outcome" was therefore not derivative of the fees billed.

IBM also tries to explain the hours differential by saying that it faced asymmetrical risk compared to BMC. App. at 16. This theory is made up out of whole cloth, supported by nothing. This case was equally important to both parties and both parties faced equal risk. While IBM may have faced a "massive damages claim," *see* App. at 14, BMC faced the equivalent expectation loss of that same amount. *See* Dkt. 757. Further, IBM's counterclaim, if successful in reforming the OA, had a potential value that was multiples of the actual damages sought by BMC. *See* Pecht Decl. ¶ 58; Dkt. 299 at ¶65(a)-(c);Dkt. 760-1 ¶ 25. IBM simply did not face a disparate risk that would explain the vast difference in hours.

IBM also tries to justify its higher hours by implying that it spent more time reviewing documents than BMC did. App. at 15-16. Maybe, but maybe not. IBM certainly has no evidence of this. Nowhere does IBM isolate the time it spent reviewing documents and compare it to BMC's time spent reviewing documents. *Id.* This could be because IBM block-billed and it therefore cannot even attempt that comparison, or it could be that it is just not true. In point of fact, even if IBM's document universe was broader, IBM's counterclaim was singularly focused on discovery from BMC—with no reciprocal discovery for IBM to conduct. Ex. 1 ¶ 16. And it is not as if IBM's production of 33,550 documents in a case of this length and scope is some dramatically unusual number. *Id.* ¶ 17. Further, the Fifth Circuit reversed on a discrete contract interpretation issue that had nothing to do with the discovery record. *See generally* Dkt. 959. Thus, the time IBM spent reviewing documents was ultimately superfluous to any success it achieved.

18

Other tasks, too, weighed in favor of *more hours for BMC*. For example, BMC took four more depositions than IBM, which courts note requires more hours than defending depositions. *See, e.g., In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 811 (Tex. 2017). BMC also prepared multiple complaints, filed two more motions for summary judgment, filed three more expert challenges, and drafted numerous motions to compel discovery (necessitated by IBM's unreasonable and dilatory discovery tactics) that ultimately succeeded. *See* App. at 15-16.

Each side also retained the same number of expert witnesses (5); published roughly the same number of expert reports (8 to 9); offered nearly the same number of hours for deposition designations; filed separate proposed findings of fact and conclusions of law; and, of course, tried the same case. *Id.* at 15-16. IBM cannot demonstrate that its counsel reasonably expended 41,015.4 *additional* hours of effort (equivalent to 20 years of lawyering).

In this case, BMC's hours are the best starting point for what "a reasonable attorney would have engaged in similar time expenditures."[8] *Feng*, 2024 WL 1348654, at *23. While IBM cites two cases to argue that BMC's fees are irrelevant in evaluating IBM's fees, those cases arise in different contexts,[9] *see* App. at 17, and "[t]here may be instances when district courts will want to consider—among the myriad of other factors—the fees charged by opposing counsel." *Chambless*, 885 F.2d at 1059; *Ravina v. Columbia Univ.*, 2020 WL 1080780, at *9 (S.D.N.Y. Mar. 6, 2020) (reducing the prevailing party's hours by 35% to bring them "significantly closer" to the sum of hours expended by opposing counsel); *Ross Dress for Less, Inc. v. ML Dev. LP*, 2022 WL

---

[8] Again, while the number of hours BMC billed was appropriate *for BMC*, the same number of hours is not appropriate for IBM. *See infra* Section II.A.3.

[9] IBM's cases are easily distinguishable. In *Chambless v. Master, Mates & Pilots Pension Plan*, the court held that there may be instances when a district court *will* want to consider an opposing parties' attorneys' fees. 885 F.2d 1053, 1059 (2d Cir. 1989). In *In re National Lloyds Ins. Co.*, the issue involved the relevance of a discovery request for a party's attorneys' fees in a dispute between an insurance company, who was likely to value the case "more significantly" because it would be "subject to repeat litigation" and have "more resources to expend on litigation," and individual insureds. 532 S.W.3d at 811.

2704545, at *6 (S.D. Tex. July 12, 2022) (Rosenthal, J.) (opposing counsel's fees "a good reference point for what is a reasonable amount of attorneys' fees"). This case is such an instance. Both sophisticated parties were represented by sophisticated counsel. Ex. 1 ¶ 15. Both sides asserted claims against the other. *Id.* Both parties did the same work. *Id.* This case is also unique in that BMC has already been awarded its reasonable and customary fees. *See* Dkt. 781. Now that the shoe is on the other foot, the same methodology and analysis should apply. *See* Ex. 1 ¶¶ 8-9. Accordingly, the hours expended by BMC through trial (not including IBM's appellate hours) should be used as a starting point for what is reasonable in this case, representing the maximum number of hours recoverable. *See id.* ¶ 43.

### 2. *Quinn's Hours Should be Reduced Further to Account for its Block-Billing*

For nearly every time entry, Quinn block-billed. *See generally* Dkts. 963-89. Courts will make reductions in block-billed hours where (1) there is reason to believe "that the hours billed were independently unreasonable;" (2) "the block-billing involved tasks that were not all compensable;" or (3) the "number of hours block-billed together were so high (*e.g.*, five hours or more) as to create an unacceptable risk that the aggregated total exceeded reasonable hours worked on compensable projects." *Thor 725 8th Ave. LLC v. Goonetilleke*, 2015 WL 8784211, at *14 (S.D.N.Y. Dec. 15, 2015). All three scenarios exist here. Quinn's more than 70,000 block-billed hours is the equivalent of 14 lawyers billing full time on the case from inception through trial. Because block-billing creates "limited transparency" and "clouds a reviewer's ability to determine the projects on which significant legal hours were spent," consistent block-billing has led to across-the-board fee reductions.[10] *See King Fook Jewellry Grp. v. Jacob & Co. Watches, Inc.*, 2019 WL

---

[10] IBM agrees that block-billing requires discounting as it sought a 20% reduction of BMC's fees for BMC's "block-billing" during a portion of the case. Dkt. 773 at 9-10.

2535928, at *9 (S.D.N.Y. June 20, 2019) ("nontrivial amount of block-billed entries" can justify at least a 10% across-the-board reduction); *see also Thor 725*, 2015 WL 8784211, at *15 (reducing the requested attorneys' fees by 10% when only 9 entries of a 31-page invoice were objectionably block-billed); *Hines v. City of Albany*, 613 F. App'x 52, 55 (2d Cir. 2015) (30% reduction may be appropriate if block-billing is so pervasive that it "frustrate[s] meaningful review").

IBM's expert concedes that "[s]ome of IBM's time entries are block-billed or general" but concludes that the hours should not be reduced because the entries are "adequate and sufficient" to determine reasonable hours. Pecht Decl. ¶ 40. Quinn's practice of block-billing was pervasive, however, and attorneys' time entries repeatedly blend one project with entirely separate tasks. *See, e.g.*, Dkts. 963-2; 967-1, 983-2. The problem is compounded by the fact that several Quinn attorneys appeared to be working virtually full time on this case. *See* Dkt. 962-2 (5,936.9 hours billed by R. Epstein and 6,919.8 hours billed by D. Reinhard throughout the case). It therefore becomes impossible to calculate the hours that Quinn spent on any particular task—calculations that are especially important here because IBM argues that it spent more time reviewing documents, because IBM is seeking recovery for non-compensable tasks, *see infra* Section III, and because Quinn's block-billing makes it impossible to segregate IBM's counterclaim hours (on which BMC indisputably prevailed).

When faced with block-billed entries, the Court may make a percentage reduction as a "practical means of trimming the fat" from the Application. *Broker Genius Inc. v. Seat Scouts LLC*, 2019 WL 3773856, at *1 (S.D.N.Y. Aug. 12, 2019). Due to the pervasive and continuous nature of Quinn's block-billing practices, the Court should reduce Quinn's hours by at least 30%.[11]

---

[11] This is hardly the first case in which Quinn's fee award has been reduced to account for its block-billing practices. *See, e.g., Red Tree Invest. LLC v. Petroleos de Venezuela SA*, 2022 WL 17834945, at *8 (S.D.N.Y Nov. 29, 2022) (reducing Quinn's fees by 30% for its "facially more unreasonable" hours and

*See Red Tree Invest.*, 2022 WL 17834945, at *8; *see also Pall Corp. v. 3M Purification Inc.*, 2012 WL 1979297, at *7 (E.D.N.Y. June 1, 2012) (applying a 30% reduction in hours "[d]ue to the extensive block-billing"); *Bank v. Ho Seo*, 2009 WL 5341672, at *6 (S.D.N.Y. Dec. 16, 2009) (reducing fees by 30% due to vagueness and block billing, among other things); *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, 2008 WL 5539688, at *3 (S.D.N.Y. Dec. 18, 2008) (reducing hours billed by 30% for vagueness and 15% for block-billing).

### 3. *IBM's Hours Should be Further Reduced Because IBM's Counsel Drove Up the Number of Hours Expended During Discovery*

Although the Court has already concluded that 36,892 hours was a reasonable number of hours for this case through trial, *see* Dkt. 781 at 7-8, this only represents a reasonable number of hours *for BMC*. Because IBM employed "consistently unreasonable" tactics when litigating this case, which led to "rampant and gross overlitigation" with an "extended discovery process," IBM's hours should be discounted against BMC's (to the extent IBM is entitled to recover anything at all). *See Piccolo v. Top Shelf Prods., Inc.*, 541 F. Supp. 3d 256, 263 (E.D.N.Y. May 25, 2021) (holding that a "combination of partial success and unreasonable litigation tactics," which was "well documented in [the court's] opinion and [in] the history of th[e] case," required a "reduction of 80% of the fees sought by plaintiffs' counsel").

The "contentious nature" of a case does not inherently justify the amount of time spent by counsel litigating, especially when the suit is "ultimately a contract interpretation dispute." *Fluor Corp. v. Citadel Equity Fund Ltd*., 2011 WL 3820704, at *6 (N.D. Tex. Aug. 26, 2011); *see Piccolo*, 541 F. Supp. 3d at 263 (requested fees "rendered even more inordinate by the consistently unreasonable approach" taken by counsel "at almost every turn"). Any hours spent must still be

---

block-billing practices); *SS Richmond LLC v. Harrison*, 2023 WL 7646505, at *8 (D.N.J. Nov. 14, 2023) (reducing Quinn's award by 10% for its block-billing practices).

justifiable; "unnecessary, and avoidable, expenditure of fees" should not be awarded. *See In re Arbitration Between Okyere & Houslanger & Assocs., PLLC*, 2015 WL 4366865, at *18 (S.D.N.Y. May 28, 2015); *Piccolo*, 541 F. Supp. 3d at 263 (reducing attorneys' fees 80% due to "partial success and unreasonable litigation tactics").

Here, the amount of hours IBM seeks to recover for litigating this case through trial is not reasonable. IBM drove up the cost of both sides' fees by taking unreasonable positions in discovery. By IBM's calculations, it spent nearly $18 million alone on the "Discovery and Experts" phase of the case. *See* Pecht Decl. ¶ 64. However, much of this cost could have been avoided if IBM had not been insistent on staking out unreasonable positions during discovery. IBM should not be able to recover its fees for hours associated with employing its hyper-aggressive approach to discovery.

IBM's discovery tactics were the genesis of many "unnecessary, and avoidable, expenditure of fees" in this case. For example:

- IBM's excessive and unreasonable privilege claims led to protracted discovery disputes, as IBM theorized that the OA was the result of one large settlement negotiation. Shortly after IBM began pushing this privilege theory, the Magistrate Judge warned IBM that it was "going to have a hard time with that [argument]" and she had "[n]ever seen that work." Feb. 14, 2018 Hrg. Tr. at 10:11-15. Still, IBM persisted with this argument for *over two years*. The Magistrate Judge ended up conducting an evidentiary hearing and then an *in camera* review of certain withheld materials, and found that IBM's theory was "more than a stretch." Dkt. 378. And when IBM tried to challenge this ruling after Magistrate Judge Johnson retired, the Court again rejected the argument following yet another *in camera* review of certain withheld documents. *See* Sept. 4, 2020, Hrg. Tr. at 31.

- At the June 14, 2018 discovery hearing, BMC won or was able to resolve all but 2 of the 11 topics at issue completely in its favor. *See* Dkt. 209. One of BMC's victories was the Magistrate Judge's holding that "it would be relevant … if IBM has pitched any displacement to Exhibit K customers or rejected an inquiry from an Exhibit K customer on displacement based on that 5.4 section." *See id.*; Hrg. Tr. at 12:22-13:2. But just two months later, IBM's obstinance that it only had to produce "formal or informal" proposals again required the

Magistrate Judge's intervention. *See* Dkt. 255. The Magistrate Judge again ordered IBM to produce "not just formal or informal proposals," but any "inquiries" and any "rejections to displace" or "agreements to displace." *Id.*; *see also* Aug. 28, 2018 Hrg. Trs. at 76-77. None of this would have been necessary if not for IBM's desire to take every single discovery issue to the extreme.

- BMC won its motion to compel regarding IBM's responses to requests related to code-changes made to products at the September 13, 2019 discovery hearing and the Magistrate Judge ordered IBM to review documents on this issue that hit on certain searches. *See* Hrg. Tr. at 109-110. The Magistrate Judge also ordered IBM to produce documents related to the revenue and profit from any IBM customer that uses BMC products while IBM provides IT services to the customer. *See id.* at 143:14-22. However, the Magistrate Judge had to again order IBM's compliance with both these requests at a November 21, 2019 discovery hearing. Hrg. Tr. at 19:11-14; 29:9-13; 53-56. Such hours and fees could have all been avoided.

IBM's tactics ultimately created substantial amounts of unnecessary hours worked. IBM should not be permitted to recover fees for these hours, as IBM's unsuccessful and unreasonable discovery stances drove up both sides' costs substantially. Ex. 1 ¶¶ 25, 44. IBM's hours should be reduced by at least another 20% to account for the unnecessary hours spent litigating these unreasonable positions.

### 4.    *IBM's Hours Should be Reduced to Account for Inefficient Staffing*

Courts frequently reduce the hours billed when a case is inefficiently staffed. *See, e.g.*, *Impact Fluid Sols. LP v. Bariven SA*, 2022 WL 824836, at *4 (S.D. Tex. Mar. 18, 2022) (reducing attorneys' fees because "it does not seem reasonable that an opposing party should be made to pay for the other side's lawyers to talk to each other); *WFCM 2016-LC25 W. Bay Area Blvd., LLC v. Tyler*, 2024 WL 4664720, at *8 (S.D.N.Y. Mar. 12, 2024) (reducing attorneys' fees by 10% because "more lawyers than necessary [were] assigned" and "the level of duplication of efforts increase[d]"); *Gillberg v. Shea*, 1996 WL 406682, at *5 (S.D.N.Y. May 31, 1996) (excessive staffing and office conferences "have been the basis for courts to reduce fee requests by one-quarter to one-third"). That is especially true where, as here, the client elects to use multiple law

firms to complete overlapping tasks. *Patel v. St. John's Univ.*, 2020 WL 13157553, at *3 (E.D.N.Y. Dec. 27, 2020) (explaining the need to "carefully scrutinize counsels' billing records and cut the fees sought for the inefficiencies of having multiple firms working together").

While IBM touts that fourteen of its 105 timekeepers account for "approximately 45,000 hours," Pecht. Decl. ¶ 42, this means that 91 of its timekeepers account for the remaining 33,000 hours. 60 timekeepers billed between $10,000 and $500,000 in fees each. *Id.* Each of these timekeepers had to be brought up to speed on the case just to complete the alleged "discreet [sic] tasks of short duration" that each was asked to perform. *Id.* However, IBM does not account for the cost of 91 learning curves, nor does it explain why 91 additional timekeepers were necessary. *See generally* Dkt. 962.

Moreover, Quinn associates comprise over 80% of the total hours billed. Quinn's staffing surely added to, rather than reduced, the amount of "repetition" of tasks. Such redundancies are not compensable. *See Gillberg*, 1996 WL 406682, at *5. A significant reduction in IBM's hours billed is warranted due to its inefficient staffing. *See Impact Fluid*, 2022 WL 824836, at *4.

### B.    Quinn's 2021-2024 Rates Are Not Reasonable or Customary for This Case in This Market

While IBM's Houston-based counsel (Yetter) billed at reasonable hourly rates, Quinn charged unreasonable rates for its services after the pandemic waned in 2021 and Quinn raised its rates significantly. *See* Ex. 1 ¶¶ 32, 35. Quinn's rates must be "reasonable in the Houston market in light of the complexity of this case and the experience, reputation, and ability of [its] lawyers." *Preston Expl.*, 2013 WL 3229678, at *5. Quinn cannot justify its outsized rates when IBM also engaged Yetter, an equally capable firm in the forum, to handle the same matter at a lower rate. Ex. 1 ¶¶ 33-35. Further, IBM must overcome the presumption against awarding out-of-district rates by showing that its selection of Quinn was reasonable because Quinn would "likely (not just

possibly) produce a substantially better net result." *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 175 (2d Cir. 2009). IBM does not even try to do this, nor could it. IBM cannot justify its decision by "relying on [Quinn's] prestige or 'brand name.'" *Id.* at 176. Given that IBM's only success was on appeal—where Quinn did not appear—IBM cannot justify Quinn's rates by claiming it produced better results. *See* Ex. 1 ¶ 20. Thus, the Court should reduce Quinn's rates to equal Yetter's hourly rates as a way to impose reasonable hourly rates for the lodestar.

## III.    IBM Cannot Recover for Hours Billed for Non-Compensable Work

Although IBM's counsel claims it "exercised billing judgment by reducing [Quinn's] fees by 1.5% (approximately $600,000)," App. at 13 n.8, it still seeks to recover fees for certain tasks for which New York law does not permit recovery. These categories include fees for unfiled motions, fees for its unsuccessful and severable counterclaim, and its request for "fees on fees."

### A.    IBM Cannot Recover for Time Spent Working on Motions Never Filed

While the court "should not disallow fees for every motion that a [] party did not win," IBM still bears the burden to show the hours it billed were justified. *See Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 538 (S.D.N.Y. 2008). Courts regularly disallow billing for "hours spent working on submissions that were never filed." *See Indep. Project, Inc. v. Ventresca Bros. Constr. Co., Inc.*, 397 F. Supp. 3d 482, 497 (S.D.N.Y. 2019) (excluding hours for time spent working on a motion that was never filed); *Rai v. WB Imico Lexington Fee, LLC*, 2017 WL 1215004, at *13 (S.D.N.Y. Mar. 31, 2017) (deducting hours billed for an injunction that was never filed); *Gierlinger v. Gleason*, 160 F.3d 858, 880 (2d Cir. 1998) (affirming the "denial of compensation for [] hours spent preparing for motions that were never filed").

IBM seeks to recover nearly $300,000 in fees working on a temporary restraining order and a motion to dismiss that were never filed. Between January 2018 and March 2018, 14

timekeepers billed 369.2 hours working on a temporary restraining order that was never filed.[12] *See* Dkt. 966-2, 966-4.  Similarly, in March 2019, IBM contemplated/prepared a motion to dismiss that it never filed.  Seven timekeepers logged 155.5 hours working on this unfiled motion.  *See* Dkt. 975-2.

These 524.7 hours billed totaling $297,232 should be excluded from the calculation of IBM's fees.  *See Indep. Project, Inc.*, 397 F. Supp. 3d at 497; *Gierlinger*, 160 F.3d at 880.

### B.    IBM Failed to Segregate for its Unsuccessful Counterclaim

If the Court concludes that IBM prevailed despite the loss of its counterclaim, the fees associated with pursuing that claim must still be segregated and disallowed.  *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999) (instructing courts to exclude "hours dedicated to severable unsuccessful claims").

While IBM argues without explanation that its counterclaim and prior material breach affirmative defense were "intertwined legal theories" with BMC's breach claims, App. at 18, that is wrong.  The claims were not intertwined and did not share a factual core.  *Sanchez v. Oceanside First Class Roofing, Inc.*, 818 F. App'x 106, 108 (2d Cir. 2020) ("Claims are intertwined when they are based on a 'common core of facts,' 'related legal theories,' or 'require essentially the same proof.'").  The parties' claims rest on entirely different and unrelated provisions of the agreement. IBM's claim focused on the pricing and terms BMC offered to its other customers compared to IBM, while BMC's claims had nothing to do with any of that.  The parties enlisted experts to address the counterclaim.  Ultimately, the success or failure of each parties' claim was independent, evidenced here by both claims' failure.

---

[12] Because of IBM's block-billing, it is impossible to distinguish the time spent working on the unfiled motions from other work.  Thus, BMC has tallied all hours in an entry expressly mentioning the unfiled motion.  It is equally possible that other block-billed entries included time toward these unfiled motions, but without describing the work expressly.

IBM failed to segregate the time spent prosecuting its failed claim from time spent defending against BMC's claims. And BMC is unable to do so because of Quinn's pervasive and continuous block-billing coupled with vague descriptions. It is thus impossible to know how much time is unrecoverable.

### C.    IBM Cannot Recover "Fees on Fees"[13]

IBM seeks to recover $936,574 in attorneys' fees and costs it incurred in preparing its Application, or "fees on fees."[14] App. at 17; Dkt. 921-1 at ¶ 66-67. However, New York law on the recoverability of such fees is clear: if a contract's fee-shifting provision "does not contain clear language expressly providing for an award of fees on fees," then "a right to recover those fees should not be implied." *IG Second Generation Partners, L.P. v. Kaygreen Realty Co*., 114 A.D.3d 641, 643 (N.Y. App. Div. 2014); *Thor 725 8th Ave.*, 2015 WL 8784211, at *12 ("Under New York law, a general contract provision for the shifting of attorneys' fees does not authorize an award of fees for time spent in seeking the fees themselves." (internal quotation marks omitted)).

Because the MLA does not contain clear language granting IBM the right to "fees on fees," those fees cannot be shifted. *See SING for Serv., LLC v. DOWC Admin. Servs., LLC*, 2023 WL 3294279, at *5 (S.D.N.Y. May 5, 2023) (concluding that a contract providing for "all costs and

---

[13] BMC also sought "fees on fees" in its application, and IBM did not contest their recoverability. Because IBM's request for "fees on fees" was roughly double what BMC requested, BMC conducted specific research into this issue. Under New York law, awarding such fees "would work a manifest injustice." *United States v. Vahlco Corp*., 895 F.2d 1070, 1072 (5th Cir. 1990). BMC is not precluded from opposing IBM's "fees on fees" and the Court is not bound to award them.

[14] IBM does not provide its own calculation for the "fees on fees" that it seeks. App. at 17. IBM's expert states that IBM incurred "$708,338 for attorney services and $53,236 in costs," including his own fee, for "preparing and briefing" the Application and for responding to BMC's motions for rehearing before the Fifth Circuit. Pecht Decl. ¶ 66. IBM's expert did not segregate the fees IBM incurred responding to BMC's motions for rehearing from those incurred in the Application. *Id.* He only explained that the "fee application has been extraordinarily costly." *Id.* He continues that IBM will incur an estimated $175,000 "in further briefing relating to this fee and cost application" and in entering final judgment. *Id.* at ¶ 67. Because IBM considers these fees together, BMC does as well.

expenses, including, without limitation, reasonable attorneys' fees and costs" did not "evince such an unmistakable intent to award fees on fees that their inclusion in [the prevailing party's] award would be proper"); *Thor 725 8th Ave.*, 2015 WL 8784211, at *12 (similar); *IG Second Generation*, 114 A.D. at 643-44 (mandating lower court calculate attorneys' fees "without inclusion of legal fees incurring in prosecuting the plaintiffs' claim for legal fees" because contract did "not contain clear language expressly providing for an award of fees on fees").

Even if the Court were to award IBM its "fees on fees," the amount of fees IBM seeks for this task is unreasonable. *See* Ex. 1 ¶ 27 & n.10. For example, Quinn billed $1,185/hour just to redact invoices. *See* Dkt. 992-1. Further, it enlisted an attorneys' fee expert who charged $1,400 per hour for his services (as compared to BMC's fee expert, a practicing lawyer, who charged $850/hour). *Compare* Pecht Decl. ¶ 66, *with* Dkt. 760-1 ¶ 27(m). While IBM's fee expert claims that the Application was "extraordinarily costly" because it "involved collecting and analyzing costs from six law firms," Pecht Decl. ¶ 66, that burden resulted exclusively from IBM's own decisions and, because of electronic billing, cannot have been as complicated as IBM implies.

### D.    IBM Cannot Recover Attorneys' Fees and Costs Paid or Owed by Kyndryl

IBM seeks to recover all fees billed directly to Kyndryl.[15] IBM even expects BMC to pay for Kyndryl's own retained appellate counsel, Lynn Pinker. *See* Dkt. 990-5. BMC, however, has no obligations to Kyndryl pertaining to this litigation, let alone an obligation to reimburse Kyndryl for any legal expenses it incurred in relation to this litigation. The MLA only permits "the

---

[15] As explained *supra*, Kyndryl may have paid, or may be financially responsible for, *all* the fees and costs that IBM now seeks to recover. *See supra* Background, Part IV. It is unclear whether IBM paid the expenses for which it now seeks reimbursement. And IBM's expert was retained by Kyndryl, which is very odd and is not explained. We will never know who is paying for what. At the very least, however, we know that Kyndryl has been billed for IBM's attorneys' fees in this litigation since November 2022. *See* Dkt. 989-4. IBM is seeking reimbursement for all these fees, nonetheless. The Court should take this evidentiary gap in the exercise of its discretion.

prevailing party" to recover reasonable and customary attorney's fees and costs. PX001 at MLA § 18. Kyndryl, of course, is not the prevailing party nor is it a party to the MLA. Accordingly, BMC should not be required to reimburse IBM for fees and costs that were covered or reimbursed, or that will be, by Kyndryl.

**IV.    The Court Should Exclude Quinn's Fees from IBM's Appellate Fee Recovery**

IBM seeks to recover over $3 million in attorneys' fees related to the post-judgment proceedings and the appeal. Pecht Decl. ¶ 64. IBM's appellate attorneys unquestionably obtained success in the face of a significant judgment, but Quinn's fee of over $1 million for the post-judgment proceeding and the appeal should not be awarded. BMC does not challenge the reasonableness of the appellate fees charged by Yetter, Clement & Murphy, Jones Day, or Beck Redden.

IBM's appellate team consisted of three new firms brought on specifically as appellate counsel to work with Yetter, IBM's lead trial counsel, on the appeal. Pecht. Decl. ¶ 39. IBM's appellate counsel worked efficiently and effectively at achieving its desired result. Further, IBM reasonably retained Yetter, its trial counsel, to work on the appeal as well. Quinn on the other hand did not sign the appellate briefing, nor did it attend oral argument (or even file a notice of appearance). Yet, Quinn seeks to recover over $1 million in fees, almost the full amount that BMC was awarded by the Court for its appellate fees. *Id.* ¶ 64. Clement & Murphy, IBM's lead appellate counsel who signed the briefs and argued the case, billed $1,384,262.40. Dkt. 990-2. IBM's expert does not address those fees and IBM fails to show that Quinn's efforts were reasonable and customary, as opposed to "excessive, redundant or otherwise unnecessary." *Feng*, 2024 WL 1348654, at *23. IBM should not recover Quinn's fees for the post-judgment proceeding and the appeal in the amount of $1,024,279.

## V.    IBM's Litigation Costs Are Excessive and Unrecoverable

To be entitled to recover its costs, IBM must show that they were a "reasonable out-of-pocket disbursement[] ordinarily charged to clients."  *Stanczyk v. City of New York*, 990 F. Supp. 2d 242, 253 (E.D.N.Y. 2013).  IBM seeks to recover $12.1 million in litigation costs, some of which were not reasonable or customary.  App. at 19-20; *see* Ex. 1 ¶¶ 38-40.

### A.    IBM's Expert Fees Should be Reduced

"The party seeking reimbursement for expert fees bears the burden of proving reasonableness."  *Matteo*, 2012 WL 5177491, at *5.  IBM has failed to satisfy this burden, as IBM's proffered support falls far short of justifying the $3,292,964 it seeks.[16]  For the reasons explained below, the Court should reduce IBM's requested experts' fees should be $1.8 million.

In determining whether expert fees are reasonable, "the rates actually charged" by experts, "and the hours actually expended, are not dispositive."  *Id.* at *2.  Just like with the lawyers, the substantiation provided must be sufficiently detailed for a court to assess whether the requested expert fees are reasonable.  *See, e.g., Penberg v. HealthBridge Mgmt.*, 2011 WL 1100103, at *15 (E.D.N.Y. Mar. 22, 2011) (if "reasonableness of an expert's fees is not fully explained, the Court may exercise its discretion to determine a reasonable fee." (citing cases)); *Matteo*, 2012 WL 5177491, at *5 ("In the face of very limited evidence, a court may, in its discretion, simply apply an across-the-board reduction of expert's fees.").

Here, IBM attempts to justify the $3+ million in expert fees it seeks by relying on: (1) testimony from IBM's fee expert that the fees were "reasonably incurred," *see* Pecht Decl. ¶¶ 61, 63(10), and (2) IBM's experts' invoices.  But IBM's fee expert's vague and conclusory testimony does not explain why IBM's expert fees were reasonable.  *See generally* Pecht Decl.;

---

[16] Notably, IBM is seeking $843,934 more in expert fees than BMC sought, notwithstanding the fact that BMC and IBM retained the same number of experts to cover the same topics.

*see also* Ex. 1 ¶ 39.  Further lacking is any evidence to support the reasonableness of the rates

charged by IBM's experts or any explanation as to whether such rates are commensurate with other

experts of similar backgrounds and credentials.  *See id.*  This alone warrants a fee reduction.  *See*

*Vista Outdoor Inc. v. Reeves Family Trust*, 2018 WL 3104631, at *11-12 (S.D.N.Y. May 24, 2018)

(reducing expert's rates by 50% when party failed to provide details about their education and

training and prevailing rates for other comparably respected experts); *Craig v. UMG Recordings,*

*Inc.*, 2019 WL 2992043, at *6 (S.D.N.Y. July 9, 2019) (fee adjustment required where defendant

failed to "submit[] any evidence to convince the Court that [expert's] hourly rate of $650 [was]

reasonable or commensurate with other experts of similar backgrounds and credentials").

Although IBM claims its experts' invoices are "sufficiently detailed," App. at 22, most of

these invoices fail to adequately explain how IBM's experts spent their time (and, in some

instances, provide no explanation whatsoever).  For example:

- IBM seeks to recover a total of $840,079.52 for fees billed by FTI Consulting ("FTI").  Across FTI's fifteen invoices, however, there is *no individual breakdown* of the hours billed.  Even more, there is *no individual explanation* for the hours billed.  *See, e.g.*, Dkt. 991-7 at 17-18.  FTI's failure to break out the hours billed or connect such hours to any specific task essentially makes a reasonableness determination impossible.

- IBM seeks to recover a total of $424,625.11 for fees billed by Arete Advisors ("Arete").  But five out of Arete's seventeen invoices, which in total account for $216,104.16 in fees and a collective 437 hours, contain *no explanation* as to how those hours were spent (except for one 2-hour entry for "preparation of exhibits").  *See* Dkt. 991-5 at 4-5, 22-27.  In the remaining 12 invoices, approximately 80 hours billed by Anthony Locke, a non-testifying expert, similarly provides no explanation regarding how this time was spent.  *See, e.g.*, Dkt. 991-5 at 13-15.

- IBM seeks to recover a total of $556,369.92 for fees billed by Compass Lexecon ("Compass").  Yet, Compass's first invoice for $60,910 provides only four sentences of explanation for the 56.75 hours billed.  Dkt. 991-6 at 2-3 (20.75 hours for "[p]rofessional [s]ervices" and 36.00 hours for the following: "Reviewed case materials; Drafted memo.  Conversations with expert.  Conference calls with attorneys and expert.").  Although Compass's remaining four invoices break out the hours with individual explanations, many

explanations provided for large blocks of time are insufficient. *See* Dkt. 991-6 at 8 (12.50 hours for: "Reviewed case materials. Drafted report."; separate 16.00 hours for: "Drafted report. Reviewed case materials. Reviewed literature."; 13.75 hours for: "Reviewed case materials. Reviewed literature. Drafted report.").

- IBM seeks to recover approximately $72,600 of the fees (or a collective 103 hours) billed by Smart Computing for "keeping 'fresh' [on] the case." *See, e.g.*, Dkt. 991-9 at 19, 24, 27, 30, 33-34, 36-37. No further explanation is provided as to what this entails. *See id.*

Given the lack of detail in IBM's experts' invoices regarding how IBM's experts spent their time, a further reduction of IBM's requested expert fees is warranted. *See Craig*, 2019 WL 2992043, at *6 (implementing 50% reduction to requested expert fees where expert's timesheet contained "little explanation of how [expert's] time was spent, relying exclusively on vague entries such as "[c]ommunication" or "[p]rovide written responses"); *Penberg*, 2011 WL 1100103, at *15 (cutting requested expert fees by 15% where experts failed to explain the reasonableness of time expended conducting work for his testimony or provide "any information" regarding the prevailing rates of similar experts).

In addition, IBM cannot recover for its expert costs related to its failed counterclaim. *See* Dkt. 781 at 9 (denying BMC recovery of costs associated its expert Geoffrey Decker because his "work focused more exclusively" on its unsuccessful trade secrets claim). Here, IBM's expert Paul Pinto provided an expert report relating to the "comparison between the 'pricing terms'" of IBM's contract with BMC, and BMC's contracts with other businesses. Similarly, the majority of the opinions offered by IBM's damages expert, Christopher Gerardi, related to IBM's asserted damages associated with its counterclaim. Thus, Mr. Pinto's fees ($501,539.62, *see* Dkt. 991-10) should be subtracted from IBM's requested expert fees entirely. Gerardi's fees ($840,079.52, *see* Dkt. 991-7) should be reduced by 60%.

Finally, IBM's expert on antitrust issues and the enforceability of the non-displacement provision, Dr. Richard Gilbert, charged a jaw-dropping $1,400/hour for his services. *See* Dkt. 991-6. Like attorneys, experts' rates must still be reasonable. *Matteo*, 2012 WL 5177491, at *2. Yet, IBM provides no justification whatsoever to support the $1,400/hour it now seeks to recover for Dr. Gilbert (notwithstanding the fact that Dr. Gilbert's rate is double that of BMC's expert, Dr. Schulman, who was engaged to opine on the same issues as Dr. Gilbert). *See* Dkt. 760-16. The Court should thus reduce Dr. Gilbert's rate to the same as Dr. Schulman's rate. This would result in a reduction of approximately $278,184.96. *See* Dkt. 991-6.

In sum, approximately $1.8 million of the $3.2 million that IBM seeks to recover for its experts' fees and costs should be denied.

## B. The Taxable and Other Costs IBM Incurred Are Not Reasonable or Customary

A portion of IBM's $2,809,368 in taxable and other costs are not "reasonably and customarily" costs charged to clients in the forum. For example, IBM asks for reimbursement for a hotel conference room at the downtown JW Marriot during trial, costing $280,000 to rent, furnish, and equip. Dkt. 988-2-3. This was plainly unnecessary when both Yetter *and* Quinn have offices "easily accessible to the courthouse" in Houston. *See N.A.A.C.P. v. E. Ramapo Cent. Sch. Dist.*, 2020 WL 7706783, at *11 (S.D.N.Y. Dec. 29, 2020) (concluding that $52,467.86 spent to rent a "war room" and $11,393.66 in "computer and technology costs" for the room are excessive when the attorneys' office is "roughly twenty-seven miles away from the courthouse"); *AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 2011 WL 102715, at *2 (S.D.N.Y. Jan. 6, 2011) (declining to award costs for a "war room").

Similarly, IBM's costs ran amok in other ways too. For example, IBM seeks to recover $22,848.60 for the Smart Computing expert's air fare between Cape Town, South Africa and

Houston, Texas (plus over an additional $3,000 for flight change fees and over $5,000 for his Houston hotel), even though Mr. Graham was not deposed in-person and did not testify at trial. *See* Dkt. No. 991-9 at 8, 38, 40. While IBM may be entitled to recover the costs of its experts' travel, the sheer cost of the airfare charged, and imposition of change fees are not reasonable in this circumstance. *See Mark Andrew of the Palm Beaches, Ltd. v. GMAC Comm. Mortg. Corp.*, 2003 WL 21767633, at *2 (S.D.N.Y. July 31, 2003) (finding $1,800 in airfare for a roundtrip flight from California to New York unreasonable given availability of $268 tickets).

IBM also tacks on meals at Brennan's and Commander's Palace in New Orleans. While a client may agree to pay certain expenses related to "the quality of the accoutrements furnished in the course" of service, the Court should exercise its discretion to prevent IBM from "pass[ing] that along in toto to" BMC. *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 51 F. Supp. 2d 302, 309 (S.D.N.Y. 1999) (reducing an attorneys' fees award by 30% to account for excessive costs charged).

In sum, at least 15%, or $421,405, of IBM's requested taxable costs should be disallowed.[17]

## CONCLUSION

Because there is no prevailing party, IBM's application for attorneys' fees should be denied in full. If the Court determines that IBM is entitled to any fees, however, "fees totaling $21 million … are … on the high side of what would be a reasonable and customary fee for the services of IBM's counsel in this case." Ex. 1 ¶ 45. For the reasons discussed above, a fee award materially less than that amount is warranted and is within the Court's discretion.

[SIGNATURE ON FOLLOWING PAGE]

---

[17] BMC does not challenge the reasonableness of IBM's supersedeas bond request of $6,059,869.

Date: December 9, 2024

Respectfully submitted,

Of Counsel:

 */s/ Sean Gorman*

Sean Gorman

Christopher L. Dodson

Texas State Bar No. 08218100

Texas State Bar No. 24050519

S.D. Bar No. 10168

S.D. Bar No. 613937

White & Case LLP

Kyle Mason

609 Main Street, Suite 2900

Texas State Bar No. 24116728

Houston, Texas 77002

S.D. Bar No. 3501712

(713) 496-9700 Telephone

Stephen Shuchart

(713) 496-9701 Facsimile

Texas State Bar No. 24125703

sean.gorman@whitecase.com

S.D. Bar No. 3831642

White & Case LLP

**Attorney-In-Charge**

609 Main Street, Suite 2900

Houston, Texas 77002

(713) 496-9700 Telephone

(713) 496-9701 Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing document has been served electronically on all counsel of record on December 9, 2024.

*/s/ Kyle A. Mason*