United States District Court
Southern District of Texas

**ENTERED**

July 19, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| BMC SOFTWARE, INC., | § |
| | § |
| *Plaintiff,* | § |
| | § |
| v. | §     CIVIL ACTION NO. 4:17-cv-2254 |
| | § |
| INTERNATIONAL BUSINESS | § |
| MACHINES CORPORATION, | § |
| | § |
| *Defendant.* | § |
| | § |

## ORDER

Pending before the Court is Defendant International Business Machine Corporation's ("Defendant" or "IBM") Motion for Attorneys' Fees. (Doc. No. 962). Plaintiff BMC Software, Inc ("Plaintiff" or "BMC") responded in opposition (Doc. No. 999) and IBM replied (Doc. No. 1001). After consideration of the Motion, the evidence, and the law, the Court hereby **GRANTS in part** and **DENIES in part** Defendant's Motion. (Doc. No. 962).

### I.     Background

BMC initiated this breach of contract/fraudulent inducement suit against IBM in 2017.[1] (Doc. No. 756 at 1). Many years prior to this suit, BMC and IBM executed a Master License Agreement ("MLA") that, in relevant part, limited IBM's ability to use confidential information about BMC's products that it might receive during the parties' business relationship. (*Id.* at 14). IBM and BMC subsequently signed the 2015 Outsourcing Attachment (the "2015 OA") that

---

[1] Though the Fifth Circuit reversed the ultimate finding of the original trial court, this Court, in setting out the background of this case, relies on Judge Miller's Findings of Fact solely to give context to the motion. As the parties are intimately familiar with the underlying facts, the Court finds it unnecessary to discuss them at length.

expressly prohibited IBM from displacing BMC's products with IBM's products when working with third parties ("Section 5.4"). (*Id.* at 25).

One of BMC and IBM's mutual customers is AT&T. (*Id.* at 11). At the risk of oversimplifying the parties' roles, BMC provided software to AT&T, whereas AT&T outsourced its IT needs to IBM. (*Id.* at 11–12). Sometime in 2015, as part of what AT&T dubbed "Project Swallowtail," AT&T solicited IBM's involvement in a displacement project, during which IBM would integrate its own software onto AT&T's mainframe computers rather than BMC's software. (*Id.* at 25). Prior to signing the 2015 OA, IBM signed a contract with AT&T to displace BMC's software with its own. (*Id.*).

BMC sued IBM for breach of contract, fraud, and misappropriation of trade secrets. (*Id.* at 1–2). IBM asserted a breach of contract counterclaim. (*Id.* at 3). After years of litigation, including dozens of depositions and tens of thousands of pages of discovery, IBM moved for summary judgment, which the District Court granted in part. The District Court also granted summary judgment against IBM's counterclaim. The remaining claims proceeded to a bench trial. The trial court issued its Findings of Fact and Conclusions of Law, in which it concluded that IBM breached the 2015 OA and that it had fraudulently induced BMC to enter the 2015 OA. Consequently, the trial court entered a Final Judgment in favor of BMC, and ultimately awarded BMC over $1.6 billion in compensatory and punitive damages. It subsequently awarded BMC over $21 million in attorneys' fees and costs as the "prevailing party" pursuant to the MLA's fee-shifting provision, which provides that the "prevailing party" in "any" litigation "is entitled to recover reasonable and customary attorney's fees and costs from the other party." (Doc. No. 781); (Doc. No. 756 at 104).[2]

---

[2] Multiple courts have held that the MLA and the 2015 OA form an "integrated whole." (Doc. No. 256 at 14–21); (Doc. No. 756 at 2). As such, the parties agree that litigation that primarily focused on an alleged breach of the 2015 OA would trigger the MLA's fee-shifting provision.

The Fifth Circuit later reversed and rendered judgment in IBM's favor, finding that IBM did not breach Section 5.4 of the 2015 OA and, therefore, had not committed fraud. *See* (Doc. No. 959). IBM then filed the pending Motion for Attorneys' Fees. It claims that the Fifth Circuit's ruling makes it the "prevailing party," and, therefore, it should be awarded its "reasonable" attorneys' fees and costs of $59,268,562. BMC disputes that IBM is the prevailing party. Alternatively, BMC raises multiple objections as to why IBM's attorneys' fees and costs to the tune of $59 million are not reasonable.

## II.    Analysis

There are two issues the Court must resolve. First, whether IBM is the prevailing party in this litigation, such that it is entitled to recover "reasonable and customary attorney's fees and costs" from BMC under the MLA's fee-shifting provision. Second, if IBM is the prevailing party, what amount of attorneys' fees and costs is "reasonable and customary."

### A.  Prevailing party

The parties dispute whether IBM is the prevailing party in this litigation. A party can be said to have prevailed if it succeeded "with respect to the central relief sought." *Blinds to Go (U.S.), Inc. v. Times Plaza Dev., L.P.*, 143 N.Y.S.3d 91, 93 (N.Y. App. Div. 2021).[3] "Such a determination requires an initial consideration of the true scope of the dispute litigated, followed by a comparison of what was achieved within that scope." *Id.* (internal quotations omitted). Put differently, a party must receive "substantial relief" relating to the central claims advanced. *Grand v. Schwarz*, No. 15-CV-8779 (KMW), 2019 WL 624603, at *3 (S.D.N.Y. Feb. 14, 2019) (citing *Sykes v. RFD Third Ave. I Assocs., LLC*, 833 N.Y.S.2d 76, 77–78 (N.Y. App. Div. 2007)).

---

[3] The parties, and the trial court, agree that New York law governs the claims in this case. (Doc. No. 756 at 67). Where the Court cites to opinions published by the Second Circuit or New York federal District Courts, it has tried to concentrate on opinions that interpret either New York law, as specified in the contract, or federal law, such as the Second Circuit's use of the Fifth Circuit's *Johnson* factors when evaluating attorney's fees.

IBM, of course, contends that it is the prevailing party. Essentially, IBM argues that it received "substantial relief" relating to the central claims advanced when the Fifth Circuit rendered a take-nothing judgment in IBM's favor. Moreover, IBM contends that the fact that its counterclaim was dismissed is "of no moment." It cites case law to support its position that it need not prevail on all claims in order to be considered the prevailing party.

On the other hand, BMC argues that this litigation falls into the rare exception where no party is the prevailing party. It states that "[n]o money exchanged hands and . . . everyone lost." (Doc. No. 99 at 21). Unlike IBM, who claims that the dismissal of its $100 million counterclaim is "of no moment," BMC contends that it is that very dismissal that proves that neither party prevailed in this suit. BMC seemingly argues that, because it lost on its $1.6 billion claim, and IBM lost on its $100 million claim, "everyone lost." Accordingly, it concludes that since no party is truly a prevailing party, an award of attorneys' fees pursuant to the MLA is improper.

BMC's argument suggests that a party must obtain complete relief to be the prevailing party. That is not the standard under New York law. Rather, New York law states that "one must simply prevail on the central claims advanced, and receive substantial relief in consequence thereof." *Board of Mgrs. of 55 Walker St. Condominium v. Walker St., LLC*, 6 A.D.3d 279, 774 N.Y.S.2d 701 [2004]. BMC already defined the central claims of this action. In its own motion for attorneys' fees, filed prior to the Fifth Circuit's reversal, BMC acknowledges that the central claim advanced was "whether IBM breached the [2015 OA] and IBM's conduct and intentions in agreeing to the 2015 OA and performing Project Swallowtail." (Doc. No. 760 at 9). IBM clearly received substantial relief on those claims when the Fifth Circuit rendered judgment in IBM's favor. The fact that IBM was unsuccessful on its counterclaim—where it sought an amount roughly

6% of BMC's claim—does not negate the fact that it was successful on what even BMC defined as the central claim.

The Court finds that IBM is the prevailing party. As such, IBM "is entitled to recover reasonable and customary attorney's fees and costs from" BMC pursuant to the MLA's fee-shifting provision. *See* (Doc. No. 781); (Doc. No. 756 at 104).

### B. Reasonable Attorneys' Fees

When a New York contract "provides for shifting of the actual attorneys' fees expended by a prevailing party, 'the court will order the losing party to pay whatever amounts have been expended . . . so long as those amounts are not unreasonable.'" *Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 353 (S.D.N.Y. 2003) (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1263 (2d Cir. 1987)). Since the Court has determined that IBM is the prevailing party, it must now determine the reasonable and customary attorneys' fees and costs that IBM is entitled to recover from BMC. IBM seeks $46,528,535 in attorneys' fees. (Doc. No. 1003 at 2).

The Second Circuit uses a two-step approach for calculating attorney's fees. First, the Court must multiply "the number of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area." *Cohen v. W. Haven Bd. of Police Comm'rs*, 638 F.2d 496, 505 (2d Cir.1980) (quoting *Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir. 1977)). As the second step, the Court may evaluate the lodestar figure and adjust it upward or downward to take account of a multitude of subjective factors, as discussed below. *Id.* Both the Second Circuit and the Supreme Court "have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required

by the case—creates a 'presumptively reasonable fee.'" *Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008).

The Second Circuit, like the Fifth Circuit, applies the *Johnson* factors when determining the reasonableness of attorneys' fees. *Arbor Hill*, 522 F.3d at 190. The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Hwy. Exp., Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). Additionally, the Second Circuit instructs courts to "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively," and "that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case." *Arbor Hill*, 522 F.3d at 190. The Court "should then use that reasonable hourly rate to calculate what can properly be termed the 'presumptively reasonable fee.'" *Id.*

BMC challenges rates charged by Quinn Emanuel, as well as the total number of hours billed by all firms retained by IBM. Both issues are discussed at length below.

### i.   Hourly Rates

IBM retained multiple well-recognized law firms. At the trial level, IBM retained Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), a national, trial-oriented firm, and Yetter Coleman LLP ("Yetter Coleman"), a trial firm that is primarily centered in Texas. IBM notes that

6

"Yetter Coleman focused on the trial and the injunction proceedings brought by BMC, while Quinn Emanuel worked on all aspects of the case's development." (Doc. No. 962 at 17). On appeal, IBM retained Paul Clement of the firm Clement & Murphy PLLC, as well as attorneys from the firms Beck Redden LLP and Jones Day. (*Id.*). While well-recognized in their own fields, it is somewhat unclear what role each firm played other than the fact that Clement made the oral argument in the Fifth Circuit.

BMC does not challenge the reasonableness of the trial level fees charged by Yetter Coleman, nor does it challenge the reasonableness of the appellate fees charged by Yetter Coleman, Clement & Murphy, Jones Day, or Beck Redden.[4] (Doc. No. 999 at 32, 37). It does, however, challenge Quinn Emanuel's rates starting in 2021. The highest billing rate charged by a Quinn Emanuel attorney was $1,925 an hour, with multiple partners exceeding the $1,000-per-hour threshold. (Doc. No. 962-2).

Reasonable hourly rates "are to be calculated according to the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). In assessing a reasonable hourly rate, the Court takes into consideration the market rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation," also known as the "forum rule." *Id.* at 895 n.11. "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* The "community," according to New York law, is the District where the case is pending. *Arbor Hill*, 522 F.3d at 190. In this case, of course, that would be Houston.

---

[4] IBM also requested fees billed by Lynn Pinker Hurst & Schwegmann LLP. BMC challenges whether it is responsible for Lynn Pinker Hurst & Schwegmann LLP's fees in their entirety. The Court will discuss those fees in a later section.

The Second Circuit has determined, however, that the presumption that the district court should use in-district rates to determine the reasonable fee may be rebutted "if the party wishing the district court to use a higher rate demonstrates that his or her retention of an out-of-district attorney was reasonable under the circumstances as they would be reckoned by a client paying the attorney's bill." *Id.* at 191. A district court may also use its knowledge of the relevant market when determining the reasonable hourly rate. *See Miele v. New York State Teamsters Conference Pension & Ret. Fund*, 831 F.2d 407, 409 (2d Cir. 1987).

BMC contends that Quinn Emanuel cannot justify its post-2020 rates when IBM hired Yetter Coleman at a lower rate. (Doc. No. 1001 at 32). BMC also argues that IBM cannot overcome the presumption against awarding out-of-district rates. (*Id.*). Consequently, BMC concludes that the Court should reduce Quinn Emanuel's rates to equal Yetter Coleman's. (*Id.* at 33). IBM, of course, argues that Quinn Emanuel's rates are reasonable and customary. (Doc. No. 1001 at 16). It notes that there is no support for the position that when a client hires two law firms at different rates, the lower rate should act as the cap for reasonable fees.

Since there is a presumption that this Court should use in-district rates to determine the reasonable fee, the Court will consider whether the rates charged by Quinn Emanuel are reasonable in the Southern District of Texas. IBM supports its claim that the rates are within the reasonable market rates in the Southern District of Texas by including the declaration from Gerard Pecht ("Pecht"), the former Global Chief Executive Officer of and Global Head of Dispute Resolution and Litigation for Norton Rose Fulbright.[5] (Doc. No. 962-1). Pecht essentially makes four points

---

[5] BMC responded to Pecht's affidavit with a rebuttal declaration by its own expert, Murray Fogler. (Doc. No. 999-1). Fogler, a former partner of Pecht's, contests Pecht's points and presents evidence supporting the arguments presented in BMC's response to the pending motion. While the Court has considered both Pecht's and Fogler's affidavits, it declines to adopt the reasoning of either one *in toto*. The Court's discussion centers around Pecht, as he is the expert supporting the position of the movant.

in his declaration. First, he concludes that BMC's attorneys' 2017 rates are roughly comparable to Quinn Emanuel's 2017 rates. (*Id.* at 25). Second, he cites a 2015 article from the Texas Lawbook that suggests that rates for top lawyers within the Southern District of Texas were surpassing $1,000 an hour. (*Id.* at 26). Third, he maintains that Quinn Emanuel's average billing rate is roughly $20 lower than Yetter Coleman's, and since BMC has already agreed that Yetter Coleman's rates are reasonable, he concludes that Quinn Emanuel's rates must also be reasonable. (*Id.*). Fourth, and finally, Pecht analyzes the *Johnson* factors in an attempt to show that the rates are reasonable. (*Id.* at 29–33).

Points one, two, and four have little persuasive value. As for Pecht's first reason, BMC does not challenge Quinn Emanuel's pre-2021 rates. As such, the fact that the attorneys' 2017 rates are comparable is of little importance. More generally, IBM also argues that rates for IBM's trial counsel in this matter are equivalent to those that BMC claimed were reasonable and customary in its own fee application. (Doc. No. 962 at 17–18). The Court, however, does not find a single instance where a BMC-hired attorney billed at a rate higher than $850. *See* (Doc. No. 760-4). With respect to Pecht's second point, the mere fact that some lawyers in 2015 were starting to charge rates over $1,000 is not necessarily indicative of their reasonableness in doing so. As for the fourth contention—that the *Johnson* factors support the rates charged—the Court agrees with some of Pecht's analysis, such as the experience levels of the various attorneys and the nature and length of the professional relationship between Quinn Emanuel and IBM. One factor, however, weighs heavily against finding the rates reasonable—the awards in similar cases and the fee customarily charged in the locality for similar legal services. (Doc. No. 962-1 at 33). Pecht cites three cases from within the Fifth Circuit where the court found that a rate of up to $915 an hour for a partner

was reasonable, including a case from this Court.[6] (*Id.*). In each of those cases, however, the reasonableness of the rate was uncontested. The Fifth Circuit has held that "[w]hen the rate is not contested, it is *prima facie* reasonable." *Islamic Ctr. of Mississippi, Inc. v. City of Starkville, Miss.*, 876 F.2d 465, 469 (5th Cir. 1989). Thus, the courts in the cited cases had no reason to inquire further regarding whether the fee was reasonable. Moreover, IBM has not cited, and this Court has not found a published case where a rate over $1,000 per hour, whether contested or not, was found reasonable in the Southern District of Texas.

With respect to Pecht's third point—that Quinn Emanuel's average billing rate is roughly $20 lower than Yetter Coleman's, and BMC has already agreed that Yetter Coleman's rates are reasonable—while slightly more persuasive, it is far from convincing. The reasonableness inquiry requires a review of an individual attorney's rates, not the average rate charged by the firm; especially when the billing records differentiate which employee billed each hour. *See McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 98 (2d Cir. 2006) (finding that "the application of a blended hourly rate in calculating the lodestar figure has not been endorsed" by the Second Circuit); *see also Leva v. First Unum Life Ins. Co.*, No. 96 Civ. 8590(DC), 1999 WL 294802, at *2 (S.D.N.Y. May 11, 1999) (applying blended rate where it was not clear which of multiple billing attorneys performed each task). Since the Court has before it detailed billing records, not only can it consider the rate of each attorney, it can also consider the experience and overall credentials of each timekeeper. *Freedman v. Town of Fairfield*, 312 F. App'x 422, 425 (2d Cir. 2009). After considering the arguments and evidence presented by IBM, the Court finds that IBM has not demonstrated that Quinn Emanuel's post-2020 rates are reasonable in this District.

---

[6] The finding of reasonableness for a $915 hourly rate is a far cry from finding a rate of over $1,900 per hour reasonable.

IBM also has not rebutted the presumption in favor of application of the forum rule. The

Second Circuit has expounded upon the required analysis when faced with a request for an award

of higher out-of-district rates. The Second Circuit held that

> a district court must first apply a presumption in favor of application of the forum
> rule. In order to overcome that presumption, a litigant must *persuasively establish*
> that a reasonable client would have selected out-of-district counsel *because doing*
> *so would likely (not just possibly) produce a substantially better net result.* In
> determining whether a litigant has established such a likelihood, the district court
> must consider experience-based, objective factors. Among the objective factors that
> may be pertinent is counsel's *special expertise in litigating the particular type of*
> *case, if the case is of such nature as to benefit from special expertise.* A litigant
> cannot overcome the presumption through mere proximity of the districts, nor can
> a litigant overcome the presumption by relying on the prestige or "brand name" of
> her selected counsel. Lawyers can achieve prestige and fame in numerous ways that
> do not necessarily translate into better results. *The party seeking the award must*
> *make a particularized showing, not only that the selection of out-of-district counsel*
> *was predicated on experience-based, objective factors, but also of the likelihood*
> *that use of in-district counsel would produce a substantially inferior result.*

*Simmons v. New York City Transit Auth.*, 575 F.3d 170, 176 (2d Cir. 2009) (emphasis added). IBM

notes that Quinn Emanuel has handled "countless matters" for IBM for the past three decades.

(Doc. No. 962-1 at 10). More specifically, Quinn Emmanuel represented IBM in a separate dispute

with BMC involving the same 2015 OA. (*Id.*). Quinn Emanuel's knowledge of IBM, and vice

versa, suggests that IBM's retention of Quinn Emanuel for this dispute was reasonable, such that

they were willing to pay its higher rates.[7] While it may be arguable that Quinn Emanuel may have

"special expertise" in litigating matters relating to the 2015 OA, IBM has not made a

"particularized showing" that the use of in-district counsel would produce a substantially inferior

result. The Southern District of Texas is, of course, home to a multitude of world-renowned law

firms—whether with a national, statewide, or local presence. Quinn Emanuel, itself, has a Houston

---

[7] One of the reasons that undergirds the familiarity element found in *Johnson* is that a firm that is intimately familiar
with a client has an easier time getting up to speed and thus a court might consider that a higher billing rate is offset
by the need for lesser hours expended in the representation.

office, which is directly across the street from this very courthouse. Its Houston office surely has at its disposal many qualified litigators. Yet, the vast majority of the attorneys who participated in this case were located at Quinn Emanuel's New York office. (Doc. No. 962-2). While the New York-based attorneys may have had more familiarity with this particular client, IBM does not suggest that the use of Houston-based attorneys (that charge Houston rates and have no travel expenses) would have likely resulted in a substantially inferior result.

In sum, IBM failed to satisfy its burden to demonstrate that the post-2020 rates charged by Quinn Emanuel's attorneys are reasonable in the Southern District of Texas. It has also failed to rebut the presumption in favor of application of the forum rule. As such, the Court finds that the following rates are a reasonable cap for Quinn Emanuel's post-2020 rates in the Southern District of Texas: a maximum hourly rate of $935.00 for partners, $660.00 for associates, $200.00 for paralegals, $200.00 for litigation support staff, and $200.00 for law clerks.

Applying the capped rates to the post-2020 hours billed by Quinn Emanuel reduces Quinn Emanuel's total amount billed by $3,198,386. This reduces the IBM's total amount requested from $46,528,535 to $43,330,149. Any further reduction will be subtracted from this new total.

### ii. Number of Hours

While BMC only questions the billing rates of Quinn Emanuel's attorneys after 2020, it objects to the hours billed to IBM throughout the case's history. IBM seeks to recover attorneys' fees for over 80,000 total hours.[8] BMC challenges the number of hours sought by IBM for a multitude of reasons. First, BMC argues that IBM's requested hours should be reduced because Judge Miller's previous award already determined what a reasonable number of hours is for this case. (Doc. No. 999 at 23). Second, BMC contends that Quinn Emanuel's hours should be reduced

---

[8] Roughly 72,000 of those hours were billed by Quinn Emanuel. (Doc. No. 962-2 at 3). As such, the following analysis predominantly focuses on the hours billed by Quinn Emanuel.

due to block-billing. (*Id.* at 27). Third, BMC maintains that IBM's hours should be reduced because IBM's counsel engaged in unreasonable litigation tactics that drove up the cost. (*Id.* at 29). Fourth, BMC argues that IBM's attorneys' hours should be reduced to account for its inefficient staffing. (*Id.* at 31). Fifth, BMC claims that IBM cannot recover for hours billed for "non-compensable" work. (*Id.* at 33). Sixth, BMC contends that IBM cannot recovery attorneys' fees and costs paid owed by a third-party. (*Id.* at 36). Seventh, and finally, BMC urges the Court to exclude Quinn Emanuel's fees from IBM's appellate fee recovery. (*Id.* at 37). IBM, of course, maintains that its hours are reasonable and should not be reduced.

In determining the number of hours reasonably expended, courts must consider both "contemporaneous time records . . . specifying, for each attorney, the date, hours expended, and nature of the work done," *Marion S. Mishkin Law Off. v. Lopalo*, 767 F.3d 144, 148 (2d Cir. 2011) (internal quotation marks, citation, and alterations omitted), in addition to "its own familiarity with the case and its experience generally as well as . . . the evidentiary submissions and arguments of the parties," *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992) (internal quotation marks and citation omitted). Courts may reduce the fee award requested in some circumstances, such as when plaintiffs submit deficient or incomplete billing records, *Hensley v. Eckerhart,* 461 U.S. 424, 437 & n.12 (1983), or in order to exclude "excessive, redundant, or otherwise unnecessary hours," *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999). "In determining whether hours should be excluded, the inquiry is not based on what effort appears necessary in hindsight, but rather on whether 'at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.' " *Harrell v. Van der Plas*, 2009 WL 3756327, at *6 (S.D.N.Y. Nov. 9, 2009) (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)).

*1. BMC's previously awarded hours*

BMC first contends that the maximum number of hours the Court should allow IBM to recover is 36,892—the number of hours that Judge Miller found to be a reasonable number of hours for BMC to recover. (Doc. No. 999 at 23). IBM essentially argues that the fact that hours billed to BMC were found to be reasonable does not necessitate a finding that IBM's hours are unreasonable.

It is true that IBM seeks remuneration for more than double the number of billed hours than the trial court found that BMC was entitled to recover in the same proceeding. Nevertheless, the fact that IBM's lawyers greatly exceeded the hours billed by BMC's attorneys does not make IBM's lawyers' hours per se unreasonable. There are too many other considerations and variables that come into play. Consequently, the number of hours that may be considered reasonable is not a fixed number that should be based upon an opponent's expenditures. Therefore, it cannot be said that 36,892 is the maximum number of hours for which IBM can recover.

Moreover, the Court agrees with IBM that it would be illogical to establish a general rule that the number of hours that the prevailing party is entitled to is capped at the number of hours billed to the losing party. It is always arguable that the additional hours may have contributed to the prevailing party's ultimate win. BMC, in fact, has "no good answer to why the amount [it] paid to lose should limit the amount [IBM] paid to win." *Red Tree Invs., LLC v. Petroleos de Venezuela, S.A.*, No. 19CV02519PKCSN, 2022 WL 17834945, at *7 (S.D.N.Y. Nov. 29, 2022), *report and recommendation adopted*, No. 19-CV-2519 (PKC), 2023 WL 3004883 (S.D.N.Y. Feb. 23, 2023).

BMC generally argues that IBM's attempt to recover attorneys' fees for over 80,000 hours is "insane." (Doc. No. 999 at 23). The Court agrees that 80,000 is an unreasonable number of hours

to bill for this litigation. While the Court will not utilize BMC's proposed 36,892 hour cap, it will decrease the number of hours sought for the reasons specified below.

2. *Block-billing*

BMC next complains that Quinn Emanuel's fee submissions reflect "block billing." BMC urges the Court to reduce Quinn Emanuel's hours by 30% "due to the pervasive and continuous nature of Quinn [Emanuel's] block billing practices." (Doc. No. 999 at 28). As a general rule, block billing—defined as "grouping multiple tasks into a single billing entry, so as to leave unclear how much time was devoted to each constituent task," *Themis Capital v. Dem. Rep. Congo*, No. 09 Civ. 1652 (PAE), 2014 WL 4379100, at *6 (S.D.N.Y. Sept. 4, 2014)—is disfavored. The practice has been criticized by clients and courts alike. That is because this practice impedes both the client's ability to understand the precise time allocable to the tasks for which it is being billed, and, in the event of a later fee application, the court's ability to assess whether the time expended on any given task was reasonable. *See Ramirez v. Benares Indian Rest. LLC*, No. 14 Civ. 7423 (JMF), 2015 WL 926008, at *2 (S.D.N.Y. Mar. 4, 2015) (collecting cases).

Block billing does not, however, automatically preclude recovery for the hours billed. Courts have generally made reductions in block-billed hours in situations where (1) there was reason to believe that the hours billed were independently unreasonable; (2) the block-billing involved aggregating tasks that were not all compensable; or (3) the number of hours block-billed together was so high (*e.g.*, five hours or more per entry) as to create an unacceptable risk that the aggregated total exceeded reasonable hours worked on compensable projects. *Adusumelli v. Steiner*, Nos. 08 Civ. 6932, 09 Civ. 4902, 10 Civ. 4549 (JMF), 2013 WL 1285260, at *4 (S.D.N.Y. March 28, 2013); *Adorno v. Port Auth. of N.Y. & N.J.*, 685 F. Supp. 2d 507, 515 (S.D.N.Y. 2010) ("While block billing is disfavored and may lack the specificity for an award of attorneys' fees, it

is not prohibited as long as the court can determine the reasonableness of the work performed."
(citation omitted)); *see also Abdell v. City of New York*, No. 05 Civ. 8453 (RJS), 2015 WL 898974,
at *4 (S.D.N.Y. Mar. 2, 2015) (finding block billing unproblematic where it was "for temporally
short entries combining related tasks"); *Charles v. City of New York*, No. 13 Civ. 3547 (PAE),
2014 WL 4384155, at *5–6 (S.D.N.Y. Sept. 4, 2014) (reducing fee award based on block billed
entries spanning between 5–10 hours each).

The Court finds that, on numerous occasions, "the number of hours block-billed together
was so high . . . as to create an unacceptable risk that the aggregated total exceeded reasonable
hours worked on compensable projects." *Adusumelli*, 2013 WL 1285260, at *4. While not the only
offenders, the two attorneys who contributed most to this block-billing issue—designated in the
billing records as DR2 and RE—coincidently billed the second and third highest number of hours,
respectively. (Doc. No. 962-2 at 2). Both attorneys routinely block-billed over 10 hours a day.
Though the entries seemingly detail the work done by the attorneys, the Court cannot determine
whether the attorney expended a reasonable number of hours on each task. For example, on
October 17, 2017, RE billed 15.7 hours and described the tasks as follows:

> Prepare for and participate in teleconference with [AM] and [LF]; calls and emails
> with opposing counsel, QE and YC team, and [SP] re. [ ] deposition, deposition
> scheduling generally, preliminary injunction schedule, discovery issues; emails and
> calls with E. Smith re. Help desk tickets, [ ] preparation, [AM] preparation; emails
> with D. Reinhard, S. Mehjabeen re. [GS] preparation and materials; emails and calls
> with QE and YC teams re. [ ] documents, prep kits, and strategy; teleconference
> with Baker Botts; review materials and prepare for [GS] deposition preparation.

(Doc. No. 964-1 at 21). How much time did she bill IBM for working on help desk tickets? How
much was spent on calls and responding to emails with her team? These are just two questions
raised by this particular block. As such, there is an unacceptable risk that the total hours billed on
October 17, 2017 exceed the reasonable hours worked. This, of course, is just one example picked

from thousands of pages of billing records, replete with the same problem. In fact, it would be hard to find an invoice that did not contain a copious number of block-billed entries.

Nevertheless, the Court disagrees with BMC that a 30% reduction in hours is appropriate. Instead, the Court finds that a 20% deduction is more appropriate to account for the many instances of block-billing. In doing so, it notes that when IBM objected to the block billing contained in BMC's billing records, IBM stated that "[i]n such cases, a 20% across-the-board reduction in the requested fees is standard and appropriate." (Doc. No. 773 at 9). The Court adopts IBM's suggested approach.

### 3.  *Unreasonable litigation tactics*

BMC also argues that the IBM's requested hours should be reduced another 20% because IBM allegedly employed "consistently unreasonable tactics when litigating this case, which led to rampant and gross overlitigation with an extended discovery process." (Doc. No. 999 at 29) (citations and quotations omitted). BMC cites to occasions where the court commented that IBM's positions regarding discovery disputes and objections were "more than a stretch" and also had to intervene when BMC filed motions to compel after IBM refused to produce documents. (*Id.* at 30–31). IBM contends that its discovery positions were not unreasonable simply "because the district court did not rule in IBM's favor." (Doc. No. 1001 at 13). It further argues that this Court should not use hindsight; that is, the Court should not consider BMC's favorable discovery ruling to find that IBM acted unreasonably in its discovery positions. (*Id.*).

The trial court observed that the "parties zealously litigated this matter at every stage . . . ." (Doc. No. 781 at 11). This observation is no doubt true, given that there were talented lawyers on both sides and a billion dollars at stake. Nevertheless, upon review of the Magistrate Judge's order where she comments that IBM's position was "more than a stretch," it is clear that the comment

17

was made with respect to one argument regarding one document that IBM claimed was privileged. (Doc. No. 378 at 4). The Court cannot say that a single comment necessitates finding that IBM's counsel consistently engaged in "unreasonable litigation tactics," as suggested by BMC; nor can it say that IBM's fees should be substantially reduced because it lost a few discovery battles. As such, the Court will not reduce IBM's fees for the alleged "unnecessary hours spent litigating [ ] unreasonable positions." (Doc. No. 999 at 31).

*4. Inefficient staffing*

The Court turns now to BMC's contention that IBM's hours should be reduced to account for its inefficient staffing. (Doc. No. 999 at 31). BMC asserts that a significant reduction in hours is warranted because IBM used multiple law firms to complete overlapping tasks. (*Id.*). Further, BMC claims that IBM's use of 105 timekeepers was inefficient when 91 of those timekeepers were used to complete "discreet tasks of short duration." (*Id.* at 32). It argues that it should not be responsible for the costs of these timekeepers' learning curves, nor for the resulting redundancies of tasks. (*Id.*).

IBM, on the other hand, asserts that BMC's failure to cite any specific instance of duplicative work should foreclose BMC's argument. It states that IBM is entitled to recover for the work of its multiple attorneys because their work was necessary due to the complexity and length of the case.

Here, the Court takes issue with the billing practices now under review. On multiple occasions, attorneys billed for the hours it took them to get up to speed on the case. While perhaps necessary, the sheer number of attorneys involved in this case results in a considerable number of hours billed reviewing documents that other attorneys have already reviewed in order to catch up. For example, at least a dozen attorneys billed for hours spent reviewing BMC's complaint.

18

Moreover, on April 12, 2018 alone, eleven attorneys billed roughly 100 hours for work relating to a privilege log.[9] (Doc. No. 967-1 at 11–12). Entries relating to a privilege log also extend multiple days before and after. Another example of what appears to be duplicative work occurred on November 28, 2017. Ten attorneys from New York billed a total of 137 hours to attend the preliminary injunction hearing in Houston. (Doc. No. 965-1 at 38–39). Only four of these attorneys actually appeared on record at the hearing (along with Paul Yetter of Yetter Coleman), and only three actually spoke. (Doc. Nos. 126–128, 130, 132–134). The day before, ten attorneys billed 136 hours to prepare for the preliminary injunction hearing. (*Id.* at 36–38). In total, Quinn Emanuel billed IBM almost 700 hours in a five-day span for the preliminary injunction hearing, and charged IBM almost $400,000, not including travel time or costs. While there may be an intrinsic value in having multiple attorneys present for important hearings, the Court finds a deduction is warranted to account for the duplication. *See Sabatini v. Corning–Painted Post Area Sch. Dist.*, 190 F. Supp. 2d 509, 521 (W.D.N.Y. 2001) (finding the attendance of two attorneys at oral argument to constitute "duplication of effort warrant[ing] a modest reduction in the hours claimed"); *Ragin v. Harry Macklowe Real Estate Co.*, 870 F. Supp. 510, 521 (S.D.N.Y. 1994) (deeming the attendance of three attorneys at oral argument to constitute "duplicative efforts"). BMC should not have to pay for a law firm's staffing, or overstaffing, problems.

The number of attorneys involved also necessarily increases the number of hours spent coordinating with co-counsel and managing tasks by less experienced associates or lawyers unfamiliar with the issues. All of these attorneys engaged in a substantial number of undefined or insufficiently described emails, calls, teleconferences, and meetings with each other (who are also

---

[9] The issue regarding block-billing arises here, too. While the descriptions provided by the individual attorneys include work other than that relating to a privilege log, the Court is not able to determine the hours the attorney apportioned to each task.

billing for those hours and billing at very high rates). The time billed for numerous internal conferences between attorneys demonstrates duplication of attorney time. *See Hop Hing Produces Inc. v. X & L Supermarket, Inc.*, No. 12–CV–1401, 2013 WL 1232919, at *7 (E.D.N.Y. Mar. 4, 2013) (reducing requested fees by 15% for, *inter alia*, "excessive time spent on conferences between attorneys"), *adopted by* 2013 WL 1232483 (E.D.N.Y. Mar. 27, 2013); *Allende v. Unitech Design, Inc.*, 783 F. Supp. 2d 509, 515 (S.D.N.Y. 2011) (reducing fee award by 7% to account for, *inter alia*, "some duplicative billing for conferences" among attorneys). This is especially warranted since IBM concedes that it was Yetter Coleman that focused on the injunction proceedings. (Doc. No. 962 at 17).

Therefore, the Court agrees with BMC that IBM's hours should be reduced to account for its overstaffing. Thus, the Court finds an additional 10% reduction is warranted.

   *5. Non-compensable work*

BMC next argues that IBM cannot recover fees for what it describes as "non-compensable" work, which includes: (1) fees for unfiled motions; (2) fees for its unsuccessful and severable counterclaim; and (3) its request for "fees on fees." (Doc. No. 999 at 33).

As for its first argument—that IBM cannot recover for fees for unfiled motions—BMC argues that courts regularly disallow billing for hours spent working on submissions that were never filed. (*Id.*). It cites to two motions that IBM drafted but never filed: a motion for a temporary restraining order and a motion to dismiss. IBM seeks to recover roughly $300,000 in fees for its work on these motions. IBM notes that there is "[n]o brightline rule [that] disallows an award of fees for unfiled motions." (Doc. No. 1001 at 18). Rather, it argues that, because BMC was allowed to recover fees for *unsuccessful* motions, IBM should get to recover for *unfiled* motions. The two are not analogous, and IBM's argument is unavailing.

Courts in the Second Circuit regularly disallow billing for hours spent working on submissions that were never filed. *See, e.g.*, *Gierlinger v. Gleason*, 160 F.3d 858, 880 (2d Cir. 1998) (affirming district court's refusal to award attorneys' fees "for some 35 hours spent preparing for motions that were never filed"); *Mondragon v. Keff*, No. 15-CV-2529, 2019 WL 2551536, at *13 (S.D.N.Y. May 31, 2019) (disallowing hours spent researching and drafting a motion that was never filed in that action), *adopted by* 2019 WL 2544666 (S.D.N.Y. June 20, 2019); *Rai v. WB Imico Lexington Fee, LLC*, No. 09-CV-9586, 2017 WL 1215004, at *13 (S.D.N.Y. Mar. 31, 2017) (deducting hours billed for a motion that was never filed), *adopted by* 2017 WL 4350567 (S.D.N.Y. June 28, 2017), *aff'd*, 719 F. App'x 90 (2d Cir. 2018). This Court, too, will exclude what it finds to be 427.7 hours billed for the unfiled motions from the calculation of IBM's fees. That amounts to a $255,430.50 deduction in the total fees. See (Doc. Nos. 966-2, 966-4, and 975-2)

Second, BMC argues that IBM cannot recover fees for its unsuccessful and severable counterclaim. When a party has achieved substantial success in the litigation but has prevailed on fewer than all of his claims, the most important question in determining a reasonable fee is whether the failed claim was intertwined with the claims on which he succeeded. *Hensley,* 461 U.S. at 433– 37; *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996). When unsuccessful claims "involve a common core of facts" with a meritorious claim "or [are] based on related legal theories," they are compensable. *Hensley,* 461 U.S. at 435; *accord LeBlancSternberg v. Fletcher*, 143 F.3d 748, 762 (2d Cir. 1998) ("No fees should be awarded for time spent pursuing a failed claim if it was unrelated to the plaintiff's successful claims in the sense that it was based on different facts and legal theories.") (internal quotations omitted). BMC contends that IBM's counterclaim and prior material breach affirmative defense were not "intertwined legal theories

21

with BMC's breach claims. (Doc. No. 999 at 34). BMC does not suggest a how much time the Court should deduct because it concludes that IBM's "continuous block-billing coupled with vague descriptions" renders it impossible to know how much time is unrecoverable.

That being said, BMC's position is thwarted by its own expert. In its own fee application, BMC's expert opined that IBM's counterclaim was "intertwined with BMC's contract claims." (Doc. No. 760-1 at 15). BMC's expert further opined that no segregation is necessary because the "claims (and IBM's counterclaim) all arise from a common set of facts and are therefore all interrelated such that no segregation is required." (*Id.* at 18). The Court agrees with BMC's original position that segregation of IBM's counterclaim is unnecessary. Moreover, the Court finds that IBM's prior material breach affirmative defense was clearly intertwined with BMC's breach claim. As such, the Court will not exclude the time IBM's attorneys spent on the unsuccessful counterclaim.

Third, BMC contends that IBM cannot recover "fees on fees." (Doc. No. 999 at 35). IBM seeks to recover almost $708,338 in attorneys' fees and costs it incurred in preparing its fee application. (Doc. No. 962-1 at 41). BMC argues that New York law precludes an award of fees for time spent in seeking the fees themselves. IBM, of course, argues that it should be entitled to these fees. It notes that BMC previously stated that that the prevailing party is entitled to recover fees incurred in preparing a fee application under New York law. (Doc. No. 760 at 22) ("BMC can receive attorneys' fees incurred in preparing this fee application," citing the Second Circuit and New York district courts).

The Second Circuit recognizes that "the district judge [has] great leeway" in assessing whether "to award [any] fees for the time spent litigating [a] fee petition." *K.L. v. Warwick Valley Cent. Sch. Dist.*, 584 F. App'x 17, 20 (2d Cir. 2014) (citing *Gagne v. Maher*, 594 F.2d 336, 344

(2d Cir. 1979)). The Court agrees with BMC that IBM's counsel's billing for its work in connection with the instant motion appears excessive. As one may guess, the Court will not award IBM the extraordinary amount that it billed solely for time spent in preparing the pending Motion.

IBM argues that the "fee application has been extraordinarily costly because it involved collecting and analyzing costs from six law firms, five experts, and IBM over seven years, and the size of the request warrants extra work to reasonably address all possible issues." (Doc. No. 962-1 at 41). Nevertheless, it was IBM's choice to hire six law firms in multiple cities. While it is free to spend its money as it pleases, BMC is not obligated to pay for such spending. Moreover, the amount sought offends any notion of reasonableness and reflects poorly on the profession.[10] The billing records demonstrate why this request is so outrageous. For example, multiple Quinn Emanuel attorneys billed dozens of hours at rates over $1,000 just to redact the billing records. (Doc. No. 992-1). This is a task that any well-educated and well-trained first-year associate could perform at a much lower rate. Yetter Coleman, for instance, acted reasonably when it had its staff attorney, who bills at a lower rate, redact its billing records. (Doc. No. 992-2).

The Court, of course, understands that the attorneys expended time and effort to prepare the application for attorneys' fees and should be awarded some recompense. Still, that compensation must be *reasonable*. Thus, the fees IBM incurred in preparing its fee application is capped at $200,000.

---

[10] In this day and age of computerized records, this amount of time to prepare a fee application is totally unacceptable—unless the billing records of the lawyers involved were in total disarray or non-existent. If the computer-generated time records are so inaccurate as to need hundreds of thousands of dollars' worth of attorney time to fix, the attorneys in question should hire their client—a long-time leader in the technology industry—instead of having their client hire them.

6. *Fees and costs paid or owed by a third-party*

Next, BMC argues that it has no obligation to pay for fees and costs billed directly to Kyndryl Holdings, Inc. ("Kyndryl"), a "spin-off" of IBM created in 2021. (Doc. No. 999 at 36). Kyndryl is apparently IBM's outsourcing division (the division involved in the dispute that gave rise to this case) repackaged as a stand-alone company. (*Id.* at 18). The parties agree that Kyndryl is not an actual party to this case. The billing records indicate, however, that Quinn Emanuel began billing Kyndryl directly starting in November of 2022. (Doc. No. 989-4). IBM, however, is purposefully vague regarding its arrangement with Kyndryl, stating "whether and how Kyndryl and IBM agreed to share paying any fees or costs in defending BMC's claims is irrelevant to IBM's fee application." (Doc. No. 1001 at 20). IBM argues that New York law recognizes that a party may recover fees even if another party paid the fees. (Doc. No. 1001 at 20).

The Court disagrees with BMC that it is not required to pay IBM's fees that were fronted or are reimbursed, or will be, by Kyndryl. Regardless of whether IBM is ultimately responsible for the fees, IBM *incurred* the fees in the litigation at hand.[11] IBM was, and is, the named defendant in this case. IBM would have been liable for any final judgment. IBM hired attorneys to defend it in this matter, and those attorneys were ultimately successful in their defense of IBM. Those attorneys were not working directly on Kyndryl's behalf.

Most importantly, courts in the Second Circuit (and elsewhere) agree that a third-party's agreement to pay for a party's legal fees should not preclude the party from recovering the total amount spent to successfully litigate the case. *See Latin Am. Music Co., Inc. v. Spanish Broad. Sys., Inc.*, No. 13-CV-1526 (RJS), 2020 WL 2848232, at *8 (S.D.N.Y. June 1, 2020) ("The fact

---

[11] BMC's own fee application states (and IBM, here, agrees) that the prevailing party is "contractually entitled to its reasonable and customary attorneys' fees and costs *incurred* litigating this case." (Doc. No. 760 at 9) (emphasis added).

that a prevailing party's legal fees are paid by a third party should not deprive it of the ability to recover fees for the total amount spent on successfully litigating a case."); *Hughes v. Benjamin*, No. 17-CV-6493 (RJS), 2020 WL 4500181, at *4 (S.D.N.Y. Aug. 5, 2020) ("[C]ourts frequently allow recovery even where the prevailing party did not actually suffer financial harm, as in cases where a third party provided or paid for the prevailing party's legal services."); *ABC, Inc. v. Primetime 24, Joint Venture*, 67 F. Supp. 2d 558, 562 (M.D.N.C. 1999) ("[T]he fact that [a prevailing party's] legal fees and expenses have been paid by [a third party] may be a factor which the court considers in deciding whether to exercise its discretion in awarding fees, that fact does not bar [the prevailing party] from recovering such fees."), *aff'd*, 232 F.3d 886 (4th Cir. 2000). Thus, the Court will not deduct the fees and costs solely because they were billed to Kyndryl on IBM's behalf.

On the other hand, BMC contends that Kyndryl retained its own appellate counsel—Lynn Pinker Hurst & Schwegmann, L.L.P ("Lynn Pinker"). (Doc. No. 999 at 13). IBM does not contest this statement, and the Court finds no evidence to the contrary. While IBM can recover fees incurred on its behalf but simply billed to a third-party, this Court will not require BMC to pay for fees billed to and *incurred by* Kyndryl—a non-party. As such, IBM cannot recover the fees that were billed by Lynn Pinker—a total of $14,430.64. (Doc. No. 990-5).

### 7. *Quinn Emanuel's appellate fee recovery*

BMC's final argument regarding IBM's request for attorneys' fees challenges Quinn Emanuel's entitlement to appellate fees. IBM seeks over $1 million to recover for fees billed by Quinn Emanuel even though IBM retained separate counsel to represent it on appeal. BMC argues that Quinn Emanuel's work was "excessive, redundant, or otherwise unnecessary," as it did not sign the appellate briefing or attend oral argument. (Doc. No. 999 at 37). Perhaps because it

25

prevailed on appeal, IBM contends that "this is not a serious objection." (Doc. No. 1001 at 21). Regardless of this characterization, this Court takes all legitimate objections, such as this one, seriously.

After considering Quinn Emanuel's post-trial billing records, the Court agrees that IBM is entitled to recover at least some of the fees billed by Quinn Emanuel for work done during appeal. Obviously, Quinn Emanuel was involved throughout the pretrial proceedings and at the trial stage, and that history is invaluable to someone working on the appeal. Quinn Emanuel billed for work such as drafting comments on the appeal brief, answering questions from the appeal team, and preparing questions for the moot court exercise. *See, e.g.*, (Doc. No. 989-6); (Doc. No. 989-13). The Court agrees with IBM that it was "reasonable for Quinn Emanuel, with its knowledge of the facts and trial, the assist appellate counsel." (Doc. No. 1001 at 21). Nevertheless, the Court agrees with BMC that Quinn Emanuel's attempt to recover over $1 million for appellant fees for an appeal ultimately handled by another firm is excessive. As such, the fees Quinn Emanuel billed IBM for the post-judgment proceedings and the appeal are reduced by 50%. Utilizing the already capped rates, this amounts to a reduction of $439,807.75.

### iii.  Total Attorneys' Fees

Considering the number of hours worked multiplied by the reasonable rates charged, IBM's lodestar figure is $43,330,149. Per the discussion above, the Court will reduce the lodestar figure by 20%—or $8,666,029.80—to account for the attorneys' block-billing, and an additional 10%—or $4,333,014.90—to account for IBM's inefficient staffing. The Court also deducts $255,430.50 for motions not filed, and $14,430.64 for fees billed to and incurred by a third-party. The Court will also cap IBM's "fees on fees" recovery to $200,000. Finally, the Court reduces the

fees Quinn Emanuel billed IBM for the post-judgment proceedings and the appeal by 50%—or $439,807.75. Therefore, the total amount of recoverable fees is $29,113,097.41.

## C. Reasonable Costs

In addition to its reasonable and necessary attorneys' fees, IBM also seeks $12,740,027 for what it considers to be reasonable and necessary costs incurred. (Doc. No. 1003 at 2). BMC argues that the Court should reduce IBM's costs for two reasons. (Doc. No. 999 at 38). First, BMC contends that IBM's expert fees should be reduced by roughly half. (*Id.*). Second, BMC asserts that the taxable and other costs incurred by IBM are not reasonable or customary. (*Id.* at 41). [12]

### i. Expert Fees

IBM seeks $3,292,694 in costs for expert fees. (Doc. No. 962 at 29). BMC asks the Court to reduce IBM's expert fees to $1,800,000. (Doc. No. 999 at 38). BMC asserts three arguments in support of that request: that the experts' invoices lack sufficient detail, that IBM cannot recover for its expert costs related to its failed counterclaim, and that the experts' rates are unreasonably high.

As for the alleged lack of detail, IBM counters this argument by noting that BMC previously submitted billing records for experts that included no description of the work performed. At best, BMC's experts' descriptions were equally as detailed as IBM's. *See* (Doc. No. 760-17). It its own application, BMC reasoned that its experts' invoices were "sufficiently detailed for the purposes of assessing the nature and timing of the services provided." (Doc. No. 760 at 25). The Court sees no reason to find otherwise here with respect to IBM's experts.

---

[12] IBM contends that BMC should be required to reimburse the $6,609,080 that IBM expended on a supersedeas bond. (Doc. No. 962-4); (Doc. No. 1001 at 2). That amount is included in IBM's $12,740,027 total request for costs. BMC explicitly "does not challenge the reasonableness" of IBM's request for reimbursement for its supersedeas bond costs. (Doc. No. 999 at 42).

Next, BMC contends that IBM cannot recover its expert costs related to the failed counterclaim. Specifically, BMC requests that the Court reduce or wholly exclude the fees of two experts—Christopher Gerardi and Paul Pinto—whom BMC claims focused primarily on IBM's unsuccessful counterclaim. (Doc. No. 999 at 40). As noted above, however, the Supreme Court made clear in *Hensley* that when unsuccessful claims "involve a common core of facts" with a meritorious claim "or [are] based on related legal theories," they are compensable. 461 U.S. at 435. Since the Court has already determined that segregation of fees for IBM's counterclaim is not necessary because the counterclaim "involve[d] a common core of facts," it also declines to segregate costs involved in the counterclaim.

Lastly, BMC argues that one of IBM's experts—Richard Gilbert ("Dr. Gilbert")—charged an unreasonable rate for his services. (Doc. No. 999 at 41). Conversely, IBM contends that Dr. Gilbert's rate of $1,400 per hour for his services as an antitrust expert is reasonable and customary for an experienced expert in his field. (Doc. No. 1001-1 at 17). While Pecht's affidavit avers that Dr. Gilbert's rate is reasonable and customary, the only other evidence IBM cites to support this contention is an article from 2016 that states that similarly credentialed experts to Dr. Gilbert "charge[ ] at least $1,350 an hour." (*Id.*). Again, simply because someone charges a high rate for their services does not necessarily make that rate reasonable. The Court agrees with BMC that $1,400 an hour is unreasonable. It disagrees, however, with BMC's contention that it should cap Dr. Gilbert's rate at that of BMC's expert who opined on the same issue. Instead, the Court caps Dr. Gilbert's rate at $1,000. This decreases IBM's total recoverable expert costs from $3,292,694 to $3,248,194.

### ii. Taxable and Other Costs

BMC's final argument involves IBM's request for taxable and other costs. Specifically, IBM points to three instances that it claims includes excessive costs: (1) over $200,000 incurred to rent, furnish, and equip a "war room" for out-of-state attorneys; (2) $22,848.60 for one expert's air fare between South Africa and Houston; and (3) attorneys' meals at high-end restaurants.

Though IBM obviously contends otherwise, spending over $200,000 to rent and equip a "war room" for a two-week bench trial is clearly excessive. IBM's expert testified that neither Quinn Emanuel nor Yetter Coleman's office could accommodate the "large incoming trial team" traveling from New York to Houston for the trial. (Doc. No. 1001-1 at 18). This argument actually works against IBM as it reinforces BMC's claim of inefficient and/or over-staffing. Only three Quinn Emanuel attorneys spoke at the trial. See (Doc. Nos. 702–708). While the presence of one or two additional attorneys could perhaps be justified, BMC should not have to compensate IBM because it chose to bring a "flood" of attorneys to attend a trial in which they did not actually participate. As such, the Court will deduct the $180,681.88 Quinn Emanuel billed IBM to rent the "war room." (Doc. No. 988-3). Moreover, even if neither Houston office could host the out-of-state attorneys, surely one of the offices would have allowed the traveling attorneys to use their printers, scanners, etc. That is one of the benefits of hiring local counsel and/or having offices in multiple cities. Thus, the Court will also deduct the $43,013.97 billed to IBM to rent equipment and software during trial. (Doc. No. 988-2).

BMC next objects to IBM's expert's air fare between Cape Town, South Africa and Houston, Texas. The challenge here lies with the fact that this expert did not testify at trial and was not deposed in-person. Nevertheless, the expert did travel to New York to meet with the Quinn Emanuel attorneys and did attend trial. The Court agrees with IBM that it should not be penalized

for deciding not to call a witness at trial—a decision that was ultimately proved successfully, as IBM eventually prevailed. The cost billed for airfare seems, at first blush, excessive. The invoices reflect a cost of $10,786.46 for, what the court presumes is, a round-trip flight between Cape Town and New York. (Doc. No. 991-9 at 8), as well as a $12,062.14 charge for a flight between Cape Town and Houston. While this Court questions whether IBM could have found an equally qualified expert somewhere in the Western Hemisphere, it is not unreasonable to allow an individual that must travel a great distance to do so in first or business class.

Lastly, BMC points to meals billed to IBM before oral argument. Specifically, BMC takes issue with meals at Brennan's and Commander's Palace in New Orleans. (Doc. No. 999 at 42). The records indicate that one attorney billed IBM $162 and $1,017 for those two meals, respectively. (Doc. No. 962 at 3). The former is not necessarily exceptional. In the case of the latter meal, it is likely that the one attorney picked up the bill for the appellant team; however, the records do not state that to be the case. As such, the Court will deduct these latter meal charge, but no others.

The Court also found many instances of excess regarding IBM's attorneys' choice of lodging. For example, many attorneys billed IBM for rooms at hotels like the Four Seasons and the Ritz Carlton. *See* (Doc. No. 962-7 at 241). While, of course, the attorneys do not need to stay at a motel alongside the interstate, BMC should not be required to pay for these establishments for a large number of attorneys who were peripherally involved. The Court finds a 1% reduction in costs warranted to correct for these excessive charges.

### iii. Total Costs Awarded

As noted above, IBM seeks $12,740,027.00 for what it considers its reasonable and necessary costs incurred. (Doc. No. 1003 at 2). For the foregoing reasons, the Court deducts the

following costs from IBM's requested amount: a 1% overall reduction[13] to correct for excessive charges for lodging for a number of attorneys, $44,500 to account for the cap on Dr. Gilbert's expert fees, $223,695.85 for IBM's "war room" costs, and $1,017 for one meal. Thus, IBM is awarded $12,409,504.68 in costs.

### D.  Post-Judgment Attorney Expenses and Appellate Expenses

Finally, IBM seeks $500,000 in conditional appellate fees—$400,000 for briefing if BMC seeks appellate review of this Order, and $100,000 if oral argument is granted. In the Second Circuit, as in Texas, the trial court may award conditional post-judgment and appellate attorney fee expenses. *See, e.g., Wifiland, LLP v. R.V.C., Inc.*, 564 F. App'x 612, 614 (2d Cir. 2014) (interpreting a contract including an attorneys' fee award to include appellate attorneys' fees); *Q2 Software, Inc. v. Radius Bank*, No. A-18-CV-00878-RP, 2020 WL 1482591, at *1 (W.D. Tex. Mar. 27, 2020) ("In Texas, it is well-settled that the trial court's award of attorneys' fees may include appellate attorneys' fees.") (internal quotations omitted), *report and recommendation adopted*, No. 1:18-CV-878-RP, 2020 WL 10056073 (W.D. Tex. Apr. 14, 2020). BMC, apparently, does not object to IBM's conditional appellate expenses. The Court, nonetheless, finds this request excessive and will award IBM $200,000 in conditional appellate fees. At best, this Order will generate a two-issue appeal—both of which have already been briefed here. It should not require anything close to the work involved in the original appeal.

---

[13] The Court excluded the bond amount when calculating this 1% reduction.

### III.    Conclusion

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** IBM's

Motion for attorneys' fees and costs. (Doc. No. 962). IBM is hereby awarded:

1.  $29,113,097.41 in attorneys' fees;

2.  $12,409,504.68 in litigation costs; and

3.  $200,000 in conditional appellate fees.

SIGNED this 18 day of July, 2025.

Andrew S. Hanen
United States District Judge